Kristine S. Tardiff
NH Bar No. 10058
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
EMAIL: kristine.tardiff@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. CV99-324S-MHW |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

Pursuant to Fed. R. Civ. P. 56 and in accordance with the Court's Order of April 26, 2006 (Doc. 144), Defendant hereby moves for summary judgment on the Category 1 lands.

Plaintiffs allege that the United States has taken their property without just compensation through the Interstate Commerce Commission's ("ICC") issuance of a Notice of Interim Trail Use ("NITU") under Section 8(d) of the National Trails System Act, 16 U.S.C. 1247(d) ("Trails

Act"),[1] which "authorize[s] the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails." Preseault v. ICC, 494 U.S. 1, 6-7 (1990). When the ICC (now the Surface Transportation Board or STB)[2] authorizes interim use of a right-of-way, "such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d); see Preseault, 494 U.S. at 7-8.

Section 8(d) "gives rise to a takings question" in some cases "because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests." Preseault, 494 U.S. at 8. If the specific terms of such easements and the applicable law provide that the right-of-way property reverts to the abutting landowner when rail use ceases, a plaintiff may be able to demonstrate a taking by proving that he has been deprived of the "reversionary" rights he otherwise would have had or realized but for the preemptive effect of 16 U.S.C. § 1247(d). Importantly, however, not every railbanking and interim use of a right-of-way authorized under the Trails Act constitutes a taking. For example, when railbanking and interim trail use are within the scope of a still effective easement, there is no taking. Preseault, 494 U.S. at 16; see also Preseault v. United States, 100 F.3d 1525, 1552 (Fed. Cir. 1996) (en banc) (plurality).

This motion for summary judgment is addressed to the Category 1 lands in this case.

---

[1]See National Trails System Act Amendments of 1983, Pub.L.No. 98-11, Title II, 97 Stat. 42, 48 (amending National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (codified as amended at 16 U.S.C. 1241 et seq.)).

[2]See ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (abolishing ICC and delegating many of its responsibilities to the STB). Both agencies are generally referred to herein and in Defendant's supporting memorandum as the STB.

Category 1 encompasses those lands that were acquired by the Idaho Northern and Pacific Railroad Company directly from the United States under the General Railroad Right-of-Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified as 43 U.S.C. §§ 934-939 (1982)) (the "1875 Act").[3] The Federal Circuit has determined that the Railroad acquired an easement under the 1875 Act and that the underlying fee title, i.e., the servient estate, was conveyed by the United States when it issued patents to homesteaders and other settlers for the land subject to that 1875 Act easement.[4] Hash v. United States, 403 F.3d 1308, 1313-18 (Fed. Cir. 2005).

Now before the Court is the question of liability for those segments of the subject right-of-way that were created under the 1875 Act. In order to establish a taking of their property in this case, Plaintiffs must establish that, absent the application of the Trails Act, the 1875 Act easements would no longer burden the land, *i.e.* that those easements would have been deemed abandoned or otherwise extinguished under applicable law. In other words, the question of whether the Trails Act effects a taking depends upon the nature of the property interest that a plaintiff would have enjoyed "absent the federal action and upon the extent that the federal action burdened that interest." Preseault, 494 U.S. at 24 (O'Connor, J., concurring). In most Trails Act

---

[3]The 1875 Act was repealed, effective October 21, 1976, insofar as applicable to the issuance of rights-of-way over, upon, under, and through the public lands and lands of the National Forest System, by section 706(a) of FLPMA, Pub. L. 94-579, 90 Stat. 2793. However, section 701(a) of FLMPA provides that the repeal does not affect rights-of-way previously granted.

[4]The parties have not yet identified the owners of the servient estate beneath the 1875 Act. The parties agree that if the United States is found liable for a taking of property interests in this case, further proceedings will be needed to identify the owners of that servient estate as of the alleged date of taking. Joint Status Report at 3 (Dec. 14, 2005) (Doc. 119). Accordingly, for the purposes of this motion, Plaintiffs are presumed to be the owners of the servient estate that is subject to this 1875 Act easement.

takings cases, the nature and scope of the easement and, correspondingly, the nature and scope of the plaintiff's property interests are "a function of state law and the language of the conveyance to the railroad." Moore v. United States, 41 Fed. Cl. 394, 397 (1998) (citing Nat'l Wildlife Fed'n v. ICC, 850 F.2d 694, 703-04 (D.C. Cir. 1988)). However, because this motion addresses those segments of the right-of-way that were created under federal law, these inquiries are questions of federal law. Because the resolution of these questions of law is not dependent on any disputed issues of material fact, these questions are well-suited for resolution by summary judgment.

Accordingly, for the reasons set forth in the memorandum of law filed herewith, Defendant contends that summary judgment must be granted in its favor because the nature and scope of the 1875 Act easement that has burdened the subject properties since the late 1800's is broad enough to allow for the preservation of that right-of-way through railbanking, and to allow the interim use of the right-of-way as a public trail. Alternatively, summary judgment is warranted because these uses are permissible under the doctrine of shifting public uses. In either case, the present uses of the right-of-way are permissible uses that do not further burden the ownership of the servient estate and do not result in a taking.

//

//

//

//

//

//

Dated: June 9, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

/s/ Kristine S. Tardiff
E-Mail: kristine.tardiff@usdoj.gov

______________________________________
KRISTINE S. TARDIFF (NH Bar No. 10058)
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577

OF COUNSEL:

HELENANNE LISTERMAN
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Division
P.O. Box 663
Ben Franklin Station
Washington, DC 20044-0663
TEL: (202) 305-0239
FAX: (202) 305-0506

ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Washington, D.C. 20423

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of June, 2006, I electronically filed the foregoing **Defendant's Motion for Summary Judgment With Respect to Category 1** through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Cecilia Fex, Attorney for Plaintiffs
fex@ackersonlaw.com

Nels J. Ackerson, Attorney for Plaintiffs
nels@ackersonlaw.com

Lary C. Walker
walkerlaw_bk@ruralnetwork.net

/s/ Kristine S. Tardiff
E-mail: kristine.tardiff@usdoj.gov

Kristine S. Tardiff
NH Bar No. 10058
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
EMAIL: kristine.tardiff@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*, | |
| Plaintiffs, | Case No. CV99-324S-MHW |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

Dated: June 9, 2006

## TABLE OF CONTENTS


DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CATEGORY 1 LANDS . . . . 1

I. BACKGROUND . . . . 1

A. Federal Authorization to Establish Rights-of-Way Across Public Lands . . . . 1

B. The Regulatory Scheme Governing Railroad Lines . . . . 3

C. The History of the Subject Railroad Right-of-Way . . . . 6

II. ARGUMENT . . . . 9

A. The Scope of the 1875 Acts Easements is a Question of Federal Law . . . . 11

B. The Easement Created Under the 1875 Act is a Public Transportation Easement That Is Expressly Subject to Further Federal Regulation and Control . . . . 12

C. Railbanking Under the Trails Act Does Not Exceed the Scope of the 1875 Act Easement . . . . 21

D. Interim Trail Use Under the Trails Act Serves a Public Transportation Purpose and Does Not Exceed the Scope of the 1875 Act Easement . . . . 23

E. The Doctrine of Shifting Public Uses Applies and Allows for Railbanking and Interim Trail Use . . . . 26

F. The 1875 Act Easement At Issue Has Not Been Abandoned or Forfeited . . . . 28

III. CONCLUSION . . . . 30

## TABLE OF AUTHORTIES

### CASES

Barney v. Burlington N. R.R.,
490 N.W.2d 726 (S.D. 1992), cert. denied sub nom,
Kaubisch v. South Dakota, 507 U.S. 914 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 24

Beres v. United States,
64 Fed. Cl. 403 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 16

Bernards v. Link,
248 P.2d 341 (Or. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Birt v. STB,
90 F.3d 580 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 22

Boise Cascade Corp. v. Union Pacific R.R. Co.,
630 F.2d 720 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Brown v. State of Washington,
924 P.2d 908 (Wash. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Caldwell v. United States,
57 Fed. Cl. 193 (2003), aff'd, 391 F.3d 1226 (Fed. Cir. 2004),
cert. denied, 126 S. Ct. 366 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6-7

Cherokee Nation v. S. Kansas Ry. Co.,
135 U.S. 641 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Chevy Chase Land Co. v. United States,
37 Fed. Cl. 545 (1997), aff'd, 230 F.3d 1375 (Fed. Cir. 1999),
cert. denied, 531 U.S. 957 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

Chevy Chase Land Co. v. United States,
733 A.2d 1055 (Md. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,
450 U.S. 311 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Citizens Against Rails-To-Trails ("CART") v. STB,
267 F.3d 1144 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21

Colorado v. United States,
271 U.S. 153 (1926) . . . . . 3

Crandall v. Goss,
167 P. 1025 (Idaho 1917) . . . . . 12

Goos v. ICC,
911 F.2d 1283 (8th Cir. 1990) . . . . . 6

Fogle v. Richley,
378 N.E.2d 472 (Ohio 1978) (per curiam) . . . . . 26

Grantwood Village v. Missouri Pac. R.R.,
95 F.3d 654, 659 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997) . . . . . 4

Great Northern Ry. Co. v. United States,
315 U.S. 262 (1942) . . . . . 13, 14

Hash v. United States,
403 F.3d 1308 (Fed. Cir. 2005) . . . . . 9

Hayfield N. R.R. v. Chicago & N.W. Transp. Co.,
467 U.S. 622 (1984) . . . . . 4

Himonas v. Denver & R.G.W.R. Co.,
179 F.2d 171 (10th Cir 1949) . . . . . 14

Idaho v. Oregon Short Line R.R. Co.,
617 F.Supp. 207 (D. Idaho 1985) . . . . . 15, 16, 17, 18, 29

Kolouch v. Kramer,
813 P.2d 876 (Idaho 1991) . . . . . 22

Lawson v. Washington,
730 P.2d 1308 (Wash. 1986) . . . . . 24

Leo Sheep Co. v. United States,
440 U.S. 668 (1979) . . . . . 12, 13, 14

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . 10

McQueen v. So. Carolina Coastal Council,
580 S.E.2d 116 (S.C. 2003), cert. denied, 540 U.S. 982 (2003) . . . . . . . . . . . . . . . . . . . . 11

Marlow v. Malone,
734 N.E.2d 195 (Ill. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Matteodo v. Capaldi,
138 A. 38(R.I. 1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Nat'l Ass'n of Reversionary Property Owners ("NARPO") v. STB,
158 F.3d 135 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

Nat'l Wildlife Federation v. ICC,
850 F.2d 694 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Nebraska Trails Council v. STB,
120 F.3d 901 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

Northern Pacific Ry. Co. v. Townsend,
190 U.S. 267 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

O'Brien v. Best,
194 P.2d 608 (Idaho 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Olcott v. Supervisors,
83 U.S. 678 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Oregon Short Line R. Co. v. Pfost,
27 P.2d 877 (Idaho 1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Oregon Short Line R.R. Co. v. City of Mountain Home,
465 P.2d 105 (Idaho 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Preseault v. ICC,
494 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21, 22, 23

Preseault v. United States,
100 F.3d 1525 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Quinn v. Stone,
270 P.2d 825 (Idaho 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Reiger v. Penn Cent. Corp.,
No. 85-CA-11, 1985 WL 7919 (Ct. App. Greene County, Ohio, May 21, 1985) . . . . . . 24

RLTD Ry. v. STB,
166 F.3d 808 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 21

Scranton v. Wheeler,
179 U.S. 141 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

State of Idaho v. Oregon Short Line R.R. Co.,
617 F. Supp. 207 (D. Idaho 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15-17, 19

Toews v. United States,
376 F.3d 1371 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Denver & R.G. Ry. Co.,
150 U.S. 1 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

United States v. Trans-Missouri Freight Ass'n,
166 U.S. 290 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Union Pac. R. Co.,
91 U.S. 72 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Vieux v. Easy Bay Regional Park Dist.,
906 F.2d 1330 (9th Cir. 1990), cert. denied, 498 U.S. 967 (1990) . . . . . . . . . . . . . . 19, 28

Washington Wildlife Preservation v. Minnesota,
329 N.W.2d 543 (Minn.), cert. denied, 463 U.S. 1209 (1983) . . . . . . . . . . . . . . . . . . . . 24

Whipps Land & Cattle Co. v. Level 3 Comms., LLC,
658 N.W.2d 258, 264 (Neb. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

**STATUTES**

16 U.S.C. § 1247(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21, 23, 28
23 U.S.C. § 316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18
43 U.S.C. § 912 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19, 20
43 U.S.C. § 913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

General Railroad Right-of-Way Act of March 3, 1875,
ch. 152, 18 Stat. 482 (codified as 43 U.S.C. §§ 934-939 (1982)) (the "1875 Act") . . . . . 1
43 U.S.C. § 934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 15

43 U.S.C. § 935 . . . . . 20
43 U.S.C. § 937 . . . . . 2
43 U.S.C. § 939 . . . . . 2, 17
43 U.S.C. § 940 . . . . . 2, 17, 18
49 U.S.C. § 10903-04 . . . . . 8
49 U.S.C. § 10505 . . . . . 8
49 U.S.C. § 10906 . . . . . 4

Safe Accountable Flexible Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. 109-59, 119 Stat. 1144 (Aug. 10, 2005) . . . . . 25

**REGULATIONS**

49 C.F.R. § 1152.29 . . . . . 5
49 C.F.R. § 1152.29(a)(1) . . . . . 6
49 C.F.R. § 1152.29(c)-(d) . . . . . 5
49 C.F.R. § 1152.50 . . . . . 5

**LEGISLATIVE MATERIALS**

H.R. Rep. 28, 98th Cong., 1st Sess., 1983 WL 25294 (1983) . . . . . 24

S. Rep. No. 100-408, 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. 2607. . . . . . 20

S. Rep. No. 388, 67th Cong., 2d Sess. (1922) . . . . . 20

**OTHER AUTHORITIES**

E. Pierce, A Treatise on the Law of Railroads (1881) . . . . . 27

http://www.weiserrivertrail.org. . . . . . 9

http://www.fhwa.dot.gov/safetealu/factsheets/rectrails.htm . . . . . 24

http://www.fhwa.dot.gov/safetealu/summary.htm (Transportation Planning) . . . . . 25

http://www.fhwa.dot.gov/environment/te/ guidance.htm#eligible (Background and Project Linkage and Eligible Activities) . . . . . 25

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CATEGORY 1 LANDS**

I. BACKGROUND

This case involves a federally granted right-of-way that is part of the national transportation system. This background section summarizes the federal laws under which the subject right-of-way was created and under which Congress specified its intent regarding the use of such rights-of-way (Section I.A.), the contemporaneous federal laws that gave the ICC exclusive and plenary authority over the construction, operation and abandonment of the nation's rail lines (Section I.B.), and the specific facts regarding the creation of the subject right-of-way and the events preceding the filing of Plaintiffs' class action complaint (Section I.C.).

A. Federal Authorization to Establish Rights-of-Way Across Public Lands

The segments of the right-of-way at issue are easements that were created under the General Railroad Right-of-Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified as 43 U.S.C. §§ 934-939 (1982)) (the "1875 Act"). The 1875 Act is comprised of six sections. Section 1 of the 1875 Act granted a 200-foot wide right-of-way through the public lands of the United States to any railroad company that met the requirements of the statute. 43 U.S.C. § 934. This section also granted the railroads the right to take, as necessary for construction, rock and timber from public lands adjacent to the right-of-way, and up to twenty acres for stations along the line and land needed for other railroad-related facilities. Id.

Section 2 of the 1875 Act governed when a railroad's right-of-way "passe[d] through any canyon, pass, or defile." Id. § 935. In this provision, Congress also focused on the effect such a situation would have on other types of public transportation:

> And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway located

> therein on March 3, 1875, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation . . .

Id. Section 4 of the Act recognized that the public lands across which these rights-of-way were granted might not remain part of the public domain and provided:

> [T]hereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road.

Id. § 937. Finally, under Section 6 of the 1875 Act, Congress "reserve[d] the right at any time to alter, amend, or repeal" the Act. Id. § 939.

In the early 1900s, Congress enacted several statutes that further defined certain aspects of the 1875 Act. Two of these statutes declared that all existing, unused rights-of-way on which plats had been filed must be forfeited. See Act of June 26, 1906, c. 3350, 34 Stat. 482, codified as 43 U.S.C. § 940; Act of Feb. 25, 1909, c. 191, 35 Stat. 647, also codified as 43 U.S.C. § 940. Three more statutes followed in the 1920s. In 1920, Congress authorized all railroad companies that were granted rights-of-way through the public lands to convey to state or local governments "any portion of such right of way to be used as a public highway or street," provided that the railroad retain 50-feet of the right-of-way on each side of the track.[1] Act of May 25, 1920, c. 197, 41 Stat. 621, codified at 43 U.S.C. § 913. Shortly thereafter, in 1921, Congress provided consent to any railroad to convey rights-of-way granted by the United States to state transportation departments. Act of Nov. 9, 1921, § 16, c. 119, 42 Stat. 212, 216, codified as amended as 23 U.S.C. § 316.

---

[1]Rights-of-way granted under the 1875 Act were 200 feet in width, leaving as much as 100 feet available for use as a public highway or street under the 1920 Act.

In 1922, Congress enacted the Abandoned Railroad Right of Way Act of Mar. 8, 1922, c. 94, 42 Stat. 414, codified as 43 U.S.C. § 912 ("1922 Act"). Under this statute,

> all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid . . . .

Id. Congress also provided that the statute would not "affect any public highway on said right of way . . . ." Id.

B. The Regulatory Scheme Governing Railroad Lines[2]

Stemming from the Interstate Commerce Act of 1887, as amended and revised, and the Transportation Act of 1920 (41 Stat. 477-78) and subsequent statutes, the STB has exclusive and plenary authority over the construction, operation and abandonment of virtually all of the nation's rail lines. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311 (1981); see also RLTD Ry. v. STB, 166 F.3d 808, 810 (6th Cir. 1999) (general discussion of the history of railroad regulation). Consequently, a railroad cannot be relieved of its legal obligation to offer service on a particular rail line without first obtaining the express consent of the STB. See Colorado v. United States, 271 U.S. 153, 165 (1926); NARPO v. STB, 158 F.3d at 137

The termination of active rail service by a railroad generally occurs under one of two

[2]The federal regulatory process for railbanking a railroad right-of-way that might otherwise be abandoned has been described in some detail in numerous cases, including: Preseault v. ICC, 494 U.S. 1, 4-9 (1990); Chevy Chase Land Co. v. United States, 37 Fed. Cl. 545, 553-54 (1997), aff'd, 230 F.3d 1375 (Fed. Cir. 1999), cert. denied, 531 U.S. 957 (2000); and Nat'l Ass'n of Reversionary Property Owners ("NARPO") v. STB, 158 F.3d 135, 137-39 (D.C. Cir. 1998).

mechanisms. First, a railroad can apply for permission to discontinue service. This authority allows the railroad to decide "to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." Preseault, 494 U.S. at 6 n.3; see also NARPO, 158 F.3d at 137 n.1 ("A line that is no longer in use, but has not been officially abandoned, may be reactivated later and is termed 'discontinued.'"). Second, a railroad may seek permission to terminate its service over a corridor through an abandonment proceeding. If authority to abandon is granted by the STB, and the railroad "consummates" the abandonment, the rail line is removed from the national transportation system and the STB's jurisdiction generally comes to an end. Hayfield N. R.R. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 633 (1984); Preseault, 494 U.S. at 6 n.3; Birt v. STB, 90 F.3d 580, 585 (D.C. Cir. 1996).

In 1976, Congress passed legislation to address concerns about the loss of railroad rights-of-way nationwide. See Preseault v. ICC, 494 U.S. at 5-6. The provisions of the 1976 legislation authorized the STB to delay disposition of lines subject to abandonment for a period of time in order to allow the sale of the line for public purposes and recreational use. 49 U.S.C. § 10906 (1982 ed.). However, Congress subsequently found that these provisions "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H.R. Rep. No. 98-28, p. 8 (1983) (quoted in Preseault v. ICC, 494 U.S. at 6). Accordingly, in 1983, Congress acted once again, this time passing the Trails Act and providing railroads seeking to either abandon or discontinue their use of a rail line with a third option: railbanking.[3] See RLTD Ry., 166 F.3d at 811 ("Railbanking is an alternative to abandonment."); Grantwood Village v. Missouri Pac. R.R.,

[3]The term railbanking refers to "the preservation of railroad corridor for future rail use." Nebraska Trails Council v. STB, 120 F.3d 901, 903 n.1 (8th Cir. 1997).

95 F.3d 654, 659 (8th Cir. 1996) ("Congress determined that interim trail use was to be treated like discontinuance rather than as an abandonment."), cert. denied, 519 U.S. 1149 (1997); Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) (under the railbanking process, "[t]he right-of-way is 'banked' until such future time as railroad service is restored"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 126 S. Ct. 366 (2005).

The railbanking provision of the Trails Act states that,

> . . . Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976], and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for the purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d). See also 49 C.F.R. § 1152.29 (implementing regulations). In order for a railroad corridor or right-of-way to be railbanked, the railroad must first engage in the STB's regulatory abandonment process.[4] Caldwell, 57 Fed. Cl. at 195; see also 49 C.F.R. § 1152.29; 49 C.F.R. § 1152.50. Once an abandonment application or request for an exemption is filed, a party interested in acquiring or using the right-of-way for railbanking and interim trail use may then request the issuance of a certificate of interim trail use or "CITU" (in abandonment application proceedings) or a notice of interim trail use or "NITU" (in abandonment exemption proceedings). 49 C.F.R. § 1152.29(c)-(d). The STB's regulations require a qualified party interested in

---

[4]The steps that a railroad must take prior to filing an abandonment application are described generally in NARPO v. STB, 158 F.3d at 138.

"acquiring or using" a right-of-way proposed to be abandoned for railbanking and interim trail use to file a request or petition that includes, *inter alia*, a statement of willingness to assume responsibility for the right-of-way, and an acknowledgment that interim trail use of the right-of-way is subject to the "possible future reconstruction and reactivation of the right-of-way for rail service" (railbanking). 49 C.F.R. § 1152.29(a)(1)–(3). If the railroad indicates that it is willing to negotiate a Trails Act agreement, the issuance of the NITU is required.[5] Citizens Against Rails-To-Trails ("CART") v. STB, 267 F.3d 1144, 1150-53 (D.C. Cir. 2001).

The NITU operates to preserve the STB's jurisdiction, thereby preempting the application of applicable law that would otherwise apply in the event that the railroad were fully authorized to abandon its rail line. Caldwell v. United States, 391 F.3d 1226, 1229-30 (Fed. Cir. 2004), cert. denied, 126 S. Ct. 366 (2005). If a railbanking and trail use agreement is reached, the NITU automatically authorizes the interim trail use and the trail sponsor may then assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service. Goos v. ICC, 911 F.2d 1283, 1295 (8th Cir. 1990); Birt, 90 F.3d at 583; Caldwell, 57 Fed. Cl. at 195.

C. The History of the Subject Railroad Right-of-Way

This class action involves a railroad right-of-way previously occupied and used by the Idaho Northern and Pacific Railroad[6] between Weiser and New Meadows, Idaho. This right-of-way is approximately 83 miles in length and generally follows the path of the Weiser River. Pls.'

---

[5]The STB has long described its role in issuing a NITU as "ministerial," in that the STB are required by statute to issue the NITU if the statutory requirements are met. CART v. STB, 267 F.3d at 1151-53.

[6]The Idaho Northern and Pacific Railroad Company and its predecessors and successors in interest are referred to throughout this brief as simply the "Railroad."

Class Cert. Brief, Exhibits 2-4 (Dec. 17, 1999) (Doc. 18); Def. Ex. 8, p. 7.

In the early days of Idaho settlement, prior to the arrival of the Railroad, "a trail up the Weiser River through the Council Valley became the primary avenue of travel for pack trains carrying supplies from Boise to the gold camps at Warren and Florence." Def. Ex. 7; Pls.' Class Cert. Brief at 3 and Ex. 1. The railroad arrived at the town of Weiser in 1882. Id.

In 1894, the Railroad filed its first map with the Department of the Interior showing the location of the first 20 miles of its line, extending in a northerly direction from Weiser along the path of the Weiser River. Pls.' Class Cert. Brief, Exhibit 3. A revised map of the final location of this segment of the rail line was filed in 1899. Id. This revised map includes a sworn statement attesting to its accuracy and indicating that the map "has been prepared to be filed in order to obtain the benefits of Congress approved March 5, 1875 entitled an act granting to railroads the rights of way through public lands of the United States." Id. Another map showing the location of the second 20 miles of the line was also filed in 1899. Id., Exhibits 2 & 4.

Construction of the Railroad commenced and reached Cambridge in December 1900, Council in March of 1901, and Meadow Valley or "New Meadows" in 1911. Pls.' Class Cert. Brief at 4 (citing various sources). A review of documentation filed by the Railroad with the STB following the completion of the line showed that the right-of-way from Weiser to New Meadows consisted of approximately 192 original parcels and 1,689 acres. Of this total, approximately 895 acres were acquired under the 1875 Act. Id., Ex. 6.

The construction of the railroad from Weiser to New Meadows spurred growth in mining, livestock, agriculture and, in later years, timber. Pls.' Class Cert. Brief at 3 and Ex. 1; Def. Ex. 7. Economic times fluctuated in the area of the Railroad. The mining boom waned in the 1920s and the area was affected by the agricultural depression that followed World War I. Def. Ex. 7; Pls.'

Class Cert. Brief, Ex. 1. In 1939, the Boise-Payette lumber company built a sawmill in Council and began harvesting timber from the surrounding area. Def. Ex. 7; Pls.' Class Cert. Brief, Ex. 1. Beginning in the 1980s, the availability of jobs in the local timber industry began to decline. By 1994, there were only three shippers using the Weiser to New Meadows rail line: two timber and timber products companies (Evergreen Forest Products and Boise Cascade Corporation), and a liquid propane gas company (Amerigas). Def. Ex. 8 (Petition). In March 1995, the largest of these shippers, Boise Cascade, closed the sawmill that had been built in Council in 1939. Def. Ex. 8, pp. 4 and 8-9; Def. Ex. 7; Pls.' Class Cert. Brief, Ex. 1.

On March 17, 1995, citing the closure of the Boise Cascade facility and an anticipated loss of 75% of the rail traffic on the Weiser to New Meadows line, the Railroad filed a petition with the STB seeking an exemption under 49 U.S.C. § 10505 from the prior approval requirements of 49 U.S.C. § 10903-04 to abandon the 83.1-mile line. Def. Ex. 8, pp. 1-3. By a decision served on November 1, 1995, the STB granted the Railroad's petition, subject to several conditions. Def. Ex. 9, pp. 1-5. Requests for the issuance of a NITU were subsequently filed by several groups, and the Railroad indicated that it was willing to negotiate regarding the railbanking and interim trail use of the right-of-way. Def. Ex. 10; Def. Ex. 9, p 8. Consequently, on December 28, 1995, the STB issued a NITU that: (1) authorized the Railroad to discontinue its use of this right-of-way; (2) "railbanked" or preserved the right-of-way for future railroad use; and (3) authorized the right-of-way to be used – in the interim – as a recreational trail. Def. Ex. 9, pp. 6-7. The Railroad subsequently reached a Trails Act agreement with the Friends of the Weiser River Trail ("FWRT"), and quitclaimed its interest in the subject right-of-way to FWRT on June 17, 1997. Pls.' Class Cert. Brief, Ex. 10. Subject to the Trails Act and the conditions set forth in the NITU, the right-of-way is presently owned and operated by FWRT and is known as

the "Weiser River Trail." Pls.' Class Cert. Brief, Ex. 10; Def. Ex. 9, pp. 6-7. See generally http://www.weiserrivertrail.org.

On July 26, 1999, owners of land allegedly abutting or traversed by the Railroad's right-of-way brought the present class-action takings lawsuit. Their Amended Class Action Complaint was filed in this Court on December 19, 1999 (Doc. 16), along with a motion for class certification (Doc. 17-18). The Court certified the class on July 7, 2000 (Doc. 39). Subsequently, in order to facilitate resolution of the case, the parties created categories, numbered 1 through 14, to identify how each segment of the right-of-way was acquired by the Railroad. (Doc. 93). This motion for partial summary judgment pertains only to "Category 1," which encompasses those lands that were acquired by the Railroad directly from the United States under the 1875 Act. The Federal Circuit has determined that "the land of Category 1 is owned in fee by the landowners, subject to the railway easement." Hash v. United States, 403 F.3d 1308, 1318 (Fed. Cir. 2005). This case is now on remand from the Federal Circuit. The issue now before the Court is whether the United States is liable for a taking of the Category 1 lands.

## II. ARGUMENT

In order for Plaintiffs to establish that the United States is liable for a taking of the lands in Category 1, they must prove that, but for the operation of the Trails Act, the 1875 Act easement would have been extinguished and the servient estate (*i.e.*, the property allegedly owned by the Plaintiffs) would no longer be burdened by that easement. Resolution of the question of liability thus requires the Court to determine the nature and scope of the 1875 Act easement that burdens the servient estate because that determination reveals whether there are any limitations or restrictions that inhere in the title of the owner of the servient estate. See

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1029 (1992) (government restrictions do not constitute a taking if they "inhere in the title itself").

In this case, the scope of the 1875 Act easements, and the burden those easements place on ownership of the servient estate, are questions of federal law. As set forth below, the easement granted to the Railroad under the 1875 Act was a perpetual and exclusive use easement. Under federal law, the right-of-way created under the 1875 Act became a "public highway" as soon as it was created. Indeed, the use of this transportation corridor for public purposes other than railroad use has been authorized by Congress since 1875, when it specified in Section 2 of the 1875 Act that the location of an 1875 Act easement in areas such as canyons could not interfere with existing public roads or prevent the location of new roads from being laid within the same corridor "for public accommodation." Congress's intent that the easements created under the 1875 Act be made available for other public transportation purposes is further evident in the Acts of 1920, 1921, and 1922, all of which authorize the use of these easements for public road or highway purposes.

The ownership of the servient estate beneath the 1875 Act easements is now, and always has been, subject to and limited by the nature and scope of those easements. The perpetual and exclusive nature of these easements, and the other public uses that are permitted within these easements, are inherent limitations in the "bundle of sticks" that comprise the ownership interest in the servient estate that is subject to the 1875 Act easements. See Lucas, 505 U.S. at 1028 (observing that "the Court assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the owner's title" in defense of a physical occupation-type taking claim); cf. Scranton v. Wheeler, 179 U.S. 141, 163 (1900) (interests of "riparian owner in the submerged lands . . . bordering on a public navigable water" are held

subject to public's navigational servitude); McQueen v. So. Carolina Coastal Council, 580 S.E.2d 116, 120 (S.C. 2003) (the denial of a permit to backfill or place bulkheads on property was not a taking where the State's right to control the tidal wetlands in question for the public benefit was a restriction was "inherent in the ownership of property bordering tidal water"), cert. denied, 540 U.S. 982 (2003).

Under these circumstances, railbanking and interim trail use of the 1875 Act easement pursuant to the Trails Act are each a public use that falls within the scope of the 1875 Act easement and thus cannot, as a matter of law, form the basis of a Fifth Amendment takings claim. Even if one of these uses are found to exceed the scope of the 1875 Act easement, the doctrine of shifting public uses applies and allows a change from one public use (railroad use) to another (railbanking and interim trail use). Under either theory, there has been no taking of any interest owned by the Plaintiffs and their takings claims should be rejected as a matter of law.

A. The Scope of the 1875 Acts Easements is a Question of Federal Law

The easements at issue in this case were granted to the Railroad under the 1875 Act. It is well established that federal law governs the scope of an easement created under the 1875 Act. State of Idaho v. Oregon Short Line R.R. Co., 617 F. Supp. 207, 212 (D. Idaho 1985). Federal and state courts, alike, have recognized this bedrock principle. See Beres v. United States, 64 Fed. Cl. 403, 410 (2005) (holding that because "the railroad company's right-of-way was granted under the 1875 Act . . . defining the intentions of Congress as to the property interests impacted by the federal statute is an issue of federal law.") (citing Leo Sheep Co. v. United States, 440 U.S. 668, 682 (1979)); Crandall v. Goss, 167 P. 1025, 1027 (Idaho 1917) (the nature and effect of a federal grant to a railroad "involves the interpretation of an act of Congress, and presents a federal question of which the Supreme Court of the United States has ultimate jurisdiction.");

Barney v. Burlington N. R.R., 490 N.W.2d 726, 729 (S.D. 1992) (holding that the nature of the property interest held by various parties as a result of the grant of an 1875 Act easement "is defined and controlled by federal legislation and is, therefore, a federal question"), cert. denied sub nom Kaubisch v. South Dakota, 507 U.S. 914 (1993); Whipps Land & Cattle Co. v. Level 3 Comms., LLC, 658 N.W.2d 258, 264 (Neb. 2003) ("The scope of [a] right-of-way [under the 1875 Act] is a matter of federal law."); Marlow v. Malone, 734 N.E.2d 195, 205 (Ill. App. 2000) ("rights created under federal statute are not governed by state law"). Accordingly, the nature and scope of the 1875 Act easements which burden the servient estate allegedly owned by the Plaintiffs is a question of federal law.

B. The Easement Created Under the 1875 Act is a Public Transportation Easement That Is Expressly Subject to Further Federal Regulation and Control

Because the easement at issue was created under the 1875 Act, it "is subject to the intentions and specifications of Congress; it is not a common law easement." Barney, 490 N.W.2d at 730; see also Brown v. State of Washington, 924 P.2d 908, 917 (Wash. 1996) ("'easements' on public lands are granted by Congress and subject to the intentions and specifications of Congress rather than common law"). To determine the intent of Congress, we look first at the language of the 1875 Act, which "is to be liberally construed to carry out its purpose." Great Northern Ry. Co. v. United States, 315 U.S. 262, 272 (1942). Otherwise stated, when "an act, operating as a general law, and manifesting clearly the intention of congress to secure public advantages" is being construed, "such legislation stands upon a somewhat different footing from merely a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted." United States v. Denver & R.G. Ry. Co., 150 U.S. 1, 15-16 (1893); see also Leo Sheep Co. v. United States, 440 U.S. 668, 683

(1979) (railroad land grants are "to receive such a construction as will carry out the intent of Congress"). It is this rule, "rather than the more strict rule of construction adopted in the case of purely private grants" that the Supreme Court has determined to be applicable to the 1875 Act and similar federal railroad grants. Denver & R.G. Ry., 150 U.S. at 15-16.

In applying this rule of statutory construction to the 1875 Act, the court is "not limited to the lifeless words of the statute and formalistic canons of construction in [its] search for the intent of Congress." Great Northern, 315 U.S. at 273. Instead, because the 1875 Act "was the product of a period," the court, in construing the statute, "'may with propriety recur to the history of the times when it was passed.'" Id. (quoting United States v. Union Pac. R. Co., 91 U.S. 72, 79 (1875)); see also Leo Sheep Co., 440 U.S. at 669. In addition, "[i]t is settled that 'subsequent legislation may be considered to assist the interpretation of prior legislation upon the same subject.'" Great Northern, 315 U.S. at 276-77 (looking at legislation enacted in 1906, and 1909 to assist in the interpretation of the 1875 Act).

Like many federal railroad land grants enacted in the late 1800's, the general intent of the 1875 Act "was to effectuate construction of a transcontinental railroad." Beres, 64 Fed. Cl. at 410. As explained by the Supreme Court, the 1875 Act "was designed to permit construction of railroads through the public lands and thus enhance their value and hasten their settlement."[7] Great Northern Ry., 315 U.S. at 272. At the time it granted rights-of-way under the 1875 Act, it was Congress's intention that "limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed." Northern Pacific Ry.

[7] Federal grants of land and rights of way to facilitate the development of a transcontinental transportation network and related facilities were not limited to railroads, but also included grants to aid in the construction of roads and canals. Leo Sheep Co., 440 U.S. at 672-73 (citing P. Gates, History of Public Land Law Development 341-356 (1968)).

Co. v. Townsend, 190 U.S. 267, 272 (1903) (discussing Congress's intent in passing an earlier grant); see also Himonas v. Denver & R.G.W.R. Co., 179 F.2d 171, 173 (10th Cir 1949) (Congress "clearly" must have intended that limitations on 1875 Act rights-of-way could be imposed "in favor of the public"). In later making its 1875 Act grant "Congress conclusively determined that the strip covered was necessary for an important public work." Boise Cascade Corp. v. Union Pacific R.R. Co., 630 F.2d 720, 723 (10th Cir. 1980) (applying principle of Townsend to 1875 Act case). Consistent with Congressional intent to develop a national transportation system to facilitate the settlement of the west, and its intent to impose limitations on such rights-of-way in favor of the general public, railroads are considered public highways created for public purposes under federal law.[8] See Cherokee Nation v. S. Kansas Ry. Co., 135 U.S. 641, 657 (1890) ("a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and, therefore, subject to governmental control and regulation"); Olcott v. Supervisors, 83 U.S. 678, 694 (1872) ("That railroads, though constructed by private corporations and owned by them, are public highways, has been the doctrine of nearly all of the courts ever since such conveniences for passage and transportation have had any existence.").[9]

---

[8]Railroads are also considered public highways under Idaho state law. See Idaho Constitution, Section 5, Article 11 ("All railroads shall be public highways . . . ."); Oregon Short Line R. Co. v. Pfost, 27 P.2d 877, 880-81 (Idaho 1933) ("The term 'highway' has been held to comprehend a navigable stream or waterway as well as railroads, tramways, bridges, ferries, and canals; in short, every public thoroughfare is a highway." (citations omitted)).

[9]Other public transportation corridors are also considered to be "public highways." See Olcott, 83 U.S. at 695 ("So turnpikes, bridges, ferries, and canals, although made by individuals under public grants, or by companies, are regarded as *publici juris*. . . . That all persons may not put their own cars upon the road, and use their own motive power, has no bearing upon the question whether the road is a public highway. It bears only upon the mode of use, of which the legislature is the exclusive judge.").

Turning next to the plain language of the 1875 Act, Section 1 of the Act granted a 200-foot wide right-of-way through the public lands of the United States to any railroad company that met the requirements of the Act. 43 U.S.C. § 934. Although there is no question that Congress was granting rights-of-way to railroad companies under this Act for the construction of their roads, there is no language in the Act that expressly limits the use of the rights-of-way granted thereunder to "railroad purposes." The Supreme Court has previously refused to read such restrictions into the 1875 Act that Congress could have expressed therein, but did not. See United States v. Denver & Rio Grande Ry. Co., 150 U.S. at 11 (declining to read a restriction into the provisions of the 1875 Act allowing railroads to take timber or other materials from public lands adjacent to a right-of-way created under the 1875 Act, noting that "[i]f congress had intended to impose [such a] restriction . . . it should have been so expressed").

In addition to the absence of any express limitation on the use of the rights-of-way created under the 1875 Act, Congressional awareness of the interplay between federally-granted railroad rights-of-way and other forms of transportation is evident in the plain language of the 1875 Act. As noted above, Section 1 of the Act granted a 200-foot wide right-of-way through the public lands of the United States. Section 2 of the 1875 Act then explicitly states that where railroads and "other public highways" might conflict, in areas such as canyons, such public roads or highways should not be prevented from being laid "for public accommodation" along or within the railroad rights-of-way.

Given that the federal railroad grants were part of the creation of a larger transportation network, it is not surprising that courts have determined that in passing the 1875 Act Congress intended to create not just a private passage for a private railway company, but a public transportation corridor. As the Court found in Idaho v. Oregon Short Line R.R. Co., 617 F.

Supp. 207, 212 (D. Idaho 1985), Congress granted the 1875 Act easements "subject to [Congress's] own terms and conditions – which were to preserve a corridor of public transportation, particularly the railroad transportation, in order to facilitate the development of the 'Western vastness.'" Numerous other courts have agreed with this analysis. For example, in Barney v. Burlington N. R.R., 490 N.W.2d at 730, the court emphasized that "[u]nder the broad power over interstate commerce, Congress had authority to grant railroad easements subject to its own terms and conditions." Following Oregon Short Line, the Barney court found that, in granting rights-of-way under the 1875 Act, "Congress wanted to preserve a corridor of public transportation, especially the railroad transportation, for further development of the western United States."[10] Id.; see also Whipps, 658 N.W.2d at 266 (same).

Beyond the broader purposes of the 1875 Act discussed above, a number of courts have examined the nature and scope of the easement created under the 1875 Act subsequent to Great Northern, including the U.S. District Court for the District of Idaho. In the oft-cited Idaho v. Oregon Short Line R. Co., 617 F. Supp. 207 (D. Idaho 1985), the Court correctly noted that the Supreme Court's decision in Great Northern did not attempt to define the nature and scope of that easement beyond finding that Congress did not grant railroads the right to remove minerals from the servient estate. See also Beres, 64 Fed. Cl. at 422 ("Unfortunately, . . . the Supreme Court, in Great Northern, and in subsequent cases, has not provided a more specific definition of

---

[10] In some of the cases cited herein by Defendant, the courts reconciled the intent of Congress as expressed in the 1875 Act and in subsequent legislation such as the 1920, 1921 and 1922 Acts, by holding that the United States retained a reversionary interest in 1875 Act easements. Although these holdings now conflict with the Federal Circuit's holding in this case that the United States does not hold a reversionary interest in the 1875 Act corridors, the prior decisions remain relevant here because of the courts' analysis of the purpose of the 1875 Act and other related statutes.

the term "easement" in the 1875 Act"). The Oregon Short Line court found that the 1875 Act granted the railroads "an interest suitable for railroad purposes – a right-of-way, which, by definition, carried with it the right to exclusive use and occupancy of the land." Oregon Short Line, 617 F. Supp. at 212. As the Supreme Court of Idaho stated in another case involving 1875 Act easements, "[w]hile a railroad right-of-way may not carry with it the power to remove minerals from the servient estate, it is still a perpetual and exclusive possessory interest in the land surface as long as the right-of-way is used for railroad purposes." Oregon Short Line R.R. Co. v. City of Mountain Home, 465 P.2d 105, 107 (Idaho 1970). Accordingly, until an 1875 Act easement is extinguished, the owner of the servient estate can not "use the surface of the right-of-way without permission of the holder of the easement." Id.

It is also important to note that in drafting the 1875 Act, Congress was concerned with its "*continuing* commerce power over railroad rights-of-way." Oregon Short Line, 617 F. Supp. at 212 n.4 (citing the legislative history of the 1875 Act) (emphasis added). Specifically, Congress contemplated future oversight of the rights-of-way it was creating under the 1875 Act and other similar statutes. The viatic easement created under the 1875 Act was thus made expressly subject to the further control of Congress by Section 6 of that Act, which states that "Congress reserves the right at any time to alter, amend, or repeal" any of the provisions of the 1875 Act, or any part thereof.[11] 43 U.S.C. § 939. Several such alterations were subsequently made to address the disposition of easements created under the 1875 Act (and other similar federal railroad

[11]The retention of Congressional control over the easements created under the 1875 Act is best understood within the context of the general history of federal railroad land grants, including the shift away from large land grants to the railroads with very little retained federal control toward more limited grants with more extensive federal regulation and control that was occurring during this period in our nation's history.

grants) in the event of forfeiture or abandonment by the Railroad.

Congress first altered the 1875 Act with the enactment of the Act of June 26, 1906, 34 Stat. 482, and the Act of Feb. 25, 1909, 35 Stat. 647, which were collectively codified as 43 U.S.C. § 940. In these Acts, Congress addressed what would happen to rights of way created under the 1875 Act and similar federal statutes in the event that the Railroad failed to construct its line within the specified five year time frame. If the Railroad failed to construct its line (or make good faith progress in its construction), these Acts provided that the right of way is "declared forfeited to the United States" and that "the United States resumes the full title to the lands" conveyed to the Railroad "free and discharged from such easement[.]" Id. Section 940 further provides that this forfeiture "shall, without the need of further assurance or conveyance, inure to the benefit of any owner or owners of land conveyed by the United States prior to such date subject to any grant of right of way or station grounds[.]" Id.

In another series statutes, Congress demonstrated its understanding that easements created under the 1875 Act could be used for other non-rail public transportation purposes. In the 1920 Act, supra, Congress authorized all railroad companies granted rights-of-way through the public lands to convey to state or local governments "any portion of such right of way to be used as a public highway or street" provided that the railroad retained 50-feet of the right of way on each side of the track. 43 U.S.C. § 913.. The 1920 Act also specified "[t]hat no such conveyance shall have the effect to diminish the right of way of such railroad company." Id. In 1921, Congress passed the Federal Highway Act, Act of Nov. 21, 1921, c. 119, 42 Stat. 212, to amend and further legislation enacted in 1916 to aid the States in the construction of roads.[12] Section 16

[12]The cited provision of the Federal Highway Act of 1921 was included in subsequent pieces of federal highway legislation, including the Act of August 27, 1958, 72 Stat. 915, which

of that Act provides, "That for the purpose of this Act the consent of the United States is hereby given to any railroad or canal company to convey to the highway department of any State any part of its right of way or other property in that State acquired by grant from the United States." Id., 42 Stat. 212, 216. This language demonstrates that Congress viewed railroads and other public highways as both serving public transportation purposes, and that shifting from one transportation use (railroad) to another (roads or highways) is a permissible use of these federally created rights-of-way. A year later, Congress enacted the 1922 Act and again indicated that federally-created railroad rights-of-way could be used in other ways by enacting legislation that precluded the transfer of rights-of-way on which public highways had previously been established or were established within a year after the railroad's lawful abandonment. See 43 U.S.C. § 912.

These various statutes were enacted "to ensure that railroad rights of way would continue to be used for public transportation purposes." Vieux v. Easy Bay Regional Park Dist., 906 F.2d 1330, 1335 (9th Cir. 1990) (discussing the 1920 and 1922 Acts), cert. denied, 498 U.S. 967 (1990). As explained by this Court, the Acts are best understood in the historical context of the time, to wit, "[w]ith the [then] relatively recent advent of the automobile, the 66th and 67th Congresses obviously perceived the rising importance of highway transportation; and acted to preserve, where possible, railroad rights-of-way for such use." Oregon Short Line R.R., 617 F. Supp. at 212-13; see also id. at 212 (finding that the 1920 and 1922 Acts "evince an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation."). The legislative history of the 1922 Act confirms that the

---

was codified as 23 U.S.C. § 316.

intent of this statute was to allow any public highways already established with such rights-of-way to continue and to allow public authorities the opportunity to establish roads on such rights-of-way in the future. The Senate Report issued on the 1922 Act states:

> The attention of the committee was called, however, to the fact that in some cases highways have been established on abandoned rights of ways or that it might be desirable to establish highways on such as may be abandoned in the future. Recognizing the public interest in the establishment of roads, your committee safeguarded such rights by suggesting the amendments above referred to protecting not only roads now established but giving the public authorities one year's time after a decree of forfeiture or abandonment to establish a public highway upon any part of such right of way.

S. Rep. No. 388, 67th Cong., 2d Sess. 2 (1922).

As previously noted, the use of 1875 Act easements for other transportation purposes has its source in the language of the 1875 Act itself. Section 2 of the 1875 Act contemplated the coordination of different public roads and highways and required the sharing of easement areas for multiple roads when an 1875 Act easement was located through a canyon, pass or defile. 43 U.S.C. § 935 (the location of an 1875 Act easement shall not "prevent the location . . . of any such wagon road or highway where such road or highway may be necessary for the public accommodation"). The Acts of 1920, 1921 and 1922 further this original intent of Congress by authorizing the use of 1875 Act easements for public road or highway purposes. In this respect, the statutes enacted in the 1920's simply alter the 1875 Act in a manner that was contemplated by and is permissible under Section 6 of the 1875 Act.[13]

[13] A more recent indication of Congressional intent to use federally granted railroad rights-of-way for other public transportation purposes is found in a 1988 statute which provides that, "[c]ommencing upon October 4, 1988, any and all right, title and interest, and estate of the United States in all rights-of-way of the type described in the Act of March 8, 1922 (43 U.S.C. § 912), shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is

In sum, the 1875 Act and the series of statutes enacted in the 1920's and discussed above collectively demonstrate that Congress intended to grant a right-of-way that could be used for multiple public transportation purposes. Although Congress contemplated that rights-of-way granted under the 1875 Act would be used by railroads for railroad purposes, Congress has consistently and repeatedly indicated that it intended that these federally granted rights-of-way could be used for other public transportation purposes as well. These 1875 Act easements are thus impressed with a public trust which is an inherent limitation on the rights of the owner of the servient estate which is burdened by these easements.

C. Railbanking Under the Trails Act Does Not Exceed the Scope of the 1875 Act Easement

The Trails Act authorizes two distinct present uses of the 1875 Act right-of-way at issue in this case: (1) railbanking, and (2) interim trail use. Preseault v. ICC, 494 U.S. at 17-18. Each of these uses falls within the scope of the 1875 Act easement.

As noted above, the term railbanking refers to "the preservation of railroad corridor for future rail use." Nebraska Trails Council v. STB, 120 F.3d at 903 n.1; Chevy Chase, 37 Fed. Cl. at 584 (railbanking is "preserving the rail corridor for future railroad use"). Railbanking is an alternative to the abandonment of a right-of-way, which can result in the extinguishing of any easements that comprise the right-of-way and the loss of the right-of-way as a transportation corridor. Preseault v. ICC, 494 U.S. at 5 n.3; RLTD Ry., 166 F.3d at 811. The railbanking mechanism furthers "the national policy to preserve established railroad rights-of-way for future

---

embraced within a public highway no later than one year after a determination of abandonment or forfeiture, as provided under such Act." The purpose of this statutory provision is to "facilitate [] trail development and use by allowing the United States to retain its interest in abandoned rights-of-way and encouraging trail development on these rights-of-way." S. REP. NO. 100-408, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 2607.

reactivation of rail service" and protects rail transportation corridors. 16 U.S.C. § 1247(d).

Railbanking is a separate use of a right-of-way with a separate purpose than interim trail use. Preseault v. ICC, 494 U.S. at 10, 15-18; see also CART v. STB, 267 F.3d at 1153 ("Congress' stated purposes in enacting the Trails Act were twofold: to preserve rail corridors for future railroad use and to permit public recreational use of trails."); Nat'l Wildlife Federation v. ICC, 850 F.2d 694, 707 (D.C. Cir. 1988) (declining to find that railbanking is a fiction, noting that "Congress specifically identified rail banking as a goal in the test of § 8(d)" of the Trails Act). This is evident not only in the plain language of the Trails Act, but also in the decisions issued by the STB in this case, where the STB emphasized that "[o]ur chief concern, once a trail condition has been imposed, is that the statutory rail banking condition not be compromised, and that nothing occur that would preclude a railroad's right to reassert control over the right-of-way at some future time to revive active service." Def. Ex. 9, p. 22.

Railbanking, which is simply the preservation of a railroad corridor during a period when there is no active use of that corridor for the running of trains, is itself a present use of the corridor.[14] It serves a railroad purpose by maintaining and preserving a right-of-way, as an intact corridor that remains part of the national transportation system, until the corridor is needed for the reactivation or restoration of rail service. Birt v. STB, 90 F.3d at 581-83; Preseault v. ICC, 494 U.S. at 10, 18-19. As set forth above, the 1875 Act easement is a public highway. The

[14]By analogy to state law, railbanking is akin to non-use of the right-of-way for a period of time without intent to abandon the right-of-way. Under Idaho state law, the mere non-use of an easement does not cause an abandonment of that easement to occur. See Kolouch v. Kramer, 813 P.2d 876, 878 (Idaho 1991) ("The rule is well settled that mere non-use of an easement by grant does not effect an abandonment of the easement."); O'Brien v. Best, 194 P.2d 608, 613-14 (Idaho 1948) (same); Quinn v. Stone, 270 P.2d 825, 829 (Idaho 1954) ("mere non-use of an easement by grant does not show abandonment nor does the mere non-use or deferment or non-exercise of an easement by grant result in the statute of limitations barring the easement.").

easement was granted to the Railroad for railroad purposes, but the easement created under the 1875 Act is not strictly limited to railroad purposes. Instead, even under the plain language of the 1875 Act, the easements created thereunder had to accommodate other public roads. Moreover, Congress has repeatedly indicated its intent that 1875 Act easements may be utilized for other non-rail transportation purposes, either in combination with railroad use or as a substitute for railroad use, and the courts have repeatedly sought to give effect to this intent. See supra note 10. The only limitation is that the other transportation use be a public one.

Railbanking thus falls squarely within the scope of the 1875 Act easement. The purpose of railbanking is to preserve the 1875 Act right-of-way so that it is available for future use as an active railroad. Preseault v. ICC, 494 U.S. at 10, 17-19. Railbanking is fully consistent with the purpose of the 1875 Act because it furthers railroad purposes by preserving the right-of-way for future railroad use, and because it serves a broader public transportation purpose. Consequently, the railbanking of the 1875 Act easements in this case does not "take" anything from the owners of the servient estate. The servient estate simply remains burdened by the same easement that was created under the 1875 Act and that has existed for more than a century.

D. Interim Trail Use Under the Trails Act Serves a Public Transportation Purpose and Does Not Exceed the Scope of the 1875 Act Easement

The second use of the 1875 Act easements that is authorized by the Trails Act is interim trail use. As with railbanking, this use of the subject right-of-way does not exceed the scope of the 1875 Act easements.

Interim trail use falls within the scope of the 1875 Act easement for two reasons.[15] First,

[15] A number of courts have considered the question of whether railbanking and interim trail use fall within the scope of a railroad easement created under *state* law. Decisions in which the court found that railbanking and interim trail use fall within the scope of a railroad easements

interim trail use furthers the preservation of the 1875 Act easement so that the corridor is available in the future and rail service can be restored. As detailed above in Section I.B., the corridor at issue in this case has been subject to extensive federal regulation since its creation in the late 1800's. Under applicable regulations, the STB could authorize a railroad to discontinue its service without abandoning its line so that the corridor is available for future rail service. However, Congress subsequently determined that the discontinuance mechanism was not effective for preserving railroad corridors. The Trails Act was enacted in 1983 in response to this concern. The interim trail use feature of the Trails Act facilitates the preservation of the corridor by authorizing a third party (often referred to as the trail sponsor) to manage and utilize the corridor during the railbanking period. This is a more attractive option for the railroads than a traditional discontinuance because the third party assumes management responsibility and liability for the corridor during the railbanking period, along with all of the costs associated with those responsibilities. See H.R. Rep. 28, 98th Cong., 1st Sess., 1983 WL 25294 (1983) (stating that the Trails Act "will protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed, and by protecting the railroad interests from any liability or responsibility in the interim period."). Here, the interim use of the subject right-of-way that was authorized by the STB "is subject to

---

under state law include: Chevy Chase Land Co. v. United States, 733 A.2d 1055 (Md. 1999); Washington Wildlife Preservation v. Minnesota, 329 N.W.2d 543 (Minn.), cert. denied, 463 U.S. 1209 (1983); Reiger v. Penn Cent. Corp., No. 85-CA-11, 1985 WL 7919 (Ct. App. Greene County, Ohio, May 21, 1985); Barney v. Burlington N. R.R., 490 N.W.2d 726 (S.D. 1992). Decisions in which the court reached the opposite conclusion under other state law include Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004) (California law), and Lawson v. Washington, 730 P.2d 1308, 1311-13 (Wash. 1986). Although all of these decisions may provide some general guidance for this Court on the nature of the inquiry, they are not controlling here because the question of whether railbanking and interim trail use are uses that fall within the scope of the 1875 Act easement at issue in this case is a question of *federal* law.

restoration or reconstruction for railroad purposes[.]" 16 U.S.C. § 1247(d); see also Def. Ex. 9, p. 7 (the NITU issued by the STB states"[i]nterim trail use/rail banking is subject to the future restoration of rail service.").

Interim trail use also falls within the scope of an 1875 Act easement because this use qualifies as a public transportation use of the corridor. Under federal law, bicycle and pedestrian corridors are recognized as an important component of the national transportation system. In the most recent federal highway funding law, the Safe Accountable Flexible Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. 109-59, 119 Stat. 1144 (Aug. 10, 2005), $370 million is allocated over a five year period to provide funds to the States "to develop and maintain recreational trails and trail-related facilities for both non-motorized and motorized recreational trail uses." See http://www.fhwa.dot.gov/safetealu/factsheets/rectrails.htm (last visited on June 6, 2006). In addition, Congress has authorized a pilot program to construct "a network of nonmotorized transportation infrastructure facilities" in order "to demonstrate the extent to which bicycling and walking can carry a significant part of the transportation load, and represent a major portion of the transportation solution, within selected communities." SAFETEA-LU, Sec. 1807. Another feature of SAFETEA-LU that demonstrates the connection between trails and other forms of public transportation is the requirement that metropolitan and statewide transportation planning processes include consideration of bicycle and pedestrian facilities as part of a national intermodal transportation system. SAFETEA-LU, Sec. 3006; see also http://www.fhwa.dot.gov/safetealu/summary.htm (Transportation Planning) (last visited June 6, 2006). In addition, federal law presently requires that 10% of federal surface transportation funds must be used for "transportation enhancements," which are activities or projects that "relate to surface transportation." See http://www.fhwa.dot.gov/environment/te/

guidance.htm#eligible (Background and Project Linkage) (last visited June 6, 2006). Congress's list of transportation enhancements that are eligible for such funding includes the "[p]rovision of facilities for pedestrians and bicycles" and "[p]reservation of abandoned railway corridors (including the conversion and use *of the corridors* for pedestrian or bicycle trails)." Id. (Eligible Activities).

Accordingly, under federal law, the use of a railroad corridor as a public trail is a public transportation use and furthers railroad purposes by maintaining the corridor. Congress has determined that such uses relate to surface transportation and that such corridors, even when used for trail purposes, are an important part of the national multimodal transportation system. Therefore, the use of the subject 1875 Act easements for interim trail use not only serves a railroad purpose (by facilitating the preservation of the corridors through railbanking), but is also an independent public transportation purpose that falls within the scope of the 1875 Act. Because the 1875 Act easements are being used in a manner intended and authorized by Congress, that use does not result in a taking of any interest owned by the Plaintiffs.

E. The Doctrine of Shifting Public Uses Applies and Allows for Railbanking and Interim Trail Use

Even if railbanking and/or interim trail use are found to constitute a public use that does not fall within the scope of the easement created by Congress under the 1875 Act, the change in use from active railroad use to railbanking and interim trail use is permitted under the so-called doctrine of shifting public uses and does not result in a termination of the easement in this case. See generally Preseault v. United States, 100 F.3d 1525, 1541, 1544-45 (Fed. Cir. 1996) (plurality opinion) (generally recognizing the doctrine of shifting public uses, but questioning whether that the doctrine exists under Vermont law); id. at 1568-75 (Clevenger, J., dissenting)

(determining that the shifting public use doctrine exists under Vermont law and that trail use is a permissible public use thereunder).[16]

Long before the railroad arrived in Idaho, a trail running along the Weiser River was the primary avenue of travel for people and goods. Def. Ex. 7; Pls.' Class Cert. Brief, Ex. 1. With the arrival of the railroad in Weiser in 1882, the mode of transportation in this area evolved from travel by foot, horse and wagons to include travel by railroad. When the railroad began the process of continuing beyond Weiser, it chose to construct its line along the Weiser River, using the same corridor that had long been used for travel. At the time the 1875 Act easement was created, adaptation of a viatic easement to accommodate new public use was understood not to trigger an abandonment. As explained in one leading treatise on this subject:

> The property [taken by a railroad] is, however, to be deemed taken for a public use itself, rather than for the peculiar use and enjoyment by the party to whose possession it passes. It does not therefore revert to the owner upon a mere transfer of the railroad to another company, nor upon its appropriation to another similar public use.

E. Pierce, A Treatise on the Law of Railroads 158 (1881). Congress clearly understood this concept of "shifting public uses" and applied this doctrine to the easements created under the 1875 Act when it authorized the use of these easement for other public purposes, particularly public highway purposes, through Section 2 of the 1875 Act and through the subsequent

[16]See also Fogle v. Richley, 378 N.E.2d 472, 474-75 (Ohio 1978) (per curiam) (determining that a shift from railroad use to highway use did not render an easement abandoned); Bernards v. Link, 248 P.2d 341, 344-52 (Or. 1952) (finding that a shift in use from a railroad right-of-way to a logging road did not result in abandonment of the easement); Matteodo v. Capaldi, 138 A. 38, 38-39 (R.I. 1927) (recognizing that a shift in use from carriages to automobiles did not place an added burden on the right-of-way).

enactment of the 1920, 1921 and 1922 Acts, discussed above.[17] Under this doctrine, the substitution of a new public use (railbanking and interim trail use) for the original use (railroad) is permitted and thus does not constitute a taking.

F. <u>The 1875 Act Easement At Issue Has Not Been Abandoned or Forfeited</u>

Apart from the question of whether either or both of the current uses of the 1875 Act easements fall within the scope of those easements, or whether those uses are permissible changes in the mode of public use, is the question of whether these easements have otherwise been extinguished or abandoned as a matter of federal law.

First, Defendant notes that the STB's issuance of a NITU in this case does not authorize the Railroad to abandon the subject right-of-way as a matter of federal law while the right-of-way is subject to railbanking and interim trail use. 16 U.S.C. §1247(d); Def. Ex. 9, pp. 6-7 (NITU). Absent authorization from the STB to abandon the right-of-way, other federal laws that address the disposition of federally granted railroad rights-of-way upon forfeiture or abandonment by the railroad are not triggered. Second, even if the railroad and interim trail use conditions were lifted and the Railroad thereafter sought to consummate abandonment in accordance with federal law, the resulting termination of the STB's regulatory authority over the subject right-of-way does not mean that the right-of-way itself has been extinguished. Instead, federal law still governs when and how 1875 Act easements can be extinguished. <u>See</u> Section I.A., <u>supra</u>.

There are several federal statutes that govern the disposition of 1875 Act easements upon abandonment or forfeiture by the Railroad. Of particular applicability here is the 1922 Act. Both

[17]The fact that the terms "shifting public use" or "shifting public use doctrine" do not appear is the legislation or legislative history discussed here is irrelevant. Those terms appear to be simply a modern label applied to a concept that has been applied to transportation-related public easements since at least the 1800's.

this Court and the Ninth Circuit have had an opportunity to examine the 1922 Act and both courts agree that in order for 1875 Act easements to be extinguished under the 1922 Act, the railroad "must 1) cease 'use and occupancy' of the rights of way *and* 2) abandonment must be declared or decreed" by a court of competent jurisdiction or a congressional act." Vieux, 906 F.2d at 1337 (citing and concurring with the same interpretation of the 1922 Act in Oregon Short Line R.R., 617 F. Supp. at 216, 218) (emphasis in original). Here, of course, there has been no such court decree or Act of Congress. Accordingly, the provisions of the 1922 Act have never been triggered and, for the purposes of that section, the 1875 Act easements have not been abandoned or otherwise extinguished.[18] Plaintiffs' alleged ownership of the servient estate thus remains subject to the 1875 Act easements notwithstanding the application of the Trails Act in this case. Because the 1875 Act easements cannot be deemed abandoned as a matter of federal law but for the application of the Trails Act, the railbanking and interim trail use of that easement does not constitute a taking.

//

//

//

//

[18]Moreover, because railbanking and interim trail use operate to preserve the 1875 Act easements as part of the national multimodal transportation network, this easement is a public highway. As such, these uses do not result in abandonment as a matter of federal law and, even absent application of the Trails Act provision in question, these easements would not and could not be "declared or decreed" as abandoned by a court of competent jurisdiction or Congress under the 1922 Act.

## III. CONCLUSION

For the reasons set forth above, Defendant respectfully requests that the Court grant Defendant's motion for summary judgment as to the lands in Category 1.

Dated: June 9, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

/s/ Kristine S. Tardiff
E-Mail: kristine.tardiff@usdoj.gov

KRISTINE S. TARDIFF (NH Bar No. 10058)
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577

OF COUNSEL:

HELENANNE LISTERMAN
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Division
P.O. Box 663
Ben Franklin Station
Washington, DC 20044-0663
TEL: (202) 305-0239
FAX: (202) 305-0506

ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Washington, D.C. 20423

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of June, 2006, I electronically filed the foregoing **Defendant's Memorandum in Support of Its Motion for Summary Judgment With Respect to Category 1** through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Cecilia Fex, Attorney for Plaintiffs
fex@ackersonlaw.com

Nels J. Ackerson, Attorney for Plaintiffs
nels@ackersonlaw.com

Lary C. Walker
walkerlaw_bk@ruralnetwork.net

/s/ Kristine S. Tardiff
E-mail: kristine.tardiff@usdoj.gov

Kristine S. Tardiff
NH Bar No. 10058
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
EMAIL: kristine.tardiff@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*, Plaintiffs, | Case No. CV99-324S-MHW |
| v. | |
| UNITED STATES OF AMERICA, Defendant. | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

Pursuant to Fed. R. Civ. P. 56 and L.R. 7.1(b), Defendant submits this statement of facts that are material to its motion for summary judgment as to Category 1 and that Defendant contends are not in dispute. As set forth in Defendant's motion for summary judgment and supporting memorandum, filed herewith, the questions presented in Defendant's motion are questions of federal law, the resolution of which is not dependent on any disputed facts. The facts set forth herein are primarily background facts regarding the creation of the easements at

issue in Defendant's motion.

1. The railroad right-of-way at issue in this case ("the subject right-of-way") is located between Weiser and New Meadows, Idaho. This right-of-way is approximately 83 miles in length and generally follows the path of the Weiser River. Def. Ex. __ (MAPS); Pls.' Class Cert. Brief, Exhibits 2-4 (Dec. 17, 1999) (Doc. 18).

2. In the early days of Idaho settlement, prior to the arrival of the Railroad, "a trail up the Weiser River through the Council Valley became the primary avenue of travel for pack trains carrying supplies from Boise to the gold camps at Warren and Florence." Def. Ex. 7; Pls.' Class Cert. Brief, Ex. 1; Pls.' Class Cert. Brief at 3.

3. The railroad arrived at the town of Weiser in 1882. Def. Ex. 7; Pls.' Class Cert. Brief, Ex. 1.

4. In 1894, Pacific and Idaho Northern Railway ("Railroad")[1] filed its first map with the Department of the Interior showing the location of the first 20 miles of its line, extending in a northerly direction from Weiser along the path of the Weiser River. Pls.' Class Cert. Brief, Exhibit 3. A revised map of the final location of this segment of the rail line was filed in 1899. Id. This revised map includes a sworn statement attesting to its accuracy and indicating that the map "has been prepared to be filed in order to obtain the benefits of Congress approved March 5, 1875 entitled an act granting to railroads the rights of way through public lands of the United States." Id. Another map showing the location of the second 20 miles of the line was also filed in 1899. Id., Exhibits 2 & 4. See also Amended Class Action Compl., ¶¶ 6-7 (Dec. 17, 1999)

---

[1]The Pacific and Idaho Northern Railway and its predecessors and successors in interest are referred to throughout this statement of facts and Defendant's summary judgment brief as simply the "Railroad."

(Doc. 16).

5. The maps filed by the Railroad with the Department of the Interior were approved by the authorized federal officials. Pls.' Class Cert. Brief, Exhibits 2-4; Amended Class Action Compl., ¶ 7 (Dec. 17, 1999) (Doc. 16).

6. Construction of the Railroad's line commenced and reached Cambridge in December 1900, Council in March of 1901, and Meadow Valley or "New Meadows" in 1911. Pls.' Class Cert. Brief at 4 (citing various sources).

7. In 1916, the Railroad filed a schedule of Lands Owned or Used for Purposes of a Common Carrier with the ICC. Pls.' Class Cert. Brief, Ex. 6; Amended Class Action Compl., ¶¶ 10-11 (Dec. 17, 1999) (Doc. 16). A review of this schedule shows that the right-of-way from Weiser to New Meadows consisted of approximately 192 original parcels and 1,689 acres. Of this total, approximately 895 acres were acquired under the 1875 Act. Pls.' Class Cert. Brief, Ex. 6 (copy of the schedule); Pls.' Class Cert. Brief at 5; Amended Class Action Compl., ¶¶ 10-11 (Dec. 17, 1999) (Doc. 16).

8. The segments of the subject right-of-way that were acquired by the Railroad under the 1875 Act have been identified by the parties in Category 1. Doc. 93.

9. On March 17, 1995, citing the closure of a Boise Cascade sawmill in Council and an anticipated loss of 75% of the rail traffic on the Weiser to New Meadows line, the Railroad filed a petition with the STB seeking an exemption under 49 U.S.C. § 10505 from the prior approval requirements of 49 U.S.C. § 10903-04 to abandon the 83.1-mile line. Def. Ex. 8, pp. 1-3; Amended Class Action Compl., ¶ 12 (Dec. 17, 1999) (Doc. 16).

10. By a decision served on November 1, 1995, the ICC granted the Railroad's

petition, subject to several conditions. Def. Ex. 9, pp. 1-5; Amended Class Action Compl., ¶ 13 (Dec. 17, 1999) (Doc. 16).

11. Several groups filed requests for the issuance of a NITU, along with "Statements of Willingness to Assume Financial Responsibility" for the right-of-way were later filed by the City of Weiser and by the Friends of the Weiser River Trail, and the Railroad indicated it was willing to negotiate a Trails Act agreement. Def. Ex. 10 Def. Ex. 9, p 8.

12. On December 28, 1995, the ICC issued a NITU that: (1) authorized the Railroad to discontinue its use of this right-of-way; (2) "railbanked" or preserved the right-of-way for future railroad use; and (3) authorized the right-of-way to be used – in the interim – as a recreational trail. Def. Ex. 9, pp. 6-7; Amended Class Action Compl., ¶ 13 (Dec. 17, 1999) (Doc. 16).

13. The Railroad reached a Trails Act agreement with the Friends of the Weiser River Trail ("FWRT"), and quitclaimed its interest in the subject right-of-way to FWRT on June 17, 1997. Pls.' Class Cert. Brief, Ex. 10; Amended Class Action Compl., ¶ 15 (Dec. 17, 1999) (Doc. 16). Subject to the Trails Act and the conditions set forth in the NITU, the right of way is presently owned and operated by FWRT and is known as the "Weiser River Trail." Pls.' Class Cert. Brief, Ex. 10; Def. Ex. 9, pp. 6-7. See generally http://www.weiserrivertrail.org.

//

//

//

//

Dated: June 9, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

/s/ Kristine S. Tardiff
E-Mail: kristine.tardiff@usdoj.gov

---

KRISTINE S. TARDIFF (NH Bar No. 10058)
United States Department of Justice
Environment & Natural Resources Division
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577

<u>OF COUNSEL</u>:

HELENANNE LISTERMAN
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Division
P.O. Box 663
Ben Franklin Station
Washington, DC 20044-0663
TEL: (202) 305-0239
FAX: (202) 305-0506

ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Washington, D.C. 20423

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of June, 2006, I electronically filed the foregoing **Defendant's Proposed Findings of Uncontroverted Fact in Support of Its Motion for Summary Judgment With Respect to Category 1** through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Cecilia Fex, Attorney for Plaintiffs
fex@ackersonlaw.com

Nels J. Ackerson, Attorney for Plaintiffs
nels@ackersonlaw.com

Lary C. Walker
walkerlaw_bk@ruralnetwork.net

/s/ Kristine S. Tardiff
E-mail: kristine.tardiff@usdoj.gov