Kristine S. Tardiff
NH Bar No. 10058
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
53 Pleasant Street, 4th Floor
Concord, NH 03301
TEL: (603) 230-2583
FAX: (603) 225-1577
EMAIL: kristine.tardiff@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*, | |
| Plaintiffs, | Case No. CV99-324S-MHW |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**DEFENDANT'S APPENDIX OF EXHIBITS
FILED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING
MEMORANDUM AS TO THE CATEGORY 1 LANDS**

DATED: JUNE 9, 2006

## INDEX TO EXHIBITS CITED IN DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO CATEGORY 1

**New Exhibits Included in this Appendix:**

| Defendant's Exhibit No.[1] | Description |
|---|---|
| 7 | A History of the Council Valley Area, Adams County Historic Preservation Commission (available at http://www.adamscountyhistory.org/history.htm) |
| 8 | Excerpt of Petition for Exemption filed with the ICC by Idaho Northern & Pacific Railroad Company, pp. 1-5 and Exhibits A & C. |
| 9 | ICC Decisions issued in Idaho Northern & Pacific Railroad Co. – Abandonment and Discontinuance Exemption – in Washington and Adams Counties, ID, Docket No. AB-433 (Sub. No. 2X):<br><br>Decision of November 1, 1995;<br>Decision of December 28, 1995 (NITU);<br>Decision of July 5, 1996;<br>Decision of April 1, 1998.<br><br>NOTE: All dates listed are the service dates for the decisions. |
| 10 | Statements of Willingness to Assume Responsibility filed by: Idaho Department of Parks and Recreation (dated June 10, 1996); City of Weiser, Idaho (dated June 13, 1996); and Friends of the Weiser River Trail (dated June 20, 1996). |

[1]These exhibits begin with Defendant Exhibit 7. Defendant's Exhibits 1-4 are included in the Appendix filed on June 1, 2001 (Doc. 82), and Defendant's Exhibits 5-6 are included in a Supplemental Appendix filed on January 20, 2006 (Doc. 122).

**Exhibits previously filed with Plaintiffs' Memorandum in Support of Their Motion for Class Certification (December 17, 1999) (Doc. 18):**

| | |
|---|---|
| Plaintiffs' Exhibit 1 | Adams County History,<br>Council Valley Museum, 1998 |
| Plaintiffs' Exhibits 2-4 | Location maps filed with the General Land Office of the Department of the Interior by the Pacific and Idaho Northern Railway in 1894 and 1899 |
| Plaintiffs' Exhibit 6 | Schedule of Lands Owned or Used For Purposes of a Common Carrier, filed with the ICC by Pacific & Idaho Northern Ry., dated July 13, 1916 |
| Plaintiffs' Exhibit 10 | Quitclaim Deed from the Railroad to the Friends of the Weiser River Trail, dated June 17, 1997. |

# A History of the Council Valley Area

## A Place of Native American Gatherings

Before non-native settlement began in the Council Valley, the area was inhabited by small bands of Shoshoni Indians. Pioneers who frequented the Council Valley in those early days told of huge groups of Indians who gathered here from all over the Northwest.

Perry Clark, a member of the Idaho Territorial Legislature and later an Indian Valley schoolteacher, described what he saw near the present town of Council. He said that from on top of the little hill just north of present-day downtown, he could see ". . . many hundreds of Indians and thousands of head of Indian horses at one sight, literally covering the valley as a blanket."

Clark never actually lived here, but he named the place "Council Valley" because of these gatherings that he interpreted as being Indian "council" meetings. It is hard to tell just how long such native gatherings had been held here. The festivals seem to have peaked about 1872 when a total of about 2,500 Indians gathered here.

## Western Emigrants Reach the Weiser River

In the mid-1860s, a loop in the Oregon Trail to Olds Ferry began bringing large numbers of emigrants through the new town of Weiser, at the mouth of the river it was named after. Travelers on the Oregon Trail must have felt like the children of Israel wandering in the desert after months of traveling through mostly desolate, sagebrush wasteland.

By the time they got this far west it was late in the season, and the bone-dry countryside was only occasionally punctuated by feeble strips of green along its rivers. As they trudged along week after week they must have grown weary of seeing land that was devoid of trees other than scattered juniper.

When they reached the mouth of the Weiser River the scenery was still the same depressing desert drab, but far off to the north they caught tantalizing glimpses of forest-clad mountains. The word that there were lush valleys along the Weiser River piqued their interest.

With the winding down of Indian wars in the Northwest in 1868, some travelers decided to end their journey at the Weiser River. By this time most of the best land in Oregon had already been claimed. More than a few families continued on to Oregon, but then

To Mann Creek and Beyond

Mann Creek, a tributary of the Weiser River, formed the first farmable valley north of the Weiser area. The main travel route north from Weiser, to Mann Creek and beyond, followed an old Indian trail; it went up Monroe Creek, over into Mann Creek, and on over the hill into Middle Valley. From very early on, wagon roads followed this trail to reach the upper Weiser River valleys. This general route is still followed by Highway 95 today.

The next valley up the Weiser River acquired the name "Middle Valley" because it was between the upper and lower valleys along the river. The first settlers came here in 1868, but the actual town of Midvale wasn't officially established until 1909. The first bridge across the Weiser River (other than the one at its mouth) was built at Midvale near the site of the present bridge. The first road to points north crossed the river here and proceeded through the hills to the northeast.

**Salubria and Indian Valley**

The next valley up the river was where the Little Weiser River entered the main Weiser. This vicinity also began to be settled about 1868. It was named "Salubria Valley" because the location was said to be "salubrious," meaning "pleasant and beneficial to ones health." The community of Salubria was established where the first wagon road entered the valley from the south--a little over a mile southeast of the present site of Cambridge.

Salubria was granted a post office in 1870. The forming of an actual town began with the first store, which was erected in 1885. Salubria was the only town in that vicinity until Cambridge was established along the railroad when the tracks reached the valley in 1900. Almost no remnant of Salubria remains to mark the spot today.

North of Salubria, the main Weiser River entered mostly narrow canyons with little farmable land. As a result, settlement followed the more open valleys along Little Weiser River to the northeast. About ten miles from Salubria a large basin formed. It was called "Indian Valley" because the Weiser Shoshoni often wintered there. Indian Valley began to be settled at about the same time as the Salubria Valley (1868).

To the east of Indian Valley the terrain swept up into a high mountain range that ran north and south, separating the Weiser River drainage from Long Valley. To the north, the Middle Fork of the Weiser tumbled west to the main river, slashing steep breaks along its course. This challenging obstacle to wagon travel farther north is probably why settlement of the Council Valley lagged behind that of the lower valleys.

**The"Upper Country"**

In those early days the Salubria and Indian valleys, and even Middle Valley, were referred to as the "upper Weiser," "the upper valleys" or the "upper country." The Council and Meadows Valleys were later included as part of the upper country. Early upper-country residents referred

to the Weiser area as the "lower country." This tradition continues today, and the terminology has evolved further. Newcomers hearing an upper-country person say they are going "down below" are often confused until it is explained that this generally indicates a trip to anywhere between Weiser and Boise



Fall colors along the Weiser River

## Weiser River Trail

In the earliest days of Idaho settlement, a trail up the Weiser River through the Council Valley became the principal avenue of travel for pack trains carrying supplies from Boise to the gold camps at Warren and Florence. This route was easier to travel than the more direct but torturous terrain along the Payette River. The Weiser River trail was also clear of snow earlier in the spring.

## Early Settlers

Although it would be almost another decade before the Council Valley would be settled, it did acquire at least one non-native occupant in 1868: a 32 year old bachelor named Henry Childs. He built a home and did some farming about 2.5 miles up Hornet Creek from the present site of Council. Hornet Creek was named after a nasty encounter that Childs had with a nest of hornets while he was clearing brush. Before it had any other name, the Council area was called "Hornet Creek" or "Hornet Valley" as it was the place where Hornet Creek entered the Weiser River.

George and Elizabeth Moser and their children became the first white family to settle in the Council Valley in 1876. Their homestead later became the location of the town of Council. The Moser cabin was located just across the corner southwest of the present Ronnie's Market.

By 1880 the Meadows Valley had a few settlers. Like the Council Valley, there were a few bachelors living there before Calvin and Lydia White and their children became the first family to arrive in the fall of 1877. By 1883 Cal White had established a post office at Meadows and generally become the founding father of the community.

## The Railroad, Copper and Gold

Construction of the railroad up the Weiser River brought a boom to the town beginning in 1898. For a couple of years Council was a "wide open" town, with about six saloons. The arrival of the tracks in March of 1901 shortened the trip to Weiser from a bone-jarring two-day trip each way in a wagon to a matter of two or three hours in the comfort of a passenger car. Copper ore from the Seven Devils mines that had previously been hauled over 100 miles

to Weiser was now loaded onto rail cars at Council.

When the Thunder Mountain mining boom came in 1902, Council was the nearest rail town to the gold strike and became the "jumping off point" for that gold rush. Writer Earl Wayland Bowman arrived in Council that summer, and described it as a bustling, dirty little town with money flowing like water.



The Council Valley

## Livestock, Farming, Mining - and Orchards

Council soon became more civilized, and the town of officially incorporated January 20, 1903. By about 1905 the town had a population of about 1,000. The area continued to boom throughout the first decade of the twentieth century. Cattle, sheep, farming and mining formed the core of the economy. About 1907 the fruit industry began in the Council area on a large scale. The most famous of the orchards in the area were those of the Mesa Orchards Company, eight miles south of Council. At its peak the company had just over 1,200 acres growing various fruit trees (mostly apples) and was one of the biggest orchards in the world.

## From Hitching Racks to Electricity

Until 1913 Council's town square was used as a place to tie horses and park wagons. That year the hitching racks all around the square were taken out for "sanitary and appearance reasons." One can only imagine the "ambiance" of the square during constant use by dozens of horses.

In 1915 the town suffered its worst fire, and lost many of the buildings of its downtown core. An ordinance was passed requiring new buildings to be made of brick. Most of the present brick structures in downtown Council were built right after the 1915 fire. The new buildings were wired for electricity that reached the town that year.

## Economic Ups and Downs

The 1920s brought hard times to the Council area. The mining boom had gone bust, and the area was hit hard by the national agricultural depression that followed World War I. By 1929 Council had a population of about 500.

The economy of the area started to improve in 1939 when the Boise-Payette lumber company built a sawmill in Council and started logging operations in the surrounding mountains. The town experienced a boom and a housing shortage. A new high school was finished in 1941, just about the time the U.S. jumped into World War II.

For several decades after the War, life and the economy in the Council area were stable, with logging and ranching as its core industries. In the 1980s timber-related jobs began to decline, and the Council sawmill closed March 31, 1995.

© 2002 Adams County Historic Preservation Commission, Council ID. All rights reserved
About Us | Funding Info | History | Projects | Photo Gallery | Guest Book | Links
Home Contact Us Privacy Policy
Web Design by High Desert Design, Nampa, ID

3-17-95

0/00566001

ORIGINAL

BEFORE THE

INTERSTATE COMMERCE COMMISSION

---

DOCKET NO. AB - 433 (Sub-No. 2X)

---

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY

ABANDONMENT IN WASHINGTON AND ADAMS COUNTIES, IDAHO

PETITION FOR EXEMPTION
UNDER 49 U.S.C. 10505

FILED
17 1995

1995

ROBERT A. WIMBISH
REA, CROSS & AUCHINCLOSS
1920 N Street, N. W.
Washington, D. C. 20036
(202) 785-3700

Counsel for Petitioner
Idaho Northern & Pacific
Railroad Company

LICENSING BRANCH
Mar 20 10 20 AM '95
RECEIVED
OFFICE OF THE SECRETARY

OF COUNSEL:

REA, CROSS & AUCHINCLOSS
Suite 420
1920 N Street, N. W.
Washington, D. C. 20036

DATED: March 17, 1995

Blendu v. US, No. 01-718L (Fed. Cl.)
Joint Motion for Summary Judgment
With Respect to the 1875 Act Lands
Exhibit 3, Page 9

BEFORE THE

INTERSTATE COMMERCE COMMISSION

---

Docket No. AB - 433 (Sub-No. 2X)

---

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY

ABANDONMENT AND DISCONTINUANCE OF TRACKAGE RIGHTS

IN WASHINGTON AND ADAMS COUNTIES, IDAHO

PETITION FOR EXEMPTION

UNDER 49 U.S.C. 10505

---

INTRODUCTION

Pursuant to 49 U.S.C. 10505, the Idaho Northern & Pacific Railroad Company ("IN&P" or "Petitioner"), a class III shortline railroad, seeks an exemption from 49 U.S.C. 10903-10904, permitting it to (1) discontinue service over and abandon approximately 83.1 miles of railroad (hereinafter "The Line") located between railroad milepost 1.0 near Weiser and railroad milepost 84.1 at Rubicon, all in Washington and Adams Counties, Idaho; (2) discontinue trackage rights over a line of railroad currently owned and operated by the Union Pacific Railroad Company between milepost 0.0 and milepost 1.0 in Weiser, ID.

As shown herein, the demand for rail service is soon expected to decline to minimal levels, and the revenues generated from continued rail service on The Line will not justify the

capital and maintenance costs that will be required to maintain safe track conditions. A copy of this Petition has been served on the remaining active shippers located on The Line -- Amerigas at Rubicon, ID; Evergreen Forest Products at Tamarack, ID; and Idaho Power (one-time shipper) -- as well as the affected political subdivisions.

Petitioner submits as Exhibit A a scale map showing The Line and its relationship to cities, towns, nearby rail lines and highways. Petitioner also submits as Exhibit B an Environmental and Historic Report showing the abandonment's impacts, if any, on the environment.

Petitioner requests that its Petition be granted within 120 days of filing, with the decision effective within 15 days of service.

STATEMENT OF FACTS

The Line IN&P seeks to abandon is a 83.1 mile segment of an approximately 84.1 mile light density stub branch line which IN&P acquired from the Union Pacific Railroad Company in 1993. (The remaining one mile of this 84.1 mile branch -- between milepost 0.0 and 1.0 in Weiser, ID -- is owned and served by the Union Pacific Railroad. IN&P seeks to discontinue trackage rights it possesses over this one mile line segment.) The Line presently passes through sparsely populated timber areas and the farther canyon reaches of the Weiser River Valley, as well as farmland and ranchland in Washington and Adams Counties, ID. It serves the communities of Weiser, Midvale, Cambridge and Council with

respective populations of approximately 4,571: 136; 374; and 831. The stations served on The Line are Presley (MP 19.1), Concrete (MP 19.1), Midvale (MP 31.8), Cambridge (MP 40.5), Mesa (MP 56.6), Council (MP 60.1), Tamarack (MP 81.8), and Rubicon (MP 84.1) in the Counties of Washington and Adams, Idaho. Of these stations, Presley, Concrete, and Mesa currently see no commercial activity.

IN&P is a class III shortline rail carrier established in 1993 to purchase and operate light density rail lines in the States of Idaho and Oregon. IN&P obtained authority to acquire The Line (and the other portions of its system) pursuant to FD No. 32370, Idaho Northern & Pacific Railroad Company -- Purchase, Lease and Operation Exemption -- Union Pacific Railroad Company (not printed, served [illegible]ember 7, 1993).

Petitioner seeks to abandon The Line due to recent events that will result in dramatic reductions in carload traffic, and consequently, serious financial losses to IN&P. Specifically, on or about March 31, 1995, Boise Cascade Corporation ("BCC"), the largest shipper on The Line, will terminate operations at its Council, ID lumber facility. (See Exhibit C -- Letter and press release from Boise Cascade Corp.) As a result of this plant closing, Petitioner projects that it will suffer an approximate 75% reduction in rail traffic over The Line. Petitioner submits as Exhibit D evidence indicating shippers' use of The Line for the years 1992 to 1994. As the 1994 figures demonstrate, without

BCC traffic, carloadings over The Line will decline from 1,881 in 1994 to a projected 480 in calendar year 1995. At projected 1995 levels, Petitioner would handle approximately 5.78 cars per mile per year on The Line.[1] The area served by The Line is generally mountainous and rural, and has little potential for industrial development.

The Line is currently operated as FRA class II track, and is in standard operating condition. However, Petitioner anticipates that, due to the rugged terrain surrounding it and the remote territory through which it runs, The Line will require substantial maintenance even to keep the line to Class I track conditions. Revenues from projected traffic levels will not cover maintenance and operating costs, with the result that Petitioner will suffer serious losses on this soon-to-be unprofitable line.

Simultaneous with this filing, Petitioner is serving a copy of this Petition on the remaining on-line customers, local planning agencies, representatives of the affected political subdivisions and the appropriate agencies in the State of Idaho.

---

[1] Evergreen Forest Products ("Evergreen"), the largest shipper after BCC, shipped 499 cars during the course of 1994. Unfortunately, Evergreen is located in Tamarack, Idaho -- approximately 82 rail miles from IN&P's connection with the Union Pacific Railroad at Weiser, Idaho. Thus, considering the operating costs associated with moving about 500 cars annually over 82 miles of railroad, abandonment of the Line for only that portion of the Line beyond the Evergreen facility is not an economically practical alternative.

Petitioner is willing to negotiate with responsible parties concerning continued operations over the line by a third party. Similarly, petitioner is also willing to negotiate subsidy proposals to ensure continued service over the line. Petitioner will continue to consider such proposals until such time as the Commission issues a decision in this proceeding.

Several transportation alternatives are available to the remaining on-line customers. As the attached map shows, the affected area is served by a network of federal highways and state roads, including US Highway 95 and Idaho State Roads 55 and 71 (Exhibit A). Petitioner has reason to believe that shippers on The Line already utilize trucks for a portion of their transportation needs.

The track structure consists primarily of a combination of 131 and 133 pound rail. Due to current weather conditions in that portion of the country, Petitioner has not been able to re-evaluate the condition of the rail to determine what portion may be suitable for re-use.

Based on information in our possession, the line does not contain federally granted right-of-way. Any documentation in petitioner's possession will be made available promptly to those requesting it.

Case 1:99-cv-00072-EJL-MHW Document 301-5 Filed 10/09/2008 Page 15 of 34




Bledsoe v. US, No. 0[illegible] (Fed. C[illegible]
Joint Motion for Summary Judgme[illegible]
With Respect to the 1875 Act La[illegible]
Exhibit 5, Page[illegible]

000052

# News Release

Boise Cascade Corporation

Contact: Barry Chapman or Robert Hayes

(Office) (208) 365-4431 (Office) (208) 384-7675
(Home) (208) 939-~~1456~~ (Home) (208) 345-9863

FOR IMMEDIATE RELEASE: January 20, 1995

COUNCIL, Idaho -- Boise Cascade's Timber and Wood Products Division announced today that it will permanently close its Council, Idaho, sawmill on March 31, 1995. The mill currently employs 56 people.

Jim Weathers, manager of Idaho Region operations for the division, said that changes in available timber supply require a consolidation of the company's wood products manufacturing in this area. "Timber being sold from federal lands in the region is of a much smaller diameter today, and total sales volumes are declining," Weathers said. "For our Idaho wood products manufacturing operations to remain viable into the future, consolidation is unavoidable.

"The Council mill was not designed to process today's small logs," Weathers said. "We have invested $3.2 million to improve the Council mill in recent years, but given the disappointing timber supply outlook, additional investments are not justified."

Weathers said that several factors have contributed to the changes in southwest Idaho timber supply. Federal

-more-

timber sale programs on national forests have declined due to administrative appeals and lawsuits brought by environmental organizations and by changes in federal programs. This trend began on forests west of the Cascade Range and has now rippled into Idaho. Weathers added that widespread forest health problems in the Boise and Payette National Forests have diminished the productivity of those lands.

With the consolidation, Boise Cascade will reduce its number of Idaho sawmills from three to two. Weathers said that a third shift will be added at the company's Cascade, Idaho, sawmill, which efficiently processes small logs. Council mill employees will be given consideration for an estimated 14 jobs created by the start-up of the third shift at Cascade.

All other Idaho operations of Boise Cascade's Timber and Wood Products Division will continue. They include the Cascade sawmill, the sawmill and specialty pine board plant at Horseshoe Bend, and plywood, lumber, planing, and Glu-lam beam and decking plants at Emmett. The company also operates an electrical cogeneration plant at Emmett. These remaining operations employ 620 people. Boise Cascade also owns 196,000 acres of forestland in Idaho, which supplement the company's purchases of timber from other sources.

# # #

EC

INTERSTATE COMMERCE COMMISSION

DECISION

Docket No. AB-433 (Sub-No. 2X)

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY--ABANDONMENT AND DISCONTINUANCE EXEMPTION--IN WASHINGTON AND ADAMS COUNTIES, ID

Decided: October 23, 1995

By petition filed March 17, 1995, Idaho Northern & Pacific Railroad Company (IN&P or petitioner), a class III railroad, seeks an exemption under 49 U.S.C. 10505 from the prior approval requirements of 49 U.S.C. 10903-04 to: (1) abandon approximately 83.1 miles of rail line between milepost 1.0 near Weiser and milepost 84.1 at Rubicon, in Washington and Adams Counties, ID; and (2) discontinue trackage rights over a rail line currently owned and operated by Union Pacific Railroad Company between milepost 0.0 and milepost 1.0 in Weiser, ID. The Railway Labor Executives' Association seeks labor protective conditions. The State of Idaho, Department of Parks and Recreation (IDPR), requests that we issue a Notice of Interim Trail Use (NITU) and impose a public use condition. We will grant the petition subject to standard labor protective conditions, environmental conditions, and a public use condition.

The line proposed for abandonment is an 83.1-mile segment of an approximately 84.1-mile light density stub branch which IN&P acquired from Union Pacific Railroad Company (UP) in 1993. IN&P states that the line passes through sparsely populated timber areas and canyons as well as farmland and ranchland in Washington and Adams Counties. The line serves the communities of Weiser, Midvale, Cambridge and Council, ID.

IN&P states that there are currently three shippers on the line: Amerigas; Evergreen Forest Products; and Idaho Power. According to IN&P, the largest shipper on the line, Boise Cascade Corporation (BCC), is terminating its operations at Council in March of 1995. IN&P asserts that, as a result of this closing, IN&P will suffer an approximately 75 percent reduction in rail traffic, declining from 1,881 carloads in 1994 to 4[illegible] carloads in 1995.

IN&P states that it is currently operating the line as Federal Railroad Administration class 2 track. However, due to the rugged terrain and remote territory surrounding the line, IN&P anticipates that the line will require substantial maintenance even to maintain it at class 1 condition. The area served by this line is generally mountainous and rural, according to IN&P, and has little potential for industrial development.

[illegible] requests that the Commission make the exemption effe[illegible] days of service and that the petition be gra[illegible]. IN&P states that this request is made due to [illegible] rating losses it will incur in meeting its [illegible]tions.

DISCUSSION AND CONCLUSION

[illegible] Under 49 U.S.C. 10903-04, a rail carrier may not abandon, [illegible] scontinue service over a rail line without prior Commission approval. Under 49 U.S.C. 10505, however, we must exempt a transaction or service from regulation when we find that: (1) continued regulation is not necessary to carry out the rail transportation policy of 49 U.S.C. 10101a; and (2) either (a) the transaction or service is of limited scope, or (b)

regulation is not necessary to protect shippers from market power abuse.

Detailed scrutiny under 49 U.S.C. 10903-04 is not necessary to implement the rail transportation policy. By minimizing the administrative expense and attendant delay of the application process, an exemption will expedite regulatory decisions and reduce regulatory barriers to exit [49 U.S.C. 10101a(2) and (7)]. In addition, an exemption will foster sound economic conditions and encourage efficient management by permitting IN&P expeditiously to avoid the cost of operating and maintaining an uneconomic line [49 U.S.C. 10101a(3), (5), and (10)]. Other aspects of the rail transportation policy will not be adversely affected.

While the transaction arguably is limited in scope, involving only the unopposed abandonment of a light density, rural branch line and discontinuance of trackage rights over a 1-mile line segment owned by UP, we need not make that determination. Clearly, regulation here is not necessary to protect shippers from an abuse of market power. The IN&P has certified to us that it has served copies of its petition on all the shippers on the line. None has objected to the proposed abandonment. IN&P has asserted that one of the shippers is closing its plant or has done so already, and that the remaining shippers using the line have alternative means of transportation available. To ensure that the shippers are informed of our action, we will require IN&P to serve them with a copy of this decision within 5 days after the service date and to certify to us that it has done so.

Under 49 U.S.C. 10505(g), we may not use our exemption authority to relieve a carrier of its statutory obligation to protect the interests of its employees. Accordingly, as a condition to granting this exemption, we will impose the employee protective conditions in Oregon Short Line R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979).

IN&P has submitted an environmental report with its petition and has notified the appropriate Federal, state, and local agencies of the opportunity to submit information concerning the energy and environmental impact of the proposed action. See 49 CFR 1105.11. Our Section of Environmental Analysis (SEA) has examined the environmental report, verified its data, and analyzed the probable effects of the proposed action on the quality of the human environment.[1] Based upon SEA's recommendations, we conclude that the proposed abandonment, if implemented, subject to the conditions discussed below, will not significantly affect the quality of the human environment or conservation of energy resources.

The Idaho State Historic Preservation Officer has not completed the section 106 review process of the National Historic Preservation Act, 16 U.S.C. 470f. SEA recommends that IN&P retain its interest in and take no steps to alter the historic integrity of all structures that are 50 years old or older until completion of the section 106 process. This condition will be imposed.

Because the U.S. Fish and Wildlife Service (FWS) has not yet determined the effect, if any, that the proposed project would have on the Bald Eagle (Haliaeetus leucocephalus), FWS recommends that no salvage activities take place in the area from December 1

---

[1] SEA's environmental assessment was served on May 19, 1995.

through February 15th. SEA recommends that this condition be imposed, and we will do so.

The Idaho Division of Environmental Quality (DEQ) has expressed concern that salvage activities may have an impact on water quality. DEQ recommends that IN&P implement best management practices in order to reduce impacts on water quality during salvage activities. SEA also recommends that this condition be imposed, and we will do so.

<u>Trail use</u>. SEA indicates in its environmental assessment that the right-of-way may be suitable for alternative public use after abandonment, including trail use. IDPR requests imposition of interim trail use/rail banking under the National Trails System Act, 16 U.S.C. 1247(d) (Trails Act), and has submitted a statement of willingness to assume financial responsibility for the right-of-way as required at 49 CFR 1152.29. Under 49 CFR 1152.29(b)(5), the abandoning railroad must file a written response to a trail use request (serving a copy on the requester, of course) within 10 days after the request is filed. IN&P has not responded.[2]

Because the Trails Act permits only voluntary trail use, the Commission may not issue an NITU at this time. <u>See Rail Abandonment--Use of Rights-of-Way as Trails</u>, 2 I.C.C.2d 591 (1986). IDPR need not refile its request with the Commission. Qualified entities other than IDPR may file requests for interim trail use/rail banking within the 10-day period prescribed below. 49 CFR 1152.29(a). IN&P shall respond to all requests filed. 49 CFR 1152.29(b)(5). The Commission will consider all trail use requests in a subsequent decision.

<u>Public use</u>. As an alternative to trail use, IDPR requests imposition of a public use condition under 49 U.S.C. 10906 barring IN&P from disposing of bridges, trestles, culverts, tunnels, and related structures on the right-of-way for 180 days. IDPR states that the corridor in question provides a multi-use trail for recreational purposes. The corridor is located in a scenic area that has a diverse environment ranging from desert canyons to high alpine meadows. IDPR indicates that the full 180 days is required so that it may review title information, complete a trail plan, and successfully negotiate with IN&P.

IDPR has met the public use criteria by specifying: (1) the condition sought; (2) the public importance of the condition; (3) the desired duration of the condition; and (4) justification for the time sought. 49 CFR 1152.28(a)(2). A 180-day public use condition will be imposed, commencing with the effective date of this decision and notice. The public use negotiating period may not be extended.

A public use condition is not imposed for the benefit of any one potential user, but rather to provide an opportunity for any interested person to acquire a right-of-way that has been found suitable for public purposes, including trail use. Accordingly, we shall provide a period of 20 days after publication in the

---

[2] Although IDPR certifies that it served its request on IN&P at 4420 West Vickery Blvd., #110, Fort Worth, TX 76107, IN&P's representative, Robert A. Wimbish, has informed Commission staff that he has not received a copy. IDPR will be ordered to serve a copy of its request on Mr. Wimbish at REA, CROSS & AUCHINCLOSS, Suite 420, 1920 N Street, N.W., Washington, DC 20036, within 5 days after the service date of this decision. IDPR should serve a copy of any future filings in this proceeding on Mr. Wimbish at his business address. 49 CFR 1104.12(a).

Federal Register of notice of the exemption for interested persons to request a public use condition.

Financial assistance. An offer of financial assistance (OFA) to continue rail freight service under 49 U.S.C. 10905 takes precedence over both the interim trail use/rail banking and the public use procedures. Accordingly, if a statement of intent to file an OFA is timely filed under 49 CFR 1152.27(c)(2), the effective date of this decision will be postponed for 10 days beyond the effective date set forth below. In addition, the effective date may be further postponed at later stages of the OFA process. 49 CFR 1152.27(e)(2) and (f). Finally, if the line is sold under the OFA procedure, the petition for exemption will be dismissed and public use and trail use opportunities (if any) arising out of this proceeding would end. If, on the other hand, the OFA procedure is terminated without a sale, the public use and trail use procedures could proceed.

Effective date. Because the petitions are unopposed, we will permit IN&P to discontinue service immediately. But in order to permit the section 10905 and Trails Act processes to go forward, we will authorize abandonment on the customary 30 days' notice. Because we are imposing a public use condition, IN&P would not be able to salvage the track in any event.

It is ordered:

1. Under 49 U.S.C. 10505, we exempt from the prior approval requirements of 49 U.S.C. 10903-04 the abandonment by IN&P of the above-described 83.1-mile line and the 1-mile discontinuance of trackage rights, subject to the following conditions: (1) the employee protective conditions in Oregon Short Line R. Co.--Abandonment--Goshen, 360 I.C.C. 91 (1979); (2) the condition that IN&P retain its interest in and take no steps to alter the historic integrity of all structures on the line that are 50 years old or older until completion of the section 106 process of the National Historic Preservation Act, 16 U.S.C. 470f; (3) IN&P shall not conduct salvage activities in the area from December 1 through February 15 and shall consult with the U.S. Fish and Wildlife Service prior to commencing salvaging activities on the line and report the outcome of its consultation to the Commission's Section of Environmental Analysis; (4) IN&P shall implement best management practices in order to reduce impacts on water quality during salvage activities; and (5) IN&P shall keep intact all the right-of-way underlying the track, including bridges, culverts, and similar structures (but not track or track materials) for a period of 180 days from the effective date of this decision to enable any state or local government agency, or interested person, to negotiate the acquisition of the right-of-way for public use.

2. IDPR shall serve a copy of its trail use/public use request on Robert A. Wimbish, at REA, CROSS & AUCHINCLOSS, Suite 420, 1920 N Street, N. W., Washington, DC 20036, within 5 days after the service date of this decision. IN&P shall respond to that request within 20 days after the service date of this decision.

3. IN&P must serve a copy of this decision on each of the shippers on the line within 5 days after the decision is served, and certify to the Commission that service has been effected.

4. Notice will be published in the Federal Register.

5. Provided no formal expression of intent to file an offer of financial assistance has been received, this exemption will be effective on December 1, 1995, except that IN&P may discontinue

service on the line and may discontinue trackage rights immediately.

6. Formal expressions of intent to file an offer of financial assistance under 49 CFR 1152.27(c)(2)[3] and requests for NITU/rail banking under 49 CFR 1152.29 must be filed by November 13, 1995. Petitions to stay must be filed by November 16, 1995. Requests for a public use condition must be filed by November 21, 1995. Petitions to reopen must be filed by November 27, 1995.

7. If a formal expression of intent to file an offer of financial assistance has been timely filed, an offer of financial assistance to allow rail service to continue must be received by the railroad and the Commission within 30 days after publication, subject to the time extensions authorized under 49 CFR 1152.27(c)(2)(ii)(C) and (D). The offeror must comply with 49 U.S.C. 10905 and 49 CFR 1152.27(c)(2).

8. Offers of financial assistance and related correspondence to the Commission must refer to this proceeding. The following notation must be typed in bold face on the lower left-hand corner of the envelope: "**Office of Proceedings, AB-OFA.**"

By the Commission, Chairman Morgan, Vice Chairman Owen, and Commissioners Simmons and McDonald. Commissioner McDonald did not participate in the disposition of this proceeding.

(SEAL)

Vernon A. Williams
Secretary

---

[3] See Exempt. of Rail Abandonment--Offers of Finan. Assist., 4 I.C.C.2d 164 (1987).

SERVICE DATE
DEC 28 1995

INTERSTATE COMMERCE COMMISSION

DECISION AND NOTICE OF INTERIM TRAIL USE

Docket No. AB-433 (Sub-No. 2X)

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY--ABANDONMENT AND DISCONTINUANCE EXEMPTION--IN WASHINGTON AND ADAMS COUNTIES, ID

Decided: December 21, 1995

Idaho Northern & Pacific Railroad Company (IN&P) filed a petition for exemption under 49 U.S.C. 10505 from the prior approval requirements of 49 U.S.C. 10903-04 to: (1) abandon approximately 83.1 miles of rail line between milepost 1.0 near Weiser and milepost 84.1 at Rubicon, in Washington and Adams Counties, ID; and (2) discontinue trackage rights over a rail line currently owned and operated by Union Pacific Railroad Company between milepost 0.0 and milepost 1.0 in Weiser, ID. By decision served November 1, 1995, an exemption was granted, subject to standard labor protective, environmental, and public use conditions. The exemption became effective December 1, 1995.

The Commission's Section of Environmental Analysis (SEA) issued an environmental assessment (EA) on May 16, 1995, indicating that an evaluation of the potential impact of this project on historic resources has not been completed. SEA recommends that a condition be imposed requiring IN&P to retain its interest in and take no steps to alter the historic integrity of all sites and structures on the line that are 50 years old or older until completion of the section 106 process of the National Historic Preservation Act, 16 U.S.C. 470f. The condition will be imposed as recommended.

On June 26, 1995, the Idaho Department of Parks and Recreation (IDPR) had filed a request for a notice of interim trail use (NITU) under the National Trails System Act, 16 U.S.C. 1247(d) (Trails Act) as well as for public use under 49 U.S.C. 10906. IDPR submitted a statement of willingness to assume financial responsibility for the right-of-way as required at 49 CFR 1152.29. As noted, the Commission imposed a public use condition in its November 1 decision, and the 180-day public use negotiating period commenced on December 1, 1995. Because IDPR had not served a copy of its request on IN&P, the Commission was unable to impose a trail use condition in its November 1 decision. Instead, the Commission directed IDPR to serve IN&P with a copy of its request, and it directed IN&P to respond to the request. On November 28, 1995, IN&P filed a letter indicating that it is willing to negotiate with the prospective trail user.[1] Accordingly, we shall issue a NITU covering the line being abandoned.

The parties have 180 days to negotiate an agreement. The negotiating period commences with the service date of this decision and may be extended on request if IN&P remains willing to negotiate. Qualified entities other than IDPR may file requests for interim trail use/rail banking so long as the abandonment has not been consummated and IN&P is willing to negotiate with them. IN&P shall respond to any such additional requests filed. 49 CFR 1152.29(b)(5). If a trail use agreement is executed, no further action by the Commission is necessary. If no agreement is executed within the allotted time, IN&P may consummate the abandonment. 49 CFR 1152.29(d)(1). If an interim trail use/rail banking agreement is executed before expiration of

---

[1] IN&P asserts in the letter that any negotiations for trail use must necessarily involve Union Pacific Railroad Company (UP). IN&P's representative explained to Commission staff that UP retains interests in the right-of-way and the rail assets of the line being abandoned.

the 180-day public use negotiating period prescribed in the Commission's November 1 decision, the public use process will be terminated to the extent of that agreement: if the trail use agreement covers the entire line, the public use process is terminated; if, however, a trail use agreement is executed for only a segment of line, the public use process is terminated only for that line segment. Use of the right-of-way for trail purposes is subject to restoration for railroad purposes.

<u>It is ordered</u>:

1. This proceeding is reopened.

2. The notice published in the <u>Federal Register</u> on November 1, 1995, exempting the abandonment of the above-described line is modified to the extent necessary to implement interim trail use/rail banking. Idaho Northern & Pacific Railroad Company shall keep intact the right-of-way underlying the line, including bridges, trestles, culverts, and tunnels but excluding track and track materials, for 180 days after the service date of this decision and notice. If an interim trail use/rail banking agreement is executed before expiration of the 180-day public use negotiating period, the public use process will be terminated to the extent of that agreement: if the trail use agreement covers the entire line, the public use process is terminated; if, however, a trail use agreement is executed for only a segment of line, the public use process is terminated only for that line segment.

3. Subject to the condition in the next preceding paragraph, IN&P may discontinue service, cancel tariffs for the line on not less than 10 days' notice to the Commission, and salvage track and track materials consistent with interim trail use/rail banking after the effective date of this decision and notice. Tariff cancellations must refer to this decision and notice by date and docket number.

4. If an interim trail use/rail banking agreement is reached, it must require the trail user to assume, for the term of the agreement, any legal liability arising out of the transfer or use of the right-of-way (unless the user is immune from liability, in which case it need only indemnify IN&P from any potential liability), and full responsibility for management of and for the payment of any taxes that may be assessed against the right-of-way.

5. Interim trail use/rail banking is subject to the future restoration of rail service.

6. If, after interim trail use/rail banking is implemented, the user wishes to terminate trail use, the user must file with the Commission a request that trail use be vacated on a date specific, attaching a copy of this decision and notice.

7. If an agreement for interim trail use/rail banking is executed within the 180-day period prescribed above, trail use may be implemented. If no agreement is executed by the 180th day, IN&P may consummate the abandonment.

8. This decision is effective on its service date.

By the Commission, David M. Konschnik, Director, Office of Proceedings.

Vernon A. Williams
Secretary

(SEAL)

Blendu v. US, No. 01-718L (Fed. Cl.)
Joint Motion for Summary Judgment
With Respect to the 1875 Act Lands
Exhibit 3, Page 24

SERVICE DATE

JUL 5 1996

19931
DO

SURFACE TRANSPORTATION BOARD[1]

DECISION

Docket No. AB-433 (Sub-No. 2X)

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY--
ABANDONMENT AND DISCONTINUANCE EXEMPTION--
IN WASHINGTON AND ADAMS COUNTIES, ID

Decided: June 28, 1996

On March 17, 1995, Idaho Northern & Pacific Railroad Company (IN&P) filed a petition for exemption under 49 U.S.C. 10505 from the prior approval requirements of 49 U.S.C. 10903-04 to: (1) abandon approximately 83.1 miles of rail line between milepost 1.0 near Weiser and milepost 84.1 at Rubicon, in Washington and Adams Counties, ID; and (2) discontinue trackage rights over a rail line currently owned and operated by Union Pacific Railroad Company (UP) between milepost 0.0 and milepost 1.0 in Weiser, ID. By decision served November 1, 1995, an exemption was granted, subject to standard labor protective, environmental, and public use conditions. The exemption became effective on December 1, 1995.

On June 26, 1995, the Idaho Department of Parks and Recreation (IDPR) had filed a request for a notice of interim trail use/rail banking (NITU)[2] as well as for public use.[3] On December 28, 1995, a NITU was served which authorized a 180-day period for IDPR to negotiate an interim trail use/rail banking agreement with IN&P for the right-of-way covering the line being abandoned. The NITU negotiation period was scheduled to expire on June 25, 1996.

By letter dated May 31, 1996, IDPR requested a 180-day extension of time to negotiate under the NITU, until December 21, 1996. IDPR stated that the parties have been delayed in their negotiations because IN&P recently transferred the corridor to UP

---

[1] The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (the ICCTA), which was enacted on December 29, 1995, and took effect on January 1, 1996, abolished the Interstate Commerce Commission (ICC) and transferred certain functions and proceedings to the Surface Transportation Board (Board). Section 204(b)(1) of the ICCTA provides, in general, that proceedings pending before the ICC on the effective date of that legislation shall be decided under the law in effect prior to January 1, 1996, insofar as they involve functions retained by the ICCTA. This decision relates to a proceeding that was pending with the ICC prior to January 1, 1996, and to functions that are subject to Board jurisdiction pursuant to 49 U.S.C. 10903. Therefore, this decision applies the law in effect prior to the ICCTA, and citations are to the former sections of the statute, unless otherwise indicated.

[2] Because IDPR had not served a copy of its request on IN&P, the ICC was unable to impose a trail use condition in its November 1 decision. IDPR was directed to serve IN&P with a copy of its request and IN&P was directed to respond. On November 28, 1995, IN&P filed its response indicating its willingness to negotiate with the prospective trail user. IN&P added that any negotiations for trail use must necessarily involve UP, as UP retains interests in the right-of-way and the rail assets of the line being abandoned.

[3] The public use condition commenced on December 1, 1995, and expired on May 28, 1996.

and that it must now start the negotiation process with UP. By letter filed June 14, 1996, UP agreed to the extension request and indicated that the involved line has been reconveyed to it.

On June 17, 1996, a letter-petition was filed by Ron D. Blendu, Donna Servatius, and Dave C. Springer on behalf of the Coalition of Concerned Citizens, requesting rejection of IDPR's extension request. On June 21, 1996, two additional NITU requests for 180 days each were filed by Friends of the Weiser River Trail and the City of Weiser (the City).[4] In a letter received June 24, 1996, UP agreed to negotiate with these parties for trail use.

As stated above, the May 31 letter from IDPR reported that IN&P "has recently transferred the corridor" to UP, and UP indicated in its letter that "the line involved in this proceeding has been reconveyed" to UP. These statements raise questions that need to be addressed prior to Board action on the NITU extension requests. It is not clear how IN&P could have conveyed this property to UP without violating the terms of the NITU issued by the ICC on December 28, 1995. Nor is it clear how IN&P could have conveyed the property (an active line of railroad until it is abandoned) to UP without Board authorization.

Accordingly, this proceeding will be held in abeyance (including any action on the outstanding NITU extension requests) to allow the Idaho Northern & Pacific Railroad Company and the Union Pacific Railroad Company to clarify the status of the 83.1 mile line between milepost 1.0 and milepost 84.1.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. This proceeding is held in abeyance pending clarification by the Idaho Northern & Pacific Railroad Company and the Union Pacific Railroad Company and further order of the Board.

2. This decision is effective on the service date.

By the Board, David M. Konschnik, Director, Office of Proceedings.

Vernon A. Williams
Secretary

---

[4] The City's request is for a segment of rail line known as the New Meadows Branch, between milepost .5 and milepost 1.0 in Weiser. This segment, however, is not included in the 83.1 miles of rail line between milepost 1.0 at Weiser and milepost 84.1 at Rubicon that IN&P seeks to abandon. As the City is requesting trail use over a UP line (between milepost 0.0 and milepost 1.0) for which abandonment authority has not been sought, the Board cannot entertain the City's trail use request.

The City also requests a similar extension of the public use condition. The public use condition cannot be extended. It was imposed in the decision served November 1, 1995, became effective on December 1, 1995, and was for a period of 180 days--the maximum period permitted by statute. As indicated, the negotiation period under the public use condition terminated on May 28, 1996.

21436
DO

SERVICE DATE - FEBRUARY 28, 1997

SURFACE TRANSPORTATION BOARD[1]

DECISION AND NOTICE OF INTERIM TRAIL USE OR ABANDONMENT

Docket No. AB-433 (Sub-No. 2X)

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY--
ABANDONMENT AND DISCONTINUANCE EXEMPTION--
IN WASHINGTON AND ADAMS COUNTIES, ID

Decided: February 24, 1997

On December 28, 1995, a decision and notice of interim trail use or abandonment (NITU) was served in this proceeding which authorized a 180-day period for the Idaho Department of Parks and Recreation (IDPR) to negotiate an interim trail use/rail banking agreement with Idaho Northern & Pacific Railroad Company (IN&P).[2] The NITU negotiation period was scheduled to expire on June 25, 1996.

By letter dated May 31, 1996, IDPR requested a 180-day extension of time until December 21, 1996, to negotiate under the NITU. IDPR stated that the parties had been delayed in their negotiations because IN&P had recently transferred the corridor to Union Pacific Railroad Company (UP), and that IDPR now had to start the negotiation process with UP. By letter filed June 14, 1996, UP agreed to the extension request and indicated that the involved line had been reconveyed to it on May 14, 1996.

On June 17, 1996, the Coalition of Concerned Citizens (CCC) asked the Board to reject IDPR's extension request because the request was submitted in an untimely fashion and was made without notification to adjacent property owners or members of the public in Washington and Adams Counties. On June 21, 1996, two additional NITU requests for 180 days each were filed by Friends of the Weiser River Trail, Inc. (Friends) and the City of Weiser,

---

[1] The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (the ICCTA), which was enacted on December 29, 1995, and took effect on January 1, 1996, abolished the Interstate Commerce Commission (ICC) and transferred certain functions and proceedings to the Surface Transportation Board (Board). Section 204(b)(1) of the ICCTA provides, in general, that proceedings pending before the ICC on the effective date of that legislation shall be decided under the law in effect prior to January 1, 1996, insofar as they involve functions retained by the ICCTA. This decision relates to a proceeding that was pending with the ICC prior to January 1, 1996, and to functions that are subject to Board jurisdiction pursuant to 49 U.S.C. 10903 and 16 U.S.C. 1247(d). Therefore, this decision applies the law in effect prior to the ICCTA, and citations are to the former sections of the statute, unless otherwise indicated.

[2] On March 17, 1995, IN&P had filed a petition for exemption under 49 U.S.C. 10505 from the prior approval requirements of 49 U.S.C. 10903-04 to: (1) abandon approximately 83.1 miles of rail line between m[illegible]st 1.0 near Weiser and milepost 84.1 at Rubicon, in Was[illegible]n and Adams Counties, ID; and (2) discontinue trackage ri[illegible]er a rail line currently owned and operated by Union Pac[illegible]ilroad Company (UP) between milepost 0.0 and milepost 1.0 in [illegible]ser, ID. By decision served November 1, 1995, an exemption was granted, subject to standard labor protective, environmental, and public use conditions. The exemption became effective on December 1, 1995.

ID (the City).[3] By letter received June 24, 1996, UP agreed to negotiate with those parties for trail use.

By decision served July 5, 1996, the Board, by order of the Director of the Office of Proceedings directed this proceeding to be held in abeyance to allow IN&P and UP to clarify the status of the 83.1-mile line between Weiser and Rubicon, ID. The Board concluded that the statement made in IDPR's May 31 letter (that IN&P had recently transferred the corridor to UP) and UP's statement in its June 14 letter (that the involved line had been reconveyed to it) raised questions that needed addressing prior to Board action on the NITU extension request. Specifically, the Board noted that it was not clear how IN&P could have conveyed the property to UP without violating the terms of the NITU issued by the former Interstate Commerce Commission (ICC) on December 28, 1995. Nor was it clear how IN&P could have conveyed the property, an active line of railroad, because abandonment had not been consummated, to UP without Board authorization. On July 12, 1996, IN&P and UP jointly filed a response to the Board's July 5 decision.

By decision served November 14, 1996, the Board stated that because the line had not been fully abandoned, it was subject to Board jurisdiction at the time UP acquired it from IN&P; that the acquisition of a line of railroad by a rail carrier from another rail carrier is a transaction subject to Board jurisdiction under 49 U.S.C. 11323(a)(2); and that UP's acquisition of the line required, but had not received, Board approval under section 11323 or exemption from that approval under section 10502. Accordingly, the Board: (1) continued to hold the proceeding (including the NITU extension request) in abeyance pending further order; (2) directed UP either to undo its acquisition from IN&P of the subject rail line or to file an application or a request for exemption to acquire the line within 30 days of the November 14 service date; and (3) denied a petition for administrative review.[4]

In compliance with the Board's November 14 decision, UP filed a notice of exemption on December 12, 1996 in <u>Union Pacific Railroad Company--Acquisition Exemption--Idaho Northern & Pacific Railroad Company</u>, STB Finance Docket No. 33305 (STB served Jan. 3, 1997), to acquire the involved line of railroad from IN&P, subject to negotiations for trail use. UP noted in the notice of exemption that it had no plan to reactivate rail service on the line at the present time, although reactivation for rail service would be possible in the future if the line were conveyed to a trail user under the Trails Act; and that, if trail use negotiations were unsuccessful, it would abandon the line pursuant to the authorization granted in Docket No. AB-433 (Sub-No. 2X).

By letter filed December 10, 1996, IDPR had notified the Board that Friends would take its place as the new trail use

---

[3] The City had actually sought trail use over a .5 mile segment of line not included in the 83.1 miles of rail line in this proceeding. On July 29, 1996, the Board exempted UP's abandonment of the .5 mile segment in <u>Union Pacific Railroad Company--Discontinuance of Service Exemption--in Washington County, ID</u>, STB Docket No. AB-33 (Sub-No. 100X) (STB served July 29, 1996). The City filed a NITU request in that proceeding, which request was granted in a decision and notice of interim trail use or abandonment served September 18, 1996.

[4] On July 24, 1996, Ron D. Blendu, Donna Servatius, and Dave C. Springer, on behalf of CCC, filed a petition for administrative review of the July 5 decision.

negotiating party.[5] By letter filed January 13, 1997, UP agreed to the pending extension request and suggested that the negotiation period be extended for a period of 180 days from the service date of this decision.

DISCUSSION AND CONCLUSIONS

The purpose of section 1247(d) of the Trails Act, 16 U.S.C. 1247(d), is to preserve rail corridors for possible reactivation of rail service (rail banking) by permitting and encouraging their interim use as recreational trails. See Ex Parte No. 274 (Sub-No. 13B), Policy Statement on Rails to Trails Conversions, 55 FR 4026-28 (Feb. 6, 1990). The Trails Act ensures that the right-of-way remains intact by authorizing interim trail use before abandonment occurs.

Because the railroads here have continually agreed to negotiate for trail use, abandonment of this line has not been consummated, Board jurisdiction over the matter continues, and the NITU originally issued in December 1995 may be extended. Moreover, as the new owner of the line, UP, is willing to continue trail use negotiations and has agreed to a new 180-day negotiating period, the sought extension will be granted.[6] An extension of time here will promote the establishment of trails and rail banking consistent with the Trails Act. Moreover, because UP has consented to the substitution of Friends for IDPR as the new trail use negotiating party, that request will be granted as well. Finally, CCC's petition to reject IDPR's extension request will be denied on grounds that all required notice was effected and because the action taken here otherwise moots CCC's petition.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. CCC's petition to reject IDPR's extension request is denied.

2. The decision and notice of interim trail use served December 28, 1995, is modified to reflect the fact that Friends of the Weiser River Trail, Inc. is authorized to negotiate an interim trail use/rail banking agreement with Union Pacific Railroad Company.[7]

---

[5] Friends has submitted the requisite statement of willingness to assume financial responsibility for interim trail use/rail banking in compliance with 49 CFR 1152.29, and has acknowledged that the use of the right-of-way as a trail is subject to future reactivation of rail service.

[6] So long as abandonment has not been consummated and negotiations are continuing, the negotiating period may be extended beyond the initial 180 days provided in our rules. See Burlington Northern Railroad Company--Abandonment Exemption--In Franklin, Adams, Whitman, Lincoln, and Spokane Counties, WA (ICC Docket No. AB-6 (Sub-No. 295X)) (ICC served Dec. 11, 1990).

[7] Because both the railroad and the prospective trail user differ from the initial negotiating parties, we are issuing a new NITU here.

Docket No. AB-433 (Sub-No. 2X)

3. The negotiation period under the NITU is extended for 180 days from the service date of this decision.

4. This decision is effective on the service date.

By the Board, David M. Konschnik, Director, Office of Proceedings.

Vernon A. Williams
Secretary

28389
EB

SERVICE DATE - APRIL 1, 1998

# SURFACE TRANSPORTATION BOARD

## DECISION

Docket No. AB-433 (Sub-No. 2X)

IDAHO NORTHERN & PACIFIC RAILROAD COMPANY--
ABANDONMENT AND DISCONTINUANCE EXEMPTION--
IN WASHINGTON AND ADAMS COUNTIES, ID

STB Docket No. AB-33 (Sub-No. 100X)

UNION PACIFIC RAILROAD COMPANY--DISCONTINUANCE OF
SERVICE EXEMPTION--IN WASHINGTON COUNTY, ID

STB Finance Docket No. 33305

UNION PACIFIC RAILROAD COMPANY--ACQUISITION EXEMPTION--
IDAHO NORTHERN & PACIFIC RAILROAD COMPANY

Decided: March 20, 1998

On July 23, 1997, the Coalition of Concerned Citizens (CCC) filed a petition to reopen these proceedings. Friends of the Weiser River Trail, Inc. (Friends) filed a reply on July 25, 1997.[1] Various interests submitted comments and letters.[2] We will deny the petition to reopen.

---

[1] The parties have filed a number of pleadings which we normally would reject as in violation of our rules at 49 CFR 1104.13(c), many of which have been the subject of motions to strike. We will, however, construe our rules liberally here and accept the pleadings in the interest of deciding the merits on as complete a record as possible. Our acceptance of these pleadings will not unduly broaden the issues in any significant respect.

[2] Comments/letters were filed by Union Pacific Railroad Company (UP), Idaho Senator Dirk Kempthorne, the Washington County Board of Commissioners, the Adams County Board of Commissioners, Robert and Gerlene A. Hach, Evelyn Snider on behalf of Starkey Hot Springs Summer Resort, Douglas M. Scism, Philip and Virginia Govedare, and Duane Fairchild.

PRELIMINARY MATTER

CCC and Friends argue about whether CCC has standing to participate in these proceedings. Because CCC is already a party of record and has participated in these cases, the standing issue has already been resolved in its favor. Consequently, we will not discuss it further.

BACKGROUND

Docket No. AB-433 (Sub-No. 2X). On March 17, 1995, Idaho Northern & Pacific Railroad Company (IN&P) filed a petition for exemption to: (1) abandon approximately 83.1 miles of rail line formerly owned by Union Pacific Railroad Company (UP) between milepost 1.0 near Weiser and milepost 84.1 at Rubicon, in Washington and Adams Counties, ID; and (2) discontinue trackage rights over a rail line owned and operated by UP between milepost 0.0 and milepost 1.0 in Weiser. By decision served November 1, 1995, the former Interstate Commerce Commission (ICC) granted the exemption, subject to standard labor protective conditions, environmental conditions, and a public use condition.[3]

On December 28, 1995, the ICC served a decision and notice of interim trail use or abandonment (NITU), authorizing a 180-day period for the Idaho Department of Parks and Recreation (IDPR) to negotiate an interim trail use/rail banking agreement with IN&P for the right-of-way. On May 31, 1996, IDPR requested a 180-day extension of time to negotiate under the NITU. On June 14, 1996, UP informed the Board that IN&P had reconveyed the line to it on May 14, 1996: UP, however, also agreed to the extension request. On June 17, 1996, a letter-petition was filed by Ron D. Blendu, Donna Servatius, and Dave C. Springer on behalf of CCC, requesting rejection of IDPR's extension request.[4] By decision served July 5, 1996, the proceeding was held in abeyance (including any action on the outstanding NITU extension request) to allow IN&P and UP to clarify the status and ownership of the Weiser-Rubicon line.

On July 24, 1996, CCC filed a petition for administrative review of our July 5, 1996 decision contending, among other things, that the Board lacked jurisdiction to hold the proceeding in abeyance but, rather, was required either to grant the NITU extension or to authorize final abandonment. By decision served November 14, 1996, we: (1) continued to hold the proceeding (including the NITU extension request) in abeyance; (2) directed UP to undo its acquisition of the line from IN&P or to file an application or a petition for exemption to acquire the line; and (3) denied CCC's petition for administrative review.

---

[3] The public use condition expired on May 28, 1996.

[4] On June 21, 1996, two additional trail use requests were filed by Friends and the City of Weiser, ID (the City), although the City was actually seeking trail use over the 0.5-mile segment of line sought to be abandoned in STB Docket No. AB-33 (Sub-No. 100X). On June 24, 1996, UP agreed to negotiate with those parties.

By letter filed December 10, 1996, IDPR notified the Board that Friends would take its place as the new trail use negotiating party.[5] UP agreed. On February 28, 1997, a new NITU decision was served which: (1) denied CCC's letter-petition opposing IDPR's extension request; (2) authorized Friends to negotiate an interim trail use/rail banking agreement with UP; and (3) extended the negotiation period under the NITU for 180 days, until August 27, 1997.

STB Docket No. AB-33 (Sub-No. 100X). By notice served and published in the Federal Register on July 29, 1996 (61 FR 39512), the Board exempted UP's abandonment of a 0.5-mile segment of rail line adjacent to the line in Docket No. AB-433 (Sub-No. 2X), extending from milepost 0.5 to the end of the line at milepost 1.0, near Weiser, in Washington County, ID. On August 22, 1996, the City filed a NITU request resulting in the issuance of a decision and notice of interim trail use or abandonment on September 18, 1996.[6] During the negotiating period, on December 6, 1996, Friends, a new potential trail sponsor, filed another NITU request. On December 11, 1996, UP indicated its willingness to negotiate with Friends for trail use/rail banking of the line. Accordingly, by decision served December 20, 1996, a NITU was issued, providing 180 days, until June 18, 1997, for Friends to negotiate an interim trail use arrangement with UP.

STB Finance Docket No. 33305. In compliance with the Board's November 14, 1996 decision in Docket No. AB-433 (Sub-No. 2X), UP filed a notice of exemption on December 12, 1996, to acquire the involved line of railroad from IN&P, subject to negotiations for trail use. Notice of the filing was served and published in the Federal Register on January 3, 1997 (62 FR 441).

By letter filed June 19, 1997, UP notified the Board that it had reached an agreement with Friends on June 17, 1997, regarding interim trail use on the right-of-way in both abandonment proceedings. By letter filed August 13, 1997, UP notified the Board that the right-of-way (including ballast, bridges and culverts) between milepost 0.5 near Weiser and milepost 84.1 at Rubicon had been conveyed to Friends, effective August 2, 1997. By letter filed August 22, 1997, Friends notified the Board that it had acquired the rail corridor.

## POSITION OF THE PARTIES

CCC, a non-profit corporation, states that many of its members are adjacent landowners that allegedly have reversionary property rights in portions of the right-of-way. CCC asserts again, as in its prior petition for administrative review, that the Board lacked authority in its July 1996 decision to hold the proceeding in abeyance in Docket No. AB-433 (Sub-No. 2X). CCC claims that the Board was required either to grant the NITU extension or to authorize final abandonment.

---

[5] Our trail rules specifically provide for the substitution of potential trail sponsors.

[6] Also, a public use condition was imposed for 180 days, which expired on February 24, 1997.

Moreover, CCC argues that there has been both a de facto and de jure abandonment by IN&P and UP of the subject right-of-way here. CCC asserts that the railroads, by refusing to repair bridges and trestles or to pay taxes on the property, coupled with the physical removal of all rails, ties and crossings, have demonstrated a clear intent to completely abandon the line. CCC contends that, because a trail use agreement was not finalized during the initial negotiation period, and because no extension was granted before that period expired, as of May 28, 1996, the abandonment became final as a matter of law, the agency lost jurisdiction over the lines, and the right-of-way reverted under state law to the adjacent landowners.

CCC adds that Friends is not a "qualified private organization" within the meaning of 16 U.S.C. 1247(d) and is not financially prepared to assume full responsibility for management of the right-of-way. CCC states that Friends' signed statement of willingness to assume financial responsibility for the property, which is all that is required by our Trails Act implementing procedures, is not enough to demonstrate that Friends has the ability to meet the financial and liability conditions in the statute. CCC asserts that the Board's failure to further evaluate whether Friends is financially able to manage the corridor constitutes material error.[7] CCC is concerned that the poor condition of rail structures on the line and the rugged terrain of the right-of-way could lead to significant current and future liabilities as a result of injuries to persons and livestock. CCC also asserts that Friends may not have the financial capability to pay for a variety of tasks and services that it believes will be needed on this right-of-way.[8] CCC suggests that the Trails Act arrangement is merely an attempt by the railroads to unload their liabilities on an underfunded, nonprofit organization. Finally, according to CCC, Friends has not provided any information concerning its financial backing, its net worth, or its ability to actually meet its financial obligations.[9]

For these reasons, CCC asks us to: (1) enter a decision declaring the subject rail line abandoned and denying approval of the proposed transfer of the right-of-way from UP to Friends; or (2) conduct hearings concerning (a) the impact of the proposed transfer on small businesses in the area, (b) whether the subject line should be declared abandoned, and (c) whether Friends is able to

---

[7] Although CCC's primary ground for reopening is alleged material error, CCC also attempts to show "new evidence" and "changed circumstances" by citing recent flooding in the corridor that allegedly caused severe damage to bridges and trestles, and the withdrawal of local and state government support for the trail. That information is not relevant to the issues before us because they have nothing to do with whether Friends is a qualified trail sponsor. Accordingly, the information will not be discussed further.

[8] For example, repairing and maintaining bridges, trestles and signage, spraying and controlling noxious weeds, providing fencing, parking and restrooms, conducting an environmental cleanup, and offering such services as fire suppression/fighting, law enforcement, security, search and rescue, and emergency medical response.

[9] Petitioner notes that state and local governments oppose transfer of the corridor and development of a trail, and have refused to provide any funding for those purposes.

assume financial responsibility for the line; or (3) impose a series of environmental and public safety conditions in the event the transfer to Friends is approved.[10]

In reply, Friends asserts that CCC has not shown that it lacks adequate financial resources to be a trail manager or that it does not intend to honor its obligations under the statute. Friends argues that CCC does not indicate anything that Friends should now be doing that it is not doing by reason of financial incapacity. Friends objects to CCC's contention that it is not a "qualified private organization" under 16 U.S.C. 1247(d). Friends asserts that it is as qualified as anyone else to rail bank a right-of-way. Friends states that it has already collected substantial financial resources and that it can rely on donated legal services, engineering services, and construction help. Friends has submitted a copy of its balance sheet (as of July 1?, 1997) showing $35,716.72 in assets and no liabilities, and an additional $5,990.50 which is still available in matching grants.[11] Friends has also submitted information regarding weed control and liability insurance.

Friends notes that the Board's role in issuing a NITU is ministerial, and that the agency has consistently deferred to the railroad to determine if the prospective trail user is financially responsible.[12] Finally, Friends asserts that, throughout these proceedings, the railroads have evinced a consistent intent to rail bank the right-of-way and to continue negotiating for interim trail use. Such action, Friends argues, shows that the railroads have never fully abandoned the subject lines and the Board retained jurisdiction to extend the negotiating period in Docket No. AB-433 (Sub-No. 2X).

---

[10] CCC also asserts that any trail use negotiations between UP and Friends should be open and involve public hearings, and that the parties should be required to submit a copy of their trail use agreement and copies of any relevant property deeds to the Board, which should evaluate those documents before approving any "deal." However, the procedures established by the Board and the ICC have been repeatedly upheld by the courts. E.g., National Wildlife Fed'n v. ICC, 850 F.2d 694, 696-699 (D.C. Cir. 1988); Goos v. ICC, 911 F.2d 1283 (8th Cir. 1990) (Goos). If CCC wishes to propose additional requirements, it should file a formal petition for rulemaking setting forth specific suggestions for the Board to consider and providing reasons why the Board should devote its scarce resources to imposing additional regulatory requirements in this area.

[11] CCC responds that Friends' assets are "woefully inadequate" and that its balance sheet is "questionable."

[12] In this regard, in its August 26, 1997 letter, UP states that it and Friends have entered into an agreement by which the latter has assumed financial and managerial responsibility, effective upon closing of a transfer of the line to Friends. UP adds that it is satisfied that Friends has adequate financial capacity to discharge its responsibilities with respect to the property.

## DISCUSSION AND CONCLUSIONS

The decision to grant or deny a petition to reopen is within the broad discretion of the agency, and only on a showing of a clear abuse of that discretion would a court overrule the agency. E.g., Bowman Transp. Inc. v. Arkansas Best Freight System, Inc. 419 U.S. 281, 294-95 (1974). Under 49 CFR 1115.4, a petition to reopen must state in detail the respects in which the proceeding involves material error, new evidence, or substantially changed circumstances. CCC here essentially argues that the Board committed material error warranting reopening of these proceedings in two respects: (1) in improperly holding the proceeding in abeyance in Docket No. AB-433 (Sub-No. 2X), when it was required to either grant an outstanding NITU extension request or to find that the line had been fully abandoned; and (2) in failing to evaluate whether Friends is, in fact, a financially fit trail sponsor.

The first ground is simply a rehash of an argument CCC made previously and which we rejected. In our November 14, 1996 decision in Docket No. AB-433 (Sub-No. 2X), we stated at p. 3:

> In its petition, CCC asserts that the Board lacked authority to hold the proceeding in abeyance but, rather, was required either to grant the NITU extension or to authorize abandonment. The petition will be denied. The Board has authority to control its own docket. In exercising that authority, we may hold a proceeding in abeyance if we conclude that doing so would be the best course of action. Here, the Director appropriately decided to defer a ruling on the extension request pending the filing of further information on the reconveyance.

We added,

> We also reject CCC's assertion that, because the NITU negotiation period has expired, a full abandonment has occurred and our jurisdiction over this matter has been lost. . . . A railroad must take action to exercise abandonment authority. Moreover, the Board does not lose jurisdiction over the underlying right-of-way unless the railroad's action is to fully abandon the line, as opposed to exercising the lesser included authority to discontinue service over the line. Here, the parties' expressed desire and intention to continue trail use negotiations beyond the 180-day period, and the railroads' joining in the requests for more time, show that there was no intent to fully abandon the line. Thus, we retain jurisdiction over the property.

Nothing in CCC's petition to reopen warrants a different conclusion here. See, e.g., Birt v. STB, 90 F.3d 580, 588 n.15 (D.C. Cir.), reh'g denied, 98 F.3d 644 (D.C. Cir. 1996) (agency does not lose jurisdiction over a line where there is contemporaneous evidence suggesting that the railroad

intended to retain control over the line until a rails-to-trails conversion had been negotiated, rather than abandoning the line).[13]

We now turn to CCC's second ground for reopening, that the agency committed material error by failing adequately to evaluate whether Friends is a financially fit trail sponsor. There are two parts to CCC's argument. CCC claims first that we erred in not assessing Friends' financial fitness when we issued the NITU and second, that we should consider Friends' fitness now.

CCC's argument that we should have done more to evaluate Friends' fitness when we issued the NITU ignores the fact that Friends filed the statement of willingness required by our Trails Act implementing procedures. Friends, by filing the required statement of willingness, consented to assume responsibility for managing the right-of-way and for legal liability and for payment of taxes for the period of any interim trail use. Friends also agreed to comply with the statutory rail banking condition in section 1247(d). Accordingly, when UP agreed to negotiate a trail arrangement with Friends, we properly issued a NITU allowing negotiations to begin.

Congress clearly intended to preserve as many rail corridors as possible under section 1247(d). See Preseault v. ICC, 494 U.S. 1, 19 (1990) (Preseault). Under the statute, a prospective trail sponsor may acquire the right-of-way through "donation transfer, lease, sale or otherwise" so long as the financial and rail banking requirements of the statute are met. Moreover, any "State, political subdivision or qualified private organization" can invoke section 1247(d). In these circumstances, we see no reason to change our longstanding practice of reading the word "qualified" in the statute to mean any private organization willing to assume responsibility for the line and agree to rail banking. See T and P Railway--Abandonment Exemption--In Shawnee, Jefferson and Atchison Counties, KS, Docket No. AB-381 (Sub-No. 1X) (STB served Feb. 20, 1997) (T and P Railway), reversed on other grounds, Becker v. STB, 132 F.3d 60 (D.C. Cir. 1997). Our Trails Act procedures have been in effect for more than 10 years. Yet no one has provided us with evidence suggesting any problem with trail sponsors failing to assume financial responsibility for the rights-of way they manage under the Trails Act.

Furthermore, a railroad presumably would not agree to negotiate with a prospective trail sponsor unless the railroad believes the potential trail sponsor will be able to manage the right-of-way and assume legal liability and pay taxes. We appropriately defer to the railroad's decision to negotiate a Trails Act arrangement to determine if the prospective trail sponsor is financially responsible. The function of a trail condition is to delay the railroad's right to consummate the abandonment for the negotiating period and the period of any interim trail use. Pending an agreement with the proponent of a trail, or the consummation of the abandonment, the right-of-way remains the responsibility of the railroad. It must pay taxes, assume liability and maintain the right

[13] In Birt, the court expressly found that we have authority to extend the Trails Act negotiation period after the original NITU has expired provided extension was sought prior to the expiration.