of way. If a railroad does not think a proponent is likely to meet its obligations, it is hard to see why the carrier would agree to negotiate with the potential trail sponsor. Thus, the carrier is the most appropriate party to determine whether any offer of negotiations is likely to prove successful, both in meeting the railroad's desires and in fulfilling the statutory and regulatory rail banking and liability requirements of the Trails Act.

Requiring the proponent of a trail to provide detailed financial information or to pass a fitness test before the Board issues a trail condition could deter or delay interim trail use, which would be contrary to Congress' intent to facilitate and encourage rail banking and interim trail use on lines that otherwise would be abandoned. Moreover, the primary purpose of a fitness test would be to protect a railroad from wasting its time negotiating with an unfit trail sponsor.[14] However, the railroad already has the ability to protect itself from that result merely by refusing to consent to the issuance of the trail condition. In these circumstances, we see no reason to change our longstanding practice of not routinely requiring detailed financial or other information from potential trail sponsors and railroads in Trails Act cases. Given our limited, ministerial role in administering this statute, and the fact that the railroad is the real party in interest, we can be assured that the Trails Act has been properly invoked and that its requirements will be met when (1) the prospective trail sponsor files the required statement of willingness and (2) the railroad that otherwise would be entitled to fully abandon the line voluntarily agrees to negotiate a Trails Act arrangement.

CCC's second argument in this regard is that we should consider Friends' financial fitness now. In T and P Railway, at p. 5, we indicated that if a trail use arrangement is successfully negotiated and a landowner or other interested party presents evidence to call into question the continued application of the Trails Act, we would reopen the proceeding to afford the trail user an opportunity to demonstrate that it continues to meet the requirements of the statute. We stated that if we determined that the trail group does not have the ability to meet the financial and liability conditions of the statute, the trail condition would be involuntarily revoked and the line declared fully abandoned, at which point the right-of-way would no longer be part of the national transportation system, and any reversionary interests in the property would vest. Because CCC has raised fitness issues, and the parties have presented evidence on them, we will consider Friends' ability to continue to meet the financial and liability requirements of the statute. In doing so, we will clarify the kind of showing we would require to involuntarily revoke a trail condition on financial fitness grounds.

Taxes. Local governments often have a right to collect taxes from those who build trails. If a state or local government could demonstrate that a trail manager had not or was not likely to meet its obligation to pay taxes, we would find that the financial conditions for interim trail use had not

---

[14] As the courts have repeatedly found, if there is any taking of property interests by deprivation of, or deferral of, the right to reversion of the property, claims for compensation can be addressed to the Court of Federal Claims under the Tucker Act. See Preseault; Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996).

been met. We would then require that this deficiency be remedied, or that the trail condition be involuntarily revoked. No taxing authority has made any such claim here, however.

Liability. Assumption of liability is only meaningful if the party with the potential liability is adequately insured or financially responsible. Under the Trails Act, the trail sponsor assumes liability only when it enters into an agreement with the railroad pursuant to 16 U.S.C. 1247(d) and our Trails Act rules. Because the railroad may have some exposure if the trail sponsor incurs a liability it cannot satisfy, we think it is reasonable to rely in the first instance on the railroad's protection of its own interests. Therefore, it is appropriate to require that someone raise this issue before we inquire into it.

Here, CCC has called into question Friends' ability to satisfy any liability it might incur arising out of interim use of this right-of-way as a trail. But Friends in reply states that it has purchased liability insurance in an amount adequate to provide $6 million in coverage per incident and $7 million aggregate. CCC does not state that this amount is inadequate. Moreover, we have no reason on this record to find that this amount of insurance is insufficient. In these circumstances, we conclude that CCC has not shown that Friends is unable to carry out its obligation to assume liability for injuries arising out of the recreational use of the trail under section 1247(d).

Management. The statute and our rules require that a trail sponsor assume responsibility for the management of the trail. CCC claims that Friends' capitalization for an 87-mile trail is "woefully inadequate." But this argument presumes that Friends is under an affirmative duty to develop a trail for advanced recreational use. In fact, as we explained in T and P Railway, quoting Missouri Pacific R. Co.--Aband. In Okmulgee, Okfuggee, Hughes, Pontotoc, Coal, Atoka, and Bryan Counties, OK, ICC Docket No. AB-3 (Sub-No. 63) (ICC served Jan. 4, 1991), the Trails Act does not require the trail to be "developed" in any particular way. There can be differing types or levels of trail use, and the agency has never become involved in determining the type or level of trail for a specific right-of-way. Moreover, there is no time limit for how quickly a trail must be developed to its intended level of use.

Our chief concern, once a trail condition has been imposed, is that the statutory rail banking condition not be compromised, and that nothing occur that would preclude a railroad's right to reassert control over the right-of-way at some future time to revive active service. CCC, however, has not alleged that it would be impossible to reinstitute rail service over these lines.

In addition to maintaining the integrity of rail banking, Friends is obligated to use the right-of-way so that it does not become a public nuisance. However, that is a state or local requirement, not a Board requirement. Federal preemption does not extend to the legitimate exercise of police power by states and localities. In Iowa Southern R. Co.--Exemption--Abandonment, 5 I.C.C.2d, 496, 505 (1989) (Iowa Southern), aff'd sub nom. Goos, the ICC said.

> We note, however, that a trail use must comply with State and local land use plans, zoning ordinances, and public health and safety legislation. . . . This local regulation can

address the Landowners' concerns about such issues as vandalism or noise. . . . Indeed, the State and local agencies in the area are attuned to the specific interests and needs of their communities. . . . Nothing in our Trails Act rules or procedures is intended to usurp the right of state, regional and local entities to impose appropriate safety, land use, and zoning regulations on recreational trails.

See also, e.g., Rail Abandonments--Use of Rights-Of-Way As Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13) (ICC served May 26, 1989) (rejecting, following full notice and comment rulemaking proceeding, argument that the agency's Trails Act implementing procedures should address maintenance along rights-of-way or require railroads and/or trail groups to report to the agency on the outcome of trail negotiations).

State and local laws vary from jurisdiction to jurisdiction. Because we cannot become familiar with all of those laws, it would be inappropriate, if not impossible, for us to try to establish a standard by which a trail sponsor could demonstrate its fitness to manage and maintain a particular trail. Nor has CCC introduced evidence to show that Friends has violated any particular state or local laws, or that its concern that this right-of-way may not be adequately maintained while it is used as a trail cannot be appropriately addressed at the state or local level.

In short, we and the ICC acted in a manner consistent with our limited responsibilities under the Trails Act in issuing trail conditions here. Moreover, CCC has failed to demonstrate that Friends is an unfit trail user or that we lost jurisdiction over this property. Consequently, there is no basis for us to reopen these proceedings to involuntarily revoke the NITUs granted in this proceeding or to declare the line fully abandoned.

In addition, we must reject CCC's request that we impose a number of environmental and public safety conditions here. The requested conditions relate to concerns beyond our limited Trails Act authority. In Iowa Southern, 5 I.C.C.2d at 502-03, the ICC stated:

> Our role and responsibilities under the Trails Act are quite limited. We do not decide whether rail banking and use of the right-of-way as a recreational trail is desirable for a particular line of railroad; Congress has itself made that determination (for all lines) in Section 1247(d). . . . Nor do we have any discretion under the Trails Act, other than to determine whether the statute has been properly invoked and the statutory requirements (regarding liability and rail banking) met. . . . We lack authority to force the parties to negotiate where recreational use could benefit the environment, to impose conditions upon the parties' ability to use the Trails Act, or to refuse to issue a NITU or CITU on environmental grounds. No purpose would be served by an examination of possible environmental consequences when it cannot affect our action. In short, our issuance of a NITU or CITU under the Trails Act is only a ministerial act, not a "major Federal action" to which NEPA would apply.

The Eighth Circuit affirmed this determination in Goos.

Finally, we find no basis for oral hearing here. A thorough and accurate record has already been developed by the parties. It has not been shown that cross-examination is needed at this point in time to resolve any disputed issues of material fact, and witness demeanor has not been shown to be a matter requiring oral hearing in these proceedings. For these reasons, CCC's petitions requesting that we reopen these proceedings and hold an oral hearing are denied.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. CCC's petition to reopen these proceedings is denied.

2. CCC's request for oral hearing is denied.

3. This decision is effective on its service date.

By the Board, Chairman Morgan and Vice Chairman Owen.

Vernon A. Williams

Vernon A. Williams
Secretary

6-26-95

AB-433 (Sub No. 2X)

IDAHO DEPARTMENT of PARKS & RECREATION

June 10, 1995

Mr. Sidney L. Strickland, Jr.
Secretary
Interstate Commerce Commission
12th & Constitution Ave. NW
Washington, D.C. 20423

Dear Mr. Strickland:

RE: Idaho Northern and Pacific Abandonment of the Weiser to Tamarack Line in Adams and Washington Counties in Idaho

This comment should be treated as a protest or a petition for reconsideration in the above-captioned proceeding. The comment is filed on behalf of the Idaho Department of Parks and Recreation of the State of Idaho, interested trails, parks, and natural and historical resources, hereinafter referred to as "Commenter."

While not taking a position on the merits of this abandonment, Commenter requests issuance of a Certificate or Notice of Interim Trail Use rather than an outright abandonment authorization between Weiser and Tamarack.

A. **Public Use Condition**

Commenter requests the ICC to find that this property is suitable for other public use, specifically trail use, and to place the following conditions on the abandonment:

1. An order prohibiting the carrier from disposing of the corridor, other than the tracks, ties, and signal equipment, except for public use on reasonable terms. The justification for this condition is that the rail corridor in question provides a good multi-use trail for ATV's, snowmobiles, motorcycles, hikers, mountain bikers, and horseback riders. It would be a year-round trail that would enhance economic development along the line. It is located in a scenic area and has a diverse environment ranging from desert canyons to high alpine meadows. In addition, the corridor provides an

PHILIP E. BATT
Governor
YVONNE S. FERRELL
Director
FRANKLIN E. BOTELER, Ph.D.
Deputy Director

IDAHO PARK AND RECREATION BOARD
Robert M. Haakenson
Thomas L. Neal
Sheila Robertson
Glenn Shewmaker
Ken E. Thomason
Monte Q. Later

P.O. BOX 83720
BOISE, IDAHO

Mr. Sidney L. Strickland, Jr.
June 10, 1995
Page 2

important wildlife habitat, and its preservation as a recreational trail is consistent with that end. The time period sought is 180 days from the effective date of the abandonment authorization. The Commenter needs this much time because we have not had the opportunity to assemble or to review title information, complete a trail plan or commence negotiations with the carrier.

2. An order barring removal or destruction of potential trail-related structures such as bridges, trestles, culverts, and tunnels. The justification for this condition is that these structures have considerable value for recreational trail purposes. The time period requested is 180 days from the effective date of the abandonment authorization for the same reason as indicated in paragraph 1.

B. **Interim Trail Use**

The railroad right-of-way in this proceeding is suitable for rail banking. In addition to the public use conditions sought above, Commenter also makes the following request:

**STATE OF WILLINGNESS TO ASSUME FINANCIAL RESPONSIBILITY**

In order to establish interim trail use and rail banking under Section 8 (d) of the National Trail System Act, 16 U.S.C. 1247 (d), and 49 C.F.R. 1152.29, the Idaho Department of Parks and Recreation is willing to assume full responsibility for the management of, for any legal liability arising out of the transfer of use of (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability), and for the payment of any and all taxes that may be levied or assessed against the right-of-way owned and operated by the Idaho Northern and Pacific Railroad.

The property, known as the Weiser-Tamarack line, extends from railroad milepost 1 near Weiser to railroad milepost 84.1 near Tamarack, a distance of 83.1 in Washington and Adams Counties, Idaho. The line proposed for abandonment is referred to in ICC Docket N. AB-433 (Sub No. 2X ).

A map depicting the right-of-way is attached.

Mr. Sidney L. Strickland, Jr.
June 10, 1995
Page 3

The Idaho Department of Parks and Recreation acknowledges that use of the right-of-way is subject to the user's continuing to meet its responsibilities described above and subject to possible future reconstruction and reactivation of the right-of-way for rail service.

A copy of this statement is being served on the Railroad on the same date it is being served on the Commission.

By my signature below, I certify service upon Idaho Northern and Pacific Railroad, 4420 West Vickery Blvd., #110, Fort Worth, Texas, 76107 by U.S. Mail, postage prepaid, first class this 10th day of April 1995.

Respectfully submitted,

Name

On behalf of : **Idaho Department of Parks and Recreation**

Enclosure (1)


O R
I D
PAYETTE
Heath
Goodrich
Midvale
KILOMETERS 0 5
MILES 0 1 2 3 4 5

6-21-96

D

Capital
National Oldtime Fiddle Contest

# THE CITY OF WEISER, IDAHO

55 WEST IDAHO 83672 • (208)549-1965

*OFFICE OF THE MAYOR*

AB433-2X

June 13, 1996

ENTERED
Office of the Secretary
JUN 21 1996
3 Part of Public Record

OFFICE OF SECRETARY
JUN 21 9 08 AM '96
RECEIVED SURFACE TRANSPORTATION BOARD

Evelyn Kitay
Secretary
Surface Transportation Board
12th & Constitution Ave, N.W.
Washington, D.C. 20423

Dear Evelyn

RE: Union Pacific/Idaho Northern and Pacific Abandonment of the New Meadows Branch line in the City limits of the City of Weiser

This comment should be treated as a protest or a petition for reconsideration in the above-captioned proceeding. The comment is filed on behalf of the City of Weiser, Weiser, Idaho, interested trails, parks, and natural and historical resources, hereinafter referred to as "Commenter".

While not taking a position on the merits of this abandonment, Commenter requests issuance of a Certificate or Notice of Interim Trail Use rather than an outright abandonment authorization within the City Limits of Weiser.

A. Public Use Condition

Commenter requests the STB to find that this property is suitable for other public use, specifically trail se, and to place the following conditions on the abandonment:

1. An order prohibiting the carrier from disposing of the corridor, other than the tracks ties, and signal equipment, except for public use on reasonable terms. The justification for this condition is that the rail corridor in question provides access to the already requested Idaho Northern and Pacific Abandonment of the Weiser to Tamarack Line in Adams and Washington Counties in Idaho (ICC Docket N. AB-433 (Sub No. 2X) and will provide good multi-use trail for ATV's, Snowmobilers, Motorcycles, hikers, mountain bikers, and horseback riders. It would be a year-round trail that would enhance economic development drastically needed for the City of Weiser. It provides access to the Weiser river and as stated above access to a 83.1 trail. The time period sought is 180 days from the date of receipt of approval. The Commenter needs this much time because the City Council needs time to assemble and review title information, complete a trail plan or commence negotiations with the carrier.

2. An order barring removal or destruction of potential trail-related structures such as bridges or culverts.

The justificat on for this condition is that these structures have considerable value for recreation trail purposes. The time period requested is 180 days from the date of receipt of approval for the same reason as indicated in paragraph 1.

B. Interim Trail Use

The railroad right-of-way in this proceeding is suitable for rail banking. In addition to the public use conditions sought above, Commenter also makes the following request:

CITY OF WEISER WILLINGNESS TO
ASSUME FINANCIAL RESPONSIBILITY

In order to establish interim trail use and rail banking under Section 8 (d) of the National Trail System Act, 16 U.S.C. 1247 (d), and 49 C.F.R. 1152.29, the City of Weiser is willing to assume full responsibility for the management of, for any legal liability arising out of the transfer of use of (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability), and for the payment of any and all taxes that may be levied or assessed against the right-of-way owned and operated by the Union Pacific Railroad/Idaho Northern and Pacific Railroad.

The property, known as the New Meadows Branch, extends from railroad miles post .5 in Weiser to railroad milepost 1 also within the city limits of Weiser. A map depicting the right-of-way and Union Pacific's abandonment proposal are attached.

The City of Weiser acknowledges that use of the right-of-way is subject to the user's continuing to meet its responsibilities described above and subject to possible future reconstruction and reactivation of the right-of-way for rail service.

A copy of this statement is being served on the Railroad on the same date it is being served on the Board.

By my signature below, I certify service upon Union Pacific Railroad, Room 930, 1416 Dodge Street, Omaha, Nebraska 68179, by U.S. Mail, postage prepaid, first class this 13th day of June 1996.

Respectfully submitted,

Don Stephens

Don Stephens
Mayor




NOTE:
THERE ARE NO 50 YEAR OLD STRUCTURES ON THIS ABANDONMENT.

NEW MEADOWS BRANCH

MP 0.50 TO MP 1.00
NEW MEADOWS BRANCH A TOTAL OF 0.50 MILES
IN WASHINGTON COUNTY, IDAHO

| STATION | MILE POST | AGENCY |
|---|---|---|
| - | - | - |

LEGEND

UPRR LINES TO BE ABANDONED
OTHER UPRR LINES
OTHER RAILROADS
50+ YEAR OLD STRUCTURES
PRINCIPAL HIGHWAYS
OTHER ROADS

UNION PACIFIC RAILROAD CO.
NEW MEADOWS BRANCH
INCL. 50+ YEAR OLD STRUCTURES

SCALE 0 2 MILES

Blendu v. US, No. 01-718L (Fed. Cl.)
Joint Motion for Summary Judgment
With Respect to the 1875 Act Lands
Exhibit 3, Page 48

ab0152

K. R. (KEN) WELCH
Assistant Vice President
Environmental Management

Mailing Address.
Room 930
1416 Dodge Street
Omaha, Nebraska 68179
Fax No. (402) 271-4461

UNION PACIFIC RAILROAD COMPANY

G. (GLENN) THOMAS
Director-Environmental Operations-Central
S. W. (STEVE) BERKI
Director-Environmental Operations-Western
L. A. (LANNY) SCHMID
Director-Environmental Operations-Southern
R. L. (RICK) EADES
Director-Environmental Site Remediation

RECEIVED
SURFACE TRANSPORTATION BOARD
08 MAY '96
SECRETARY

Track: Abandonment
New Medows Branch

April 18, 1996

Mr. Don Stephens, Mayor
City of Weiser
55 West Idaho
Weiser, ID 83672

RE: Proposed Abandonment of the New Medows Branch In Washington County, Idaho.

Dear Mr. Stephens:

Union Pacific (or Missouri Pacific) Railroad Company plans to submit formal application to the Interstate Commerce Commission (ICC) for authority to abandon its New Medows Branch from M.P. 0.50 to M.P. 1.00 in Weiser, Idaho. A map of the proposed track abandonment shown in black is attached.

Pursuant to the ICC's regulations at 49 C.F.R. Part 1152, and the environmental regulations at 49 C.F.R. Part 1105.7, as revised effective 9/29/91, this is to request your assistance in identifying any potential effects of this action as indicated in the paragraphs below. If any adverse environmental impacts are identified, describe any actions that are proposed in order to mitigate the environmental impacts. Please provide us with a written response that can be included in an Environmental Report which will be sent to the ICC.

<u>LOCAL AND/OR REGIONAL PLANNING AGENCIES</u>. State whether the proposed action is consistent with existing land use plans. Describe any inconsistencies.

<u>U.S. SOIL CONSERVATION SERVICE</u>. State the effect of the proposed action on any prime agricultural land.

<u>U.S. FISH AND WILDLIFE SERVICE (And State Game And Parks Commission, If Addressed)</u>. State (1) whether the proposed action is likely to adversely affect endangered or threatened species or areas designated as a critical habitat, and if so, describe the effects, and, (2) whether wildlife sanctuaries or refuges, National or State parks or forests will be affected, and describe any effects.

STATE WATER QUALITY OFFICIALS. State whether the proposed action is consistent with applicable Federal, State or Local water quality standards. Describe any inconsistencies.

U.S. ARMY CORPS OF ENGINEERS. State (1) whether permits under Section 404 of the Clean Water Act (33 U.S.C. § 1344) are required for the proposed action and (2) whether any designated wetlands or 100-year flood plains will be affected. Describe the effects.

U.S. ENVIRONMENTAL PROTECTION AGENCY AND STATE ENVIRONMENTAL PROTECTION (OR EQUIVALENT AGENCY). (1) Identify any potential effects on the surrounding area, (2) identify the location of hazardous waste sites and known hazardous material spills on the right-of-way and list the types of hazardous materials involved, and (3) state whether permits under Section 402 of the Clean Water Act (33 U.S.C. § 1342) are required for the proposed action.

Thank you for your assistance. Please forward your responses to Union Pacific Railroad, Ms. Jan Regier, Room 810, 1416 Dodge Street, Omaha, Ne 68179. If you should need further information, please contact Christi Hornick, Telephone No. (402) 271-6571, in Omaha.

Yours truly,

Christi Hornick

Christi Hornick
Manager Compliance Measurement

Attachment

g:\wpwin\western\clh\rostate\aband\nmldlot.frm

Friends of the Weiser River Trail
IDAHO
Lane Williams, PO Box 35, Midvale ID 83645

June 20,1996

Mr. Vernon Williams
Secretary
Surface Transportation Board
12th & Constitution Ave. NW
Washington. DC 20423

ENTERED
Office of the Secretary
JUN 21 1996
3 Part of Public Record

JUN 21 1996

Dear Mr. Williams,

RE: Docket No. AB-433 (Sub-No. 2x)

MOTION TO EXTEND NITU NEGOTIATION PERIOD

The Friends of the Weiser River Trail hereby moves to extend the negotiation period provided by this Board under the Notice of Interim Trail Use (NITU) applicable in the above referenced proceeding for a total of 180 days. The NITU currently will expire June 21, 1996. If this motion is granted, the NITU will expire on or about December 21, 1996. Idaho Pacific and Northern Railroad Company (IPNR) has recently transferred the corridor to the Union Pacific Railroad Company. Mark Stevenson, Union Pacific's representative for the area, stated that the Union Pacific Railroad Company does not oppose the 180 day extension. Friends of the Weiser River Trail also encloses herewith a copy of our own "statement of willingness" invoking Section 8(d) of the National Trail System Act, 16 U.S.C. 1247 (d).

Please stamp the extra copy 'file received' and return in the self addressed stamped envelop.

Respectfully submitted,

Lane Williams

Lane Williams
Chairman

By my signature below, I certify service on the 20th of May, 1996 of the foregoing motion for extension by U.S. Mail, postage prepaid, first class, upon Joseph D. Anthofer, Union Pacific Railroad Company, 1416 Dodge Street, Omaha, NE. 68179-0001.

Lane Williams

TO: Honorable Secretary Vernon Williams
FROM: Friends of the Weiser River Trail
DATE: June 20, 1996
RE: Docket No. AB-433 (Sub-No. 2x)

STATE OF WILLINGNESS TO ASSUME FINANCIAL RESPONSIBILITY

In order to establish interim trail use and rail banking under Section 8(d) of the National Trail System Act, 1b U.S.C. 1247 (d). and 49 C.F.R. 1152.29, The Friends of the Weiser River Trail is willing to assume full responsibility for the management of , for any legal liability arising out of the transfer of use of (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability), and for the payment of any and all taxes that may be levied or assessed against the right-of-way owned and operated by the Union Pacific Rail Road.

The property, known as the Weiser-Tamarack line, extends from railroad milepost 1 near Weiser to railroad milepost 84.1 near Tamarack, a distance of 83.1 in Washington and Adams Counties, Idaho. The line proposed for abandonment is referred to in STB Docket N. AB-433 (Sub No. 2X).

A map depicting the right-of way is attached.

The Friends of the Weiser River Trail acknowledges that use of the right-of-way is subject to the user's continuing to meet its responsibilities described above and subject to possible future reconstruction and reactivation of the right-of-way for rail service.

A copy of this statement is being served on the Railroad on the same date it is being served on the Board.

By my signature below, I certify service upon Joseph D. Anthofer, Union Pacific Railroad Company, 1416 Dodge Street, Omaha, NE. 68179-0001 by U.S. Mail, postage prepaid, first class this 20th day of June 1996.

Respectfully submitted,

Lane Williams
Chairman
On behalf of: Friends of the Weiser River Trail

Enclosure (1)




Blendu v. US, No. 01-718L (Fed. Cl.)
Joint Motion for Summary Judgment
With Respect to the 1875 Act Lands
Exhibit 3, Page 53

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of June, 2006, I electronically filed the foregoing **Defendant's Appendix of Exhibits Filed in Support of Defendant's Motion for Summary Judgment and Supporting Memorandum as to the Category 1 Lands** through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Cecilia Fex, Attorney for Plaintiffs
fex@ackersonlaw.com

Nels J. Ackerson, Attorney for Plaintiffs
nels@ackersonlaw.com

Lary C. Walker
walkerlaw_bk@ruralnetwork.net

/s/ Kristine S. Tardiff
E-mail: kristine.tardiff@usdoj.gov

Murray D. Feldman
(Idaho State Bar No. 4097)
HOLLAND & HART LLP
Suite 1400, U.S. Bank Plaza
101 South Capitol Boulevard
Post Office Box 2527
Boise, Idaho 83701
Telephone: (208) 342-5000
Facsimile: (208) 343-8869
mfeldman@hollandhart.com

Richard A. Allen
(District of Columbia State Bar No. 160523)
Zuckert Scoutt & Rasenberger, L.L.P.
888 Seventeenth Street, N.W., Suite 700
Washington, D.C. 20006-3309
Telephone: (202) 298-8660
Facsimile: (202) 342-0683
rallen@zsrlaw.com

Andrea Ferster
(District of Columbia State Bar No. 384648)
General Counsel
Rails-to-Trails Conservancy
1100 17th Street, N.W.
Washington, D.C. 20036
Telephone: (202) 974-5142
Facsimile: (202) 331-9680
aferster@railtrails.org

Attorneys for Amicus Curiae Rails-To-Trails Conservancy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. CV99-324-S-MHW<br><br>**BRIEF OF AMICUS CURIAE RAILS-TO-TRAILS CONSERVANCY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Blendu v. US, No. 01-718L (Fed. Cl.)
Joint Motion for Summary Judgment
With Respect to the 1875 Act Lands
Exhibit 4, Page 1

This case is on remand to this court from a decision of the United States Court of Appeals for the Federal Circuit dated April 4, 2005.

Amicus Curiae Rails-to-Trails Conservancy ("RTC")[1] submits this memorandum in support of the motion for summary judgment filed by Defendant United States of America ("United States" or "Government") on the issue of the liability of the United States to "Category 1" Plaintiffs.[2] Category 1 Plaintiffs are those with asserted interests in land subject to rights-of-way initially granted by the United States to the Pacific and Idaho Northern Railroad Co., predecessor to the Union Pacific Railroad Company, (collectively, the "Railroad") pursuant to the General Railroad Right-of-Way Act of 1875, codified at 43 U.S.C. §§ 934-939 ("the 1875 Act"). As explained below, the railbanking of those rights-of-way pursuant to 16 U.S.C. § 1247(d), the federal railbanking law, is consistent with the easement granted to the Railroad under the 1875 Act. Accordingly, as a matter of law there has been no abandonment of that easement and therefore no taking of any interests of plaintiffs in Category 1 requiring compensation.

**<u>The Interest Of Amicus RTC</u>**

RTC is a non-profit corporation formed in 1985, with more than 100,000 members and supporters nationwide, dedicated to assisting state and local governments and other organizations in preserving otherwise to be abandoned railroad corridors for

---

[1] By order dated December 6, 1977 (Docket #11), the Court granted RTC's motion to participate in this case as amicus curiae on the issues of class certification and the "merits of Plaintiffs' request for a determination of liability against the United States." The current motion addresses the merits of that liability issue.

[2] The Government's summary judgment motion with respect to Category 1 Plaintiffs is being filed pursuant to the Court's scheduling order of April 26, 2006.

continued public use. RTC is acutely interested in the construction of federal statutes applicable to federally-granted railroad right of way ("FGROW"). On the one hand, RTC has purchased, or contracted to purchase, a number of railroad lines containing FGROW for trail and related preservation purposes, and thus has a direct economic stake in some FGROW properties. But more broadly, RTC is concerned that the public's substantial investment in these transportation corridors is fostered and preserved for continued public transportation uses, as Congress has provided in statutes governing use and disposition of FGROW.

## Statement Of The Case

This case involves claims for compensation by property owners for alleged takings of property interests arising out of the operation of federal legislation enacted in 1983, 16 U.S.C. § 1247(d), commonly known as the "Rails-to Trails Act."[3] The Rails-to-Trails Act was enacted to preserve railroad corridors for future rail use that might otherwise be abandoned. It does so by establishing a process of "railbanking" by which railroads desiring to cease rail operations over specific lines for the present can, instead of "abandoning" the lines, convey them to qualified users for interim use as recreational trails until such time as the railroad may wish to reactivate rail service. The Rails-to-Trails Act provides that "if such interim use [as a trail] is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of

[3] Pub. L. No. 98-11, § 208, 97 Stat. 42, 48. The Rails-to-Trails Act was enacted as part of the National Trails Systems Act Amendments of 1983, and it is codified at 16 U.S.C. § 1247(d).

any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). *See generally*, *Preseault v. ICC*, 494 U.S. 1 (1990).[4]

The Plaintiff class in this case is comprised of persons who own land adjacent to an 83.1 mile railroad corridor formally owned by the Railroad between the towns of Weiser and Rubicon in Washington County, Idaho. The Surface Transportation Board ("STB") issued a Notice of Interim Trails Use ("NITU") on December 28, 1995, authorizing the Friends of the Weiser River Trail, Inc. to negotiate an interim trail use agreement with the Railroad pursuant to 16 U.S.C. § 1247(d). The Plaintiffs claim to have property interests in the corridor, which they allege were taken by the interim trail use agreement, thereby entitling them to compensation under the Takings Clause of the Fifth Amendment. On July 7, 2000 (Docket #39), this Court certified this case as a class action, and then proceeded to determine the Railroad's property rights along this 83-mile corridor.

The parties stipulated that the railroad corridor had been pieced together in the nineteenth century by a combination of private deeds conveying land from landowners,

---

[4] In *Preseault*, the Supreme Court held that the Rails-to-Trails Act was a constitutional exercise of Congress' Commerce Clause power. The Court did not reach the question whether it might effect a taking for which the Fifth Amendment would require compensation, but held that if it did effect a taking, the Tucker Act would provide a remedy to affected property owners. 494 U.S. at 15-17. In a later Tucker Act suit by the Preseaults, a plurality opinion of the Federal Circuit indicated that the Rails-to-Trails Act will effect a taking if, in the absence of the Rails-to-Trails Act, the actions of the railroad would have resulted in an abandonment of the railroad's easement and a reversion of the underlying property to the adjacent landowner. *Preseault v. United States*, 100 F.3d 1525, 1550-52 (Fed. Cir. 1996). *But see*, *Preseault v. United States*, 853 F.2d 145, 151 (2d Cir. 1988), *aff'd on other grounds*, 494 U.S. 1 (1990).

by adverse possession, and by federal grant under the 1875 Act.[5] The parties divided the Plaintiff class into categories depending upon the types of conveyance by which different parts of the corridor were originally conveyed to the Railroad, and asked the Court to determine the nature of the property interests conveyed to the Railroad and the interests, if any, retained by the original grantors.

By memorandum decision issued on November 27, 2001 (Docket #88), the Court held that adjacent landowners did not have any property rights in those parcels obtained by 1875 federal grants (Category 1 Plaintiffs) because any interests not conveyed to the Railroad were retained by the federal government and were disposed of according to the 1988 Amendments to the National Trails Systems Act, 16 U.S.C. § 1248(c). The Court also held that the parcels of land obtained by the Railroad by adverse possession were acquired in fee simple, and that all but a handful of the private deeds conveyed fee simple title to the Railroad as well. Most of Plaintiff's claims were therefore dismissed.

By an order entered on March 10, 2003 (Docket #107), the Court entered final judgment on the claims of the those members of the Plaintiff class whom the Court found in its 2001 decision held no property interests in the railroad corridor and therefore no valid taking claim. The Court found that final judgment under Fed. R. Civ. P. 54(b) as to those claims was appropriate, observing that "[t]he very nature of this case turns on legal issues." (Docket #107 at 7.)

---

[5] The 1875 Act was repealed as a basis for granting new railroad rights of way effective October 21, 1976, by Pub. L. No. 94-579, Title VII, § 706(a), 90 Stat. 2793. The repeal is not relevant to the discussion herein.

The Plaintiffs appealed that judgment to the Federal Circuit, which, on April 4, 2005, issued a decision reversing the judgment in part, vacating in part, and remanding for further proceedings. *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005). With respect to Category 1 Plaintiffs, the Federal Circuit held that this Court erred in holding that the United States retained the reversionary interest in the land underlying the Railroad's right-of-way; the Federal Circuit held that owners of the adjacent land, not the Government, owned the land underlying the right-of-way. The Federal Circuit concluded: "On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use, in accordance with the principles set forth in the *Preseault* cases. On remand, the district court shall determine just compensation on the conditions that apply to these landowners." *Hash*, 403 F.3d at 1318.

The Federal Circuit also vacated this Court's ruling that various private deeds conveyed a fee simple interest in the right-of-way to the Railroad. The Federal Circuit remanded that aspect of the ruling for reconsideration in light of the Idaho Supreme Court's subsequent decision in *Neider v. Shaw*, 65 P.3d 525 (Idaho 2003). *Hash*, 403 F.3d at 1321. The proper interpretation of those deeds is not addressed by the Government's present motion for summary judgment or this brief.

## Argument

**I. The Threshold Issue On Remand Is An Issue Of Federal Law: Whether The Rights-Of-Way Granted By The 1875 Act Were Abandoned By Railbanking And Interim Trail Use.**

In remanding the Category 1 issues to this Court, the Federal Circuit stated that "*[o]n the railway's abandonment of its right-of-way* these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owner's property were taken for public use." *Hash*, 403 F.3d at 1318 (emphasis added). Before it can be determined that the property interests of Category 1 Plaintiffs have been taken, therefore, there is a critical threshold issue that was not decided by the Federal Circuit and that has yet to be determined: namely, whether the Railroad's right-of-way was in fact abandoned by the railbanking and interim trail use of those portions of the right-of-way conveyed to the Railroad under the 1875 Act. If, as RTC and the Government contend, the scope of the legal rights conveyed to the Railroad by the 1875 Act includes using the right-of-way not only for present railroad operations but also for railbanking for future rail operations as well as other public right-of-way uses, including interim use as a public trail, then the railroad's conveyance of the right-of-way to the Friends of the Weiser River Trail, Inc. for those purposes and the use of it for those purposes are consistent with the right-of-way and are not an abandonment of it.

Thus, a determination that the Government did not retain the reversionary interests in rights-of-way conveyed under the 1875 Act does not resolve the issue whether the Railroad abandoned its right-of-way upon conveying the right-of-way to a qualified entity under the Rails-to-Trails Act for railbanking and interim trail use, as the Court of Claims recently ruled in *Beres v. United States*, 64 Fed. Cl. 403 (2005). In that

case, the Court of Claims ruled, like the Federal Circuit in this case, that the United States did not retain a reversionary interest in rights-of-way granted under the 1875 Act. The court, however, stated: "That result, however, by no means resolves the case before the court. There remain numerous issues to resolve before this court can determine if the plaintiffs are entitled to compensation, including resolution of the successor in title to the land *and whether or not there was an abandonment."* 64 Fed. Cl. at 428 (emphasis added).

The scope of the easement conveyed to the Railroad by the 1875 Act and whether that easement was abandoned by railbanking and interim trail use were not issues presented to the Federal Circuit by the Plaintiffs' appeal in this case (since they had not been decided by this Court in the decision appealed by the Plaintiffs), and they were not briefed by the parties or discussed or decided by the Federal Circuit's opinion. The only Category 1 issue presented to the Federal Circuit was, as the court's opinion indicates, whether "the ownership of the underlying land remained with the United States for lands subsequently patented to settlers under the Homestead Act." *Hash*, 403 F.3d at 1313. Inasmuch as the parties, on the Plaintiffs' appeal, never briefed or had reason to brief the scope of the easement conveyed by the 1975 Act and whether it was abandoned, it would have been a violation of due process for the court to have decided that issue. *See, e.g., Jenkins v. Missouri*, 216 F.3d 720, 726 (8th Cir. 2000); *Doubleday & Co. v. Curtis*, 763 F.2d 495, 502 (2d Cir. 1985).

What legal interests were conveyed to the railroad by the 1875 Act, a federal statute, and whether those interests were abandoned by railbanking and interim trails use pursuant to the Rails-to-Trails Act are, of course, issues of federal law. For example, in

*Northern Pacific Ry. Co. v. Townsend*, 190 U.S. 267, 270 (1903), the Court, in upholding the rights of a railroad under a 1864 federal statute against a person claiming title under a state adverse possession law, stated: "And depending, as this question does, upon the nature and effect of the acts of Congress, its solution necessarily involves a Federal question." *See also Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227, 1234-37 (10th Cir. 2006). State court decisions concerning the scope of rights-of-way granted by private deeds or by state laws may be instructive in resolving that issue, but the question is ultimately one of federal law.

In that regard, the 1875 Act issues in this case differs from the issues presented in most takings cases arising out of the operation of the Rails-to-Trails Act, which usually turn on state law issues concerning the scope of property rights granted to railroads by private deeds or operation of state laws and whether those rights were abandoned. For instance, in *Preseault*, 494 U.S. at 8, the Supreme Court observed that "[s]tate law *generally* governs the disposition of reversionary interests." (Emphasis added.) In this case, all of the property interests involved were originally conveyed to the Railroad and the Plaintiffs' predecessors from the public lands of the United States pursuant to federal statutes, and the general rule is not applicable; rather, the scope of those interests are solely matters of federal law.

Furthermore, the 1875 Act issues in this case are solely issues of law. They do not turn on any disputed issues of fact. As the Court observed in its March 7, 2003, opinion, "[t]he very nature of this case turns on legal issues." (Docket #107 at 7.) The issues may therefore properly be resolved by summary judgment.

## II. The Rights-Of-Way Granted By The 1875 Act Authorized Their Use For Railbanking And Interim Trail Use And Were Not Abandoned By Their Conveyance And Use For Those Purposes.

### A. The Scope Of The 1875 Act Easement Is Defined By The Act Itself, Which Does Not Restrict The Use Of The Right Of Way To Railroad Uses Only.

In its November 27, 2001 Memorandum Decision, this Court, in discussing the language in deeds at issue in Category 5, observed: "When a deed to any grantee contains a granting clause that conveys a 'right-of-way,' the deed generally will be interpreted as conveying an easement. However, the mere mention of the term 'right of way' does not necessarily constitute the conveyance of an easement limited to railroad purposes." (Docket #88, Mem. Decision at 11-12.) That observation is equally pertinent to the granting language of the 1875 Act.[6]

In the case of federally granted right-of-way, the scope of an easement conveyed under the 1875 Act turns, not on the language of any instrument of conveyance, as there is none, but on the language of the federal statutes authorizing the railroad's acquisition of the corridor. Thus, the starting point for determining the scope of the interests conveyed by the 1875 Act is, of course, the language of the statute itself.[7] The Act, now codified in 43 U.S.C. § 934, provides:

---

[6] The relevance of the Court's observation to the issue of the scope of the easements conveyed by the 1875 Act is not affected by the Federal Circuit's decision vacating the Court's ruling that Category 5 deeds conveyed fee simple interests and remanding that ruling for reconsideration in light of the Idaho Supreme Court's subsequent decision in *Neider v. Shaw*, 65 P.3d 525 (Idaho 2003).

[7] The Act was repealed in 1976 insofar as authorizing new rights of way after that date, *see supra* note 5, but its terms remain applicable to rights of way granted under the Act before that date.

> The right of way through the public lands of the United States is granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

Perhaps most significantly, the language of the statute simply granted a "right of way" two hundred feet wide to specified railroad companies. This language makes clear that, while the principal purpose of the grant was to promote the construction of railroads across federal lands, nothing in the language of the statute limits the use of the granted right-of-way to railroad uses or indicates that the right-of-way was to be granted only for the purpose of constructing and operating a railroad.

Notably, the Supreme Court has declined to graft implied restrictions on other rights granted by the 1875 Act. In *United States v. Denver & Rio Grande Ry. Co.*, 150 U.S. 1 (1893), for example, the Court rejected the Government's argument that § 934 granted railroads the right to take timber and other materials from public lands adjacent to the right of way only if they were taken from locations near the construction site but not from locations far away from the construction site. The Court observed: "If congress had intended to impose any such restriction upon the use of timber or other material taken from adjacent public lands it should have been so expressed." 150 U.S. at 11. The same

observation applies to of any contention that the rights-of-way granted by the 1875 Act are limited to railroad uses.

In this respect, moreover, the language of the 1875 Act granting the rights-of-way contrasts significantly with language in other federal statutes granting rights-of-way to railroads. For example, the Act of July 1, 1862, 12 Stat. 489, authorizing the transcontinental railroad, provided in Section 2: "That the right of way through the public lands be, and the same is here granted to said company [the Union Pacific Railroad] *for the construction of said railroad and telegraph line*[.]" (Emphasis added.) In *United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 114 (1957), the Supreme Court specifically noted that "this right of way was granted Union Pacific 'for the construction of said railroad and telegraph line.' § 2. That purpose is not fulfilled when the right of way is used for other purposes." No such qualification is contained in the language of the 1875 Act.

Although not controlling on this issue of federal law, a very thoughtful and instructive decision relevant to the proper interpretation of the language of § 934 is the Maryland Court of Appeals (Maryland's highest court) decision in *Chevy Chase Land Co. v. United States,* 733 A.2d 1055 (Md. 1999). In that case, a railroad acquired a right-of-way in 1911 for $4,000 from the Chevy Chase Land Company pursuant to a deed which conveyed to the railroad "a free and perpetual right of way, one hundred (100) feet wide, over the land and premises hereinafter designated." *Id.* at 1065. The Maryland Court of Appeals, in construing the deed as a matter of Maryland law, held that the deed did not convey a fee simple interest to the railroad but only an easement—a right of passage—over the land company's property. *Id.* at 1071-72. The court, however,

rejected the land company's argument that it had conveyed an easement that only authorized railroad operations by the grantee and its heirs and assigns. *Id*. at 1073-74.

Although the deed conveyed the easement expressly to an identified railroad, the court rejected the land company's argument that "when a right-of-way is conveyed to a railroad, it is *ipso facto* restricted to railroad uses." *Id*. at 1072. The court acknowledged that "the circumstances clearly indicate that the original instrumentality was a railroad," but it said that "nowhere does the language 'for railroad purposes' appear, and there are no other express limitations on the use of the right of way." *Id.* at 1073. The court cited a ruling to the same effect by the Minnesota Supreme Court which addressed the scope of an easement granted to a railroad and held:

> [N]one of the deeds expressly limit the easement to railroad purposes, provide that the interest conveyed terminates if use for railroad purposes ceases, or provide that the easement would exist only for so long as the right-of-way was used for railroad purposes. While the grantors were undoubtedly aware that a railroad would be constructed on the land, none of the deeds limit the use to railroad purposes.

*Id. (quoting State ex rel. Washington Wildlife Preservation, Inc. v. State*, 329 N.W.2d 543, 546 (Minn. 1983)).

The Maryland court in *Chevy Chase Land Co.* went on to hold that the easement conveyed to the railroad was broad enough to encompass use of the right of way as a trail. 733 A.2d at 1074-1079. Based on this interpretation of the railroad's property interest, the Federal Circuit found that the subsequent conveyance of the right-of-way for railbanking and interim trail use under the Rails-To-Trails Act was within the scope of the railroad's property interest, and therefore resulted in no taking of any property interest

of the land company. *Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (table), 1999 WL 1289099, *3 (Fed. Cir. Mar. 27, 2000) (unpublished opinion).

The analyses of the courts in *Chevy Chase Land Co.* and *State ex rel. Washington Wildlife Preservation* are very pertinent to the scope of the easement conveyed to the Railroad by the 1875 Act. As with the deeds in those cases, § 943 conveyed rights-of-way to railroads with the clear purpose to promote railroad use and construction. But also, like those deeds, nothing in § 934 expressly limited use of the right of way to railroad purposes or provides that the easement will exist only so long as it is used for railroad purposes. The same analysis supports the conclusion that the easement conveyed to the Railroad by the 1875 Act in this case was not limited to railroad operations but encompasses other transportation uses, including railbanking and interim trail use.

Several other considerations strongly support the conclusion that the easement conveyed to the Railroad by the 1875 Act is not limited to railroad uses and encompasses railbanking and interim train use. The first is that a principal purpose of the conveyance of the Railroad's right-of-way under the terms of the Rails-to-Trail Act is to preserve the availability of precious and rapidly shrinking transportation corridors for future *railroad* operations. In *Preseault v. ICC*, 494 U.S. at 5-6, 17-19, the Court discussed this purpose and rejected the contention that it was not genuine or valid, stating: "To the contrary, Congress apparently believed that every line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." *Id*. at 19. That purpose is clearly consistent with, and indeed furthers, the general purpose of the

1875 Act.[8] Accordingly, the Supreme Court's admonition that the 1875 Act "is to be liberally construed to carry out its purposes," *Great Northern*, 315 U.S. at 272, supports the conclusion that the rights-of-way granted by that Act include railbanking and interim trail use.

Another principle supporting that conclusion, also endorsed in *Great Northern*, is that "the Act is also subject to the general rule of construction that any ambiguity in a grant is to be resolved favorably to the sovereign grantor, " *id.*, namely, the United States. In some cases, that rule may militate in favor of a narrow construction of the rights granted to the grantee, but in cases involving railbanking and trail use under the Rails-to-Trails Act, the opposite is true. In such cases, the United States, through its legislative branch, enacted the 1875 Act to grant interests in federal lands for the purpose of promoting railroad development, and the same sovereign *also* enacted the Rails-to-Trail Act to preserve for the future the rail corridors created in large part by the earlier Act. It is therefore in the interests of the United States to resolve any doubts about the scope of

8 The Rails-to-Trails Act provides that a right-of-way will not be deemed to be abandoned by interim use as a trail only if such "interim use is subject to restoration or reconstruction for railroad purposes." 16 U.S.C. § 1247(d). Surface Transportation Board regulations require that trail use agreements between railroads and trail users contain this condition, 49 C.F.R. § 1152.29(a)(3), and a number of rights-of-way have been reconverted to railroad use. *See, e.g., BG & CM R.R.—Exemption*, Finance Docket No. 34399, 2003 WL 22379168 (S.T.B. Oct. 17, 2003); *Georgia Great S. Div., South Carolina Cent. R.R. Co.—Abandonment & Discontinuance Exemption—Between Albany & Dawson, In Terrell, Lee, & Dougherty Counties, GA*, Docket No. AB-389 (Sub-No. 1X), 2003 WL 21132515 (S.T.B. May 16, 2003); *Missouri Pacific R.R. Co.—Abandonment Exemption—In St. Louis County, MO*, Docket No. AB-3 (Sub-No. 98X), 1997 WL 201480 (S.T.B. April 25, 1997); *Norfolk & Western Ry. Co.—Abandonment Between St. Marys & Minster In Auglaize County, OH*, 9 I.C.C.2d 1015, 1017 (1993); *Iowa Power, Inc.—Construction Exemption—Council Bluffs, IA*, 8 I.C.C.2d 858, 866 (1990). Given the serious capacity constraints now facing the nations' railroads, more such reconversions are likely in the foreseeable future.

the rights-of-way granted by the 1875 Act in favor of the conclusion that they encompass railbanking and interim trail use.

### B. Subsequent Federal Statutes Have Clarified The Broad Scope Of 1875 Act Easements By Specifically Authorizing Continued Use Of The Rights-Of-Way For Public Highway And Trail Use.

Subsequent congressional enactments leave no doubt that Congress intended and desired that the rights-of-way granted by the 1875 Act be used not just for railroad operations, but more broadly for use as public highways and trails. The Supreme Court, in construing the 1875 Act in *Great Northern Ry. v. United States*, 315 U.S. 262, 272 (1942) stated: "It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'" (quoting *Tiger v. Western Investment Co.*, 221 U.S. 286, 309 (1911)).

These subsequent statutes make clear that Congress clearly in the 1875 Act to convey a very broad grant of a "right of way." In particular, 43 U.S.C. § 913 authorizes use of federally-granted rights-of-way for "public highway" purposes, except for the 50 feet on each side of centerline. This was later modified by 23 U.S.C. § 316 to allow public highway use anywhere in the right-of-way.

The broad scope of the right-of-way conveyed to the Railroad under the 1875 Act was further confirmed by 43 U.S.C. § 912. Under the plain language of 43 U.S.C. § 912, Congress provided for the disposition of all federally granted rights-of-way only upon a judicial or congressional determination of abandonment, including the 1875 Act grants. If there is a judicial or congressional declaration of abandonment, 43 U.S.C. § 912 provides that the rights to the corridor vest in the person or entity owning the legal subdivision traversed by the federally-granted right of way in question, unless (a) the

Case 1:99-cv-00328-EJL-MHW Document 3054 Filed 06/09/2006 Page 34 of 92

federally-granted right of way is in a municipality, in which case it goes to the municipality, or (b) a state or local government establishes a public highway on the federally-granted right of way parcel within one year of the judicial declaration of abandonment, in which case the rights vest in the state or local government.

As explained by this Court in *Idaho v. Oregon Shortline R.R. Co.*, 617 F. Supp. 207, 212 (D. Idaho 1985), regardless of how the interest conveyed to the railroad under the 1875 Act right of way is denominated, "[s]ections 912, 913 and 316 evince an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation." *See also Marshall v. Chicago & N.W. Transp. Co*., 31 F.3d 1028, 1032 (10th Cir. 1994) (*quoting Oregon Shortline)*. Likewise, in *Great Northern*, the Supreme Court held that statute did not grant railroads a fee simple interest in the rights of way but only a transportation easement. 315 U.S. at 271-72. However, nothing in the decision states or suggests that the easement granted was limited to rail operations.

Finally, the Rails-to-Trails Act itself reflects a clear federal policy favoring the preservation of all railroad rights-of-way for potential future rail use and for trail use in the interim.

All of the foregoing statutes further support the conclusion, indicated by the language of 43 U.S.C. § 934, that the rights-of-way conveyed by the 1875 Act were not intended to be limited to active railroad operations but broadly encompass public transportation uses, including railbanking and recreational trail use. It follows that the Railroad's conveyance of the rights-of-way involved in Category 1 to the Friends of the

Weiser River Trail, Inc. for those purposes was consistent with the rights granted to the Railroad and was not an abandonment of the rights-of-way.

## Conclusion

As a matter of federal law, the rights conveyed to the Railroad under the 1875 Act authorize use of the rights-of-way for railbanking and interim trail use under the Rails-to-Trails Act, and those rights were not abandoned by the Railroad's conveyance of those rights-of-way for such uses. As to those rights-of-way, therefore, no property interests of Plaintiffs have been taken.

Respectfully submitted this 9th day June 2006.

ZUCKERT SCOUTT & RASENBERGER, L.L.P.

Richard A. Allen

RAILS-TO-TRAILS CONSERVANCY

Andrea Ferster

HOLLAND & HART LLP

By: /s/ Murray D. Feldman
E-Mail: mfeldman@hollandhart.com

Attorneys for Amicus Curiae Rails-To-Trails Conservancy

Case 1:01-cv-00718-LMW Document 34 Filed 12/01/2006 Page 39 of 92

## Certificate Of Service

I HEREBY CERTIFY that on the 9th day of June 2006, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Nels J Ackerson
nels@ackersonlaw.com

Cecilia Fex
fex@ackersonlaw.com;
tstadtler@ackersonlaw.com
ebolton@ackersonlaw.com

Lary C Walker
walkerlaw_bk@ruralnetwork.net

C Tom Arkoosh
tarkoosh@cableone.net, alo@cableone.net

Kristine S Tardiff
kristine.tardiff@usdoj.gov
evelyn.kitay@stb.dot.gov
felecia.lesesne@usdoj.gov
efile_nrs.enrd@usdoj.gov

/s/ Murray D. Feldman
E-Mail: mfeldman@hollandhart.com

3565097_2.DOC

Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*, Plaintiffs, | ) | Case No. CV99-324S-MHW |
| v. | ) | Honorable Mikel H. Williams |
| UNITED STATES OF AMERICA Defendant. | ) | |

**CLASS REPRESENTATIVES' CROSS-MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

Dated: July 12, 2006

On behalf of the members of the class whose properties are burdened by the former railroad parcels designated under Category 1, Representatives of Plaintiffs' Class ("Plaintiffs"), by counsel, hereby oppose Defendant's motion for summary judgment (Doc. No. 155), and cross-move for summary judgment holding the Government liable for a taking of these class members' properties.

The railroad acquired right of way easements to these Category 1 parcels pursuant to the General Railroad Right-of-Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified at 43 U.S.C. §§ 934-939 (1982)) ("1875 Act"). Under the 1875 Act, the United States granted only easements for railroad purposes. *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957) (discussing the holding in *Great Northern Ry. Co. v. United States*, 315 U.S. 262 (1942), and affirming that "only an easement for railroad purposes was granted"); *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005). The class members' original predecessors in interest took the full legal subdivision burdened by these easements for railroad purposes only. For almost one hundred years, these railroad easements burdened the lands owned by class members who own property in Washington and Adams counties, Idaho, alongside the Weiser River. In 1997, after years of decline in use, prospects of facing serious financial losses, and with the need for extensive and costly maintenance and repairs to the infrastructure, the railroad company divested itself of its easement interests, conveying them to a trail sponsor to be used for a recreational, linear park.

By operation of the National Trails System Act, 16 U.S.C. §§ 1241-1251 (the "Trails Act"), railroad rights of way which would otherwise be ripe for abandonment are sometimes converted to linear parks or recreational trails, such as was done here, with the potential to be

restored in the future to railroad use if the need arises. Under prevailing law, when trail use is implemented a landowner's interests in vested rights are potentially "blocked" and any takings claim thereby accrues. *Caldwell v. United States*, 391 F.3d 1226 (2004). When the Government takes property under these circumstances, it is up to the landowner to muster the resources to bring a takings action in order to receive damages for the taking. *See id.*

The question of liability in a rails-to-trails taking turns on the nature of the scope of the interests granted to the railroad. If the grant was limited in scope so as not to permit the transition from railroad to recreational, linear park use, and if no applicable law otherwise permits the transition, then the trail conversion on private properties burdened by the new easement is a taking of private property. *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996); *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004).

At the time the interests in these 1875 Act easements were created and the legal subdivisions burdened by the easements were patented to settlers, the scope of the grant to railroads were for railroad purposes only, and patentees received the full subdivision underlying these grants burdened only by the easements for railroad purposes. *Hash*, 403 F.3d 1308; *see generally Leo Sheep Co. v. United States*, 440 U.S. 668 (1979); *Swendig v. Washington Water Power Co.*, 265 U.S. 322 (1924). In granting these railroad rights of way and in patenting the legal subdivisions to settlers of public lands, the United States did not reserve to itself the right to control or maintain these interests for other, non-railroad purposes. *Hash*, 403 F.3d 1308.

For the foregoing reasons, and those set forth in the memorandum ("Memorandum") that accompanies this cross-motion and the Plaintiffs' response in opposition to Defendant's motion (Doc. No. 155), Plaintiffs request the Court grant their cross-motion for summary judgment and

find that the United States is liable for a taking as to Category 1 easements, and shall pay just compensation to eligible class members whose properties are burdened by the Weiser River Trail.

Dated: July 12, 2006

Respectfully submitted,
**ACKERSON KAUFFMAN FEX, PC**

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Class Representatives' Cross-Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class

Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

ROBERT HASH and GERLENE HASH, *et al.*,

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

Case No. CV99-324S-MHW

Honorable Mikel H. Williams

**CLASS REPRESENTATIVES' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 155 - Filed on June 9, 2006) AS TO THE CATEGORY 1 LANDS**

Dated: July 12, 2006

## TABLE OF CONTENTS


I. QUESTION PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. BRIEF ANSWER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. BACKGROUND .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Circumstances Surrounding the Enactment of the 1875 Act.. . . . . . . . . . . . . . . . . . 2

B. Legislation Enacted in the 1900's.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. The Federal Circuit Issued a Mandate, Holding the United States has Taken Category 1 Properties and Instructing the Court to Determine Just Compensation Due to Eligible Class Members.. . . . . . . . . . . . . . . . 6

B. The Government Is Liable for Taking Private Land Because the Scope of the Rights of Way Granted Solely to Railroads under the 1875 Act Which Burdened Patentees' Lands Did Not Include the Use of Linear Parks for Hiking, Picnicking, Wildlife and Nature Walks, and Other Recreational Pursuits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. Regulatory Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2. Conversion of the 1875 Act Railroad Easements to Recreational Linear Parks Is Beyond the Scope of the Original Easements Which Burdened Patentee's Title.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

a. The 1875 Act Easements Were Limited to Railroad Purposes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

b. The Issue Is Not Whether the United States Could Reserve to Itself the Right of Way Interests, but Whether it Did; Manifestly it Did Not... . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

c. The 1920's Legislation Did Not and Could Not Operate to Change the Interests Granted under the 1875 Act or to Patentee Settlers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

d. Railroad Uses or Even Transportation Purposes Does Not Constitute Recreational Trail Use.. . . . . . . . . . . . . . . . . . . . . . . . . 22

3. Defendant's "Shifting Public Use Doctrine" Does Not Apply . . . . . . . . . 25

4. "Railbanking" Is Irrelevant to the Analysis.. . . . . . . . . . . . . . . . . . . . . . . . 26

5. The Question of Abandonment is Immaterial to Establishing Liability.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES**

*Barney v. Burlington N. R.R.*,
490 N.W.2d 726 (S.D. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Beres v. United States*,
64 Fed. Cl. 403 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 20-22

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Evans v. United States*,
504 U.S. 255 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Great Northern Ry. Co. v. United States*,
315 U.S. 262 (1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5, 7, 14, 15, 19-21

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Hastings v. Whitney,*
132 U.S. 357, 10 S.Ct. 112, 33 L.Ed. 363 (1889). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hayfield Northern R.R. Co., Inc. v. Chicago and North Western Transp. Co.*,
467 U.S. 622 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Idaho v. Oregon Short Line R.R. Co.*,
617 F. Supp. 207 (D. Idaho 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*King v. Saint Vincent's Hosp.,*
502 U.S. 215 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lawson v. State*,
730 P.2d 1308 (Wash. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Leo Sheep Co. v. United States,*
440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) . . . . . . . . . . . . . . . . . 2, 13, 24, 28, 30

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Northern Pacific Railway v. Townsend*,
190 U.S. 267 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17, 19, 20

*Pollnow v. State Dep't of Natural Resources*,
276 N.W.2d 738 (Wis. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Preseault v. I.C.C.*,
853 F.2d 145 (2nd. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Preseault v. Interstate Commerce Commission*,
494 U.S. 1 (1990) (*"Preseault I"*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 27, 29

*Preseault v. United States*,
100 F.3d 1525 (Fed. Cir. 1996) (*"Preseault II"*). . . . . . . . . . . . . . . . . . . . . . . 1, 7-11, 22-29

*Preseault v. United States*,
27 Fed. Cl. 69 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Railway Co. v. Alling Denver and Rio Grande Ry. Co.*,
99 U.S. 463 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Rio Grande Western Railroad Co. v. Stringham*,
239 U.S. 44 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 17, 19, 20

*Robert C. Herd & Co., Inc. v. Krawill Machinery Corp.*,
359 U.S. 297 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Schmitt v. United States*,
2003 WL 21057368 (S.D. Ind. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Schnabel v. County of DuPage*,
428 N.E.2d 671 (Ill. App. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Shaw v. Railroad Co.*,
101 U.S. 557 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 18

*Smith v. Townsend*,
148 U.S. 490 (1893). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Swendig v. Washington Water Power Co.*,
265 U.S. 322, 44 S.Ct. 496, 68 L.Ed. 1036 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

*Toews v. United States*,
376 F.3d 1371 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 11, 23, 25-29

*United States v. Union Pacific R.R. Co.*,
91 U.S. 72 (1875) (*"Union Pacific I"*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*United States v. Union Pacific R.R. Co.*,
353 U.S. 112 (1957) (*"Union Pacific II"*) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 7, 15, 18

*Vizcaino v. U.S. Dist. Court for Western Dist. of Washington*,
173 F.3d 713 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Wyoming v. Udall*,
379 F.2d 635 (10th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATUTES**

16 U.S.C. §§ 1241-1251
National Trails System Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 12

23 U.S.C. § 316. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

43 U.S.C. § 912
Railroad Right-of-Way Abandonment Act of March 8, 1922, 42 Stat. 414. . . . . . . . . . . 20

43 U.S.C. § 913. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

43 U.S.C. 934-939
General Railroad Right of Way Act of March 3, 1875, ch. 152,
18 Stat. 482. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

43 U.S.C. § 940. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14

43 U.S.C. §§ 942-1 to 942-9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16

49 U.S.C. § 10502. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

49 U.S.C. § 10505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

49 U.S.C. § 10903. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Union Pacific Land Grant Act of July 1, 1862, § 6, 12 Stat. 489,
*amended by* Act of July 2, 1864, ch. 216, 13 Stat. 356. . . . . . . . . . . . . . . . . . . . . . . . . 16

**REGULATIONS**

43 C.F.R. § 243.2 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

43 C.F.R. § 2842(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

49 C.F.R. § 1152.29(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

49 C.F.R. § 1152.50(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

49 C.F.R. §§ 1152.29(b) & (d).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**LEGISLATIVE MATERIALS**

H. Rep. No. 4777,
59th Cong., 1st Sess. p. 2 (Ser. No. 4908). . . . . . . . . . 14

H.R. REP. NO. 217,
67th Cong., 1st Sess. (1921). . . . . . . . . . 20-22

**OTHER AUTHORITIES**

*Rail Abandonments–Use of Rights-of-Way as Trails,*
Ex Parte No. 274 (Sub-No. 13), 2 I.C.C.2d 591 (1986). . . . . . . . . . 12

Paul W. Gates, *History of Public Land Law Development*
(Public Land Law Review Commission, 1968). . . . . . . . . . 3

## I. QUESTION PRESENTED

By operation of the National Trails System Act, 16 U.S.C. §§ 1241-1251 (the "Trails Act"), railroad rights of way which would otherwise be ripe for abandonment may be converted to linear parks or recreational trails, with the potential to be restored in the future to railroad use if the need arises. When trail use is implemented a landowner's interests in vested rights are "blocked" and any takings claim will accrue. *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004).

Under controlling law, the question of liability turns on whether the scope of the interests granted to the railroad under the General Railroad Right of Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified as 43 U.S.C. 934-939) ("1875 Act"), was limited to railroad purposes and, if limited in scope, whether applicable law nonetheless allows for recreational, linear park use on private properties burdened by the new easement. *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (*"Preseault II"*); *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004). Here, this latter question includes the issue of whether, as federal statutory grants, the 1875 Act easements were intended by Congress to be used as a perpetual right of way system to burden settlers' lands for any and all public uses as deemed appropriate by Congress.

## II. BRIEF ANSWER

When the 1875 Act easements were created and the legal subdivisions burdened by the easements were patented to settlers, the scope of the railroad grants were for railroad purposes only and patentees received the full subdivision burdened only by these easements. In granting these easements, the United States used common law language to denote the grant: "all such lands over which such right of way shall pass shall be disposed of subject to such right of way"; and in patenting the legal subdivisions to settlers of public lands, while making other express

reservations, Congress did not expressly reserve to the United States the right to control or retain these railroad interests for other, non-railroad purposes. *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005). Under those circumstances, the United States did not retain any interests whereby it could later impose upon patentee's lands the markedly different use of a recreational, linear park. This is so because "[n]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express." *Shaw v. Railroad Co.*, 101 U.S. 557, 565 (1879). When Congress passed the 1875 Act and the patent interests soon thereafter vested here, it was well-settled that "a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it." *Hastings v. Whitney,* 132 U.S. 357 (1889). Thus, while Congress in 1875 was *empowered* to create transportation rights of way for all public purposes, including for linear parks, *it did not do so in the 1875 Act* nor in supplemental acts, and accordingly no such reservations shall therefore be divined. *Leo Sheep Co. v. United States,* 440 U.S. 668 (1979); *Swendig v. Washington Water Power Co.,* 265 U.S. 322 (1924). For these reasons, the United States is liable for a taking of Category 1 lands, and just compensation is due to eligible class members whose properties are burdened by the Trail.

## III. BACKGROUND

### A. Circumstances Surrounding the Enactment of the 1875 Act.

In the early to mid-1800's great efforts were underway to settle the public lands of the United States. *United States v. Union Pacific R.R. Co.*, 91 U.S. 72, 79-82 (1875) ("*Union Pacific I*") (offering a detailed history of the period leading to land and railroad right of way grants).

> The war of the rebellion was in progress; . . . [additionally,] owing to complications with England, the country had become alarmed for the safety of our Pacific possessions . . . and there . . . was a vast unpeopled territory lying between the Missouri and Sacramento Rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. . . .

*Id*. at 79-80; *see also United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 125 (1957) ("*Union Pacific II*") (Frankfurter, J., *dissenting*) ("[d]uring this period 'there passed into the hands of western railroad promoters and builders a total of 158,293,000 acres, an area almost equaling that of the New England states, New York and Pennsylvania combined'") (citation omitted); *see also* Paul W. Gates, *History of Public Land Law Development* 356-77 (Public Land Law Review Commission, 1968).

But over time, public disfavor concerning railroad land grants took hold. The disfavor resulted in numerous State Legislators declaring, "land grants were a violation of the spirit and interest of the national Homestead Law and manifestly in bad faith toward the landless," and on March 21, 1870, the House adopted the resolution that "the public lands should be held for the 'exclusive purpose of securing homesteads to actual settlers.'" *Id.* at p. 380-81.

The 1875 Act "was [hence] the product of a period." *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 273 (1942) (citations omitted). "The Act was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement." *Id*. at 272. This period saw a "sharp change in Congressional policy" from the earlier period where, as expressed through a House Resolution, the new primary goal was to secure lands for settlers. *Id*. at 273-274 (*quoting* Cong. Globe, 42d Cong., 2d Sess., 1585 (1872)). Accordingly, with this change in policy, Congress first passed a series of special acts granting the "right of way" through public lands to specific railroad companies. *Id*. at 274. Referring to the intent of these special grants, proponents explained that the railroads were

receiving "merely a grant of the right of way," or, "nothing but a grant of the right of way." *Id.* Over time the special grants became burdensome and Congress passed the 1875 Act which bestowed the rights to construct a railway line over public lands to any railroad company so long as the terms of the Act were met. *Id.* at 275. The 1875 Act consisted of six sections where under Sections 1 and 4 Congress bestowed merely a right of way to the railroad:

> [SEC. 1.] *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the right of way through the public lands of the United States is hereby granted to any railroad company . . . .
> * * *
> SEC. 4. . . . . all such lands over which such right of way shall pass shall be disposed of subject to such right of way . . . .

(Emphasis in the original); (for the entire text, *see* Ex. 1.)

**B. Legislation Enacted in the 1900's.**

As far as can be determined, in the first quarter century following the passage of the 1875 Act, Congress passed no act that specifically sought to amend or supplement the 1875 Act. Worth noting, however, Congress on May 14, 1898, passed a bill that extended the rights already available under the applicable Homestead laws for eligible citizens of the United States to any intrepid frontiersperson who was willing to homestead in the public lands of the District of Alaska. *See* Act of May 14, 1898, ch. 299, 30 Stat. 409 (codified as 43 U.S.C. §§ 942-1 to 942-9) ("Alaska Act of 1898") (Ex. 11). This Act additionally granted railroad companies the right to construct and operate rights of way. *Id*, §2. In contrast to the 1875 Act, however, the Alaska Act of 1898 also granted rights to construct wagon roads anywhere in the Territory by any company who would meet its requisite terms, *id*., §6, and granted rights to any eligible person or company to acquire land for commercial purposes along bodies of water but reserved to the United States strips of land for the "public" for "highway" purposes. *Id.*, § 10. (*See* Ex. 11.)

Several years later, Congress passed two acts that specifically addressed the 1875 Act. These acts provided for the disposition of any rights of way forfeited under the 1875 Act. *See Great Northern*, 315 U.S. at 276-77. The statutes addressed forfeiture of railway grants under two possible contingencies: (1) the lands traversed by the rights of way were still public lands held by United States; and (2) the lands traversed by the rights of way had been conveyed to private owners. *See* Act of June 26, 1906, ch. 3550, 34 Stat. 482 (codified as 43 U.S.C. § 940); Act of February 25, 1909, ch. 191, 35 Stat. 647 (codified as 43 U.S.C. § 940) (materially similar) (collectively "Forfeiture Acts"). In the former contingency, the statute provided that "the United States hereby resumes the full title to the lands covered, thereby freed and discharged from such easement." *Id.* In the latter contingency, "the forfeiture declared shall, without need of further assurance or conveyance, inure to the benefit of any owner or owners of land conveyed by the United States prior to such date subject to any such grant of right of way or station grounds." *Id.* The Supreme Court found these two acts supported the inference that only easements were granted under the 1875 Act, *Great Northern*, 315 U.S. at 276-77, and the Federal Circuit rejected the Defendant's argument that the statute established the United States retained interests in lands already patented to settlers. *Hash*, 403 F.3d at 1315.

Following this early part of the 1900's, substantial confusion in Congress and the courts arose concerning railway interests. Two Supreme Court cases, *Northern Pacific Railway v. Townsend*, 190 U.S. 267 (1903) and *Rio Grande Western Railroad Co. v. Stringham*, 239 U.S. 44 (1915), led to the errant conclusion that the 1875 Act easements were defeasible fees with an implied reversionary interest in the United States. The Court in *Great Northern* clarified that the interests were merely easements for railroad purposes. *Union Pacific II*, 353 U.S. at 119.

## IV. ARGUMENT

### A. The Federal Circuit Issued a Mandate, Holding the United States has Taken Category 1 Properties and Instructing the Court to Determine Just Compensation Due to Eligible Class Members.

On appeal, the questions before the Federal Circuit turned on the nature and scope of the interests granted under the 1875 Act and the determination of whether the United States had retained some type of right or control over those interests. Plaintiffs contended the scope of the grant was limited to an easement for railway use and that no interests had been retained by the United States in any manner whatsoever. Defendant contended that no matter how the grant was characterized, inherent in the grant was an implied condition of reverter, and relied on various theories that the United States intended to retain the interests granted under the 1875 Act for future, alternative public use. *See Hash*, 403 F.3d at 1313-1318. The arguments the Government now advances have already been briefed and the question was decided by the Federal Circuit:

> On the railway's abandonment of its right-of-way these owners were disencumbered of the railway easement, and upon conversion of this land to a public trail, these owners' property interests were taken for public use, in accordance with the principles set forth in the *Preseault* cases. On remand the district court shall determine just compensation on the conditions that apply to these landowners.[1]

Central to Defendant's and its *amicus*, Rails-to-Trails Conservancy ("RTC"), arguments on appeal was the theory that the United States had implicitly or expressly retained, from the bundle of sticks patented to homestead families, the right of the United States to change the railway easements to an expansive "public transportation system" for "highways" or for "other public transportation" purposes (to later be converted to recreational trail use). (*See* Excerpted

---

[1] *Id* at 1318. The Defendant petitioned the panel for a rehearing to seek relief from the mandate either by reconsidering the merits of the issue or by deleting the above mandate. The petition was denied.

Brief for Appellee The United States, (Appellee Br.), attached as Ex. 3, at, *inter alia*, 10, 17, 36, 38 n.7; Excerpted Brief for RTC ("RTC App. Br."), attached as Ex. 4; *see also*, Table of Excerpted Defendant and RTC Arguments: Appeal 2003 and Remand 2006 ("Table of Excerpts"), Ex.5.) Plaintiffs fully addressed those issues in their briefing. (Excerpted Opening and Reply Briefs for Plaintiffs-Appellants ("Appellants Br." and "Appellants Reply," respectively), attached as Exs. 6 & 7.)

The Federal Circuit addressed the Government's various theories as a threshold matter. The court distilled the "*various modifications*" of these theories by boiling them down to an appropriate formulation: the court observed the Government was arguing "*to the effect that whatever the rights*" granted, the United States owned a reversionary interest in fee title:

> The government's position in the district court was that it owns the reversionary interest on abandonment of the right-of-way. In *Preseault,* 100 F.3d at 1533, this court explained that having the "reversionary interest" in an easement is the same as having the fee in the land occupied by the easement burdened by the easement itself. *On appeal the government argues various modifications of this theory*, to *the effect that whatever the rights acquired by the Railroad* and by the landowners, *on abandonment of the right-of-way the United States owns the reversionary interest* and thus owns the rail corridor in fee.

*Hash*, 403 F. 3d at 1313 (emphasis added). Accordingly, thereafter the court coined the argument as being the United States owned the underlying land to the right of way in "fee."

Distilling the various arguments down to the characterization that the United States was "in effect" arguing for a reversionary interest in "fee" title in the entire corridor is appropriate under the law. The 1875 Act rights of way are "easements." *Great Northern*, 315 U.S. 262; *Union Pacific II*, 353 U.S. 112 (stating that "[i]n [*Great Northern*] we noted that a great shift in congressional policy occurred in 1871: that after that period only an easement for railroad purposes was granted"). As the Federal Circuit earlier explained in the referenced *Preseault II*

decision, by definition an easement is merely a burden to an underlying estate which when extinguished must inure to the benefit of the owner who is "seised of the freehold estate"; and therefore if a party claims ownership to the so-called "reversionary interest" in that "easement," that party is necessarily claiming ownership in the fee estate underlying the easement–the "servient estate." In direct contrast, a "reversionary interest" under common law constitutes a future possessory interest in fee title. *Id*. There is no middle ground between these two concepts. *Id*. Therefore a "reversionary interest" in an *easement* can not coexist under common law to mean anything other than claiming ownership in the underlying fee to the easement. *Id; Hash*, 403 F.3d at 1313. For that reason, the balance of the *Hash* decision, which referred to the Government's position that it claimed the "fee" in the right of way, was an apt depiction of the "retained interest" argument the Government advanced in various forms. 403 F.3d at 1313.

The application of common law principles to the railroad easement, as explained by the court, *id*., are important here when understanding the scope of interests granted under the 1875 Act. As was extensively briefed to the Federal Circuit, in the absence of an express indication to the contrary, it must be assumed that Congress intended common law to apply to the meaning of the terms used in a statute:

> Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. *In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them*.

*Evans v. United States*, 504 U.S. 255, 259-60 (1992) (*quoting Morissette v. United States*, 342 U.S. 246, 263 (1952)) (emphasis added). This was understood by the 1875 Congress to be the law when passing the 1875 Act. *See Shaw*, 101 U.S. at 565, *supra*; (*See also* Appellants Reply,

Ex.7, at 6-9.)

In sum, the issue now before the Court has been addressed on its merits. To be sure, the issues were not couched in terms of whether the Government was, in fact, liable for a taking. Rather, the issues concerned the scope and nature of the railroad interests granted to the railroads under the 1875 Act and the interests purportedly retained by Congress. (*See* Table of Excerpts, Ex.5, Appellee Br., Ex.3; Appellants Reply, Ex.7.)

When acting under an appellate court's mandate, a trial court on remand cannot vary the mandate, or "examine it for any other purpose than execution." *Vizcaino v. U.S. Dist. Court for Western Dist. of Washington*, 173 F.3d 713, 719 (9th Cir. 1999) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). It can only consider "any issue not expressly or impliedly disposed of on appeal." *Id.* Here, on appeal, the Federal Circuit considered the issue of whether the United States retains any interest in the railway easement granted under the 1875 Act upon discontinuance of the use by the railroad. The Federal Circuit answered the question in the negative and therefore remanded the case to this Court to determine just compensation. Accordingly, Plaintiffs respectfully submit, the Federal Circuit's mandate precludes this Court from exercising jurisdiction over this question.

**B. The Government Is Liable for Taking Private Land Because the Scope of the Rights of Way Granted Solely to Railroads under the 1875 Act Which Burdened Patentees' Lands Did Not Include the Use of Linear Parks for Hiking, Picnicking, Wildlife and Nature Walks, and Other Recreational Pursuits**.

The Federal Circuit has twice ruled on the elements a landowner must satisfy to establish liability by the United States in a rails-to-trails takings claim. First, in *Preseault II*, in a seminal decision as to the United States' liability in a rails-to-trails takings case, the majority of judges sitting *en banc* held the United States liable and explained the circumstances under which

liability against the Government would be found. 100 F.3d 1525. The second time, in *Toews*, 376 F.3d 1371, the court again found the United States liable and reinforced the principles and teachings so carefully addressed in *Preseault II*. Important to understanding the impact and precedential weight of the *Preseault II* decision, the Federal Circuit in *Toews* re-affirmed that the *Preseault II* decision reflected the "considered view of a substantial majority":

> Since there was a written concurrence by two of the majority judges, the Government throughout its brief insists on referring to the opinion of the en banc court in *Preseault* as a "plurality" opinion, presumably to weaken its precedential value. Even a cursory reading of the concurrence shows that there was no disagreement on any of the issues, as well as on the result. Whether denominated as a 'concurrence' or as 'additional views,' an appellation used in other cases under similar circumstances, the holding of the case reflects the considered view of a substantial majority of the court.

*Toews*, 376 F.3d at 1380 n.6.[2]

The question of liability for a rails-to-trails conversion turns on "the scope of the easements originally granted to the railroad." *See Toews*, 376 F.3d at 1376. The Government shall be held liable for a taking if the new use to which a right of way is put–here, recreational, linear parks–is outside of the scope of the original interests burdening a landowner's property and so long as no applicable law permits the "shifting use." *Toews*, 376 F.3d at 1376, 1377-79; *Preseault II*, 100 F.3d at 1544, 1549; *accord, Glosemeyer v. United States*, 45 Fed. Cl. 771 (2000) (conversion to trail use is a taking); *Schmitt v. United States*, 2003 WL 21057368 (S.D.Ind. 2003) (same); *Lawson v. State*, 730 P.2d 1308 (Wash. 1986) (en banc) (conversion to trail use is an impermissible taking); *Schnabel v. County of DuPage*, 428 N.E.2d 671 (Ill. App. 1981) (trail use is not same as railroad use); *Pollnow v. State Dep't of Natural Resources*, 276

---

[2] Despite the admonition, Defendant and the RTC persist in the usage of "plurality" here. (Def.'s Br. at 26; RTC Br. at 1 n.4.) Remarkably, RTC acknowledges *Preseault II* found the government liable and then signals "*but see*" to an earlier Second Circuit decision as if to say the earlier decision undermines subsequent, controlling precedent from the Federal Circuit.

N.W.2d 738 (Wis. 1979) (same). As to questions of whether "railbanking" might constitute "railroad purposes" (Def.'s Br. at 21), or whether the right of way may be deemed not "abandoned" such that no taking has occurred (Def.'s Br. at 28), the court has *twice* held that these issues are immaterial to the question of liability. *Toews*, 376 F.3d at 1376, 1381; *Preseault II*, 100 F.3d at 1549 ("we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use"), 100 F.3d at 1554 (Lourie, J. *concurring*) (discussing railbanking and noting "[t]he vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement."). Accordingly, the question in this takings case is whether the scope of the easement granted to the railroad under the 1875 Act was limited to railroad purposes and if so, whether applicable law in effect during the vesting of interests nonetheless permits a change in use from railroad uses to recreational, linear parks.

**1. Regulatory Background.**[3]

Since the early 1900's, available railroad trackage declined steeply due to abandonment of use of rights of way. *Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 6 (1990) (*"Preseault I"*). This was so despite the onerous regulatory proceedings that created substantial delays in the ability of the railroads to abandon and liquidate unwanted rights of way. *See Hayfield Northern R.R. Co., Inc. v. Chicago and North Western Transp. Co.*, 467 U.S. 622, 628-29 (1984). To forestall the loss of railroad rights of way nationwide, Congress enacted, *inter alia*, the National Trails System Act, 16 U.S.C. §§ 1241-1251. The Trails Act allows railroads to

[3] Defendant's review of the regulatory background (Def.'s Br. at 3), is adopted by Plaintiffs with the following additional discussion.

relatively easily divest themselves of railways otherwise ripe for abandonment, and permits these railways to be converted to recreational trails while preserving the corridor for potential future railroad use–referred to as "railbanking." *See* 16 U.S.C. § 1247(d); *Preseault I*, 494 U.S. 1.

To abandon a right of way and divest itself of liability and responsibility, the railroad has the option of filing with the Surface Transportation Board ("STB") an abandonment application under 49 U.S.C. § 10903 or an exemption request under 49 U.S.C. § 10502.[4] To be eligible for an exemption, the railroad must show that no local traffic has run on the line in at least two years. 49 C.F.R. § 1152.50(b). Once the railroad has filed an appropriate submission, any qualified party interested in converting the right of way into a trail must submit a petition pursuant to 49 C.F.R. § 1152.29(a). If the railroad is willing to negotiate with such prospective trail sponsor, the STB is notified and will automatically issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. §§ 1152.29(b) & (d). The NITU allows for 180-day period for the railroad to negotiate with the trail sponsor. § 1152.29 (d)(1). If "the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to [STB]-imposed terms and conditions." *Preseault I*, 494 U.S. at 7.

If on the other hand no agreement is reached, the railroad may abandon the line entirely and liquidate its interest. *Id.* In other words, a NITU can lead to no conversion at all but to full abandonment of the right of way. *Id.* Accordingly, the STB refers to a NITU as being "dual-purpose." *Rail Abandonments–Use of Rights-of-Way as Trails,* Ex Parte No. 274 (Sub-No. 13), 2 I.C.C.2d 591, 612 (1986) (Commission comment).

---

[4] The railroad at issue in this case, the Idaho Northern & Pacific Railroad Company, filed for exemption under 49 U.S.C. § 10505, repealed, effective January 1, 1996, by Pub. L. 104-88, but materially similar in form to § 10502.

**2. Conversion of the 1875 Act Railroad Easements to Recreational Linear Parks Is Beyond the Scope of the Original Easements Which Burdened Patentee's Title.**

Class members' interests, if any, vested at the time their predecessor patentees received their land patents from the federal government. *Leo Sheep*, 440 U.S. 687-88, *supra*; *Hash*, 403 F.3d at 1314-15. Accordingly, there are two transactions at issue here where the United States could potentially retain the interests the Government now claims. Those transactions are when (1) the United States granted 1875 Act rights of way and, (2) the land patents were issued. *See id.* As to the latter, the United States could have, but did not, retain "reversionary" interests in the rights of way when patenting land to settlers. *See id.*[5] Accordingly, the United States is liable for taking class members' properties unless, through the 1875 Act or supplemental legislation prior to the issuance of land patents, Congress expressly created interests in the 1875 Act that were to burden settlers' lands and allow for linear parks. *See id.*

***a. The 1875 Act Easements Were Limited to Railroad Purposes.***

The express terms of Section 4 of the 1875 Act itself provided that the railway easements granted under the act merely burdened the public land and "thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way." *Hash*, 403 F.3d at 1398; *Beres v. United States*, 64 Fed. Cl. 403, 416-17 (2005). These easements were limited to railroad purposes which, when abandoned, were intended to be extinguished, and the rights that were vested in the servient estate at the time of the issuance of the original patents would be fully restored:

---

[5] The class members' predecessors in interest received their patents with certain, express reservations for ditches and canals, but without any express reservations in the Government for a "right of way for public purposes" or "highway", or any other type of easement that could be put to public transportation use, let alone recreational trail use. *See Hash*, 403 F.3d at 1308.

- “SEC. 4. That any railroad company desiring to secure the benefits of this act, shall . . . file with the register of the land office . . . a profile of its road; and upon approval thereof . . . thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: Provided, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road.”

1875 Act, §4 (emphasis added).

- “[W]hen the act was passed, we do not doubt that *the intention of Congress was to grant* to the company *a present beneficial easement* in the particular way over which the designated routes lay, *capable*, however, *of enjoyment only when* the way granted was actually located, and, in good faith, *appropriated for the purposes contemplated by the charter of the company*, *and the act of Congress*.” *Railway Co. v. Alling Denver and Rio Grande Ry. Co.*, 99 U.S. 463, 475 (1878).

*See Great Northern*, 315 U.S. at 279 (*citing Alling Denver* as one of two cases, “far more persuasive” than the *Stringham* line of cases, and that construed similar federal right of way grants to the 1875 Act that were passed after 1871) (emphasis added).

- “Doubtless whoever obtained title from the government to any quarter section of land through which ran this right of way would acquire a fee to the whole tract, subject to the easement of the company; and *if ever the use of that right of way was abandoned by the railroad company, the easement would cease,* and *the full title to that right of way would vest in the patentee of the land*.” *Smith v. Townsend*, 148 U.S. 490 (1893).

*See Great Northern*, 315 U.S. at 279 (*citing Smith* as the second “far more persuasive” case) (emphasis added).

- “*The right* as originally conferred and as proposed to be protected by this bill *simply grants an easement or use for railroad purposes*. Under the present law whenever the railroad passes through a tract of public land *the entire tract is patented to the settler* or entryman, *subject only to this easement*.” H. Rep. No. 4777, 59th Cong., 1st Sess. p. 2 (Ser. No. 4908).

*Great Northern*, 315 U.S. at 277 (*quoting* Report on an act that confirmed a grant under the 1875 Act to certain railroads) (emphasis added):

- [If the legal subdivision burdened by an 1875 Act easement had already been patented to a settler, upon forfeiture or abandonment of that easement, the right of way did not transmogrify into a different “public transportation” easement but rather,] “the forfeiture declared *shall*, without need of further assurance or conveyance, *inure to the benefit of any owner or owners of land conveyed by the United States* prior to such date subject to any such grant of right of way or station grounds.”

Forfeiture Acts of 1906 & 1909*, see* §III.B., *supra* (emphasis added).

- "43 C.F.R. § 2842(a) A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. It obtains only the *right to use the land for the purposes of which it is granted and for no other purpose* . . . . The Government conveys the fee simple title in the land over which the right-of-way is granted to the person to whom patent issues for the legal subdivision on which the right-of-way is located, and such *patentee takes the fee subject only to the railroad company's right of use and possession*."

*Hash*, 403 F.3d at 1314-15 (*quoting* 43 C.F.R. § 2842(a) (1909)) (emphasis added).

- §243.2 *Nature of Grant*. A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. *It obtains only the right to use the land for the purposes for which it is granted and for no other purpose*, and may hold such possession, if it is necessary to that use, *as long and only as long as that use continues*. The Government conveys the fee simple title to the land over which the right-of-way is granted to the person to whom patent issues for the legal subdivision on which the right-of-way is located, and *such patentee takes the fee, subject only to the railroad company's right of use and possession. . . .*

43 C.F.R. § 243.2 (1938) (specifying the 1875 Act) (emphasis added).

- In [*Great Northern*] we noted that a great shift in congressional policy occurred in 1871: that after that period *only* an *easement for railroad purposes was granted.*

*Union Pacific II*, 353 U.S. at 119 (emphasis added).

- [Noting that the United States conceded that on post-1871 federal right-of-way grants], "*title to the servient estate* [of such grants] *passes* without express mention in a subsequent grant by the United States of the traversed tract")

*Wyoming v. Udall*, 379 F.2d 635, 640 (10th Cir. 1967) (emphasis added).

That these sources expressed the rights to be easements for railroad purposes is unremarkable given the context in which they were granted. The easements were the "product of a period," *Great Northern*, *supra*; §IIIA, *supra.* No longer was the exigency of war or difficulties with Britain the driving force behind rights of way grants. Rather, the period saw a "sharp change" in policy, and Congress was resolved that "the public lands should be held for the purpose of securing homesteads to actual settlers." *Great Northern*, 315 U.S. at 273-274 (*quoting* Cong. Globe, 42d Cong., 2d Sess., 1585 (1872)). Thus, in contrast to the earlier right of way grants that had expressly reserved to the United States the ability to use the established

rights of way for the purposes of communications and troops, the 1875 Act was silent as to any express reservation for maintaining a perpetual use for the Government's or the public's need.[6]

Likewise, in contrast with the Alaska Act of 1898, §II.A., *supra,* which authorized the construction of wagon roads anywhere within the Territory and expressly reserved strips of land to the United States for purposes of highways, the 1875 Act had no such comparable provisions. (*Compare* 1875 Act, Ex. 1, *with* Alaska Act of 1898, §§6, 10, Ex. 11.)

Defendant argues Section 2 of the Act evinced Congress's intent to "[c]reat[e] a larger transportation network." (Def.'s Br., 15, 20.) But Section 2 of the 1875 Act merely targeted the occasional impassable topography where, in a canyon, pass, or narrow passage in a gorge, cooperation with other railroad companies' "roads" would be necessary:

> At the time of the passage of the act of March 3, 1875, Congress had become convinced of the importance to the country, and particularly to the Western States, of preserving canyons, passes, and defiles in the public domain for the equal and common use of all railroad companies.

*Alling Denver*, 99 U.S. at 480. The provision additionally anticipated the need for a railroad company acquiring a grant under the 1875 Act to cooperate with "any wagon or other public highway now located therein," or to be located therein, in order to avoid the monopolization of a narrow pass by one railroad company alone. *Cf. id.* But Congress's intention to safeguard canyons from being monopolized by a single railway company does not support the substantial

---

[6] *Compare*, 1862 Union Pacific Land Grant Act, § 6, 12 Stat. 489, 493 (". . . the grants aforesaid are made upon condition that said company shall . . . keep said railroad and telegraph line in repair and use, and shall at all times transmit despatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the government, whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid . . ."), *with*, the 1875 Act, § 4, 18 Stat. 482, ("thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way").

inferential leap (*See* Def.'s Br. at 15)[7] that Congress "expressly" retained or intended to create "public highways" to be maintained in the public domain for later conversion to linear recreational parks. *See King v. Saint Vincent's Hosp.,* 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.") (internal quotation and citation omitted). Under the plain meaning of the statute and controlling authority the lands were to be "disposed of subject to such right of way" as explained by the Supreme court, Congress, and the Land Department, *supra*.

***b. The Issue Is Not Whether the United States Could Reserve to Itself the Right of Way Interests, but Whether it Did; Manifestly it Did Not.***

The Government argues that Congress had the authority to grant railroad easements subject to its own terms and conditions. (Def.'s Br. at 12-16.) To begin with, the argument relies on decisions primarily stemming from *Idaho v. Oregon Short Line R.R. Co.*, 617 F. Supp. 207 (D. Idaho 1985), such as *Barney v. Burlington N. R.R.*, 490 N.W.2d 726 (S.D. 1992). These cases relied on the discredited *Townsend* and *Stringham* decisions and failed to consider *whether* Congress, who undisputably had authority to grant rights of way on its own terms and conditions, *actually intended to do so* through the 1875 Act? As such, the underlying premises and holdings in these cases were rejected by the Federal Circuit in their entirety. *Hash*, 403 F.3d 1308; *accord Beres*, 64 Fed. Cl. at 423-25 ("[o]f significance is that none of the cases which have found a reversionary interest in the United States analyzed the words of the 1875 Act, or an intervening

---

[7] Defendant juxtaposes "railroads" with the quoted phrase from Section 2, "'other public highways,'" presumably as if to imply the "plain language" of Section 2 makes the same juxtaposition. (Def.'s Br. at 15.) Not so; the quoted language is taken out of context. Section 2 of the Act describes any railroad right of way as simply a "road." The quoted "other public highways" reference in the statute refers to "wagon roads," not the "rail road." (*See* Ex. 1, §2.)

land patent from the United States, to determine the nature of the land interest before and after a railroad right-of-way grant.")

Moreover, the common law is accorded respect in statutory construction *even in cases where no particular terminology is at issue*. "No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express." *Shaw*, 101 U.S. at 565; *see also Robert C. Herd & Co., Inc. v. Krawill Machinery Corp.*, 359 U.S. 297, 304-05 (1959).

Thus, the question in this case is not whether Congress *could* "pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests." *Oregon Short Line*, 617 F. Supp at 212, the question is whether Congress *did* so in the express terms of the 1875 Act. The answer is clearly no. Nothing in the Act purports to create a "unique estate" in the railroad. Nothing in the Act purports to characterize the easement, which was the "estate" the railroad received, as anything other than a common law easement. Nothing in the Act purports to reserve any interest of any kind in the railroad's "estate" to the United States. All that the Act does is grant the railroad "the right of way through the public lands of the United States." 1875 Act, § 1. And, as shown in §4 and contemporaneous Supreme Court decisions, Congress intended for the rights to vest in patentees.

In the face of "silence" from "the body that is empowered to give us a 'contrary direction' if it does not want the common-law rule to survive," the statute must be given the meaning it conveys under common law. *See Evans*, 504 U.S. at 269. In 1875, Congress granted the railroads an "easement for railroad purposes," *Union Pacific II*, 353 U.S. at 119; *Smith v. Townsend,* 148 U.S. 490 (1893), and thereafter "all such lands over which such right of way shall pass shall be disposed of subject to such [easement]." The meaning is plain and the statute is

utterly devoid, as are the patents, of any indication that the United States intended to withhold a "stick" from the bundle granted to the railroads and patentees, to be held in perpetuity for a broad "public transportation system purpose" should the railroad purpose end. *See* § IV.B.2.a, *supra.*

### *c. The 1920's Legislation Did Not and Could Not Operate to Change the Interests Granted under the 1875 Act or to Patentee Settlers.*

During the early 1900's, some confusion arose as to the nature of interests granted under the 1875 Act but Defendant relies on authority emanating from that confusion to make its case for summary judgment. (Def.'s Br. 20, 27.) The confusion arose from Supreme Court decisions where the Court had addressed numerous instances where a dispute had arisen over the interests acquired by railroad companies pursuant to land grant statutes enacted prior to 1871. *See Great Northern*, 315 U.S. at 277-78. As to the land grant statutes, the Court held in *Townsend*, *supra*, that the railroad received a "'limited fee, made on an implied condition of reverter'" to the United States. *See Great Northern*, 315 U.S. at 276-77 (*quoting Townsend,* 190 U.S. at 271, and *citing* scores of cases concerning land grants with similar holdings). Soon thereafter, in 1915, in *Stringham*, *supra,* the Court extended this holding to the 1875 Act, and likewise held that the Act granted a limited fee with an implied condition of a reverter. *Great Northern*, 315 U.S. at 276 (*citing Stringham,* 239 U.S. 44); *see also id*. at 277-78 (*citing Choctaw, O. & G.R.R. Co. v. Mackey*, 256 U.S. 531 (1921), and *Noble v. Oklahoma City*, 297 U.S. 481 (1936) as having relied on *Stringham* for the same proposition).

In 1942 in the *Great Northern* decision, however, the Court reversed itself and overruled the *Stringham* line of cases, finding that the 1875 Act granted only an easement to the railroad. 315 U.S. at 279. The Court held "[s]tatements in" *Mackey* and *Noble* "that the 1875 Act conveyed a limited fee are dicta based on the *Stringham* case and entitled to no more weight than

the statements in [*Stringham*].” *Id*; *see also Beres* (“It is also clear in the Supreme Court’s later decision in *Great Northern* that the United States Supreme Court specifically overturned the *Stringham* line of cases, which had previously described the railroads’ interest as a ‘limited fee.’”). As such, the reasoning found in *Stringham,* which relied on *Townsend* to hold that the 1875 Act rights of way were anything other than easements, was “inconsistent with the language of the Act, its legislative history, its early administrative interpretation and the construction placed on it by Congress.” 315 U.S. at 279; *accord, Union Pacific II*, 353 U.S. at 119.[8]

Almost half a century after passing the 1875 Act, but with the *Stringham* line of cases not yet overturned, Congress passed legislation in 1920, 1921, and 1922, on which Defendant relies (Def.’s Br. 18-20), that addressed railroad rights of way which had originated on public lands. The first two acts, Act of May 25, 1920, ch. 197, 41 Stat. 621 (codified as 43 U.S.C. § 913), and Act of Nov. 9, 1921, ch. 119, 42 Stat. 212, 216 (codified as amended as 23 U.S.C. § 316), concerned railroad rights of way that were permitted to be dedicated to highway use. The third legislation, the Railroad Right-of-Way Abandonment Act of March 8, 1922, 42 Stat. 414, (codified as 43 U.S.C. § 912) (“Section 912 ”), concerned the disposition of abandoned railways.

Congress’s understanding of the interests granted under the 1875 Act were impelled by the-then relatively recent decisional law issued by the Supreme Court in the *Townsend* and *Stringham, supra*, decisions from 1903 and 1915. *See* H.R. REP. NO. 217, 67th Cong., 1st Sess. (1921) (reporting on purpose of H.R. 244 (Act of March 8, 1922)) (referring to “the decision of the courts” and incorporating by reference a Department of Interior letter citing *Townsend* and

---

[8] The Court also observed that during the period of confusion created by the *Townsend* and *Stringham* line of cases, the Interior Department deferred to those cases. *Id.* at 276. But the Court would “not regard this subsequent interpretation as binding on . . . the Interior since it was impelled by what we regard as inaccurate statements in the *Stringham* case.” *Id*.

*Stringham, supra*); *see also Beres*, 64 Fed. Cl. at 419 ("[i]t would appear that the language of the 1922 Act was intended to address, clarify, and resolve issues created by the imprecise language employed by the courts on this subject in the early part of the twentieth century").

The stated purpose of Section 912 in any case was to dispose of *unwanted* strips of land:

> [i]t seemed to the committee that such abandoned or forfeited strips are *of little or no value* to the Government and that in case of lands in the rural communities they ought in justice to become the property to the person to whom the whole of the legal subdivision has been granted.

H.R. Rep. No. 217, at 2. The House Report added that (*id.*),

> attention of the committee was called, however, to the fact that in some cases highways have been established on abandoned rights of way or that it might be desirable to establish highways on such as may be abandoned in the future. Recognizing the public interest in the establishment of roads, your committee safeguarded such rights [by] giving the public authorities one year's time after ... abandonment to establish a public highway.

The Government argues the statutes passed in the 1920's establish Congress's view the United States retained an interest in the rights of way and manifested a clear intention to retain the rights of way for a national transportation system purpose. (Def.'s Br. at 18.) There are several points to make on this issue. First, Congress's understanding and intention at that time were impelled by decisional law which was later overruled; for that reason, a statute that was designed to vest interests in landowners whom, as it turns out once the law was clarified, possessed those interests in the first place should carry no weight in the manner argued for by Defendant. Second, even without the benefit of the Supreme Court's retrospective look at a period in which confusion arose due to errant decisional law, *see Great Northern*, 315 U.S. at 276, under any analysis, Congress's understanding in the 1920's of an Act passed over forty-five years previously should carry little to no weight in determinations of intent. *See Beres*, 64 Fed. Cl. at 415-16 (collecting authority for general proposition that "the views of a subsequent

Congress form a hazardous basis for inferring the intent of an earlier one"); *see also, generally, id.* at 413-16 (discussing at length the principles of statutory construction generally and as applied to construing the interests granted under the 1875 Act and land patents).

Third, the main purpose of the 1922 statute, specifically passed to address abandoned railroad right of way grants, was to *dispose of*, not retain, unwanted "strips" of land that were considered "of little or no value" to the Government. H.R. Rep. No. 217, at 2. This purpose does not rise to the contrary inference that Congress considered the unwanted railway system to be an important asset to be retained in a public transportation system. The afterthought that some railways had been or might be converted to highways within a year of abandonment, *id*., does not alter the expressly stated impression that in the first instance these strips were "of little or no value" to Congress where *disposal* of these interests was the primary objective. *Id*.

Fourth, to the extent that the 1920's legislation operated to control or block the extinguishment of previously vested interests if an abandoned railway was converted to a highway, such event, too, would present a cause of action. *Preseault II*, 100 F.3d at 1553 (Rader, J., *concurring*) ("[i]n this case, the offending laws are the Transportation Act of 1920 [and subsequent Trails Acts], . . . each of which took or authorized a complicit state government to take a share of the property right.)

For these reasons, the 1920's legislation cannot support an inference that Congress expressed the intent of creating, or expressed the understanding that it had already created, a "public transportation" system in the 1875 Act railway grants which burdened settlers' lands.

***d. Railroad Uses or Even Transportation Purposes Does Not Constitute Recreational Trail Use.***

Under any analysis, the change from railroad use–or even "transportation purposes"–to

recreational linear parks is "a substantial variance in the mode of or extent of user or enjoyment of the easement so as to throw a greater burden on the servient tenement," which had never been intended by Congress or the public to burden these settlers' lands.[9] *See Preseault II*, 100 F.3d at 1535 (*quoting Bernards v. Link*, 248 P.2d 341, 347 (1952)). As explained by the Federal Circuit:

> It is elementary law that if the Government . . . authorizes the use of . . . an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. . . .
>
> And it appears beyond cavil that use of these easements for a recreational trail--for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway--is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. . . .
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other.

*Toews*, 376 F.3d at 1376-77.

Under any measure, then, a right of way for railroad purposes, including for transportation purposes, is completely different from a recreational trail or linear park:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not. Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different. . . . It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.
>
> Furthermore, there are differences in the degree and nature of the burden imposed on the

---

[9] Citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028 (1992), Defendant relies on the Court's observation that physically occupying a pre-existing limitation "assuredly would" not give rise to a takings claim. (Def.'s Br. at 10.) The proposition is true if no new or additional burden is imposed, which begs the question here.

servient estate. It is one thing to have occasional railroad trains crossing one's land. Noisy though they may be, they are limited in location, in number, and in frequency of occurrence. Particularly is this so on a relatively remote spur. When used for public recreational purposes, however, in a region that is environmentally attractive, the burden imposed by the use of the easement is at the whim of many individuals, and, as the record attests, has been impossible to contain in numbers or to keep strictly within the parameters of the easement.

*Preseault II*, 100 F.3d at 1542-43; *see also id*. at 1544 (rejecting cases upon which Defendant now relies (Def.'s Br., 23-24 n.15), as "carry[ing] little persuasive authority.)

This reasoning is just as apt when the original party granting the right of way was the United States; the understanding of Congress, the courts, the Interior, and the public, was that the patentees were taking full title only "subject to" these railroad easements for railroad purposes. *See, e.g., Hash*, 403 F.3d at 1316 (observing well-settled rule that when issuing a patent all title passes and any reservation of an easement must be express, not implied) *see* §IV.B.2.a, *supra*. In that respect, the United States could no more secretly or implicitly entertain the intent that any use other than railroad use might later be placed on these patents than it could secretly or implicitly intend to reserve to itself the "easement" to the railroad right of way. *See Leo Sheep*, 440 U.S. at 678-79; *Swendig,* 265 U.S. at 329, 331, *supra*; *Hash*, 403 F.3d at 1316.

While the railroad was still operating, it was hauling timber and other products. (*See* Def.'s Ex. 8, pp. 8-9.) Now it is serving the purpose of a linear park, where the public is invited by the trail manager to gaze on the adjoining landowners' properties, pause to view nature, picnic, hike, access "Port-A-Pottys," camping, and use other amenities on or near the trail. (*See* Ex. 2, pp. 3-4.) These uses are typical of most trails and while there is no disagreement that they benefit the recreating public, these uses were simply never contemplated by Congress when passing the 1875 Act, nor by the class members' predecessors in interest when receiving patents to the whole subdivisions subject only to railroad easements. It is reasonable to presume that

Case 1:99-cv-00718-MCW Document 61 Filed 12/12/2006 Page 73 of 92

these patentees, were able to farm, protect and maintain livestock, access the other side of their properties–all without hindrance or with perhaps minor inconveniences. (*See* Jepsen, Dickerson, and Lakey Declarations, Exs. 8, 9, & 10, respectively.) Today, landowners' access to the other side of their properties are restricted, the livestock is more difficult to manage, noxious weeds are encroaching on their lands, and in some instances their farm or animals have been trespassed upon or otherwise disturbed from the trail users. In one instance, a trail user's dog ran off the trail and chased a landowner's horses, causing the terrified horses to break through the landowner's fence that contained them. (*See id.*)

Under controlling law, the recreational use is an entirely different use and places a new incumbrance on class members' properties for which compensation must be paid

**3. Defendant's "Shifting Public Use Doctrine" Does Not Apply**

Citing no controlling authority, the Defendant relies half-heartedly on a "shifting public use" doctrine (Def.'s Br. at 26), to argue that "the change in use" from railroad to recreational trail use is permitted under federal law. First, to find the doctrine applies under any circumstances, there must be applicable precedent to substantiate the claim. *Preseault II*, 100 F.3d at 1544 (observing "[t]he concept of 'shifting public use' must be anchored in established precedent, or it becomes little more than speculation . . ."). Defendant cites to none.

Second, the Federal Circuit in *Toews* had occasion to review state law in which the Doctrine could be found and the court's discussion on point is instructive here. The court first explained the concept: "[t]he Government's argument that a railroad's use of an easement may transmogrify into the public's use as a recreational trail and linear park stands on a doctrine sometimes referred to as the 'shifting public use' doctrine." *Toews*, 376 F.3d at 1377. The court next reviewed the California decisions on point and while agreeing the shifting use doctrine was

applied in those decisions, permitting a shift from street car to bus use, and from man-made canals to highway use (the latter not implicating easements at all but owned in fee by the city), the court found the doctrine failed to support the Government's position.

> Applying that narrow theme to the case before us, it is clear that under the rule as it is applied in California a public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picnickers, however desirable such uses may be for these linear strips of land. The Government has the legal power and is thus free to impose such new uses upon the fee interests held by the adjacent landowners. But the private property interests taken are not free; the Government must pay the just compensation mandated by the Constitution.

*Id.* Likewise, the Government has the legal power to regulate private- or federally-granted railroad easements–as is done under the Trails Act. But under the circumstances here, when it does so regulate, the Government must pay the just compensation mandated by the Constitution. Moreover, in contrast to the authority reviewed in *Toews*, *supra*, Defendant has cited to *no* authority to support its contention that a shifting public use doctrine under federal law exits to allow for the change in use argued for here.

**4. "Railbanking" Is Irrelevant to the Analysis.**

The Federal Circuit has twice held that "railbanking" a railroad line for future potential restoration to railroad use is immaterial to the analysis of whether rails-to-trails conversion constitutes a taking. The first time it so held, was when it reversed the Court of Federal Claims, *Preseault II*, 100 F.3d 1525, which had reasoned the Government was not liable because the right of way had been railbanked. *Preseault v. United States*, 27 Fed. Cl. 69, 94 (1992) (reasoning and holding, "[t]he nature of the encumbrance remained the same; the use to which the easements were put, evolving from railroading to railbanking, is consistent with preserving the easements for rail use."). In reversing the Federal Claims court, the Federal Circuit found that by placing a

different use on the easements–i.e., recreational trail use–the Government was liable for a taking notwithstanding, *inter alia*, the potential for future restoration to railroad uses because the new use exceeded the original scope of the easement.[10] *See Preseault II*, 100 F.3d at 1547, 1548. As concurred by Judge Rader when explaining the issues upon which the majority decision turned, "[t]he vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property inconsistent with the easement. That conversion demands compensation." *Id* at 1552.

Eight years later, in *Toews*, the Federal Circuit again addressed the issue. As it does here (Def.'s Br. 21-23, *see also* 26), the Government contended that railbanking constituted railroad purposes. The court rejected this argument for a second time, *Toews*, 376 F.3d at 1381:

> There is a reality test in takings law. It is clear from the record that for the foreseeable future these lands will be used for the recreational trail project. Whether there ever will be a light rail system or other railroad service over these paved routes in Clovis is a matter of speculation about the distant future, based on uncertain economic and social change, and a change in government policy by managers not yet known or perhaps even born. Such speculation does not provide a basis for denying protection to existing property rights under the Constitution.

The "reality test" applies equally here where there is no foreseeable chance of resumption of railroad use and any suggestion to the contrary would be speculative. (*See* Def.'s Br, Ex. 8, at 2-3) (Railroad stating "the demand for rail service" had declined to "minimal levels" and the

[10] Also, in earlier proceedings, the United States Court of Appeals for the Second Circuit had rejected a constitutional challenge advanced by the Preseaults. The Second Circuit reasoned the railbanking of the right of way constituted "railroad purposes." *Preseault v. Interstate Commerce Commission*, 853 F.2d 145, 151 (2d. Cir. 1988). While affirming the appellate court's holding, however, the Supreme Court did so for different reasons. *Preseault I,* 494 U.S. 1. As explained by Justice O'Connor in her concurring opinion, while Congress is empowered to regulate the disposition of national railway lines, "[t]he Commission's actions [of authorizing railbanking and rails-to-trails conversion] may delay property owners' enjoyment of their reversionary interests," but in so doing, "that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights." *Id.* at 22.

"revenue generated from continued rail service on The Line [would] not justify the capital and maintenance costs that [would] be required to maintain safe track conditions." ).

And it makes no difference whether the right of way was federally-created or state-created. As discussed, *supra*, there is no indication in the 1875 Act nor in the patents that issued title to settlers that those grants created expensive rights intended to be frozen in place in perpetuity, with a "stick" in the bundle patented to settlers to be withheld by the Government when patenting the lands subject only to the railroad easements. Nor is there any indication that the easements burdening settlers' lands could be converted to any purpose completely unrelated to railroad use for an indefinite period of time in perpetuity. To the contrary, the Government disposed of these lands subject only to the railway easement, not subject to any and all easements for any and all uses in perpetuity. As such, without the reservations the United States now claims it made over a hundred years later, none should be divined. *See Leo Sheep*, 440 U.S. at 678-79. Under any circumstances, "for the foreseeable future these lands will be used for the recreational trail project" and "speculation" about future railway use shall not be the "basis for denying protection to existing property rights" which vested in the patentees in the late 1800's and early 1900's "under the Constitution." *See Toews*, 376 F.3d at 1381; *accord Leo Sheep*, 440 U.S. at 678-79.

**5. The Question of Abandonment is Immaterial to Establishing Liability.**

Defendant presents argument that the right of way was never abandoned and therefore there can be no taking here. (Def.'s Br., *inter alia*, 28.) As the Federal Circuit has explained, however, questions of abandonment are beside the point. *Preseault II*, 100 F.3d at 1549 ("we find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use.");

*Toews*, 376 F.3d at 1375-6 (holding conclusions concerning abandonment of the railroad easement was not the "defining issue" and, rather, the scope of the easements are). The court's approach to this analysis makes sense, considering that the implementation of the Trails Act in and of itself precludes abandonment of railroad rights of way under federal law. *See Preseault I*, 494 U.S. at 21-22 (O'Connor, J., *concurring*).

The Federal Circuit has, however, agreed with the analysis that a railroad interest may nonetheless be considered "abandoned" when the *use* for which it was originally granted has been changed to a use not contemplated within its original scope:

> [I]f the easements were in existence in 1986 when, pursuant to ICC Order, the [trail manager] established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. Either way, the result is the same–a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.

*Preseault II*, 100 F.3d at 1550. The 1875 Act easements are to be intended for railroad uses only. As such, while not abandoned from federal jurisdiction under operation of the Trails Act, when the railroad divested its interests to a trail manager for recreational purposes, the railroad abandoned the interests for which they were originally intended. *See id.*; *Toews*, 376 F.3d at 1375-6; *Hash,* 403 F.3d at 1318; *accord Glosemeyer, Schmitt, Lawson, Pollnow*, *supra.* Indeed, but for the authorized trail conversion under the Trails Act, the "dual-purpose" NITU, §IV.B.1, *supra*, would have permitted the railroad company to abandon the unprofitable, unwanted railway that threatened "serious financial losses" to the railroad. (Def.'s Br., Ex. 8, at 4-5.)

Therefore, while a change in use from railroad use to linear parks constitutes

abandonment of the railroad easement, for questions concerning liability the defining question concerns the scope of the easement, not whether it was abandoned under federal law.

## V. CONCLUSION

The interests in dispute were vested at the time patents were granted to settlers. *E.g., Leo Sheep*, 440 U.S. 687-88, *Hash*, 403 F.3d at 1314-15. Thus, there are two transactions during which the Government could have retained the interests it now claims. The first transaction was when it granted the 1875 Act easements, and the second was when it patented fee title to the class members' predecessors in interest. In neither of those transactions, however, did Congress reserve to the Government the interests it now claims to possess in these Category 1 parcels.

For the foregoing reasons, Plaintiffs respectfully submit, (1) the Federal Circuit has issued a mandate as to Category 1 which has removed from this Court's jurisdiction the question of liability and requires the Court to proceed to determinations concerning compensation due to Class Members who are eligible to receive damages; or in the alternative, (2) the Court should deny Defendant's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment and find the Defendant liable for the taking of property burdened by 1875 Act railway easements.

Dated: July 12, 2006

Respectfully submitted,

**ACKERSON KAUFFMAN FEX, PC**

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

Case 1:01-cv-00718-TCW Document 30 Filed 07/01/2008 Page 39 of 42

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Class Representatives' Memorandum in Support of their Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment (Doc. No. 155 - Filed on June 9, 2006) as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class

Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. CV99-324S-MHW<br><br>Honorable Mikel H. Williams |

**CLASS REPRESENTATIVES' PROPOSED FINDINGS OF UNCONTROVERTED FACTS IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

Pursuant to Fed. R. Civ. P. 56 and L.R. 7.1(b), Class Representatives ("Plaintiffs"), though counsel, submit this statement of facts that are material and/or serve as background to their cross-motion for summary judgment as to Category 1 lands and that Plaintiffs contend are not in dispute.

1. The railroad right of way at issue in this case ("the subject right of way") is the former Pacific and Idaho Northern Railroad Company ("P&IN") located between Weiser and New Meadows, Idaho. This right of way is approximately 83 miles in length and generally follows the path of the Weiser River. (Pls.' Class Cert. Brief, Exhibits 2-4 (Dec. 17, 1999) (Doc. 18).)

2. The segments of the subject right of way that the P&IN acquired easement rights to pursuant to the General Railroad Right of Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified at 43 U.S.C. §§ 934-939 (1982)) ("1875 Act") have been identified by the parties as "Category 1" (Doc. 93).

3. In 1894 the Weiser and Idaho Northern Railway Company, Limited, filed a map with the Department of the Interior showing the location of the first 20 miles of its line, extending in a northerly direction from Weiser along the path of the Weiser River. (Pls.' Class Cert. Brief, Exhibit 2.) This company, who reorganized as the Weiser, Idaho and Spokane Railroad, however, failed to construct the tracks. DALE FISK AND DON DOPF, *The Story of the Pacific & Idaho Northern Railroad* 14 (Don Dopf, ed., 2001).

4. The P&IN took over the Weiser, Idaho and Spokane Railroad in February 1899. *Id.* at 15. That same year, the P&IN began to submit maps of the final location with the U.S. Land Office in Boise, concerning the subject right of way, which stated "this map has been prepared to be filed in order to obtain the benefits of Congress approved March 3, 1875, entitled an act granting to railroads the rights of way through public lands of the United States". (Pls.' Class Cert. Brief, Exs. 3-4.) The Secretary of the Interior approved these maps on April 19, 1900 "subject to all valid existing rights so far as the line of road shown thereon transverses surveyed lands." (*Id.*; *see also*, Amended Class Action Compl.,¶¶ 6-7 (Dec. 17, 1999) (Doc. 16).)

5. Construction of P&IN's line commenced and reached Cambridge in December 1900, Council in March of 1901, and Meadow Valley or "New Meadows" in 1911. (Pls.' Class Cert. Brief at 4 (citing various sources).)

6. In 1916, pursuant to the federal Valuation Act of 1913, P&IN filed their required schedule of "Lands Owned or Used for Purposes of a Common Carrier" with the Interstate Commerce Commission ("ICC"). (Pls.' Class Cert. Brief, Ex. 6; Amended Class Action Compl., ¶¶ 10-11 (Dec. 17, 1999) (Doc. 16).) A review of this schedule shows that the right of way from Weiser to New Meadows consisted of approximately 192 original parcels and 1,689 acres. Of this total, approximately 895 acres were acquired under the 1875 Act. (Pls.' Class Cert. Brief, Ex. 6 (copy of the schedule); *See also*, Pls.' Class Cert. Brief at 5 and Amended Class Action Compl., ¶¶ 10-11.)

7. In 1936, Union Pacific purchased the P&IN. FISK AND DOPF, *supra*, at 33.

8. In 1993, the Idaho Northern & Pacific Railroad ("IN&P"), a subsidiary of the Rio Grande Pacific Corporation, acquired the subject right of way from Union Pacific. *Id.* at 40.

9. On March 17, 1995, the IN&P filed a petition with the STB seeking an exemption under 49 U.S.C. § 10505 from the prior approval requirements of 49 U.S.C. § 10903-04 to abandon the subject right of way. (Def. Ex. 8, pp.1-3; Amended Class Action Compl., ¶ 12 (Dec. 17, 1999) (Doc. 16).)

10. In its petition, the IN&P reported that it "seeks to abandon . . . a 83.1 mile segment of an approximately 84.1 mile light density branch line which IN&P acquired from Union Pacific Railroad Company in 1993. . . . The Line presently passes through sparsely populated timber areas and the farther canyon reaches of the Weiser River Valley, as well as farmland and

ranchland in Washington and Adams Counties, ID. It serves the communities of Weiser, Midvale, Cambridge and Council with respective populations of approximately 4,571; 136; 374; and 831." (Def. Ex. 8, pp. 3-4.)

11. The IN&P further reported it "seeks to abandon the Line due to recent events that will result in dramatic reductions in carload traffic, and consequently, serious financial losses to IN&P. Specifically, on or about March 31, Boise Cascade Corporation ("BCC"), the largest shipper on The Line, will terminate operations at its Council, ID lumber facility. As a result of this plant closing, Petitioner projects it will suffer an approximate 75% reduction in rail traffic over The Line. . . . The area served by The Line is generally mountainous and rural, and has little potential for industrial development." (Def. Ex. 8, pp. 4-5.)

12. The IN&P continued, "The Line is operated as FRA class II track, and is in standard operating condition. However, Petitioner anticipates that, due to the rugged terrain surrounding it and the remote territory through which it runs, The Line will require substantial maintenance even to keep the line to Class I track conditions. Revenues from projected traffic levels will not cover maintenance and operating costs, with the result that Petitioner will suffer serious losses on this soon-to-be unprofitable line." (Def. Ex. 8, p. 5.)

13. Boise Cascade, mentioned by IN&P, ¶ 11, *supra*, reports owning 196,000 acres of forestland in Idaho, to supplement its harvest or purchase of timber from other sources. (Def. Ex. 8, p. 9.)

14. By a decision served on November 1, 1995, the ICC granted the Railroad's petition, subject to several conditions. (Def. Ex. 9, pp. 1-5; Amended Class Action Compl., ¶ 13 (Dec. 17, 1999) (Doc. 16).)

15. Several groups filed requests for the issuance of a NITU, along with "Statements of Willingness to Assume Financial Responsibility" for the right of way were later filed by the City of Weiser and by the Friends of the Weiser River Trail, and the Railroad indicated it was willing to negotiate a Trails Act agreement. (Def. Ex. 10 Def. Ex. 9, p 8.)

16. On December 28, 1995, the ICC issued a NITU that ordered: (1) the Railroad was permitted to discontinue its use of this right of way; (2) if trail use and "railbanking" was reached, the trail manager was to assume any legal liability for the right of way (unless immune), full responsibility for management of the right of way, and for the payment of any taxes assessed against the right of way; (3) the trail use was subject to any future restoration of rail service; (4) if no agreement for trail conversion was reached, the Railroad was authorized to fully abandon the railway. (Def. Ex. 9, pp.6-7; amended Class Action Compl., ¶ 13 (Dec. 17, 1999) (Doc. 16).)

17. The Railroad reached a Trails Act agreement with the Friends of the Weiser River Trail ("trail manager"), and divested all its interest in the railroad right of way to the trail manager on June 17, 1997. (Pls.' Class Cert. Brief, Ex. 10; Amended Class Action Compl., ¶ 15 (Dec. 17, 1999) (Doc. 16).) Subject to the Trails Act and the conditions set forth in the NITU, the right of way is presently controlled and operated by trail manager and is known as the "Weiser River Trail." (Pls.' Class Cert. Brief, Ex. 10; Def. Ex. 9, pp.6-7. *See generally,* http://www.weiserrivertrail.org., Ex. 2 .)

18. Until shortly before converting to trail use in 1997, the right of way had been used for railroad purposes. (Def.'s Ex. 8.) The primary shipper was a timber company, and railroad uses have historically included carrying timber from lumber facilities located in Council and Tamarack, Idaho. (*See id*. at 4, 5 n.1.)

19. The right of way passes through sparsely populated timber areas, canyons, farmlands, and ranch lands as well as through certain communities in Washington and Adams Counties. (Def.'s Ex. 8 at 3-4.)

20. The Weiser River Trail offers many recreational features and conveniences to its users. There are picnic tables, "Port-A-Pottys," access to camping grounds, occasional parking lot access, and kiosks stationed along the trail. (www.weiserrivertrail.org/plans.htm, Ex. 2, pp. 3-4.) Opportunities for recreational nature seekers include bird-watching and spotting other, various wildlife. (*See id.*; www.weiserrivertrail.org/workdays.htm, Ex. 2, p. 5.) In addition to the wildlife featured along the trail, the trail manager invites the public to observe other features found on adjoining properties: "Sporadically throughout its length the trail is close to working farms and ranches so people can see where milk, bread and hamburgers come from." (www.weiserrivertrail.org/wrtfaq.htm, Ex. 2, p.6-8.) The trail is open to recreational use by hikers, bikers, and equestrian users with periodic gates installed to prohibit motorized vehicles from using the recreational trail. (*Id. Also see,* www.weiserrivertrail.org/plans.htm, Ex. 2, p. 3-4.)

21. Since at least 1965, until the track was removed, trains traveled along the subject right of way only one to three times a week and traveled at a speed of only 20-25 mph. (Exhibit 10, Declaration of William Don Lakey ("Lakey Decl") at ¶ 2 ("I acquired this property along with my wife in 1965, located approximately 36 miles from Weiser, Idaho. At the time we acquired the property and until the railroad track was removed, we observed the train cross through our property only once or twice a week heading north on one day and returning the next day. The trains traveled only 20-25 mph and the railroad maintained the cattle guards to keep the

livestock within our property boundary."); Exhibit 9, Declaration of Doug Dickerson ("Dickerson Decl") at ¶ 4 ("Throughout the years, the train traveled up and down the tracks on various occasions from one to three times per week."); Exhibit 10, Declaration of Robert M. Jepsen ("Jepsen Decl") at ¶ 6 ("We observed after we had moved onto the property that a train went up the valley north from our place and returned once or twice a week.").)

22. While the subject right of way was being used for railroad purposes, adjacent landowners were able to cross the right of way without measurable restrictions and were able to move livestock and machinery along the right of way as needed. (Lakey Decl at ¶ 4 ("We historically moved our livestock and machinery along the right-of way as needed and at no time did we have interference from other local livestock coming up or down the right-of-way."); Jepsen Decl at ¶ 6, 7 ("During the time we owned the property while the railroad was running, we experienced no problems or interference with the operation and access to our farm because of the railroad. We moved our farm equipment and vehicles up and down the railroad right-of-way without difficulty or problems. We also used the right-of-way to move livestock from one end of the farm to the other from pasture to pasture and across the right-of-way from one side to the other."); Dickerson Decl at ¶ 7 ("We did not encounter problems or difficulties of any kind from the use of the property on both sides of the right-of-way for more than 40 years.").)

23. Once the subject right of way was converted into a trail, adjacent landowners were no longer able to move livestock and machinery along the right of way and crossing was limited which restricted adjacent landowners access to their properties to the other side of the right of way unlike when the railroad was there. (Lakey Decl at ¶¶ 5-6 ("When the right-of-way was converted to a trail, we were no longer allowed to move our livestock or equipment within the

right-of-way. During the conversion, the trail operator removed the cattle guards and local livestock now trespass upon my property causing damage to my crops. We are also limited to the use of one or two crossings to move livestock across the right-of-way to pasture divided by the right-of-way."); Jepsen Decl at ¶ 11 ("After the trail users developed the trail, we received demands from the trail operator's legal counsel to discontinue crossing the right-of-way, driving cattle on the right-of-way and moving equipment up and down the right-of-way. We were only allowed to cross the right-of-way at one or two designated locations.").)

24. The railroad had maintained the cattle guards. Upon trail conversion, the cattle guards were removed and trespass of other's livestock became a problem and damaged property. (Lakey Decl at ¶¶ 2, 5 ("The trains traveled only 20-25 mph and the railroad maintained the cattle guards to keep the livestock within our property boundary....During the conversion, the trail operator removed the cattle guards and local livestock now trespass upon my property causing damage to my crops."); Jepsen Decl at ¶ 11 ("We observed other livestock belonging to other parties going up and down the right-of-way creating damage to our property.").)

25. The railroad allowed landowners to build improvements along the right of way so long as the structures did not interfere with the operations of the trains. Upon trail conversion, these rights were denied by trail manager. (Jepsen Decl at ¶¶ 5, 8, 13-14 ("My predecessor had farmed right up to the edge of the railroad tracks and had fences along part of the track to retain their livestock. I operated my farm in the same manner as my predecessor, maintaining and erecting fences as needed for livestock control....The railroad also allowed us to string a wire across the right-of-way from time to time for control of livestock and from each end of my property along the tracks in order to retain and protect my livestock and to keep other owners'

livestock from moving along the tracks onto my property....Previously allowed by the railroad to fence within the 100 feet (as were originally built and located by the railroad), I was required to remove fences to no closer than 100 feet from the centerline of the preexisting tracks. I was no longer able to farm closer than 100 feet from the preexisting tracks. I was also required to remove a roping arena made of pole fencing from within the 100 feet from the centerline of the track that had been allowed by the railroad previously. The removal of the fences, the roping arena, and discontinuing farming along the right-of-way, was at a substantial expense to me and the trail people have not used more than an eight foot wide strip of land where the track was once located."); Dickerson Decl at ¶¶ 6, 9 ("My family and I have farmed the ground, added irrigation ditches and built fences along and parallel to the railroad right-of-way without interfering with the railroad traveling up and down the tracks. This practice was allowed throughout my life....We have been required by the trail manager to remove the fences from 50 feet of the centerline, remove historical irrigation ditches, and discontinue the use of the right-of-way to move equipment one place to another along our farm. We have spent substantial amounts of money reestablishing fences, ditches, and resolving other problems caused by the trail operators.").)

26. Upon trail conversion landowners were required by the trail manager to move fences and ditches and to stop using the idle portion of the right of way that had not been dedicated to the running of the trains. (Jepsen Decl at ¶¶ 13-14 ("Previously allowed by the railroad to fence within the 100 feet (as were originally built and located by the railroad), I was required to remove fences to no closer than 100 feet from the centerline of the preexisting tracks. I was no longer able to farm closer than 100 feet from the preexisting tracks....The removal of the fences, the

roping arena, and discontinuing farming along the right-of-way, was at a substantial expense to me and the trail people have not used more than an eight foot wide strip of land where the track was once located. The full two-hundred foot width is over run now by noxious weeds creating problems now for my unburdened property."); Dickerson Decl at ¶ 9 ("We have been required by the trail manager to remove the fences from 50 feet of the centerline, remove historical irrigation ditches, and discontinue the use of the right-of-way to move equipment one place to another along our farm. We have spent substantial amounts of money reestablishing fences, ditches, and resolving other problems caused by the trail operators.").)

27. Adjacent landowners also experience problems due to the trespass of trail users onto their properties. (Jepsen Decl at ¶ 12 ("I observed on occasion people leaving the right-of-way walking across my property about a one quarter of a mile for hunting or fishing along the Weiser River. We have also observed people with horses and dogs going up and down the right-of-way through the center of our property. One time a hiker's dog came off the rail bed and ran my horses through a fence."); Lakey Decl at ¶ 7 ("The trail split our farm and ranch ground and we have observed trail users walking, jogging, bicycling and riding horses through our property along the right-of-way. Occasionally trail users leave the right-of-way trespassing to gain access to the Weiser River."); Dickerson Decl at ¶ 8 ("When the railroad track and ties were removed and the right-of-way converted to a trail, we have observed the trail being used for walking, bicycling, jogging, and horse riding, which have occasionally left the right-of-way and crossed our property to access the Weiser River.").)

Dated: July 12, 2006

Respectfully submitted,
**ACKERSON KAUFFMAN FEX, PC**

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Class Representatives' Proposed Findings of Uncontroverted Facts in Support of their Cross-Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class