Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. CV99-324S-MHW<br><br>Honorable Mikel H. Williams |

**PLAINTIFFS' APPENDIX OF EXHIBITS (1 of 4) FILED IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

July 12, 2006

# INDEX OF PLAINTIFFS' EXHIBITS
## (APPENDIX 1 OF 4)

| Plaintiffs' Exhibit Number | Description of Exhibit |
|---|---|
| 1 | General Railroad Right-of-Way Act of March 3, 1875, ch. 152, 18 Stat. 482 (codified at 43 U.S.C. §§ 934-939 (1982)) ("1875 Act") |
| 2 | Pages from the website of the Friends of the Weiser River Trail (home page at www.weiserrivertrail.org), visited July 3, 2006 |
| 3 | Excerpted Brief for Appellee United States (*Hash v. U.S.*, Case No. 03-1395 (Fed.Cir.) (Filed Nov. 10, 2003) |

Dated: July 12, 2006

Respectfully submitted,
**ACKERSON KAUFFMAN FEX, PC**

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

Breaking fences, &c., and driving cattle, &c., on to lands of U. S. reserved for public use.

Permitting cattle, &c., to enter through inclosures of such lands.

Punishment.

Proviso.

Sec. 3. That if any person or persons shall knowingly and unlawfully break, open, or destroy any gate, fence, hedge, or wall inclosing any lands of the United States, reserved or purchased as aforesaid, and shall drive any cattle, horses, or hogs upon the lands aforesaid for the purpose of destroying the grass or trees on the said grounds, or where they may destroy the said grass or trees, or if any such person or persons shall knowingly permit his or their cattle, horses, or hogs to enter through any of said inclosures upon the lands of the United States aforesaid, where the said cattle, horses, or hogs may or can destroy the grass or trees or other property of the United States on the said land, every such person or persons so offending, on conviction, shall pay a fine not exceeding five hundred dollars, or be imprisoned not exceeding twelve months: *Provided*, That nothing in this act shall be construed to apply to unsurveyed public lands and to public lands subject to pre-emption and homestead laws, or to public lands subject to an act to promote the development of the mining resources of the United States, approved May tenth, eighteen hundred and seventy-two.

Approved, March 3, 1875.

---

March 3, 1875.

CHAP. 152.—An act granting to railroads the right of way through the public lands of the United States.

Right of way, materials, station-grounds, &c., granted to railroads.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station-buildings, depots, machine shops, side-tracks, turn-outs, and water-stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

Rights of several railroads through cañon, pass, or defile.

Crossing at grade.

Wagon roads, rights of.

Sec. 2. That any railroad company whose right of way, or whose track or road-bed upon such right of way, passes through any canyon, pass, or defile, shall not prevent any other railroad company from the use and occupancy of the said canyon, pass, or defile, for the purposes of its road, in common with the road first located, or the crossing of other railroads at grade. And the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any wagon or other public highway now located therein, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall before entering upon the ground occupied by such wagon road, cause the same to be reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road: *Provided*, That such expenses shall be equitably divided between any number of railroad companies occupying and using the same canyon, pass, or defile.

Private lands and possessory claims, how condemned.

1864, c. 216, s. 3, v. 13, p. 357.

Sec. 3. That the legislature of the proper Territory may provide for the manner in which private lands and possessory claims on the public lands of the United States may be condemned; and where such provision shall not have been made, such condemnation may be made in accordance with section three of the act entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the

same for postal, military, and other purposes, approved July first, eighteen hundred and sixty-two," approved July second, eighteen hundred and sixty-four.

Sec. 4. That any railroad-company desiring to secure the benefits of this act, shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road.

Profile of road claiming benefits, when to be filed.

Disposal of lands subject to right of way.

Forfeiture of right.

Sec. 5. That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale, unless such right of way shall be provided for by treaty-stipulation or by act of Congress heretofore passed.

Application of this act.

Sec. 6. That Congress hereby reserves the right at any time to alter, amend, or repeal this act, or any part thereof.

Right to alter, amend, &c.

Approved, March 3, 1875.

---

CHAP. 153.—An act to amend sections one thousand six hundred and seventy-five, one thousand six hundred and seventy-six, one thousand six hundred and eighty-one, and one thousand six hundred and eighty-two of the Revised Statutes of the United States.

March 3, 1875.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That section one thousand six hundred and seventy-five of the Revised Statutes be amended so as to read as follows:

R. S., 1675, p. 293, amended.

"Sec. 1675. Ambassadors and envoys extraordinary and ministers plenipotentiary shall be entitled to compensation at the rates following, per annum, namely:

Ambassadors, envoys, ministers plenipotentiary.

"Those to France, Germany, Great Britain, and Russia, each, seventeen thousand five hundred dollars.

"Those to Austria, Brazil, China, Italy, Japan, Mexico, and Spain, each, twelve thousand dollars.

"Those to all other countries, unless where a different compensation is prescribed by law, each, ten thousand dollars.

"And, unless when otherwise provided by law, ministers resident and commissioners shall be entitled to compensation at the rate of seventy-five per centum, chargés d'affaires at rate of fifty per centum, and secretaries of legation at the rate fifteen per centum, of the amounts allowed to ambassadors, envoys extraordinary, and ministers plenipotentiary to the said countries respectively; except that the secretary of legation to Japan shall be entitled to compensation at the rate of twenty-five hundred dollars per annum.

Ministers resident, commissioners, chargés d'affaires.

Secretaries.

"The second secretaries of the legations to France, Germany, and Great Britain shall be entitled to compensation at the rate of two thousand dollars each per annum."

Second secretaries.

That section one thousand six hundred and seventy-six of the said Revised Statutes be amended so as to read as follows:

R. S., 1676, p. 294, amended.

"The agent and consul-general at Cairo shall be entitled to compensation at the rate of three thousand five hundred dollars per annum."

Agent and consul-general at Cairo.

That section one thousand six hundred and eighty-one be amended so as to read as follows:

R. S., 1681, p. 294, amended.

"The minister resident to Uruguay, when also accredited to Paraguay, shall be entitled to compensation at the rate of ten thousand dollars per annum."

Uruguay, minister to.

# Friends of the WEISER RIVER TRAIL

*Desert Canyons to Alpine Meadows*

**Trail Condition Report!**

- Map and Tour
- Plans for the Trail
- Workdays and Events
- Events
- We Need Volunteers!
- How to Join
- Related Links
- Contact Us



*a trail for tomorrow . . .*
TODAY!

**Friends of the Weiser River Trail (FWRT) is a private, non-profit, organization fo the old Pacific and Idaho Northern (PIN) railroad grade from Weiser, Idaho, to Rut Meadows, ID) into a trail for public recreation. The 84-mile long trail passes throu**

**Midvale, Cambridge, and Council. The entire right-of-way was deeded to Friend River Trail in August, 1997, by the Union Pacific Railroad under the railbanking law.**

**The trail includes many miles of riparian habitat, an additional 1,400 acres of wild will provide access to 16,000 acres of BLM and State of Idaho Lands currently ina public. Wildlife often seen along the trail include deer, elk, heron, and wild turkey the lower (southern) part of the canyon is rolling hills and open canyons topped cliffs, while the upper (northern) portion is forested.**

**Mission Statement:**

**The mission of The Friends of the Weiser River Trail, a nonprofit organization, is:**

- **To preserve the integrity of the Pacific and Idaho Northern Railroad corridor:**
- **To develop, manage and maintain a public recreational trail along its length;**
- **To protect and enhance the riparian and other natural habitats within the corri**

Map & Tour | Trail Access Points | Plans | Workdays
Events | Volunteer! | Join FWRT
FAQ | Related Links | Contact
HOME | Welcome to Washington County | Welcome to Adams County

Please, send feedback on this page to Mike Shipman - webmaster

Copyright © 1998, 1999, 2003. This web page was last updated September 13, 2004.

webmastered by Blue Planet

Friends of the
WEISER RIVER TRAIL
*Desert Canyons to Alpine Meadows*

# PLANS

**Seven miles of the trail, centered at Cambridge, were opened on June 6, 1998. The trail is now accessible from Weiser (where Highway 95 crosses the Weiser River) to just north of Starkey, several miles north of Council. All trestles are planked on this section. There are still a few gates, with locked access at critical road crossings. These gates have livestock proof/motorized vehicle proof side gates which will easily permit hikers, equestrians, and bikers. There are a few livestock control gates at intervals along the trail. Please respect them and leave them as you find them.**

**News 2/06:**

**We are currently working with the City of Weiser to pave the first mile of trail, to include a kiosk similar to what we have in Cambridge and Council. Construction is slated to begin in the second half of 2006.**

**In 2005, we traded a 3+ acre parcel of land, adjacent to highway 95 on the northern terminus of the trail at Rubicon for a 5+ acre parcel that is back off highway 95 about 1/2 mile. Plans call for developing this into a trail head with camping spots and eventually we hope to have a well and electricity.**

**In a joint venture with the cities of Cambridge and Council respectively, we have information kiosks with adjacent parking and a picnic table. The trail is paved for approximately one-half mile in either direction from the kiosks.**

**We are currently negotiating with land developers to obtain right-of-way access to part of the abandoned rail line between Rubicon and New Meadows, in the hopes of eventually extending the trail access to New**

Meadows.

In 2007, we will be celebrating TEN YEARS of the Friends of the Weiser River Trail, and we are gearing up for a big trail-elebration!

There is a Port-A-Potty on the trail in Midvale, one south of Cambridge about 1 mile, one in Council, and one north of Starkey at the Glendale Bridge.



When the trail is completed, parking and restrooms will be available at the major trailheads at, or near, Weiser, Midvale, Cambridge, Council, and at the end of the trail at the undeveloped meadow called Rubicon. Minor trailheads will be signed at other public access points.

- See the map for trail access for vehicles, boats, horse trailers, and emergencies.
- Potable water is not available along the trail, except in the towns (unless you have purification equipment for river water).
- There are no established camping sites along the trail at this time. Commercial campgrounds are marked on the map.
- Access to telephones is also found in the towns along the trail.

Map & Tour | Trail Access Points | Plans | Workdays
Events | Volunteer! | Join FWRT
FAQ | Related Links | Contact
HOME | Welcome to Washington County | Welcome to Adams County

Please, send feedback on this page to Mike Shipman - webmaster

Copyright © 1998, 1999. This web page was last updated August 24, 2002.

webmastered by Blue Planet

*Friends of the*
WEISER RIVER TRAIL
*Desert Canyons to Alpine Meadows*

## EVENTS

**The Grand Opening, Cambridge, Idaho, June 6, 1998, was held in connection with National Trails Day. It included two bike rides, a bird walk, a walk/run relay, a horseback ride, a kayak/raft event, kids races, and plane rides over the trail.**








### Board Meetings:
**Held at 7:00 P.M. the third Tuesday of each month. The meeting place is at Rural Network Telephone Company in Weiser. Members are welcome!**

**Work Days are held several weekends a year, mostly in spring and fall. Come help build the trail and have fun while getting acquainted with other members.**

Map & Tour | Trail Access Points | Plans | Workdays
Events | Volunteer! | Join FWRT
FAQ | Related Links | Contact
HOME | Welcome to Washington County | Welcome to Adams County

Friends of the
WEISER RIVER TRAIL
*Desert Canyons to Alpine Meadows*

# Weiser River Trail FAQ (Frequently Asked Questions)

## WHAT IS THERE TO SEE ON THE TRAIL?

**Since the trail gains 3000 feet along its length there is plenty of variety. The plants and animal are typical of desert/sagebrush in the canyon south of Midvale, riparian from Cambridge to Mesa Siding and woodland/pine forest north of Council. Sporadically throughout its length the trail is close to working farms and ranches so people can see where milk, bread and hamburgers come from.**

**The geology of the last 20 million years (that is, basalt and rhyolite ash in myriad forms) is in plain view.**

**Many birds are found along the river including a heron rookery south of Midvale. Animal life from slugs, salamanders and (yes) rattlesnakes, to fish, porcupines and deer are there for people who want to watch for (or roll over rocks for) them.**

## WHEN IS THE BEST TIME TO USE THE TRAIL?

**From Weiser to Cambridge spring and autumn give the coolest weather. In the summer the northern parts of the trail are not as hot. In the winter cross country skiing is good though the melt starts in early February in the south. The trail is not groomed for cross country skiing though that is possible in 2002.**

## WHAT IS THE TRAIL SURFACE LIKE?

**The surface is the ballast or coarse gravel the railroad had under the rails. In most places it has been submerged into the dirt so the surface is stable but it can be rough to ride on. There are short stretches where the ballast is still pure gravel and those can be annoying, low gear on a mountain bike workouts. But they are infrequent.**

**CAN SKINNY TIRE CROSSOVER BIKES BE USED ON THE TRAIL?**
The trail is firm enough in most places to use crossover bikes, especially the northenmost 10-15 miles. In other places the ballast makes the ride easier on big balloon tires. It is essentially a mountain bike trail.

**HOW MUCH OF THE TRAIL IS IMPROVED AND READY FOR USE?**
As of spring 2001 the 55 miles from Weiser to north of Goodrich has all the bridges planked and can be used. There are still local areas in that stretch where the trail is rough where culverts have been placed recently and the ground is still churned up by the heavy equipment. The rough spots are mostly in the canyon between Weiser and Midvale. They are all passable.

North of Goodrich the bridges have not been planked and there are still bridges and culverts washed out by the 1997 flood. The washouts are near county roads and can be gotten around easily. Unplanked bridges are rough to ride a bike on, impossible for horses and slightly dangerous to walk on as it is easy to put a foot between the ties.

**WHAT KIND OF MOUNTAIN BIKE IS BEST?**
Because of the rough surface a bike with suspension is best. Big knobby tires that can withstand the edges of gravel and help absorb bumps are most comfortable.

**ARE HORSES ALLOWED ON THE TRAIL?**
Yes, horses, llamas and goats have all been used on the trail. There have been equestrian endurance rides on the trail and all 55 miles of improved trail are open to horses.

**IS THERE WATER AVAILABLE ON THE TRAIL?**
There are towns along the trail at convenient 10 mile intervals. In the canyon segments or other parts away from towns the trail is usually alongside the Weiser River. Then treating the water from the river or from springs as you would in any wilderness setting would make it potable.

**IS THERE CAMPING OR HOTELS FOR OVERNIGHT STAYS?**
There is one improved campground by the trail, EVERGREEN CAMPGROUND, north of Council. Camping along the trail is discouraged. There are hotels, B&Bs and commercial campgrounds in Council, Cambridge, Midvale, Weiser and New Meadows. The local Chamber of Commerce can usually provide details.

**IS THERE ANY MOTORIZED VEHICLE USE?**

**This is a muscle-powered trail. There is no motorized use allowed, though maintenance vehicles may be on the trail.**

## CAN MY GROUP DO A SERVICE PROJECT ON THE TRAIL?

**Various groups have done work on the trail for service projects. All of them are welcome. Contact Friends of Weiser River Trail Board members at the e-mail addresses on this web site for details.**

Map & Tour | Trail Access Points | Plans | Workdays
Events | Volunteer! | Join FWRT
FAQ | Related Links | Contact
HOME | Welcome to Washington County | Welcome to Adams County

Please, send feedback on this page to Mike Shipman - webmaster

Copyright © 1998, 1999. This web page was last updated August 24, 2002.

webmastered by Blue Planet

# BRIEF FOR APPELLEE THE UNITED STATES

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

---

No. 03-1395

---

ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

Plaintiffs-Appellants,

v.

THE UNITED STATES,

Defendant-Appellee.

---

Appeal from the United States District Court
for the District of Idaho in 99-CV-324,
Magistrate Judge Mikel H. Williams

---

KELLY A. JOHNSON
Acting Assistant Attorney General

KATHRYN E. KOVACS
KRISTINE TARDIFF
KATHERINE J. BARTON

Attorneys, Environment and Natural
Resources Division
Department of Justice
P.O. Box 23795 L'Enfant Station
Washington, D.C. 20026

10, which the parties later stipulated to include Categories 12 and 13, the district court held that the Railroad's acquisition of these rights-of-way by adverse possession gave it a fee simple interest in them. Op. 15-16. The district court rejected Landowners' contention that the right-of-way segments in Category 14, for which the deeds were executed after the Railroad had surveyed and located the right-of-way, were only easements even if the language of the deed indicated a fee simple interest had been conveyed. Op. 16-17. Landowners did not make a separate argument with respect to rights-of-way in Category 15; these parcels are governed by the district court's rulings on Categories 2 through 9.

## SUMMARY OF ARGUMENT

The ICC's decision to authorize the preservation of the Railroad's right-of-way for the nation's future transportation use, and to permit the Railroad to negotiate for its interim use as a recreational trail, does not constitute a taking of Landowners' property because they have no property interest in the right-of-way.

1. The district court correctly held that the United States retains the reversionary interest in rights-of-way granted from the federal lands to railroads under the 1875 Act, and that this interest was not conveyed to subsequent patentees of lands crossed by these previously-established rights-of-way. Because federal land grants must be strictly construed in favor of the United States, and the

1875 Act contains no clear language conveying any interest in the rights-of-way to the subsequent patentees, the Act must be construed to retain the reversionary interest in the United States. In addition, the purposes of the Act, to construct and maintain a national public transportation system, are served by construing the Act to retain the United States' interest in this system of rights-of-way created from the public's lands. Furthermore Congress repeatedly and specifically demonstrated in subsequent statutes that it understood that the United States retained the reversionary interest in the 1875 Act rights-of-way. Finally, with one limited exception, every court to address the question has concluded that the 1875 Act retained the reversionary interest in the rights-of-way for the United States.

2. The district court correctly interpreted Idaho law in holding that the deeds at issue in this appeal – executed between the Railroad and private landowners – conveyed a fee simple interest to the Railroad, and thus the grantors retained no property interest in the right-of-way. The district court correctly concluded that use of the term "right-of-way" in the deeds did not indicate that an easement was granted, given otherwise clear language in the deeds conveying a fee simple interest. The district court also correctly concluded that, under Idaho law, the fact that a deed was executed after the right-of-way was surveyed and located does not require a determination that an easement rather than fee simple

interest was conveyed. Idaho's presumption that a fee simple interest is conveyed, its statutory authority permitting railroads to acquire rights-of-way in fee, and case law interpreting a post-location deed to convey a fee simple interest in the right-of-way all support the district court's decision. The United States asks that this Court certify the Idaho state law questions involved in this case to the Idaho Supreme Court, however, and requests direct affirmance of the district court's ruling to the extent it requires adjudication of Idaho property law issues only in the alternative.

3. The district court also correctly concluded that, under Idaho law, the Railroad holds a fee simple interest in rights-of-way it acquired by adverse possession. Adverse possession pursuant to Idaho's adverse possession statute clearly results in the acquisition of a fee interest, and the Idaho Supreme Court has specifically upheld a railroad's fee simple ownership in a right-of-way acquired by adverse possession.

## ARGUMENT

### I. THE UNITED STATES HOLDS THE REVERSIONARY INTEREST IN RIGHTS-OF-WAY GRANTED UNDER THE 1875 ACT.

At the time the Railroad located the right-of-way at issue in this case, most of the land crossed by the right-of-way was in federal ownership as unappropriated public land. The Railroad obtained the right-of-way across this public land under

the 1875 Act. Subsequently, the public lands crossed by the right-of-way were patented to private landowners, presumably under the homestead statutes. The district court correctly held that the United States retains the reversionary interest in these 1875 Act rights-of-way, and correctly rejected Landowners' claim that the homesteaders obtained the fee simple interest in the rights-of-way burdened only by a common law easement. Thus, the district court correctly held that Landowners have no property interest in the rights-of-way.[4]

**A. The language, legislative history, and purpose of the 1875 Act compel a determination that Congress retained a reversionary interest in the rights-of-way.**

It is well-established that "federal land grants are to be construed strictly in favor of the United States." California ex rel. State Lands Comm'n v. United States, 457 U.S. 283, 288 (1982). In construing public land grants, courts must apply "'the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.'"

[4] Even if the United States does not hold a reversionary interest in the right-of-way, the rail line preservation and interim trail use authorized by the ICC is within the scope of the federal statutory easement granted by the 1875 Act for public transportation purposes; thus no abandonment would have occurred under Idaho law but for the preclusive effect of the Trails Act. However, that issue is beyond the scope of this appeal, which pertains only to whether the Landowners have a property interest in the right-of-way.

Watt v. Western Nuclear Inc., 462 U.S. 36, 59 (1983) (quoting United States v. Union Pacific R. Co., 353 U.S. 112, 116 (1957)); see also Caldwell v. United States, 250 U.S. 14, 20, 21 (1919). This canon has been repeatedly applied in construing 19th century statutes granting railroad rights-of-way, including the 1875 Act at issue here. See, e.g., Great Northern Ry. Co. v. United States, 315 U.S. 262, 272 (1942); Union Pacific, 353 U.S. at 116.

The 1875 Act contains no language conveying an interest in railroad rights-of-way to owners of property traversed by the rights-of-way. Section 1 of the 1875 Act provides for the grant of rights-of-way to railroads. It specifies:

> That the right of way through the public lands of the United States is hereby granted to any railroad company * * * [that has met certain requirements], to the extent of one hundred feet on each side of the central line of said road * * * .

43 U.S.C. § 934.[5] It also grants the railroad the right to take rock and timber necessary for construction from public lands adjacent to the right-of-way, as well as up to 20 acres for stations along the line and land needed for other railroad-related facilities. Id. Section 4 provides that a railroad company must file a profile of its rail corridor with the local U.S. Department of the Interior

---

[5] The 1875 Act was repealed, effective October 21, 1976, insofar as applicable to the issuance of rights-of-way over the public lands and lands of the national forest systems. See the Federal Land Policy and Management Act, Pub. L. 94-579, 90 Stat. 2793, Section 706(a).

("Interior") district land office within 12 months after survey or location of the road, which, after Interior's approval, is to be noted on the plats at that office. Section 4 then provides that

> thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within five years after the location of said section, the rights herein shall be forfeited as to any such uncompleted section of said road.

Id. § 937.

Thus, the 1875 Act granted a 200-foot "right-of-way" to a railroad that met the statutory requirements, and once that right of way was noted on plats by Interior, the land over which it passed was disposed "subject to" such right-of-way. From this language, Landowners assert (Br. 16-17) that Congress granted the subsequent patentees of lands crossed by 1875 Act rights-of-way the fee simple interest in the rights-of-way such that the right-of-way would disappear and merge with that fee upon its abandonment or forfeiture. But there is no language in the Act conveying such a right.

Nor does the purpose of the 1875 Act indicate that Congress intended to irrevocably relinquish the public interest in and control over the rights-of-way by automatically allowing them to devolve to the homesteaders of the surrounding land if the railroads forfeited or abandoned the rights-of-way. The purpose of the

1875 Act was to "permit construction of railroads through the public lands and thus enhance their value and hasten their settlement." Great Northern, 315 U.S. at 272. As the Court concluded in Great Northern, that purpose does not compel a conclusion that railroads were granted fee title to and the mineral interests in the rights-of-way. Id. But neither does it compel a conclusion that the reversionary interesta in the rights-of-way were granted to homesteaders of the land crossed by the rights-of-way. To the contrary, the purpose of creating public transportation corridors is furthered by retaining the reversionary interest in the rights-of-way in the United States. This allows the United States to decide – if the rights-of-way are forfeited or abandoned – whether they are still needed for transportation purposes or should be conveyed to the owners of the surrounding lands.

Similarly, the legislative history provides no indication that the reversionary interests in the rights-of-way were intended to be conveyed to the homesteaders. Prior to 1871, railroad grants generally consisted of a 200-foot to 400-foot right-of-way through the public lands, as well as alternating sections of land (consisting of 640 acres each) along the entire right-of-way. These grants resulted in 100 to 110 million acres passing to the railroads between 1862 and 1871, which caused a public outcry focused largely on the shortage of land to homesteaders as the railroads were slow to bring to market the alternating sections of land granted to

them. See D. Wright and J. Hester, Pipes, Wires, and Bicycles, 27 Ecology L.Q. 351, 372 (2000).

In 1872, Congress resolved that "the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued." Great Northern, 315 U.S. at 274 (internal quotations omitted). The 1875 Act ended the practice of making "lavish grants" to railroads; it made no grants of alternating sections of land and ensured that railroads did not receive the subsurface mineral interests in their rights-of-way. Id. at 275. Thus, in presenting the 1875 Act for vote on the Senate floor, the Senate committee chairman noted that the committee had "endeavored to preserve the public lands for the benefit of actual settlers" and "has been very conservative in regard to the appropriation of public lands to railroads." The chairman explained that no alternating sections were granted to the railroad but made no suggestion that the homesteaders would have a future right to the right-of-way itself. Instead, he explained: "All our grants of public lands, therefore, have been narrowed down to rights of way." 3 Cong. Rec. 404 (1875).

In sum, nothing in the 1875 Act indicates a clear intent of Congress to relinquish the public's interest in the federal grants of rights-of-way made to the railroads. To the contrary, construing the Act to retain a reversionary interest in

those federal property interests in the United States is fully consistent with the Act's language, purpose, and legislative history.

### B. *Great Northern*'s characterization of the 1875 Act rights-of-way as easements is consistent with the United States' retention of a reversionary interest in them.

Landowners' argument rests on their contention that Supreme Court precedent, and the language of the 1875 Act, establishes that the 1875 Act rights-of-way operate as traditional common law easements. Such easements are deemed to be a mere "'use' interest, sometimes an 'incorporeal hereditament,' but not a 'possessory' interest in the land." See Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("Preseault II"). For such easements, the land crossed by the easement is viewed as a present estate in fee simple, subject to the burden of the easement, and there is no reversionary interest; rather, upon expiration of the easement, the burden on the fee dissolves. Id. However, as case law clearly establishes, so-called "easements" granted for rights-of-way under the federal railroad statutes are unique, statutory interests that have many attributes of a fee interest in which a reversionary interest may be retained.

#### 1. The easements granted by the 1875 Act are unique, statutory easements.

The U.S. Supreme Court addressed the nature of the property interest conveyed to railroads under the 1875 Act in Great Northern Ry. Co. v. United

States, 315 U.S. 262 (1942). In Great Northern, the United States brought suit against a railroad that owned rights-of-way obtained under the 1875 Act in order to prevent it from removing the oil, gas, or minerals in the rights-of-way, which the United States claimed to own. Id. at 270. The Court held for the United States, concluding that the rights-of-way were "easements" that did not convey the subsurface mineral interests in the rights-of-way to the railroad.

The Great Northern Court applied the rule that, in a land grant by the United States, nothing passes but what is conveyed in clear and explicit language. Id. at 272. The Court found that there was no clear and explicit conveyance of the underlying oil and minerals, and that such a conveyance was not necessary to achieve the Act's purpose. Rather, the Court concluded that certain language in the Act indicated an easement was intended, including language granting "the" rather than "a" right-of-way; a provision prohibiting the railroad from preventing other railroads from using canyons or passes through which the right-of-way passed; and language providing for the disposal of land crossed by the right-of-way "subject to" the right-of-way. Id. at 271-72.

The Court then looked to the "history of the times" to discern Congress's intent. Id. at 273. The Court found the 1875 Act was intended to make a "sharp change" from the pre-1871 approach of making "lavish grants" to the railroads,

and thus Congress did not intend to grant railroads the mineral rights in the right-of-way. Id. at 275. The Court also found pertinent to the Act's construction the fact that Interior decisions issued after the Act's passage concluded that the Act granted an easement, and that Congress continued to use similar language in subsequent statutes without contesting Interior's interpretation. Id. Finally, the Court looked to Congress's own subsequent interpretations of the 1875 Act – set forth in legislation enacted in 1906 and 1909 – which interpreted the 1875 Act as granting easements. Id. at 276-77.

The Court rejected statements in prior cases that the 1875 Act granted a "limited fee" – described as the fee interest with the possibility of reverter upon cessation of use for railroad purposes – reasoning that those cases had wrongly adopted the language of cases construing pre-1871 statutes. The Court noted, in any event, that none of the prior cases explicitly decided the rights to subsurface minerals in a right-of-way. Id. at 278.

While Great Northern characterized the 1875 Act rights-of-way as "easements," it did not hold that they were akin to common law easements, but only that they constituted a property interest that did not convey the subsurface minerals. See infra, Part I.B.2. As Interior has explained with respect to the 1875 Act rights-of-way, "it is unjustifiable to force a unique estate created by Congress

into a common-law label." Proposed Installation of MCI Fiber Optic Comm. Line within Southern Pacific Transportation Co.'s Railroad Right-of-Way, 96 Int. Dec. 439, 447 (1989). Congress may "pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests," and it is not necessary to "shoe-horn" the 1875 Act easements into a traditional common law category. Idaho v. Oregon Short Line Railroad Co., 617 F. Supp. 207, 212 (D. Idaho 1985); see also Brown v. Washington, 924 P.2d 908, 917 (Wash. 1996) (easements on public land granted by Congress "are subject to the intentions and specifications of Congress"); Puett v. Western Pac. R. Co., 752 P.2d 213, 215-16, 218 (Nev. 1988) ("cases interpreting the 1875 Act demonstrate that the easements granted thereby were not intended to be construed within the traditional definition of an easement"). As the Supreme Court has recognized, 19th century statutes making grants to railroads are "to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance." Leo Sheep Co. v. United States, 440 U.S. 668, 682 (1979) (internal quotations omitted).

Given the special nature of railroad rights-of-way, it cannot be assumed that Congress intended the rights of way to operate as common law easements. Indeed, the Supreme Court has recognized that a federal grant of a railroad right-of-way

"is more than a mere right of passage. It is more than an easement." Western Union Teleg. Co. v. Pennsylvania R. Co., 195 U.S. 540, 570 (1904). Even "if a railroad's right of way was an easement," it was one "having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property." Id. (internal quotations omitted). The Court concluded, therefore, that a railroad right-of-way "has the substantiality of the fee." Id.; see also Territory of New Mexico v. United States Trust Co. of New York, 172 U.S. 171, 184 (1898) (citing cases applying certain fee title principles to railroad easements); Midland Valley R. Co. v. Sutter, 28 F.2d 163, 165 (8th Cir. 1928) (citing numerous "[w]ell-considered cases recognize that an easement for a railroad right of way differs in important respects from other easements") (internal quotations omitted). Accordingly, the 1875 Act granted not just an incorporeal use interest in the rights-of-way but rather an interest that is corporeal and possessory – operating essentially as a fee interest in the surface – and the traditional rules regarding the passing of the servient estate and precluding a "reversionary interest" need not apply.

2. Distinctions between pre- and post-1871 railroad rights-of-way grants are immaterial.

Landowners' contention that the United States does not retain the reversionary interest in 1875 Act rights-of-way also rests on distinguishing the

pre-1871 rights-of-way – characterized by the Supreme Court as a "limited fee" in which the United States holds the right of reverter – from the 1875 Act rights-of-way, characterized by the Supreme Court as "easements," in which Landowners contend the United States holds no reversionary interest. But as the case law demonstrates, the distinction between the two is at most minimal. Both are corporeal and possessory interests that carry reversionary interests, and any distinction between them has no bearing on the outcome of this case.

The evolution of the case law on the nature of interests granted in the various congressional railroad right-of-way statutes is recounted in Oregon Short Line, 617 F. Supp. at 210-211. In 1903, the U.S. Supreme Court considered whether homesteaders who had cultivated and occupied a portion of a railroad right-of-way granted under an 1864 statute (the "1864 Act") could acquire the occupied property by adverse possession. The Court ruled that the 1864 Act conveyed a "limited fee, made on an implied condition of reverter in the event the company ceased to use or retain the land for the purpose for which it was granted." Northern Pacific Ry. Co. v. Townsend, 190 U.S. 267 (1903). The Townsend Court held that the right-of-way could not be alienated by the railroad directly or indirectly via adverse possession, because the railroad held only the right to use the right-of-way for railroad purposes. Id. at 271. In other words, the United

States held the reverter.

In 1915, the Court considered whether a party holding a mining patent that granted fee title to lands encompassed by a mining claim crossed by an 1875 Act right-of-way obtained title to the right-of-way. The Court, relying on Townsend, characterized the right-of-way as a "limited fee" made on an implied condition of reverter. Rio Grande Western Ry. Co. v. Stringham, 239 U.S. 44, 47 (1915). Although Stringham, like Townsend, characterized the nature of the railroad's interest as fee title, subject to the United States' reversionary interest, both cases addressed only the question of the ownership of the surface rights.

It was against this background that the Supreme Court decided Great Northern, which for the first time addressed whether the congressional grant of a railroad right-of-way conveyed the subsurface mineral interests. The question arose in the context of the 1875 Act and, as discussed supra Part I.B.2, the Court held that the Act did not grant the railroads the mineral rights in the rights-of-way. Apparently assuming that the "limited fee" interest described in Townsend conveyed to the railroad all present interests in the right-of-way, including the mineral interests, Great Northern distinguished between pre- and post-1871 statutes and characterized the 1875 Act as granting an "easement" rather than a "limited fee" interest. While the Court rejected Stringham's characterization of

the 1875 Act rights-of-way as conveying a "limited fee" interest, the Court noted that none of the prior cases involved the question of rights to subsurface minerals. Id. at 278-79.

In 1957, the question of rights to subsurface minerals in rights-of-way granted under a pre-1871 statute came before the Court. See United States v. Union Pacific, 353 U.S. 112. The Court held that the 1862 statute in question did not convey the subsurface mineral rights to the railroad. While the Court relied in part on specific language in the statute to reach this conclusion, the Court also sought to reconcile the prior decisions of the Court characterizing the property interest conveyed in grants of railroad rights-of-way. The Court rejected the argument that the Townsend line of cases compelled a ruling that the railroad owned the subsurface mineral rights, concluding:

> The most that the 'limited fee' cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes.

Id. at 119; see also Chicago and North Western Ry. Co. v. Continental Oil Co., 253 F.2d 468, 471 (10th Cir. 1958) (questioning whether the "so-called limited fee concept of title to railroad rights-of-way" could be said to have established railroad ownership in underlying minerals). The Court also declined to apply the distinction between the pre- and post-1871 Acts made in Great Northern,

reasoning that its "suggestion that a right of way may at times be more than an easement was made in an effort to distinguish the earlier 'limited fee' cases." Id.

Subsequent courts reviewing the evolution of this case law have viewed it as indicating that there may be little, if any, distinction between the rights granted in pre- and post-1871 railroad right-of-way statutes. The Tenth Circuit explained:

> [W]e are not impressed with the labels applied to the title of the railroads in their rights-of-way across the public lands of the United States. The concept of "limited fee" was no doubt applied in Townsend because under the common law an easement was an incorporeal hereditament which did not give an exclusive right of possession. With the expansion of the meaning of "easement" to include, so far as the railroads are concerned, a right in perpetuity to exclusive use and possession the need for "limited fee" label disappeared.

Wyoming v.Udall, 379 F.2d 635, 640 (10th Cir. 1967). Oregon Short Line probed the limits of Great Northern's distinction between pre- and post-1871 statutes, noting that the language of the pre and post-1871 Acts "contained identical language." 617 F. Supp. at 212. Oregon Short Line described Townsend and Stringham as decisions that "attempt[ed] to define the property interest conveyed to a railroad by the grant of a right-of-way" and resulted in the "inartful coinage of the term 'limited fee with an implied condition of reverter.'" Id. at 210. Indeed, Stringham itself, in applying the term "limited fee with an implied condition of reverter" to 1875 Act rights-of-way, described the right as "neither a mere

easement, nor a fee simple absolute." 239 U.S. at 47; cf., United States v. Big Horn Land & Cattle Co., 17 F.2d 357, 365 (8th Cir. 1927) (stating, in reference to an 1891 right-of-way statute, "We think, it, therefore, not important whether the interest or estate passed be considered an easement or a limited fee. In any event it is a limited fee in the nature of an easement."). Similarly, in a decision that was a prelude to Great Northern, Interior accepted Stringham's characterization of the 1875 Act as granting a "limited fee" interest in the rights-of-way, and yet held that the oil and gas underlying the 1875 Act rights-of-way did not convey to the railroad grantee. Use of Right of Way for Extracting Oil, 56 Int. Dec. 206 (1937).

It is clear, as Union Pacific established, that both pre- and post-1871 railroad right-of-way statutes granted to railroads "all surface rights to the right of way and all [nonsurface] rights incident to a use for railroad purposes." 353 U.S. at 119. Both essentially grant the railroad a corporeal fee-like interest in the surface (plus ancillary nonsurface rights) so long as the railroad uses the right-of-way for railroad purposes. Consequently, both operate in the same manner with respect to their reversionary interests and effect on conveyances to homesteaders of lands crossed by the right-of-way.

3. The United States retains the reversionary interest in 1875 Act rights-of-way just as it does in earlier statutes granting a limited fee interest.

It is well-established that the United States retains the reversionary interest in pre-1871 rights-of-way. See Townsend, 190 U.S. at 271. Although the 1864 statute addressed in Townsend did not expressly retain a reversionary interest in the United States, Townsend implied the existence of such a reverter because the "grant was explicitly stated to be for a designated purpose" and thus provided a right to present use of the right-of-way only so long as it was used for that purpose. Id. Similarly, the 1875 Act grants the right-of-way for a designated purpose – for railroad use – and provides the right to present use of the right-of-way only so long as it is used for that purpose. Thus, just as in pre-1871 statutes, a right of reverter is implied in the 1875 Act rights-of-way.

It is also well-established that the reversionary interests in the pre-1871 rights-of-way are retained by the United States.[6] Id. While Townsend did not address this question directly, it noted that the grant of the right-of-way took the

---

[6] Landowners contention (Br. 26 n.12) that the reversionary interest in the limited fee rights-of-way conveys to the subsequent patentees of the surrounding land is not supported by the cases they cite, none of which rules on the United States' interests in the rights-of-way; belies their reliance on the "subject to" language of the 1875 Act; and would render subsequent legislation dealing with the disposition of the United States' reversionary interests in rights-of-way completely meaningless, null and void. See infra, Part I.C.

land granted out of the category of public lands subject to pre-emption and sale, and thus "the homesteaders acquired no interest in the land within the right-of-way" despite the fact that "the grant to them was of the full legal subdivisions." Id. Applying the reasoning of Townsend, the Seventh Circuit ruled that subsequent patentees of land crossed by railroad rights-of-way granted under statutes enacted in 1856 and 1864 did not possess a legal interest in the right-of-way, because the right-of-way constituted a limited fee interest in which the United States held the possibility of reverter. See Mauler v. Bayfield County, 309 F.3d 997 (7th Cir. 2002). Under similar reasoning, the Eighth Circuit likewise held that subsequent patentees of land crossed by 1864 Act rights-of-way did not obtain the oil and gas interests in the right-of-way, because the right-of-way "was taken out of the category of public land subject to preemption and sale"; thus those rights were retained by the United States. See Rice v. United States, 479 F.2d 58 (8th Cir. 1973); see also Rice v. United States, 348 F. Supp. 254 (D.N.D 1972) (providing detailed reasoning on which the court of appeals relied).

Given the similar fee-like attributes of the rights-of-way granted by the 1875 Act, these grants also segregate or sever these rights-of-way from the public domain, prevent their passage to the subsequent homesteaders, and retain the reversionary interest in the United States. Whatever differences may exist

between the limited fee and 1875 Act rights-of-way is immaterial in this case. As the Mauler court reasoned in holding narrow differences in grants immaterial:

> Because the land grants in this case were comprised of federal lands in the public domain and were given for exactly the same purpose as the grant in Townsend, we readily conclude that the strip of land at issue here was subject to an implied right of reverter in the United States.

309 F.3d at 1001.

Nor, contrary to the argument asserted by Landowners (Br. 13-15), is construing the 1875 Act to retain the reversionary interest in the United States contrary to Great Northern. Great Northern examined addressed the question of whether the Act granted the subsurface mineral rights to the railroads. It did not speak to the question of what interests the United States retains. Nothing in Great Northern indicates that Congress intended to retain the reversionary interests in rights-of-way granted prior to 1871 and relinquish them thereafter. To the contrary, as discussed in the following section, there is ample evidence that Congress understood it had retained the reversionary interest in both pre- and post-1871 rights-of-way.

## C. Congress repeatedly demonstrated its understanding that the United States retained the reversionary interest in the 1875 Act rights-of-way.

Numerous subsequent statutes pertaining to the 1875 Act demonstrate Congress's consistent view that the United States retained the reversionary interest in the 1875 Act rights-of-way. "It is settled that subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject." Great Northern, 315 U.S. at 277 (internal quotations omitted). In particular, courts may consider subsequent legislation that clarifies or depends on a particular interpretation of earlier legislation to have effect. See Bell v. New Jersey, 461 U.S. 773, 789-90 (1983) (view of later Congress persuasive in determining meaning of earlier statute); Wilson v. United States, 917 F.2d 529, 535 (Fed. Cir. 1990) (same, 1987 statute used to determine meaning of 1956 enactment); Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980) (giving "significant weight" to the views expressed in 1972 statute to determine the meaning of 1936 statute); International Bhd. of Teamsters v. United States, 431 U.S. 324, 393 (1977) (1976 amendments used to construe 1946 statute).

### 1. The 1898 Act: Extending the 1875 Act to Alaska

In 1898, Congress passed an act "Extending the homestead laws and