providing for the right of way for railroads in the District of Alaska." See Act of May 14, 1898, c. 299, 30 Stat. 409 (codified at 43 U.S.C. §§ 942-1 to 942-9). The 1898 Act was "grounded largely upon the right-of-way act of 1875." See H. Rep. No. 137, 55th Cong., 2d Sess. (1898). The 1898 Act reproduced verbatim the very language that Great Northern relied on to hold that the 1875 Act rights-of-way were railway easements, including the language providing that land crossed by the rights-of-way shall be disposed "subject to" the right-of-way. See 43 U.S.C. §§ 942-1, 942-2, 942-5. Thus, the 1898 Act granted the same type of railway easements as the 1875 Act, and provided for the same type of conveyance of the surrounding lands. See, e.g., Northcross v. Board of Ed. of Memphis City Schools, 412 U.S. 427, 428 (1973) (statutes with similar language and subject matter should be given the same meaning).

However, by the time of the 1898 Act, Congress had learned that the forfeiture provision of the 1875 Act was not self-executing, and that forfeitures were being delayed by the need for court orders declaring forfeiture. Thus, Congress added language to the 1898 Act declaring that, if construction was not completed on a right-of-way within five years, forfeiture would occur "without further action or declaration." 43 U.S.C. § 942-5; see also Columbia Valley R. Co. v. Portland & S. Ry. Co, 162 F. 603, 606 (9th Cir. 1908) (same language in

similar 1906 Act "takes the place of the adjudication of forfeiture"). This provision also demonstrated Congress's recognition that the United States retained the reversionary right in the railway easements granted under the Act, stating that, upon forfeiture, the right-of-way "shall revert to the United States without further action or declaration." Id. Thus, the 1898 demonstrates that Congress understood that the railway easements granted in both the 1875 and 1898 Acts reverted to the United States and did not devolve to the patentees of adjacent land.

The 1898 Act demonstrates that the phrase "subject to" does not, as Landowners contend, show that the United States did not retain any interest in the land after it was patented (Br. 14) or that only a use restriction was conveyed to the Railroad (Br. 16-17). Indeed, the Supreme Court itself has used the phrase "subject to" to exclude a fee interest. See Stringham, 239 U.S. at 46 ("defendants' title under the placer patent was subject to this [limited fee] right of way"). Interior has used the "subject to" language in the same manner. See State of Wyoming, 27 IBLA 137 (1976) (states seeking patents to sections of "school lands" traversed by pre-1871 railroad limited fee rights-of-way take such sections "subject to" the right-of-way); see id. at 168 (Ritvo, A.J., dissenting) (language stating state took lands "subject to" right-of-way "is not indicative of any title or estate vesting in the State to the lands within the right-of-way").

The 1898 Act also demonstrates that Congress understood that it retained the reversionary interest in the railroad rights-of-way well before the Supreme Court ruled in Stringham (1915) that such interests constituted limited fees. Hence, Landowners are wrong (Br. 28-39, esp. 37) that subsequent statutes demonstrating Congress's understanding that the United States retained the reversionary interest in 1875 Act rights-of-way were based on Stringham's holding that the 1875 Act rights-of-way were limited fee interests, which was subsequently overruled.

2. The 1906 and 1909 Acts: Enforcing the 1875 Act's forfeiture provision.

Congress made explicit its understanding that the 1875 Act retained the reversionary interest in the United States in two nearly identical statutes enacted in 1906 and 1909. See Act of June 26, 1906, c. 3350, 34 Stat. 482, and Act of February 25, 1909, c. 191, 35 Stat. 647 (codified as amended at 43 U.S.C. § 940). The Supreme Court relied on these statutes in Great Northern in construing the 1875 Act, 353 U.S. at 276-77, and they similarly may be relied on here. These statutes were intended to enforce the Act's forfeiture provision by legislatively declaring all existing unused rights-of-way on which plats had been filed to be forfeited. See H.R. Rep. No. 2283, 59th Cong., 1st Sess. (1906); 40 Cong. Rec. 4615 (1906). They provided that where a rail line had not been constructed within

five years of the grant of an 1875 Act right-of-way, the right-of-way

> shall be, and hereby is, declared forfeited to the United States * * * and the United States hereby resumes the full title to the lands covered thereby freed and discharged from such easement, and the forfeiture hereby declared shall, without need of further assurance or conveyance, inure to the benefit of any owner or owners of land heretofore conveyed by the United States subject to any such grant of right of way or station grounds * * *.

43 U.S.C. § 940 (emphasis added). These statutes again recognized that upon forfeiture of an 1875 Act right-of-way, the United States resumed full legal title to it and provided for the automatic conveyance upon such forfeiture from the United States to the owner of lands traversed by the right-of-way. Like the 1898 Act, the 1906 and 1909 Acts also show the error of Landowners' arguments about the meaning of the language and interests conveyed in the 1875 Act. These Acts expressly recognized that the right-of-way granted was an "easement," but one in which the United States retained the reversionary interest. Additionally, this use of the term "easement" post-dated Townsend's characterization of pre-1871 rights-of-way as "limited fee" interests, demonstrating that Congress was not acting based on an erroneous application of Townsend to the 1875 Act. The Acts also expressly recognized that the land crossed by the right-of-way had been conveyed "subject to" the right-of-way, demonstrating again – as discussed above – that this

language does not convey a fee simple interest to the homesteaders burdened only by a common law easement.

3. The 1922 Act: Disposition of 1875 Act abandoned rights-of-way.

Congress for the fourth time demonstrated its understanding that the United States retained the reversionary interest in the 1875 Act rights-of-way in 1922, with the enactment of the Railroad Right-of-Way Abandonment Act. See Act of Mar. 8, 1922, c. 94, 42 Stat. 414 (codified at 43 U.S.C. § 912). The 1922 Act was specifically intended to address forfeitures or abandonments of rights-of-way granted under the 1875 Act. See Sen. Rep. No. 388, 67th Cong., 2d Sess. (January 6, 1922), at 1 (referencing section 4 of the 1875 Act "under which most of the rights of way over public lands have been granted") and at 2 (explaining how the statute operates on 1875 Act rights-of-way). The 1922 Act provided that whenever a railroad ceased use and occupancy of a right-of-way granted to it from the federal public lands,

> all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment, be transferred to and vested in any person * * * to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or

railroad structures of any kind as aforesaid * * * .

43 U.S.C. § 912. In 1988, Congress effectively repealed those portions of the 1922 Act that allowed the government to relinquish its interest in these rights-of-way to adjacent landowners, requiring that the rights remain in the United States upon their abandonment or forfeiture. 16 U.S.C. § 1248(c).

By enacting this provision to affirmatively transfer the United States' rights in abandoned 1875 Act rights-of-way to the owners of property traversed by them, Congress once again expressed its understanding that the 1875 Act retained a reversionary interest in the rights-of-way in the United States. If the United States retained no interest in the rights-of-way, no affirmative action by Congress to convey them to the surrounding landowner would be required. Thus, to conclude that the United States holds no reversionary interest in the 1875 Act rights-of-way would improperly read the statute as having no effect on the very rights Congress expressly intended to address. Morton v. Mancari, 471 U.S. 535, 551 (1974) ("when two statutes are capable of co-existence, it is the clear duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"), quoted in Liesegang v. Secretary of Veterans Affairs, 312 F.3d 1368, 1374 (Fed. Cir. 2002). Thus, it is not surprising that courts have almost unanimously concluded that the 1922 Act applies to the 1875Act rights-of-way.

See discussion infra, Part I.D.

4. Disposition of 1875 Act rights-of-way for public highways.

In the 1922 Act, Congress also indicated that it understood it had retained interests in the 1875 Act rights-of-way – and could use them to continue to meet the country's transportation needs – by precluding the transfer of rights-of-way on which public roads had previously been established or were established within a year after the railroad's abandonment. 43 U.S.C. § 912; see also S. Rep. No. 388 at 2. Similarly, Congress expressed its understanding that it exercised continuing control over railroad rights-of-way in a statute enacted in 1920, which authorized all railroad companies granted rights-of-way through the public lands to convey to state or local governments "any portion of such right of way to be used as a public highway or street" provided that the railroad retained 50-feet of the right of way on each side of the track. Act of May 25, 1920, c. 197, 41 Stat. 621 (codified at 43 U.S.C. § 913). In 1921, in the Federal Highway Act, Congress provided the United States' consent to any railroad to convey rights-of-way granted by the United States to state highway departments. Act of Nov. 21, 1921, c. 119, 42 Stat. 212, 216 (codified as amended at 23 U.S.C. § 316). While these statutes could hypothetically be viewed as taking rights from the homesteaders, that would be inconsistent with Congress's contemporaneous efforts to convey unused rights-of-

way to the homesteaders, and Congress's apparent understanding that it retained property interests in the rights-of-way is consistent with the other statutes discussed here.[7]

### D. The courts have overwhelmingly concluded that the United States retained the reversionary interest in the 1875 Act rights-of-way.

All but one of the eight court decisions that have addressed whether the United States retained a reversionary interest in the 1875 Act rights-of-way have concluded that it did. The first of these cases is Idaho v. Oregon Short Line R. Co., 617 F. Supp. 207 (D. Idaho 1985), which examined whether the 1922 Act discussed above – often referred to as section 912 – applies to 1875 Act rights-of-way. The court recounted the history of the railroad statutes and the series of cases from Townsend to Great Northern to Union Pacific. Id. at 210-11. It concluded that Congress did not grant just a common law easement, but a special statutory interest that retained the reversionary rights in the United States. Specifically, the court reasoned that Congress

> had authority, by virtue of its broad power over interstate commerce, to grant such easements subject to its own terms and conditions – which were to preserve a corridor of public transportation, particularly the railroad transportation in order to facility the development of the

[7] At a minimum, these statutes demonstrate Congress's understanding that the use of the 1875 Act rights-of-way for highway purposes was within the scope of the rights-of-way, which were granted for public transportation purposes.

> "Western vastness." Congress could pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests. In other words, even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement.

Id. at 212. The court reasoned that Congress, in enacting section 912 as well as 43 U.S.C § 913 and 23 U.S.C. § 316 (see supra, Part I.C.4), understood that it had retained the reversionary interest in the 1875 Act rights of way:

> In enacting these statutes, Congress clearly felt that it had some retained interest in railroad rights-of-way. The precise nature of that retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law. * * * Regardless of the precise nature of the interest, Congress clearly believed that it had authority over 1875 Act railroad rights-of-way.

617 F. Supp. at 212. The court refused to "render[] null" these statutes by holding the United States retained no reversionary interest and thus concluded they apply to 1875 Act rights-of-way. Id. at 213.

The Tenth Circuit addressed the same question in Marshall v. Chicago and Northwestern Transp. Co., 31 F.3d 1028 (10th Cir. 1994), and likewise held that the United States held the reversionary interest in 1875 Act rights-of-way and thus section 912 applied; see also Wyoming v. Andrus, 602 F.2d 1379, 1384 (10th Cir. 1979) (section 912 applies to grants both before and after 1871). The Ninth

Circuit, while not specifically ruling on the question, similarly concluded that "Section 912 applies to grants both before and after 1871." Vieux v. East Bay Reg'l Park Dist., 906 F.2d 1330, 1335 (9th Cir. 1990). The three state courts that have ruled on the question agree. See Barney v. Burlington Northern R. Co., 490 N.W.2d 726, 730 (S.D. 1992); Hamilton v. King County, 2000 WL 1772525 (Wash. App. Div. 1 2000) (unpublished opinion); Whipps Land & Cattle Co. v. Level 3 Communications, LLC, 658 N.W.2d 258 (Neb. 2003).

The one case to hold to the contrary is City of Aberdeen v. Chicago and North Western Transp. Co., 602 F. Supp. 589 (D.S.D. 1984). City of Aberdeen, however, viewed Great Northern as holding that the 1875 Act granted "mere easements" that operated in accordance with common-law principles, id. at 593, a view that is widely rejected by other courts. In addition, City of Aberdeen relied solely on dicta in Wyoming v. Udall, 379 F.2d 635, 639 (10th Cir. 1967), which stated that section 912 applied only to pre-1871 grants. Id. at 639. This dicta was rejected by the Tenth Circuit when it held, ten years after City of Aberdeen, that section 912 applies to 1875 Act rights-of-way. See Marshall, 31 F.3d at 1031 n.2. Not surprisingly, the holding of City of Aberdeen has been rejected by every other court to consider the question.

## E. Interior's decisions are consistent with the United States' retention of the reversionary interest in the right-of-way.

Contrary to Landowners' assertions, Interior's decisions pertaining to the railroad rights-of-way statutes are consistent with the United States' claim to hold the reversionary interest in the 1875 Act rights-of-way.

Landowners first point (Br. 21) to Interior's early construction of the 1875 Act to grant easements rather than a limited fee, and thus to convey fee simple to a homesteader who was subsequently patented the lands traversed by the right-of-way. Landowners' reliance on this early construction is unavailing. Interior initially construed all railroad rights-of-way as easements, whether granted before or after 1871, see Brucker v. Buschmann, 21 Pub. Land Dec. 115 (1895), and applied common law principles to conclude that the homesteaders acquired fee simple title to the lands underlying the rail line. See Eugene McCarthy, 14 Pub Land Dec. 105, 109-10 (1892) (applying Kansas common law); Pensacola and Louisville R.R. Co., 19 Pub. Land Dec. 386, 387 (1894) (railroad right-of-way is "mere easement" and "incorporeal hereditament"). Subsequent Supreme Court decisions holding that pre-1871 rights-of-way granted limited fee interests and that railroad easements differ from common law easements (supra, Parts I.B.2 and I.B.3) negate these early constructions.

Interior, like the courts, has struggled through time to find the terminology

to characterize the interest conveyed by the railroad right-of-way statutes. In response to Townsend and Stringham, Interior changed its terminology from "easements" to "limited fees," but concluded that the limited fee interest did not convey the minerals to the railroads. See Use of Railroad Right of Way for Extracting Oil, 56 Int. Dec. 206 (1937). Today, Interior – like the courts – describes the 1875 Act rights-of-way as granting to the railroads an easement that is tantamount to a fee interest in the surface as well as the subsurface to the extent it may be used for the installation and support of structures and other improvements of the railroad. See MCI Fiber Optic, 96 Int. Dec. at 450. Such an interest is akin to the limited fees deemed to be conveyed in the pre-1871 statutes, and likewise should be deemed to imply a possibility of reverter in the United States.

Landowners (Br. 15, 21) also point to Interior's decisions stating that homesteaders applying for a patent to lands crossed by an 1875 Act right-of-way must pay for the full subdivision entered and take patent to the entire tract. Interior, however, applies the same requirements with respect to lands traversed by pre-1871 limited fee rights-of-way. See, e.g., State of Wyoming, 27 IBLA 137 (1976) (patents to lands traversed by 1862 and 1864 Act rights-of-way must be issued "subject to" the right-of-way); Brucker, 21 Pub. Land Dec. 115 (holding

land traversed by railroad right-of-way is disposed of "subject to" the right-of-way, without specifying the statute under which the rights-of-way were granted); W.S. Burch, 45 Pub. Land Dec. 473, 480 (1916) (noting application of this rule to limited fee rights-of-way).

Finally, Landowners rely (Br. 18, 23) on Interior's decision in Amerada Hess, 83 Int. Dec. 194 (1976), which held that the subsurface minerals underlying an 1875 Act right-of-way convey to the patentee of the lands traversed by the right-of-way and are not retained by the United States. Interior, however, incorrectly relied on Great Northern, in which the parties had stipulated that the United States had standing to sue for the subsurface mineral rights with respect to rights-of-way across public lands still owned by the United States, and in which the United States did not assert standing with respect to rights-of-way across lands that had been conveyed to homesteaders. The fact that the United States chose not to litigate the question of its interest in the minerals underlying all rights-of-way in the case, however, did not constitute a ruling of the Court or a position of the United States that is binding in any other case. Moreover, because only the rights to surface use are implicated in this case, it is immaterial whether the United States retains the reversionary interest in the mineral rights underlying the 1875 Act rights-of-way.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Plaintiffs' Appendix of Exhibits (1 of 4) Filed in Support of their Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class

Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. CV99-324S-MHW<br><br>Honorable Mikel H. Williams |

**PLAINTIFFS' APPENDIX OF EXHIBITS (2 of 4) FILED IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

July 12, 2006

**INDEX OF PLAINTIFFS' EXHIBITS**
**(APPENDIX 2 OF 4)**

| Plaintiffs' Exhibit Number | Description of Exhibit |
|---|---|
| 4 | Excerpted Appellate Brief for *Amicus Curiae* Rails-to-Trails Conservancy ("RTC") (*Hash v. U.S.*, Case No. 03-1395 (Fed.Cir.) (Filed Nov. 17, 2003) |

Dated: July 12, 2006

Respectfully submitted,
ACKERSON KAUFFMAN FEX, PC

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

No. 03-1395

In the

IN THE UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

Plaintiffs-Appellants,

v.

THE UNITED STATES,

Defendant-Appellee.

Appeal from the United States District Court
for the District of Idaho in 99-CV-324,
Magistrate Judge Mikel H. Williams

**BRIEF OF *AMICUS CURIAE* RAILS-TO-TRAILS CONSERVANCY**

Andrea C. Ferster
General Counsel
Rails-to-Trails Conservancy
1100 17th Street, N.W., 10th Fl.
Washington, D.C. 20036
(202) 974-5142

November 17, 2003

government could be expected to convey to patentees retained fee interests in these corridors when, until 1942, the courts had determined that the United States did not possess a present possessory fee interest in 1875 Act FGROW.

Finally, the district court correctly held that the plaintiffs lacked any property interest in the portions of the corridor assembled through private deeds and adverse possession since the railroad acquired fee simple title. Because ambiguities in many of these deeds preclude *de novo* review, this court should defer to the district court's thoughtful evaluation on this issue.

## ARGUMENT

### I. The District Court Correctly Held that Plaintiffs Lacked Any Property Interest in Those Portions of The Corridor that Constitute FGROW.

#### A. Evolution of Federal Law Governing FGROW.

In 1852, Congress enacted a general statute granting railroads a "right-of-way" over federal lands 100 feet in width.[2] At the same time, faced with opening the Western frontier, Congress began granting large swaths of land directly to the states for sale to raise money to build new rail lines.[3] Besides these "grants-in-aid"

[2] Act of August 4, 1852, 10 Stat. 28, Sec. 1.

[3] *See* Paul Gates, *History of Public Land Law Development* (1968); Thomas E. Root, *Railroad Land Grants From Canals to Transcontinentals: 1808-1941*, Natural Resources Law Section, Monograph Series, No. 4: American Bar Assn., 1987.

of land to help finance railroad construction, Congress continued to grant "rights-of-way" across federal lands to facilitate building these roads. By the end of the Civil War, Congress realized the importance of trans-continental, inter-state railroads and gave direct grants of land to the railroads to finance the construction.[4] With these direct grants-in-aid also came grants of right-of-way, usually 200-400 feet wide, across federal lands. The grants-in-aid ceased in 1871, after public attitudes shifted, but Congress continued making general right-of-way grants for any new railroads across federal land, enacting a general right-of-way act in 1875.

As political attitudes toward the railroads changed toward the end of the nineteenth century, and as numerous bankruptcies disrupted some rail lines, concerns over abandonment led the Supreme Court to construe the railroad right-of-way to be only a limited fee subject to a reverter interest in the federal government. *N. Pac. RR. Co. v. Townsend*, 190 U.S. 267 (1903). As a result, a railroad that forfeited its line, either through failure to construct or abandonment, would find its corridor had reverted intact to the federal government for disposition to another railroad or for other public uses.

---

[4] These grants included alternating odd or even sections of land adjoining the corridor, up to 20 miles on each side, called "checkerboard" grants.

After 1875, Congress passed numerous acts to manage these railroad right-of-way grants, including those in 1898, 1906, 1909, 1920, 1921, and 1922.[5] For purposes of this case, 43 U.S.C. § 912 is most pertinent. This statute was enacted in 1922 to dispose of the federal government's retained interests in all FGROW in case of abandonment. Under the statute, any federally granted parcel in a railroad corridor continues to exist as a railroad right of way, usable only for railroad or other public highway purposes, until Congress adopts a statute transferring the title[6] or until there is a judicial declaration of abandonment, whichever first occurs.[7] If there is a judicial declaration of abandonment,§ 912 provides on its

[5] Alaska Homestead Act of May 14, 1898, cc.299, 30 Stat. 409 (codified at 43 U.S.C. 942-1 to 942-9); Railroad Forfeiture Act of June 26, 1906, c.3350, 34 Stat. 482 and Act of Feb. 25, 1909, c.191, 35 Stat. 647 (codified as amended at 43 U.S.C. 940); Act of May 25, 1920, c.197, 41 Stat. 621 (codified at 43 U.S.C. 913); Federal Highway Act of Nov. 21, 1921, c.119, 42 Stat. 212, 216 (codified as amended at 23 U.S.C. 316).

[6] *E.g., Brown v. Washington,* 130 Wash. 2d 430, 924 P.2d 908, 916 & 924 (1996) (Congress adopts statute authorizing transfer of title to State of Washington for cross state trail).

[7] As a necessary precondition to seeking a judicial declaration of abandonment for purposes of 43 U.S.C. § 912, the Interstate Commerce Commission ("ICC"), now the STB, must determine that the line is no longer required in interstate commerce, a process known as "authorizing an abandonment." *Phillips v. Denver & R.G.W. R.,* 97 F.3d 1375, 1377 (10th Cir. 1996). ICC/STB abandonment authorizations are permissive only: the agency does not determine that a line has been abandoned, only that it may be withdrawn

face that the title vests in the person or entity owning the legal subdivision traversed by the FGROW in question, unless (a) the FGROW is in a municipality, in which case it goes to the municipality, or (b) a state or local government establishes a public highway on the FGROW parcel within one year of the judicial declaration of abandonment, in which case the government's interest is transferred to the state or local government.

With the advent of the automobile, and the shift to gasoline-powered locomotives, railroads desiring to drill for oil in their corridors claimed that their fee simple interests in these rights-of-way included the subsurface mineral rights. Not surprisingly, the federal government, which had previously focused only on the surface land traversed by the railroad, became concerned about protecting its subsurface mineral rights. The federal government had routinely reserved minerals in patents to homesteaders as well as in the vast areas of checkerboard lands granted to the railroads to aid in the construction of their roads. Thus, in a case involving a dispute between a railroad and the federal government over mineral rights in an 1875 Act grant in 1942, the Supreme Court held that the right-of-way was an easement, and therefore the railroad did not receive subsurface mineral rights. *Great Northern Ry Co. v. U.S.*, 315 U.S. 262 (1942). *Great*

---

from preemptive federal regulatory control. *See Vieux, supra,* 906 F.2d at 1339.

*Northern* made no mention of 43 U.S.C. § 912, governing the disposition of the government's retained interest in FGROW upon abandonment, and premised the reinterpretation of the railroad's rights from a defeasible fee with a reverter to an easement as being the logical result of shifting political attitudes between 1871 (the last of the grants-in-aid), and 1875 (when only rights-of-way were granted), despite the fact that the right-of-way grants themselves had never changed.

In 1988, 43 U.S.C. § 912 was modified by the Amendments to the National Trails Systems Act, signed into law by President Reagan on October 4 of that year. 16 U.S.C. § 1248(c)-(g). The Trails Act Amendments of 1988 provide that unless a public highway is established on FGROW per 43 U.S.C. § 913 (as modified by 23 U.S.C. § 316) or as provided in the public highway proviso of § 912 within one year of a judicial declaration of abandonment, the federal interest in FGROW "shall remain in the United States." 16 U.S.C. § 1248(c). In essence, the Trails Act Amendments of 1988 return to the dispositional scheme for FGROW that existed prior to adoption of 43 U.S.C. § 912: the ownership interest remains in the United States upon a judicial declaration of abandonment, with the exception that state or local governments continue to have one year from a judicial declaration of abandonment in which to establish a public highway.

B. Federal Statutes Governing the Disposition of FGROW Make Clear That Adjacent Landowners Lack Any Present or Future Property Interest in 1875 Act FGROW.

At the outset, RTC notes that Plaintiffs have not produced any documents to show their title to the railroad's corridor land. As a number of cases have held, the owners of land adjoining FGROW "are not successors in interest to those to whom title of the United States may have been granted, conveying or purporting to convey the whole of the legal subdivision traversed by the right-of-way, because their deeds did not include the land underlying the right-of-way." *Smith v. Marlow*, 742 N.E.2d 785, 790 (Ill.App. 4th Dist, 2000); *Marlow v. Malone,* 734 N.E.2d 195 (Ill.App., 4th Dist, 2000); *Keife v. Logan*, 75 P.3d 357 (Nev., 2003).[8] These cases reject any notion that a mere adjacent landowner acquires such title without a deed actually describing the land underlying the railroad's easement.

If this court nonetheless chooses to address the general question of Plaintiffs' interest in 1875Act FGROW, the case law and legislative history demonstrate that Plaintiffs have no interest in FGROW. Rather, the railroad had the right and authority to convey its FGROW for public highway purposes as

[8] As discussed in more detail in the brief of the United States, Plaintiffs cannot rely on the presumption of ownership derived from the "centerline rule," also called the strip and gore rule, available in some jurisdictions, as the Idaho courts have explicitly rejected the "centerline rule" as a policy in a railroad deed construction case "in light of the legislature's mandate in favor of conveying fee simple title." *C&G Inc., v. Rule*, 25 P.3d 76, 81 (Idaho, 2001).

specifically authorized by §912. Numerous jurisdictions have held that trails are "public highways" for purposes of §912. *See, e.g., Barney v. Burlington Northern RR. Co. Inc.*, 490 N.W.2d 726, 731 (S. Dak. 1992), *cert. denied,* 507 U.S. 914 (1993). In the absence of such a conveyance, the interest of the United States in FGROW upon abandonment or forfeiture by the railroad "shall remain in the United States." 16 U.S.C. § 1248(c).

Here, there has been no abandonment or forfeiture of the rail line at issue pursuant to§912. To the contrary, the corridor has been "railbanked" under 16 U.S.C. §1247(d). Railbanking negates and precludes a finding that a corridor has been "abandoned" for purposes of any law, or rule of law. *Id. See Grantwood Village v. Missouri Pacific Railroad Co.*, 95 F.3d 654, 659 (8th Cir. 1996); *Chevy Chase Land Co. v. United States,* 733 A.2d 1055, 1090-91 (Md. 1999).

Moreover, the trail conversion occurred after the passage of the 1988 Amendments to the NTSA in October 1, 1988. JA49. The 1988 Amendments to the NTSA eliminated even the contingent future interest of adjacent landowners that existed by virtue of §912. Thus, Plaintiffs lack any present or future interest in the FGROW parcels at issue here.

C. The United States Did Not Transfer Its Retained Interest in FGROW To Homesteaders of Adjacent Lands.

Plaintiffs' claim of interest in the FGROW rests entirely on the supposition that the federal government conveyed its retained interests in FGROW to homesteaders, pursuant to the Homestead Act of May 20, 1862 (43 U.S.C. 161; Repealed 90 Stat. 2787 (1976)), and therefore the United States had no interest in the corridor remaining to convey for a public highway use by operation of 43 U.S.C. § 912. This argument turns on its head nearly 130 years of precedent, including the rule of law in the circuit in which the case arose, renders null and irrelevant at least six acts of Congress, and flies in the face of numerous rules of statutory construction that demand giving priority to legislative intent and require construction of ambiguous government grants in favor of the sovereign.

1. <u>Plaintiffs' Argument would Directly Conflict with the Ninth Circuit's Decision in Vieux, and Thereby Create Conflicting Rules of Law Government the Treatment of real property located within the jurisdiction of the 9th Circuit.</u>

The Plaintiffs' argument that 1875 Act corridors passed to homesteaders cannot be reconciled with the court decisions interpreting the Railroad Abandonment Act, 43 U.S.C. § 912 (1922). Rather, the overwhelming majority view upheld by numerous courts is that §912 and subsequent amendments govern the disposition of the federal government's retained interests in 1875 Act

FGROW. By implication, therefore, those retained interests did not pass to homesteaders.

The U.S. Court of Appeals for the Ninth Circuit has held that § 912 "applies to grants both before and after 1871." *Vieux v. E. Bay Regional Park Dist.*, 906 F.2d 1330, 1335 (9th Cir., 1990). Likewise, the district court in Idaho stated that "§§912 and 316 apply to 1875 Act rights-of-way." *Idaho v. Oregon Short Line RR. Co.*, 617 F. Supp. 207, 212 (D. Idaho, 1985) (*Idaho I*). The seventh circuit stated that the "language of 912 . . . plainly refers to all Congressional grants of public lands for railroad rights of way." *Mauler v. Bayfield County*, 309 F.3d 997, 1001 (7th Cir. 2002). The 10th circuit held that §§ 912 and 316 apply to 1875 Act rights-of-way, in *Marshall v. Chicago & Northwestern Transp. Co.*, 31 F.3d 1028, 1032 (10th Cir., 1994). These cases make clear that 43 U.S.C. § 912 was passed explicitly to deal with the government's retained rights, regardless of whether this retained interest is considered the servient estate underlying an easement or right of reverter following a limited fee.

Even state courts have concurred in the applicability of §912 to 1875-Act lands. *See Barney v. Burlington Northern RR. Co. Inc.*, 490 N.W.2d at 731 ("[w]e conclude that the United States Government retained a reversionary interest in railroad rights-of-way, including those granted post 1871 and that 912 applies to

the right-of-way granted to the Railroad"); *Whipps Land & Cattle Co. v. Level 3 Communications, LLC*, 658 P.2d 258, 267 (Neb., 2003) ("[w]e are persuaded by the reasoning of the 9th and 10th Circuits, . . . and likewise conclude that §912 applies to rights-of-way created pursuant to the 1875 Act and that the import of §912 is that the United States retained all reversionary interests in such rights-of-way until the United States disposes of those interests as provided by law"). *See also Marlow v. Malone, supra*; *City of Maroa v. Ill. Ctrl. RR*, 592 N.E.2d 660 (Ill.App, 4th Dist, 1992).

The only case that disagrees with the applicability of §912 to 1875 Act FGROW is *City of Aberdeen v. Chicago & NW. Transp. Co.*, 602 F. Supp. 589 (D.S.Dak. 1984), but that case is clearly the anomaly and the South Dakota Supreme Court itself held otherwise in *Barney, supra*, in 1992. Plaintiffs' misplaced reliance on this case discounts the otherwise unanimous decisions of the 7th, 9th, and 10th Circuits.

Because *Vieux* held that § 912 was applicable to 1875Act FGROW, and because Idaho is in the ninth circuit, there arises a possibility of an untenable conflict were this court to rule contrary to *Vieux*. A real property defendant, who must conform to the legal standards set out in the circuit governing its jurisdiction, cannot be held to conform to different legal standards. Either §912 is applicable to

all 1875Act FGROW located in the jurisdiction of the 9th Circuit, or it is not. A contrary decision from this Court under the Tucker Act would create such a conflict. Although this conflict of laws issue is not directly before this court, it offers a compelling reason why this Court should not contradict unanimous precedents of every appellate court that has previously addressed this issue.

2. A Finding that Homesteaders Acquired Property Rights in 1875Act Corridors Would Pre-empt Application of 43 U.S.C. § 912, Rendering It and Many Others Pieces of Legislation Futile.

As Plaintiffs concede,"when grants to federal lands are at issue, any doubts 'are resolved for the Government not against it.'" *Leo Sheep Co. v. U.S.*, 440 U.S. 668, 682 (1979). As Plaintiffs also acknowledge, this rule is not to be applied so as to frustrate the intent of Congress (Pl. Brief 25). If there was any better statement of the intention of Congress, it is that 43 U.S.C. §§ 912, 913, and 940, 23 U.S.C. §316, and 16 U.S.C. §§1247-1248 evince a clear and resounding intent to preserve the government's interests in FGROW for the protection and promotion of the national interest in transportation and communications.

Although Plaintiffs try to discount the consequences of the interpretation they are advocating, if this court were to find that §912 is not applicable to 1875 Act corridors, it would eviscerate at least six statutes providing for the disposition

of FGROW. These statutes have been periodically enacted to manage these retained interests in railroad rights-of-way, first by encouraging their conversion to other public transportation uses, and then through retaining those interests and making them available for railbanking.

Any interpretation of the interplay of the pre-1871 and 1875 Act railroad grants, the Homestead Act, §912, and subsequent legislation must begin with two presumptions. First, grants from the government should be interpreted in favor of retaining property rights not explicitly conveyed. *Caldwell v. U.S.*, 250 U.S. 14, 20-21 (1919). An interpretation of § 912 should also further the goal of the railroad grants to provide a system of public transportation and communications that was recognized as being of the highest public priority.[9] The Plaintiffs' theory, however, would undermine these policies, and render all twentieth-century legislation relating to the disposition of the federal government's retained interest in FGROW null and futile.

In light of these policies, numerous courts have held that failure to apply §912 to 1875 Act interests would nullify and render futile the act itself. As the 7th circuit explained, "[c]learly Congress assumed the United States possessed a

[9] These grants were not limited to railroad purposes but rather were intended to secure to the government ability to use these corridors "for Postal, Military, and other purposes." Act of July 2, 1864, ch. 217, 13 Stat. 36

reversionary interest in railroad rights of way, else it would make little sense for Congress to have passed laws like §§ 912, 913 & 1248(c) to dispose of land the federal government did not own." *Mauler*, 309 F.3d at 1002. In *Idaho I,* the court stated that this "Court has the obligation to interpret 912 (and 913 and 316) in such a way to fully effectuate congressional intent: These statutes would be rendered null if this Court were to find them inapplicable to 1875 Act rights-of-way, for they were specifically enacted to dispose of the United States' retained interest in 1875 Act rights-of-way." *Idaho I,* 617 F. Supp. at 212. Extensive legislative history exists to support Congress' intention that §912 apply to 1875 Act corridors. See H.R. Rep. No. 217, 67th Cong., 1st Sess. 1 (1921); H.R. Rep. No. 843, 66th Cong., 2nd Sess. 2 (1920)." *See also Barney*, 490 N.W.2d at 731 ("[t]o say that 912 does not apply to the easements granted under the 1875 Act would, in effect, nullify the intent of Congress. . . the Congressional Record which accompanied the enactment of §912 shows Congress's intent to preserve railroad corridors for 'public highway' use.")

It is a well-accepted rule of construction that statutes should be interpreted to further the public policy that motivated that enactment not so as to frustrate that policy. The entire history of the railroad land grants, as explained in *Townsend* and *Great Northern*, indicate the high public policy of encouraging and protecting

railroad corridors and public highways. In *Townsend*, the Supreme Court noted that federal railroad grants are to be interpreted "subject to the condition that their rules do not impair the efficacy of the grants," and that "[t]he substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad." *Townsend*, 190 U.S. at 270-271. Another court stated that "[f]ederal legislation governing the disposition of the government's reversionary interest evinces 'an intent to ensure that railroad rights-of-way would continue to be used for public transportation purposes, primarily for highway transportation," *Hamilton v. King County Washington*, (unpubl. opinion, 2000 WL 1772525, Wash. App. Div. 1, 2000). As the legislative history of § 912 notes: "Recognizing the public interest in establishment of roads, your committee safeguarded such rights by suggesting the amendments above referred to protecting not only roads now established, but giving the public authorities one years' time after a decree of forfeiture or abandonment to establish a public highway upon any part of such right-of-way." S. Rep. No. 338, 67th Cong., 2nd Sess. 1 (1922).

There can be no question that protecting railroad corridors from fragmentation and disintegration upon abandonment was the prime motive behind the passage of §912. Congress wanted to protect these valuable corridor assets

created at significant public investment by allowing for conversion to highway use, or allowing pre-existing highway uses.[10] The importance of the public policy protecting rail corridors motivated Congress into requiring that vesting in subdivision owners would occur only upon a determination of abandonment by a court of competent jurisdiction or act of Congress. The destruction of these corridors, therefore, was not to occur simply by non-use, or even upon the elements of common-law abandonment. No interests would vest in private parties except upon a court determination or act of Congress. And subsequent legislation eliminates even the contingent future interest in these valuable public assets created by § 912 on behalf of adjacent landowners. 16 U.S.C. § 1248(c). Plaintiffs' interpretation that the federal government's retained interests in the vast majority of these corridors passed unmentioned by patents would severely frustrate the clear intent of Congress to protect these rail corridors.

3. The Rationale of Cases Holding That Patentees Receive No Interest In pre-1871 FGROW Is Equally Applicable to 1875 Act FGROW.

That the federal government retained its interest in FGROW to protect the national interest in railroads is confirmed by the legislative history of federal land grants and grants-in-aid of railroads, as well as the subsequent legislation to

[10] That is the purpose of 43 U.S.C. §913 and 23 U.S.C. §316, which sought to reverse a contrary 9th circuit holding in *Holland v. N. Pac. Ry. Co.*, 214 F. 920 (9th Cir. 1914).

manage or dispose of this retained interest upon abandonment. As the courts have virtually unanimously held, homesteaders did not acquire any property interest in pre-1871 grants except by operation of §912, and even if they did acquire some interest in 1875 Act lands, the government still retained sufficient interests to protect its investments in transportation, communications, national defense, and the postal service.

It was well settled that homesteaders did not receive any interest in pre-1871 FGROW by virtue of their patent, because, as the Supreme Court had explained in *Townsend*, the "filing the map of definite location, and the construction of the railroad within the quarter section in question preceded the filing of the homestead entries on such section, [such that] the land forming the right of way therein was taken out of the category of public lands subject to pre-emption and sale, and the Land Department was therefore without authority to convey rights therein. It follows that the homesteaders acquired no interest in the land within the right of way because of the fact that the grant to them was of the full legal subdivisions." *Townsend*, 190 U.S. at 270.

The Supreme Court of Colorado followed the *Townsend* rule that once the railroad filed its map of definite location and built its road, that land was removed from the category of public lands subject to sale to homesteaders, in *Kunzman v.*

*Union Pacific RR. Co.*, 456 P.2d 743 (Colo, 1969). And as recently as 2002, the 7th Circuit found that landowners adjacent to land granted in aid of construction did not receive any rights in the corridor from patents in *Mauler v. Bayfield County, supra*, citing *Townsend* for that conclusion. *See also Marlow v. Malone, supra.*

The Supreme Court's decision in *Great Northern,* finding that 1875 Act FGROW were easements rather than limited fees, did not change this result. Rather, the federal government's retained interest in 1875 Act FGROW is virtually identical to its interest in pre-1871 FGROW, notwithstanding the fact that 1875 Act FGROW are held by the railroad as easements while pre-1871 FGROW are held as limited fees. Numerous courts have rejected the stark distinction between the limited fee of *Townsend* and the easement of *Great Northern*, holding instead that the railroad easement is closer to a fee simple than to the common-law private easements with which it is often confused. As the Supreme Court explained, a railroad easement has the "attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and like it corporeal, not incorporeal property." *N.M. v. U.S. Trust Co.*, 172 U.S. 171, 183 (1898). Thus, as one court explained, "even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement.

This is consistent with another well-settled rule of statutory construction which provides that conveyances by the Government will be strictly interpreted against the grantee and in favor of the grantor." *Idaho I*, 617 F. Supp. at 212.

The courts have also held that homesteaders did not receive the federal government's retained interests in 1875Act FGROW. In *Marshall v. Chicago & NW Transp. Co.*, 31 F.3d 1028, 1032 (10th Cir. 1994), the court concluded that the conveyance of the "whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures" did not transfer 1875 Act interests. The Supreme Court of Nebraska agreed that the "prevailing view" is that United States' interest in an 1875 Act FGROW "is held by the United States and not by the adjacent landowner." *Whipps Land & Cattle Co., Inc. v. Level 3 Communications, LLC*, 658 N.W.2d 258, 265 (Neb. 2003).

In *Rice v. U.S.*, 384 F. Supp. 254 (D. N.Dak, 1972), *aff'd,* 479 F.2d 58 (8th Cir. 1973), the district court held that "the Homesteader cannot reasonably have claimed that in taking a homestead subject to a railroad right of way, he acquired an interest under the right of way." *Id.* at 257. The *Rice* court specifically noted that this finding applies without regard to whether "the railway got either a limited fee or an easement." *Id.* at 256-257 (citations omitted). Not only does the *Rice* court fail to distinguish between pre-1871 and 1875Act FGROW for application of

this rule, the court made clear that the government's interest in FGROW, already appropriated to the railroad, do not pass to homesteaders, even if those interests are not excepted out in the patent. *Id.* at 256-57.

Such a reading comports with the standard rule of construction in government grants that "nothing passes but what is conveyed in clear and explicit language," *Caldwell v. U.S.*, 250 U.S. at 20-21. Just as the Court in *Great Northern* held that mineral rights do not pass to the railroads unless expressly mentioned, so too the government's retained rights do not pass to homesteaders without express mention.

The only precedent plaintiffs can muster for their view that homesteaders received the government's retained interest in 1875 Act FGROW is *City of Aberdeen v. Chicago & NW Transp. Co.*, 602 F. Supp. 589 (D.S.D. 1984). However, as the court in *Whipps* noted, this view is contradictory to that of the 7th, 9th, and 10th circuits, as well as state supreme courts in South Dakota and Nebraska. *Whipps Land & Cattle Co., Inc.*, 658 N.W.2d at 265. That land was simply never intended to be available for transfer to private patentees due to the compelling need to preserve the national interests in transportation and communications in these corridors.

Plaintiffs' reliance on *dictum* in *Wyoming v. Udall*, 379 F.2d 635 (10th Cir. 1967) is also misplaced. *Udall* was specifically concerned with whether the minerals in pre-1871 corridors passed to homesteaders and did not address 1875 Act FGROW. Despite *dictum* that the rule might be different for 1875 Act FGROW, the *Udall* court rejected the plaintiffs' position that "the location of a railroad right-of-way across a tract of public land of the United States does not separate the servient estate from the public domain with the result that title to the servient estate passes without express mention in a subsequent grant by the United States of the traversed tract." Id. at 639-640. The *Udall* court explained that the difference in labeling between limited fee and easement has little substantive meaning, stating "[w]ith the expansion of the meaning of easement to include, so far as railroads are concerned, a right in perpetuity to exclusive use and possession the need for the 'limited fee' label disappeared." *Id.* at 640.[11] In any event, that *dictum* was rejected by the same court twelve years later in *Wyoming v. Andrus*, 602 F.2d 1379, 1384 (10th Cir. 1979).

In short, the precedent is overwhelming in support of the exclusion of the government's retained interests in 1875 Act lands from conveyances to

[11] Cases construing §912 hold that because the rights granted the railroad in all FGROW, are very limited fees or easements, are so similar, the government's retained interests must be similar, thus justifying the application of §912 regardless of the labels of fee or easement. *Mauler, supra.*

homesteaders. The unquestioned similarity of the *Townsend* limited fee and the *Great Northern* easement precludes a rule that would treat so differently the government's retained interests in these grants. A rule that would have the retained interests of the government pass out of its hands, without express mention, in the vast majority of the lands for which Congress enacted a specific statute, not only flies in the face of clear precedent and logic, but fundamentally undermines the national purposes behind the railroad grants.

4. The Government's Retained Interest In FGROW Does Not Pass to Patentees of the Adjoining Land, Even Where the Interest is Not Specifically Reserved from Those Patents.

Plaintiffs argue that the overriding principle of public land law is that a patent passes to the patentee all the government's interest except only those rights expressly reserved. However, this principle has no application to interests that have been removed from the public domain by prior conveyances or by statutes. *Stalker v. Oregon Short Line RR. Co.*, 225 U.S. 142 (1912). The Land Department followed *Stalker* and the necessary conclusions of *Townsend* and *Rio Grande Western Ry. Co. v. Stringham*, 239 U.S. 44 (1915) when it held that patentees did not take the government's mineral interests, or other interests, in 1875 Act corridors by virtue of patents for the subdivision traversed by the road. *Birch*, 53 Interior Dec. 340 (1931).

While the Plaintiffs cite a few cases supporting the "everything-passes" rule, most of those cases did not involve railroad rights-of-way, but were disputes between two competing private patentees. *See Moore v. Robbins*, 96 U.S. 530 (1877) and *U.S. v. Schurz*, 102 U.S. 378 (1880); *Boesche v. Udall*, 373 U.S. 472 (1963). Indeed, *Swendig v. Washington Water Power Co.*, 265 U.S. 322 (1924) holds directly contrary to the position advocated by the Plaintiffs. Where the government had issued permits to construct an electric power line, and then subsequently issued patents for the land traversed by the lines but omitted to reserve any rights for them, the Court held that the patentee did not take free and clear of the electric line easements, stating: "it is true as a general rule . . .that, when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States, . . . But we hold that, under the [1901 Act for the construction of telephone lines], these rules do not operate to strike down rights, subject to which, under the law, the lands are patented. . . .The issuing of the patents without a reservation did not convey what the law reserved." 265 U.S. at 331-332. The Court held that the failure to explicitly reserve the electric line right-of-way did not cancel it or cause it to pass to the patentees. There is absolutely no authority that a patent issued contrary to law, or that purports to

convey more interest than may be legally conveyed, somehow passes a greater right.

Plaintiffs' reliance on *Energy Tranp. Sys., Inc ("ETSI ") v. Union Pacific RR Co*, 435 F. Supp. 313 (D. Wyo. 1977), *affirmed,* 606 F.2d 934 (10th Cir. 1979), is also misplaced. The Court held only that the patentee's rights in the railroad easement included the subsurface rights to allow underground crossing of the tracks with a coal slurry pipeline. While the *ETSI* series of cases suggest that the government's retained interests passed to subsequent patentees in holding that the railroad's surface easement did not include any subsurface rights, the *ETSI* cases do not purport to address whether patentees' interest in FGROW is superior to that of the federal government.

Throughout their brief Plaintiffs misstate the precedent. For instance, Plaintiffs cite *Great Northern* for the proposition that: "When homesteaders received patents from the United States for lands burdened by 1875 Act railroad rights-of-way easements, the fee title to those lands *in their entirety* was transferred to the patentees, subject only to those easements." Pl. Br. at 13. However, *Great Northern* held simply that the federal government did not transfer its mineral interests to railroads in FGROW; it does not mention homesteaders, patents, or in any way relate to the disposition of the federal government's retained

interest. Likewise, neither *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 49-50 n.9 (1983), nor *Leo Sheep Co. v. U.S., supra*, had anything to do with the rights of railroads vis-a-vis subsequent patentees. Plaintiff's reliance on *Amerada Hess Corp.*, 83 Interior Dec. 194 (1976) is misplaced, for that case, like so many others, concerned mineral interests. It did not concern the retained reverter interests in railroad rights-of-way that are so critical to the preservation of these important transportation corridors. Accordingly, the case law makes clear that the federal government retained an interest in 1875Act lands sufficient to allow conversion to public highways, and did not convey that interest to patentees.

II. This Court Should defer to the District Court's Findings Under Idaho State Law Concerning the Scope of the Ownership Interest Acquired by the Railroad Through Private Deeds and Adverse Possession.

As the brief of the United States demonstrates, the district court correctly interpreted a number of private deeds to have conveyed fee simple absolute to the railroad, and that parcels acquired by adverse possession were in fee simple as well. This is the only interpretation that is consistent with the case law, the high public importance of the railroad endeavor, and Idaho's stated preference for fee simple transfers of land. Idaho Code §55-604.

Assuming, *arguendo*, that the use of the term "right-of-way" in some of these deeds creates an ambiguity, Plaintiffs' invitation to this Court to review

these issues *de novo* should be rejected. While *de novo* review may be appropriate for appellate review of pure issues of law, mixed issues of law and fact require deference to the district court's finding. *C&G, Inc. v. Rule, supra.* The Idaho Supreme Court explained:

> Our standard of review of a lower court's interpretation of an instrument depends on whether the instrument is ambiguous. . . . Interpretation of an ambiguous document presents a question of fact, and we will defer to the findings of the trial court so long as those findings are supported by substantial and competent evidence. Interpretation of an unambiguous document, on the other hand, is a question of law and, therefore, a matter of free review.

*C&G, Inc. v. Rule*, 25 P.3d at 78 (citations omitted).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed

Respectfully submitted,

Andrea Ferster
General Counsel
Rails to Trails Conservancy,
1100--17th St., N.W. 10th Fl.
Washington, D.C. 20036
(202) 974-5142

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Plaintiffs' Appendix of Exhibits (2 of 4) Filed in Support of their Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class