Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. CV99-324S-MHW<br><br>Honorable Mikel H. Williams |

**PLAINTIFFS' APPENDIX OF EXHIBITS (3 of 4) FILED IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

July 12, 2006

**INDEX OF PLAINTIFFS' EXHIBITS**
**(APPENDIX 3 OF 4)**

| Plaintiffs' Exhibit Number | Description of Exhibit |
|---|---|
| 5 | Table of Excerpted Defendant and RTC Arguments: Appeal 2003 & Remand 2006 |
| 6 | Excerpted Brief for Plaintiffs-Appellants (*Hash v. U.S.*, Case No. 03-1395 (Fed.Cir.) (Filed Jul. 25, 2003) |

Dated: July 12, 2006

Respectfully submitted,
ACKERSON KAUFFMAN FEX, PC

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

## TABLE OF EXCERPTED DEFENDANT AND RTC ARGUMENTS: APPEAL 2003 & REMAND 2006[1]

| Appeal (2003) | SJM (2006) |
|---|---|
| "United States retained the reversionary interest in the right-of-way granted from the federal lands to railroads under the 1875 Act, and that this interest was not conveyed to subsequent patentees of lands crossed by these previously-established rights-of-way." Gov't 2003 Br. at 9. | "Resolution of the question of liability thus requires the Court to determine the nature and scope of the 1875 Act easement that burdens the servient estate because that determination reveals whether there are limitations or restrictions that inhere to the title of the owner of the servient estate." Gov't 2006 Br. at 9. |
| "...[T]he purposes of the Act, to construct and maintain a national transportation system, are served by construing the Act to retain the United States' interest in this system of rights-of-way created from the public's lands. Furthermore Congress repeatedly and specifically demonstrated in subsequent statutes that it understood that the United States retained the reversionary interest in the 1875 Act rights-of-way." Gov't 2003 Br. at 10. | "Under federal law, the right-of-way created under the 1875 Act became a 'public highway' as soon as it was created. Indeed, the use of this transportation corridor for public purposes other than railroad use has been authorized by Congress since 1875 . . . Congress's intent that the easements created under the 1875 Act be made available for public transportation purposes is further evident in the Acts of 1920, 1921, and 1922." Gov't 2006 Br. at 10. |
| "The district court ... correctly rejected the Landowners' claim that the homesteaders obtained the fee simple interest in the rights-of-way burdened only by a common law easement." Gov't 2003 Br. at 12. | "Because the easement at issue was created under the 1875 Act, it is "subject to the intentions and specifications of Congress; it is not a common law easement." Gov't 2006 Br. at 12. |

[1] In this table, the briefs of the government and the Rails-to-Trails Conservancy for the appeal in 2003 are respectively referred to as "Gov't 2003 Br." and "RTC 2003 Br." Similarly, their briefs for this Court on remand are respectively referred to as "Gov't 2006 Br." and "RTC 2006 Br."

| **Appeal (2003)** | **SJM (2006)** |
|---|---|
| "Nor does the purpose of the 1875 Act indicate that Congress intended to irrevocably relinquish the public interest in and control over the rights of way by automatically allowing them to devolve to the homesteaders of the surrounding land if the railroads forfeited or abandoned the rights-of-way." Gov't 2003 Br. at 12.<br><br>"...[T]he purpose of creating public transportation corridors is furthered by retaining the reversionary interest in the rights-of-way in the United States. This allows the United States to decide – if the rights-of-way are forfeited or abandoned – whether they are still needed for transportation purposes or should be conveyed to the owners of the surrounding land." Gov't 2003 Br. at 15. | "Consistent with Congressional intent to develop a national transportation system to facilitate the settlement of the west, and its intent to impose limitations on such rights-of-way in favor of the general public, railroads are considered public highways created for public purposes under federal law." Gov't 2006 Br. at 14.<br><br>"As the Court found in *Idaho v. Oregon Short Line* . . . Congress granted the 1875 Act easements "subject to [Congress's] own terms and conditions -- which were to preserve a corridor of public transportation, particularly the railroad transportation, in order to facilitate the development of the 'Western vastness.'" Gov't 2006 Br. at 15.<br><br>"Following *Oregon Short Line*, [another] court found that . . .'Congress wanted to preserve a corridor of public transportation, especially the railroad transportation, for further development of the western United States.'" Gov't 2006 Br. at 15. |
| "In sum, nothing in the 1875 Act indicates a clear intent of Congress to relinquish the public's interest in the federal grants of rights-of-way made to the railroads." Gov't 2003 Br. at 16. | "Given that the federal railroad grants were part of the creation of a larger transportation network, it is not surprising that courts have determined that in passing the 1875 Act Congress intended to create not just a private passage for a private railway company, but a public transportation corridor." Gov't 2006 Br. at 15. |

| Appeal (2003) | SJM (2006) |
|---|---|
| "Congress may "pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests," and it is not necessary to "shoe-horn" the 1875 Act easements into a traditional common law category."<br>Gov't 2003 Br. at 20.<br><br>"Given the special nature of railroad rights-of-way, it cannot be assumed that Congress intended the rights of way to operate as common law easements."<br>Gov't 2003 Br. at 20. | "[Quoting *Oregon Short Line R.R. Co. v. City of Mountain Home*, 465 P.2d 105, 107 (Idaho 1970):] "While a railroad right-of-way may not carry with it the power to remove minerals from the servient estate, it is still a perpetual and exclusive possessory interest in the land surface as long as the right-of-way is used for railroad purposes."<br>Gov't 2006 Br. at 17.<br><br>"It is also important to note that in drafting the 1875 Act, Congress was concerned with its "*continuing* commerce power over railroad rights-of-way." [Citing *Oregon Short Line* (emphasis in the Br.)] Specifically, Congress contemplated future oversight of the rights-of-way it was creating under the 1875 Act and other similar statutes. [No citation offered here.]"<br>Gov't 2006 Br. at 17. |

| Appeal (2003) | SJM (2006) |
|---|---|
| "Both [the pre- and post-1871 right of way grants] essentially grant the railroad a corporeal fee-like interest in the surface (plus ancillary nonsurface rights) so long as the railroad uses the right-of-way for railroad purposes."<br>Gov't 2003 Br. at 26.<br><br>"These [1920's and National Trails Act] statutes have been periodically enacted to manage these retained interests in railroad rights-of-way, first by encouraging their conversion to other public transportation uses, and then through retaining those interests and making them available for railbanking."<br>RTC 2003 Br. at 17.<br><br>"[T]he [goal of the] railroad grants [was] to provide a system of public transportation and communications that was recognized as being of the highest public priority."<br>RTC 2003 Br. at 17.<br><br>"The entire history of the railroad grants, as explained in *Townsend* and *Great Northern*, indicate the high public policy of encouraging and protecting railroad corridors and public highways."<br>RTC 2003 Br. at 18-19. | "In another series [sic] statutes, Congress demonstrated its understanding that easements created under the 1875 Act could be used for other non-rail public transportation purposes. [Citing the 1920's statutes.]"<br>Gov't 2006 Br. at 18; *see also* RTC 2006 Br. at 15-16.<br><br>"In sum, the 1875 Act and the series of statutes enacted in the 1920's and discussed above collectively demonstrate that Congress intended to grant a right-of-way that could be used for multiple public transportation purposes. Although Congress contemplated that rights-of-way granted under the 1875 Act would be used by railroads for railroad purposes, Congress has consistently and repeatedly indicated it intended that these federally granted rights-of-way could be used for other public transportation purposes as well."<br>Gov't 2006 Br. at 21. |
| "Similarly, the 1875 Act grants the right-of-way for a designated purpose – for railroad use – and provides the right to present use of the right-of-way only so long as it is used for that purpose."<br>Gov't 2003 Br. at 27. | "[T]he use of 1875 Act easements for other transportation purposes has its source in the language of the 1875 Act itself."<br>Gov't 2006 Br. at 20. |

| Appeal (2003) | SJM (2006) |
|---|---|
| "These [1906 and 1909 Forfeiture Acts] expressly recognized that the right-of-way granted was an "easement," but one in which the United States retained the reversionary interest."<br>Gov't 2003 Br. at 34. | "In [the 1906 and 1909 Forfeiture Acts], Congress addressed what would happen to rights of way created under the 1875 Act . . . If the Railroad failed to construct its line . . . these Acts provided that the right of way is 'declared forfeited to the United States' and that 'the United States resumes the full title to the lands . . ."<br>Gov't 2006 Br. at 18. |
| "Congress for the fourth time demonstrated its understanding that the United States retained the reversionary interest in the 1875 Act right-of-way in 1922 with the enactment of . . . 43 U.S.C. § 912."<br>Gov't 2003 Br. at 35; *see also* RTC 2003 Br. at 16-18.<br><br>"In the 1922 Act, Congress also indicated that it understood it had retained interests in the 1875 Act rights-of-way – and could use them to continue to meet the country's transportation needs."<br>Gov't 2003 Br. at 36.<br><br>"Congress expressed its understanding that it exercised continuing control over railroad rights-of-way in a statute enacted in 1920, which authorized all railroad companies granted rights-of-way through the public lands to convey to state or local governments "any portion of such right of way to be used as a public highway or street. . ."<br>Gov't 2003 Br. at 36.<br><br>"At a minimum, these [1920's] statutes demonstrate Congress's understanding that the use of the 1875 Act rights-of-way for highway purposes was within the scope of the rights-of-way, which were granted for public transportation purposes."<br>Gov't 2003 Br. at 38, n.7. | "As explained by this Court [in *Oregon Short Line*] "[w]ith the [then] relatively recent advent of the automobile, the 66th and 67th Congress obviously perceived the rising importance of highway transportation; and acted to preserve, where possible, railroad rights-of-way for such use."<br>Gov't 2006 Br. at 19.<br><br>"This language [in the 1920's highway statutes] demonstrates that Congress viewed railroads and other public highways as both serving public transportation purposes, and that shifting from one transportation use (railroad) to another (roads or highways) is a permissible use of these federally created rights-of-way."<br>Gov't 2006 Br. at 19. |

Appeal No. 03-1395

In the

# United States Court of Appeals

for the

# Federal Circuit

ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States District Court for the District of Idaho in Case No. 99-CV-324, Magistrate Judge Mikel H. Williams.

## BRIEF FOR PLAINTIFFS-APPELLANTS

NELS J. ACKERSON
CECILIA FEX
SOMMER BARNARD ACKERSON, P.C.
*Attorneys for Plaintiffs-Appellants*
1666 K Street, N.W.
Suite 1010
Washington, DC 20006
(202) 833-8833

*Of Counsel:*
DANIEL J. MILLEA
ZELLE, HOFMANN, VOELBEL, MASON & GETTE, LLP
33 South Sixth Street
City Center, Suite 4400
Minneapolis, MN 55402
(612) 339-2020

July 25, 2003

1992).

The interpretation of a contract or a deed is a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 997 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ("The principle that documentary interpretation is a matter of law has become a basic tenet of modern contract law."). This principle is true where, as here, no extrinsic evidence is introduced to aid in deed construction. *Id.* State law governs contractual obligations and transfers of property rights. *Regents of Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003). This Court reviews a district court's interpretation of state law *de novo*, without deference to the district court, and reviews its findings of fact for clear error. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1051 (Fed. Cir. 2001); *Abbott Lab. v. Brennan*, 952 F.2d 1346, 1355 (Fed. Cir. 1991) ("We review *de novo* the correctness of the district court's determination of state law.").

## ARGUMENT

### I. PATENTS ISSUED SUBJECT TO 1875 ACT EASEMENTS TRANSFERRED FEE TITLE TO THE SERVIENT ESTATE IN ACCORD WITH CONGRESSIONAL INTENT.

It is well-settled that railroad rights-of-way created by the 1875 Act merely created easements on public land and did not convey fee title to the railroads. *Great Northern*, 315 U.S. at 277. This point is undisputed. Therefore, fee title to the lands underlying the railroad rights-of-way remained in the United States

Government for as long as those lands remained unsettled. When homesteaders received patents from the United States for lands burdened by 1875 Act railroad rights-of-way easements, the fee title to those lands in their entirety was transferred to the patentees, subject only to those easements. *See id.* at 276-77.

## A. UNDER THE 1875 ACT, CONGRESS INTENDED TO DISPOSE OF THE FEE TITLE TO THE PUBLIC LANDS THAT WERE SUBJECT TO THE RAILWAY GRANTS.

### 1. The *Great Northern* Decision.

In *Great Northern*, the United States Supreme Court all but settled the questions of federal law now before this Court. At issue was whether the federal right-of-way grants acquired by railroad companies pursuant to the 1875 Act bestowed easement or fee title to the companies. Mineral rights were at stake and the railroad company in possession of the 1875 Act grants claimed that it was the title owner to those rights. The United States took the position that easements were granted under the 1875 Act, not fee title. It claimed that the United States therefore owned the servient estate to those tracts of land still in the public domain. The Court agreed with the United States, holding that "[t]the Act of March 3, 1875, from which petitioner's rights stem, clearly grants only an easement, and not a fee." *Id.* at 271.

In support of its findings, the Court reviewed the plain language of the statute itself, the history surrounding the federal railway grants, policies and

decisions issued by the Department of the Interior ("Interior"), and the legislative history behind the Act. *Great Northern*, 315 U.S. at 273-77.

The Court applied principles of statutory construction to the 1875 Act and found Section 4 to be "especially persuasive" that grants made pursuant to the Act only conveyed easements. Section 4 required that the location of the right of way be recorded in the local land office, and stated that ". . . *thereafter all such lands* over which [1875 Act] right of way shall pass *shall be disposed of* subject to such right of way." 315 U.S. at 271 (emphasis added). The Court observed that Section 4's reservation of the right to dispose of the lands *subject to the right of way* was wholly inconsistent with the grant of a fee. *Id.* The Court adopted the statements of the court below: "Apter words to indicate the intent to convey an easement would be difficult to find." *Id.* In other words, Section 4 was unambiguous in its meaning.

The fact that Congress reserved the right to subsequently dispose of the land to future settlers "subject to such right of way" is clear proof that the Government did not retain any interest in the land after it was patented. It would hardly make sense if the intent was that in the subsequent disposition of the burdened lands to patentees, the Government still reserved the underlying fee.

The *Great Northern* Court supported its conclusion with reference to four decades (from 1872 to 1909) of legislative history and administrative action:

> "[*T*]*he land over which this right of way passes is to be sold subject to the right of way. It simply provides that this right of way shall be an encumbrance upon the land* . . ." (Remarks by Congressman Slater, who reported the bill for the Portland, Dalles and Salt Lake Act of April 12, 1872, 17 Stat. 52, Cong. Globe, 42nd Cong., 2nd Sess. 2137 (1872)).
>
> "Resolved, that . . . every consideration of public policy and *equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers* . . ." Resolution of the United States Congress regarding grants of public lands to railroads. Cong. Globe, 42nd Cong., 2nd Sess. 1585 (1872).
>
> ". . . *All persons settling on public lands to which a railroad right of way has attached, take the same subject to such right of way and must pay for the full area of the subdivision entered, there being no authority to make deductions in such cases.*" 12 L.D. 423, 428.
>
> ". . . Under the present law whenever the railroad passes through a tract of public land *the entire tract is patented to the settler or entryman, subject only to this easement.*" H. Rep. No. 1417, 59th Cong., 1st Sess., p. 2 (Ser. No. 4904).

315 U.S. at 272 n.3, 273-74, 276 n.13, 277 (quotations and citations in original) (emphases added). These telling excerpts from the history surrounding the Act – which were of importance to the Supreme Court in affirming the intention of Congress – reveal the driving momentum behind this Act and acts directly related: in the name of "*equal justice to the whole people*," patentees were to receive the "*public lands . . . for the purpose of securing homesteads to actual settlers*" – and those patentee settlers were to receive the "*entire tract*" subject "*only*" to the easements once they were passed on from the public lands. *Id.*

## 2. The Phrase "Subject To" Has a Well-Known Meaning at Common Law.

The phrase "subject to" as used in the 1875 Act was readily identifiable then, as it is now, as a term of art in common law. The phrase was uniformly used to denote that the servient estate was burdened by an easement or other restriction on use. The universal acceptance of that interpretation is apparent from the multitude of cases that used "subject to" in this context. *See, e.g.*, *Smith v. Townsend*, 148 U.S. 490, 499 (1893); *Roby v. New York Cent. & H.R.R. Co.*, 36 N.E. 1053, 1054-55 (N.Y. 1894) (noting that upon abandonment of railroad right of way, property "subject to the railroad easement" would revert to owner of the fee over which the easement ran); *Cravens v. Jolly*, 623 S.W.2d 569, 572 (Mo. Ct. App. 1981) ("[A] grant of land with full covenants of warranty, which definitely describes the land conveyed, and then excepts or reserves a roadway for the use of the public, or a railroad or other right of way, as such, occupying a mere easement on, over, or across the land conveyed, conveys the fee to the entire tract *subject to* the easement reserved.") (emphasis added); *accord Melton v. Davis*, 443 S.W.2d 605, 607 (Tex. Civ. App. 1969) (same); *Bolton v. Dyke Oil Co.*, 114 S.W.2d 299, 301 (Tex. Civ. App. 1938) (same); *Lillich v. Lowery*, 320 N.W.2d 463, 465 (Neb. 1982) (framing the issue, in a factual situation similar to the instant one, as: "Does a grant of title to a tract of land which exempts a right-of-way or an easement

withhold passage of fee title to the land underlying the easement, *or* does title pass to the grantee *subject only to* the outstanding right created by the easement?") (citing *Kozak v. State*, 189 Neb. 525 (1973)) (emphasis added).

In short, the 1875 Act means what it says. The lands burdened by railroad easements were to be disposed of, subject to those easements. This intent is reinforced by the legislative history and administration of the Act.

### 3. The Position of The United States In This Case Is A Reversal of Its Historic Position.

Appellee United States appears to have agreed with this interpretation for the first one hundred years after passage of the Act. For example, it is evident from the *Great Northern* decision itself that certain lands at issue *in that case* had passed out of the public domain and *had vested in private hands just as intended by Congress*. In the last paragraph of the decision, the Court noted that the railroad-petitioner challenged the Government's standing to bring the case at all, apparently arguing that *all* the lands subject to the 1875 Act right-of-way at issue were no longer in the public domain, and that the Government had failed to introduce evidence in the record to show it had any ownership in the tracts of land subject to the easements. *See id.* at 279-80. The Supreme Court permitted the parties to "cure this defect" by establishing that the Government had "retained title to *certain* tracts of land" (inside Glacier National Park) over which the 1875 Act

right-of-way passed. *Id.* at 280. The remaining tracts, it follows, had passed out of the public domain and vested in the settlers of those tracts. *See Amerada Hess Corp.*, 83 Interior Dec. 194, 200-201 (1976) (agreeing that the clear interpretation of this passage in *Great Northern* was that lands traversed by 1875 Act easements that had been conveyed by the Government without mineral reservation "were no longer subject to the jurisdiction of the United States with respect to the oil and gas deposits underlying the right-of-way").

In 1942 when *Great Northern* was decided, the United States did not take the position it now takes here. In 1942, the United States laid claim to rights *only* on those tracts which still remained in the public domain – not to those that had since been patented to settlers. 315 U.S. at 272-280. Later still, in 1976, the United States continued to assert *no* claim over post-1871 Act railway grants once they passed from the public domain. *See Wyoming v. Udall*, 379 F.2d 635, 640 (10th Cir. 1976) (noting that the United States conceded that on post-1871 federal right-of-way grants, "*title to the servient estate* [of such grants] *passes without express mention in a subsequent grant* by the United States of the traversed tract") (emphasis added).

Events in history explain why the United States historically did not claim to have kept the fee title to the railway easements and has only recently taken this new position. As noted by one author, the Government's earlier policy of

disposing of public lands changed in 1976:

> Ultimately, as far as public lands are concerned, Congress enacted the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701, et seq., which belated [*sic*] but officially changed the nineteenth century presumption that the public domain would be held only temporarily by the federal government until disposal under the public land laws to a presumption of federal retention and management.

Paul Smyth, *Conservation and Preservation of Federal Public Resources: A History*, 17-Fall, NAT. RESOURCES & ENV'T 77, 112 (2002).[9]

Nothwithstanding the government's new theory, the only conclusion that is consistent with the Supreme Court's extensive reasoning in the seminal *Great Northern* decision is that *patentees*, not the United States, hold fee title to lands burdened by the 1875 Act railroad easements.

## B. UNDER PUBLIC DOMAIN LAW, PATENTEES WHO RECEIVED TITLE TO LANDS SUBJECT TO THE 1875 ACT GRANTS BECAME VESTED WITH THE FEE SIMPLE TITLE TO THOSE LANDS.

### 1. The Overriding Principle of Public Land Law.

When a patent is issued in accordance with governing statutes, title and control of the land passes to the patentee, *Swendig*, 265 U.S. at 331; *Schurz*, 102 U.S. at 397, limited only by reservations *expressly* elaborated in the statutes or set

---

[9] At the time of the article, Mr. Smyth held the title of the Deputy Associate Solicitor in the Division of Land and Water Resources in the Department of Interior's Solicitor's Office.

out in the patents themselves. *See Leo Sheep*, 440 U.S. at 679. Indeed, "it is nearly hornbook that a patent passes to the patentee all interest the government has, on the date of the patent, to everything embraced within the meaning of the term 'land.'" *ETSI I*, 435 F. Supp. at 317 (citing 63 AM. JUR., *Public Lands* § 73); *cf. Robbins*, 96 U.S. at 533 (when "the patent issued under the seal of the United States, and signed by the President, is delivered to and accepted by the party, the title of the government passes with this delivery"). Once public lands are entered and patented to settlers, the land becomes segregated from the public land and "takes on the character of private property." *Graham v. Hastings & Dakota Ry. Co.*, 1 Pub. Land Dec. 362 (1883) (citing *Witherspoon v. Duncan*, 4 Wall., 210; Opinion of the Attorney General, 8 C.L.O., 72); *cf. Boesche*, 373 U.S. at 477 (noting as a matter of course that "a land patent[] . . . divests the Government of title"). If burdened by a federal land grant right-of-way, the person acquiring that public land *will take the entire tract*, subject to that servitude. *Baldwin*, 103 U.S. at 430; *Energy Transp. System Inc. v. Union Pac. R.R. Co.*, 619 F.2d 696, 698-99 (8th Cir. 1980) ("*ETSI II*") (ruling servient estate to railway grant passed when state acquired federal lands).

### 2. Application of Public Land Law to Patents Subject to 1875 Act Easements and Other Railway Grants.

Patents for public lands were issued by the Interior, formerly referred to as

the "Land Department." The long-term policy of the Interior was that in issuing patents for land traversed by rights-of-way, the patentee received fee title to the entire tract of land, without diminution of the right-of-way.[10] *State of Wyoming*, 83 Interior Dec. 364, 368 (1976). This meant that for those lands burdened with 1875 Act easements, the Interior carried out what it believed to be the intent of Congress, to dispose of those tracts subject only to the easements.

In the late 1800's and early 1900's, decisions issued from the Interior held that patents to tracts of land burdened by federal land grant easements, including the 1875 Act easements, passed all the title, not otherwise reserved, to the patentee, subject only to the burden of the easement. *Right of Way*, 12 Pub. Land Dec. 423, 428 (1891) (under the 1875 Act, settlers take the full tract of land that is subject to the right-of-way), *Eugene McCarthy*, 14 Pub. Land Dec. 105 (1892) (title to mineral claimant would become unrestricted upon abandonment of federal land grant right-of-way); *Pensacola & Louisville R.R. Co.*, 19 Pub. Land Dec. 386 (1894) (". . . lands across which a right-of-way is claimed by a railroad company [under federal land grants] may be disposed of by patent . . . patentees will take the servient tenement, subject to whatever servitude may exist, and they will find

---

[10] This is true as a matter of law but is also evident from the patents at issue in this case. The subject patents were issued pursuant to the Homestead Act of 1862, and neither the statute nor the patents reserved to the United States the fee title to any federal land grant right-of-way easements. (SA1; A234-37.)

ample protection in the courts, should any attempt be made to deprive them of the use or occupancy of their land. . . ."); *Brucker v. Buschmann*, 21 Pub. Land Dec. 114 (1896) (finding railroad right-of-way does not diminish the acreage held in fee by the homesteader); *John W. When*, 32 Pub. Land Dec. 33 (1903) (noting that the rights-of-way granted under 1875 and 1891 acts were mere easements and that the applicant to purchase land over which they passed would therefore be required to pay for the entire tract).

The policy of the Interior changed, however, for a period of time in the early 1900's, when the department opined, *inter alia*, that it was the United States and not the patentees who were the owners of the fee underlying the federal right-of-way grants. *See, e.g., A. Otis Birch and M. Estelle C. Birch*, 53 Interior Dec. 340 (1931) (ruling that lands burdened by 1875 Act grants were retained by the Government and did not pass to settlers). However, as noted by the Supreme Court in *Great Northern*, the Interior's decisions from the early 1900's up until that time were a "shift in interpretation" of the federal land grant statutes, and should not be regarded as binding on the department "since it was impelled by what [the Court] regards as inaccurate statements" in the earlier cases it had decided. 315 U.S. at 276. Those earlier cases, which *Great Northern* overruled, were, *inter alia, Northern Pac. R. Co. v. Townsend*, 190 U.S. 267 (1903) (in *dicta* stating federal land grant rights-of-way conferred limited fee with an implied

condition of reverter) and *Rio Grande Western R. Co. v. Stringham*, 239 U.S. 44 (1915) (applying the *dicta* from *Townsend* to a right-of-way acquired under the 1875 Act). 315 U.S. at 276. Indeed, in a lengthy analysis of patent decisions, the Interior itself acknowledged this shift in interpretation and attributed the shift to the *Townsend* and *Stringham* line of cases. *Birch*, 53 Interior Dec. at 342-45; *see also United States v. Union Pac. R. Co.*, 353 U.S. 112 (1957) (repudiating further the *Townsend* and *Stringham* line of cases).

In the wake of *Great Northern*, the Interior returned to its earlier policy on the disposition of the servient estate to 1875 Act grants. In a careful and comprehensive analysis chronicling the history of land patents that were subject to federal grants of rights-of-way, the Interior considered whether the servient mineral estate (and therefore the entire estate) of lands burdened by rights-of-way established under the 1875 Act passed to the patentees of such lands. *Amerada Hess Corp.*, 83 Interior Dec. at 197-203. The department concluded that the answer was "clear": Once the Government patented lands subject to 1875 Act easements, the title to the servient estate "passed out of federal ownership" to the patentee and the United States no longer had any interest in the land. *Id.* at 203.[11/]

[11/] It is well-settled that the agency charged with the administration of a federal statute is to be given due deference for its interpretation and administration of that statute. *AT&T v. United States,* 177 F.3d 1368 (Fed. Cir. 1999) (Rader, J., concurring); *Swendig*, 265 U.S. at 331 ("It is a 'settled rule that the practical
(continued...)

The *Amerada Hess Corp.* decision is in accord with public land laws which hold that once title passed by way of homestead patents or mineral laws and other land disposal laws, the Government would have no redress upon perfection of the title if it later discovered, for example, that valuable mineral rights had passed. *See Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 49-50 n.9 (1983) (reviewing history of public land law and noting that "under a land-grant statute, the patentee received title to the entire land, including any subsequently discovered minerals"); Andrew C. Mergen, *Surface Tension: The Problem of Federal/Private Split Estate Lands*, 33 LAND & WATER L. REV. 419, 426 n.36 (1998).

### 3. Finding Intent to Reserve When None is Expressed is Impermissible Under the Rules of Statutory Construction Applicable to the 1875 Act.

The "clear" conclusion reached by the Interior in *Amerada Hess Corp.* is similarly supported under the rules of statutory construction applicable to the 1875 Act and homestead patents. The United States Supreme Court has spoken on such construction relatively recently in *Leo Sheep*. At issue was whether Congress intended to reserve easements across federal land grants when no such

[11](...continued)
interpretation of an ambiguous or uncertain statute by *the executive department charged with its administration is entitled to the to the highest respect*, and, if acted upon for a number of years, will not be disturbed except for very cogent reasons.'") (emphasis added). The Interior's decision in *Amerada Hess Corp.*, therefore, should be given due deference here.

reservations had been expressed in the operative statute bestowing the grants. *Leo Sheep*, 440 U.S. at 679. The Court refused to find such intent. *Id.* As noted by the Court, ordinarily "when grants to federal lands are at issue, any doubts 'are resolved for the Government not against it.'" *Id.* at 682 (quoting *Andrus v. Charlestone Stone Prod. Co.*, 436 U.S. 604, 617 (1978)). This rule of construction, however, is *not* to be applied so as to frustrate the intent of Congress or to "withhold what is given either expressly or by necessary or fair implication." *Id.* at 682-83. Under this precept, there must be some affirmative expression or indication of Congressional intent to reserve interests in the United States before such reservations may be assumed.

Under the Homestead Act, patents were issued for the full one hundred and sixty acres of land, with no reservations made for railroad rights-of-way. (A236-237.) Under the 1875 Act, the express intent was to grant only easements so that the lands could be disposed of to subsequent settlers. *See Great Northern*, 315 U.S. at 272. Significantly, homestead patents did contain other, explicit reservations: the patents reserved and excepted "vested and accrued water rights," the "right of a proprietor of a vein or lode to extract and remove his ore therefrom," and "a right of way thereon for ditches or canals." (A236-7.) "Given the existence of such explicit exceptions, [the Supreme] Court has in the past

refused to add to this list by divining some 'implicit' congressional intent."[12] *Leo Sheep*, 440 U.S. at 679.

The question of whether the class members in this action own the underlying fee title implicates the Fifth Amendment to the United States Constitution: if they do own these rights, their Constitutional rights have been violated. As discussed, the rights to the tracts of land at issue vested originally under homestead patents, and the 1875 Act provided for grants of easements so that the lands should be disposed of to patentees, subject only to those easements. It must follow, therefore, that, in the absence of express or affirmative intent to withhold the fee to those easements, they must vest in the patentee. *Cf. id.* at 687-88 ("Generations of patents have issued without any express reservation of the right now claimed by the Government. . . . This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and *we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares* without compensation.")

---

[12] While not an issue before the Court, it should not be assumed that the United States retained *any* reversionary interests to pre-1871 grants either, unless expressly reserved. Courts have found that the Government's "reversionary interests" in the public lands would be granted to patentees when disposing of tracts of land, subject to the railroad's rights. *See Oregon Short Line R. Co. v. Stalker*, 94 P. 56, 64 (Idaho 1908) (citing to Interior regulations, 32 Lands Dec. 481, Dep. Int. (1904)); *Baldwin, supra*; *ETSI I*, 435 F. Supp. at 317; *ETSI II*, 619 F.2d at 698-99 (finding that lands passed to Nebraska included the servient estate to pre-1871 railway grants).

(emphasis added).

### C. Subsequent Remedial Legislation Cannot Alter The Nature Of Property Interests Established Decades Before Its Enactment.

Contrary to the position the Government took in the first hundred years following the inception of the 1875 Act, the Government-Appellee now maintains, and the district court agreed, that Congress intended to retain the servient estate to post-1871 Act railway grants. (A18-19.) The rationale behind this argument ignores the express terms of the 1875 Act, its legislative history, the express reservations which exist in relevant patents, and public domain doctrine with respect to homestead and land patent law. Instead, the rationale is based primarily on 43 U.S.C. § 912, a statute which was enacted some fifty years after the inception of the 1875 Act and whose purpose was to dispose of unwanted strips of land. The Government-Appellee argued that it was this statute, and not the patents themselves, that purported to vest "reversionary rights" in adjoining landowners to abandoned 1875 Act railroad rights-of-way. (A18-19.)

This interpretation, however, stands legal jurisprudence on its head. It imputes a Congressional power to confer rights that the Government did not have, as those rights had already vested with landowners from homestead patents.[13]

Moreover, as set out below, under the express terms of 43 U.S.C. § 912, the Government limited the reach of the enactment to rights and interests *that*

---

[13] *See* § I, *supra*.

*remained in* the Government. By its very terms, therefore, Section 912 excluded the granted lands subject to the 1875 Act easements. Morever, even if Congress actually intended Section 912 to preempt vested rights, and by operation of legislation defeat the extinguishment of the railroad easements, the result would be a disturbance of constitutionally protected property rights for which just compensation is appropriate. *Preseault I, supra.*

**1. 43 U.S.C. § 912 Did Not Evince the Intent of a Congress in Session Fifty Years Earlier.**

Almost half a century after passing the 1875 Act, Congress enacted the Railroad Right-of-Way Abandonment Act of March 8, 1922, 42 Stat. 414, 43 U.S.C. § 912 ("Section 912 "). To understand the intention behind this Act, and its relevance to the issues presented in this case, it is important to put the Act in its historic context. *E.g.*, *Great Northern*, 315 U.S. at 273 ("'[C]ourts, in construing a statute, may with propriety recur to the history of the times when it was passed.'") (citation omitted). As discussed above, for the first three decades after the enactment of the 1875 Act, the courts and the Interior consistently understood that the intention behind the 1875 Act was to grant easements to railroad companies and to reserve the servient estate thereto for homestead settlers. *Great Northern*, 315 U.S. at 275-76; *see also* § IB(1)(2), *supra.* As the Supreme Court was later to recognize in *Great Northern*, however, the issue then became confused as a result

of its intervening decisions in *Townsend,* and *Stringham*, *supra*, which *Great Northern* later repudiated. 315 U.S. at 276-79. The Supreme Court's ultimate clarification in *Great Northern* did not occur until 1942. Section 912 was enacted in 1922, in the midst of the confusion.

Section 912 reads, in relevant part, as follows:

**§ 912. Disposition of Abandoned or Forfeited Railroad Grants.**

> Whenever public lands of the United States have been . . . granted to any railroad company for use as a right of way . . . and use and occupancy of said lands for such purposes has ceased or shall hereafter cease . . . then . . . all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said . . . abandonment be transferred to and vested in any person . . . assigns, or successors in title and interest to whom or to which title of the United States may have been . . . granted, conveying . . . the whole of the legal subdivision or subdivisions traversed or occupied by such railroad . . . .

*Id.* Under its express terms, Section 912 operated to transfer and vest "*all* right, title, interest, and estate *of* the United States" in any lands previously conveyed which the railroad right-of-way traversed.[14] As discussed *supra*, the United States *no longer held* title to lands burdened by the 1875 Act easements that had been conveyed in homestead patents. Consequently, by Section 912's express terms, those lands were excluded from its provisions.

The cases relied on by the district court in reaching its decision on the 1875

---

[14] The provision also provided for future grants. *See* 43 U.S.C. § 912.

Act are *Idaho v. Oregon Short Line Ry. Co.*, 617 F. Supp. 207 (D. Idaho 1985) and *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330 (9th Cir. 1990), *cert. denied*, 498 U.S. 967.[15] (A18-19.) The district court adopted and abbreviated the analysis from *Oregon Short Line*, decided sixteen years earlier in1985 by then-Chief Judge Callister of the Idaho District Court. The district court engaged in *no* analysis concerning whether the patents that were issued to settlers under the Homestead Act carried with them the interests to the 1875 Act railroad easements that burdened the land. Rather, the district court *began* with the assumption that the United States *was* the owner of "reversionary" interests on the 1875 Act

---

[15] In *Vieux*, the question of *whether* Section 912 applied to federal railway grants *was not in dispute*. 906 F.2d at 1336 (noting the appellants argued that railroad abandonment had occurred and therefore triggered their reversionary rights purportedly conveyed *under* Section 912). Thus, that decision, addressing pre-1871 railway grants, cannot stand as precedent, notwithstanding its holding (without analysis) that Section 912 applies to pre-and post-1871 Act grants. *See* 906 F.2d at 1335. There are other courts that have similarly ruled, relying heavily on *Vieux* or *Oregon Short Line*. *See, inter alia, Marshall v. Chicago & Northwestern Transp. Co.*, 31 F.3d 1028 (10th Cir. 1994) (quoting extensively from *Oregon Short Line*); *Barney v. Burlington Northern R.R. Co.*, 490 N.W.2d 726 (S.D. 1992) (agreeing with holding in *Vieux* and quoting from *Oregon Short Line*); *Whipps Land & Cattle Co. v. Level 3 Communications, LLC*, 658 P.2d 258 (Neb. March 14, 2003) (quoting extensively from *Oregon Short Line*).

But other courts have reached the opposite conclusion or have reasoned Section 912 merely cleaned up the problem of otherwise having to take extra steps to claim vested title. *See City of Aberdeen v. Chicago & North Western Transp. Co.*, 602 F. Supp. 589 (D.C.S.D. 1984) (holding Section 912 does not apply to 1875 Act easements); *City of Buckley v. Burlington Northern R.R. Corp.*, 723 P.2D 434, 436-7 (Wash. 1986) (observing Section 912 to be a "clean-up" measure).

easements. (A18-19.) The general assumption expressed in *Oregon Short Line*, and implicitly adopted in the district court's Memorandum Decision, was that under Section 912, the government *for the first time* sought to divest itself of so-called "reversionary" fee title interests it purportedly held under the 1875 Act. Therefore, the district courts erroneously found, under the terms of the 1988 National Trails Act, *supra*, "Congress effectively repealed those portions of Section 912 that had allowed the government to relinquish its interests in these [1875 Act] rights-of-way to adjacent landowners." (A19.) Because the district court relied heavily on *Oregon Short Line*, Chief Judge Callister's 1985 decision requires careful review.

In *Oregon Short Line*, the State of Idaho sued two railroad companies for declaratory relief, alleging those companies previously abandoned certain railway lines pursuant to federal law and the State therefore was entitled to acquire the property pursuant to Section 912. *Id.* at 208-09. Additional parties, intervenor cities and one county were permitted to advance claims concerning the right-of-way within their boundaries, and adjoining landowners were likewise permitted intervention. *Id.* at 209. The intervenor County filed for summary judgment arguing that Section 912 applied to the 1875 Act. The railroad companies argued that Section 912 was not triggered because no abandonment had taken place. The intervenor landowners contended that Section 912 did not apply to 1875 Act

rights-of-way and that they held fee title to the servient estate. *Id.*

The *Oregon Short Line* court ruled that Section 912 did apply to 1875 Act railroad rights-of-way. In so ruling, the court reviewed certain segments of history related to the 1875 Act and to the legislative history of Section 912 which appeared to support its decision. *Id.* at 210-13. The court failed to consider, however, the vast body of public land law directly relevant to the questions of whether (1) patentees received the servient estate to railway grants under the Homestead Act, and (2) under the terms of the 1875 Act or land patents to settlers the United States expressed any affirmative intent to retain such interests. *See* §§ IA, B, *supra*. Instead, the *Oregon Short Line* decision focused primarily on the history of Section 912 and, to the extent the analysis went back further, that analysis misapprehended the relevant history. *See Oregon Short Line*, 617 F. Supp. at 210-13.

For example, with respect to the period between 1871 (when the origins of the 1875 Act first began) and 1903 (the beginning of the *Townsend* line of decisions), the court failed to consider whether interests had already vested under public domain law. The court failed to consider the consistent application of the laws followed by the Interior before the advent of the *Townsend* decision. Instead, the court mistakenly attributed "definitional problems" to the Interior's earlier interpretation of the "exact nature of the railroads' right-of-way interest." 617 F.

Supp. at 210. The Interior, however, did not suffer from this infirmity. Rather, as noted by the Supreme Court, the Interior consistently held the 1875 Act rights-of-way to be easements and it was not until 1904, in "a shift in interpretation . . . probably due to the [fee language] in . . . *Townsend*" that the Interior adopted a different position from what it had taken over the previous decades. *See Great Northern*, 315 U.S. at 275-76; *see also* Interior decisions cited at § IB including, *inter alia*, *Eugene McCarthy*, 14 Pub. Land Dec. 105 (1892) (title to mineral claimant would become unrestricted upon abandonment of federal land grant right-of-way).

Following along this same path, the *Oregon Short Line* court concluded that "even if the 1875 Act granted only an easement, it does not necessarily follow that Congress would or did not intend to retain an interest in that easement." 617 F. Supp. at 212. The court reached this conclusion without considering the applicable Homestead laws and patents subject to the 1875 Act easements and the admonishments dictated in *Leo Sheep*, namely that a court may not "divin[e] some 'implicit' congressional intent" to retain interests in federal land patents when not expressly reserved by statute or the deeds themselves. *Leo Sheep*, 440 U.S. at 679. As discussed, *supra*, § IB, after Congress proclaimed its intent under the 1875 Act to dispose of the entire tracts of land subject to the easements, the United States issued land patents to the full tracts of land without any implicit reservations, let

alone express reservations. These "generations of land patents have issued without any express reservation of the right now claimed by the Government" in this instance and divined by the *Oregon Short Line* court in the facts before it. *See Leo Sheep*, 440 U.S. at 687.

Accordingly, the *Oregon Short Line* court never reached the critical issues necessary to decide whether the United States actually retained or disposed of interests in the 1875 Act rights-of-way when patenting the lands to settlers. It did not recite the legislative and administrative history, found so compelling in *Great Northern*, which demonstrated the clear intention to grant only easements and, concomitantly, dispose of the servient estate to settlers. Nor did the court identify the case law described by the *Great Northern* court as "[f]ar more persuasive" than the "limited fee" case law. 315 U.S. at 279.[16] Instead, the *Oregon Short Line* court ultimately focused only on issues that supported its conclusion that Section

---

[16] In one of those "far more persuasive" cases, *Smith v. Townsend*, 148 U.S. 490 (1893), the Supreme Court noted that lands being opened and conveyed to homesteaders that were traversed by federal railway easements would likely vest full title. With the caveat, "whether so or not," the Court stated,

> Doubtless whoever obtained title from the government to any quarter section of land through which ran this right of way would acquire a fee to the whole tract, subject to the easement of the company; and if ever the use of that right of way was abandoned by the railroad company, the easement would cease, and the full title to that right of way would vest in the patentee of the land.

*Id.*

912 was the sole source of reversionary rights patentees could claim. *See* 617 F. Supp. at 210-13.

Perhaps recognizing that difficult questions were ultimately sidestepped in its reasoning, the court opined that the "precise nature of [the Government's] retained interest need not be shoe-horned into any specific category cognizable under the rules of real property law." *Id.* at 212. This holding bequeaths to Congress precisely the "ill-defined power" to violate basic principles of property law, as found unacceptable in *Leo Sheep.* 440 U.S. at 687-88.

Moreover, it is well-settled under fundamental rules of statutory construction that where Congress uses a term that has accumulated a settled meaning under common law, and unless the statute otherwise dictates, Congress meant to incorporate the established meaning into the statute. 73 AM. JUR. 2d *Statutes* § 153 (May 2003) ("[I]t is a familiar rule of construction that when a statute uses words which have a definite and well-known meaning at common law, it will be presumed that the terms are used in the sense in which they were understood at common law, and they will be so construed unless it clearly appears that it was not so intended."); *see, e.g., Field v. Mans*, 516 U.S. 59, 69 (1995); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992); *Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1372 (Fed. Cir. 1994). The nature of the relevant property interests held and disposed of by the United States were already

set by land grant statutes apart from Section 912.[17]

The *Oregon Short Line* court felt obligated to interpret Section 912 so as to "fully effectuate congressional intent" and was concerned that the provision would be "rendered null" if it found Section 912 inapplicable to 1875 Act easements. *Oregon Short Line,* 617 F. Supp. at 212. The court also described the climate of the time the statute was enacted, in which, under the shadow of the *Townsend* and *Stringham* cases, "Congress clearly felt it had some retained interest in railroad rights-of-way." *Id.* Whether Congress "clearly" felt this to be so is not, however, apparent from the history. At best, after 1915 following *Stringham*, there was confusion as to what type of interests were retained and by whom under the 1875 Act grants. Moreover, the expressed purpose of the provision was that the fee title to abandoned federal railroad rights-of-way "ought[,] in justice[,] become the property of the person for whom the whole of the legal subdivision has been granted or his successors in interest. Granting such relief in reality gives him only the land covered by the original patent." Sharon J. Bell, *Osages, Iron Horses, and Reversionary Interests: The Impact of United States v. Atterberry on Railroad Abandonments*, 20 TULSA L.J. 255, 274 n.134 (1984) (quoting from legislative

[17] For example, the rights were set under the Homestead Act and 1875 Act. Those statutes, and related land patents, used common law language to express the interest being passed to patentees, as subject to the 1875 Act easements. As such, the United States was bound by the common law terms expressed by statutes and patents used to convey land to the patentees.

history). As such, Section 912 merely served the intention of providing remedial relief for what had already transpired under homestead patents: the vesting of rights in entrymen.[18] *Cf. City of Buckley*, 723 P.2d at 437.

### 2. The Express Terms of Section 912.

The express terms of the statute itself should apply, and those terms *did not* dictate that *all* federal railway grants that became abandoned would transfer and vest in patentees or their successors in interest. 43 U.S.C. § 912. Rather, the express terms of the statute limited its scope to "*all* right, title, interest, and estate *of* the United States in" such rights-of-way. In other words, the statute itself expressly limited its scope to the rights, titles and interests that were actually retained by the United States. *Id.* Construing the statute to mean what it says would not render Section 912 null and void. For those lands in which the United States still held an interest and which had not or would not pass by patents, Section 912 would still apply. But Section 912 does not apply here where the interests vested under traditional, public land law.

Under the Homestead Act, patentees received the entire tract of land

---

[18] To be sure, under the Commerce Clause, Congress may have had it within its powers to "clean up" problems with unwanted strips of former railway networks so that title could easily be cleared to the actual fee title holders. *E.g., Preseault I., supra.* By no means, however, would the reach of Section 912 go so far as to divest the servient estates of title vesting under applicable laws, such as the Homestead Act.

patented to the entrymen, only subject to 1875 Act easements. Under the plain meaning of these words, and all applicable law, settlers received fee title underlying the railway easements when the United States issued land patents. No other conclusion would be consistent with decades of law on this subject. Certainly, legislation intended primarily to dispose of unwanted strips of land to landowners who held title to the underlying rights-of-way could not change the interests that were already to be vested.

Accordingly, the district court erred as a matter of law in its entry of judgment concerning Category 1.

## II. IDAHO STATE LAW ISSUES.

In finding that the parcels in categories 5, 6, 8, 10, 12, 13 14, and 15 are held in fee by the railroad, the district court misapplied Idaho case law and ignored widely-recognized principles of property law. The lower court's errant analysis involved the interpretation of state law, which this court must review *de novo*. *Group One*, 254 F.3d at 1051; *Abbott Lab.*, 952 F.2d at 1355.

### A. THE CONVEYANCES IN CATEGORIES 5, 6, AND 8 ARE UNAMBIGUOUSLY EASEMENTS CONVEYED UNDER IDAHO LAW.

The Idaho Supreme Court ruled definitively on the issue before this Court four months ago in *Neider*. *Neider v. Shaw*, 65 P.3d 525 (Idaho March 7, 2003). The question in *Neider* was whether a railroad company obtained a fee or an

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Plaintiffs' Appendix of Exhibits (3 of 4) Filed in Support of their Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class