Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net
and
Cecilia Fex, *pro hac vice* (DC Bar No. 435061)
ACKERSON KAUFFMAN FEX, PC
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831
Email: fex@ackersonlaw.com

Counsel for Plaintiffs' Class

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.*, Plaintiffs, v. UNITED STATES OF AMERICA Defendant. | Case No. CV99-324S-MHW<br>Honorable Mikel H. Williams |

**PLAINTIFFS' APPENDIX OF EXHIBITS (4 of 4) FILED IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE CATEGORY 1 LANDS**

July 12, 2006

**INDEX OF PLAINTIFFS' EXHIBITS**
**(APPENDIX 4 OF 4)**

| Plaintiffs' Exhibit Number | Description of Exhibit |
|---|---|
| 7 | Excerpted Reply Brief for Plaintiffs-Appellants (*Hash v. U.S.*, Case No. 03-1395 (Fed.Cir.) (Filed Dec. 5, 2003) |
| 8 | Declaration of Robert M. Jepsen |
| 9 | Declaration of Doug Dickerson |
| 10 | Declaration of William Don Lakey |
| 11 | Act of May 14, 1898, ch. 299, 30 Stat. 409 (codified as 43 U.S.C. §§ 942-1 to 942-9) ("Alaska Act of 1898") |

Dated: July 12, 2006

Respectfully submitted,
ACKERSON KAUFFMAN FEX, PC

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
CECILIA FEX, *pro hac vice* (DC Bar No. 435061)
1250 H Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 833-8833
Fax: (202) 833-8831

Of Counsel:
Lary C. Walker, ISB No. 1303
WALKER LAW OFFICE
232 East Main Street
PO Box 828
Weiser, ID 83672
Telephone: (208) 414-0390
Fax: (208) 414-0404
Email: walkerlaw_bk@ruralnetwork.net

*Counsel for Plaintiffs' Class*

Appeal No. 03-1395

In the

# United States Court of Appeals

*for the*

# Federal Circuit

ROBERT HASH, GERLENE HASH,
WILLIAM DON LAKEY, and NANCY HAWKINS,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States District Court for the District of Idaho in Case No. 99-CV-324, Magistrate Judge Mikel H. Williams.

# REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

NELS J. ACKERSON
CECILIA FEX
SOMMER BARNARD ACKERSON, P.C.
*Attorneys for Plaintiffs-Appellants*
1666 K Street, N.W.
Suite 1010
Washington, DC 20006
(202) 833-8833

*Of Counsel:*
DANIEL J. MILLEA
ZELLE, HOFMANN, VOELBEL, MASON & GETTE, LLP
33 South Sixth Street
City Center, Suite 4400
Minneapolis, MN 55402
(612) 339-2020

December 5, 2003

Counsel Press, LLC (202) 783-7288 * (888) 277-3259

## ARGUMENT

When the Department of Interior issued a homestead patent, all title to the land passed from the United States unless expressly reserved. *Swendig v. Washington Water Power Co.*, 265 U.S. 322, 331 (1924). Therefore, the primary issue in this appeal turns on a single question: Did the United States expressly reserve to itself the fee interests underlying the right-of-way easements granted to the railroads under the 1875 Act? *Leo Sheep Co. v. United States*, 440 U.S. 668, 681, 687-88 (1979).

The Government never answers this question, and offers arguments that do nothing more than evade it. This is because the 1875 Act contains no such reservation. The Government contends that Congress had an "implied" intent to retain a "reversionary interest" in the rights-of-way, but because the Government is unable to define this "reversionary interest," it contends that this interest need not be "shoe-horned" into a category cognizable under common law. That argument fails because the express terms of the 1875 Act do not provide for *any* reversionary interest in the United States, General Railroad Right-of-Way Act of 1875, 43 U.S.C. §§ 934-939, and because long-established law *prohibits* construing a statute to alter the common law unless Congress clearly directs otherwise. Under the plain terms of the statute and controlling Supreme Court

precedent, Congress granted the railroads an easement. There is no "reversionary interest" in an easement under well-settled law.

The Government's remaining arguments are predicated on subsequent legislation, and theories about the alleged purpose behind the 1875 Act that actually reflect *modern* government policy which did not come into being until the latter part of this century. The Government cannot rewrite history in this manner, and it certainly cannot do so with the result of disturbing property interests that vested long before its current policy was ever enacted into law.

The private deed issues in this appeal are resolved by *Neider v. Shaw*, 65 P.3d 525 (Idaho 2003). Despite the Government's efforts to divert this Court's attention away from that case, its holding is dispositive here: ". . . the use of the term 'right-of-way' in the substantive portions of a conveyance instrument creates an easement," *Id.* at 530. Idaho law also supports the application of this Court's analysis in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*"), and that analysis should govern the deeds that post-date the railroad's occupation. Finally, the Government's adverse possession claims cannot be deemed proven when it has failed to provide any supporting evidence, let alone the "clear and satisfactory evidence" that is required. *Utter v. Gibbins*, 48 P.3d 1250, 1254 (Idaho 2002).

# I. CONGRESS RESERVED NO INTEREST IN THE 1875 ACT RIGHTS- OF-WAY

The "reversionary interest" the Government claims to hold in the land underlying the 1875 Act rights-of-way is nowhere to be found. There is no reservation of such an interest in the Act itself; no intent to reserve such an interest in the legislative history; no reservation of such an interest in the patents which conveyed to the homesteaders the title to full tracts – though other reservations *are* made in those patents. Under these circumstances, controlling Supreme Court precedent mandates the conclusion that no such reversionary interests exist. *Leo Sheep*, 440 U.S. at 681, 687-88; *Swendig*, 265 U.S. at 331; *United States v. Schurz*, 102 U.S. 378 (1880); *Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357, 360-61 (1889); *cf. Amoco Production Co. v. Southern Ute Indian Tribe*, 526 U.S. 865, 877 (1999); *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983); (*see* Plaintiffs-Appellants' Brief ("Br.") 10, 17-26).

## A. THE GOVERNMENT IGNORES CONTROLLING SUPREME COURT PRECEDENT.

In a landmark decision the Government virtually ignores, the Supreme Court rejected materially the same argument advanced by the Government here. *Leo Sheep*, 440 U.S. at 678-688; (*See* Br.§I.B.3.) The United States claimed that it had implicitly retained easement interests in 1862 railroad land grants, but the

Supreme Court noted that although the grants expressed certain reservations, they were silent as to the easement interests claimed by the Government. *Id.* at 678-79. The Court held that an intent to reserve a property interest could not be established by an implied or "divined" reservation. Rather, the reservations that were expressed created the inference that no others were intended unless there was direct proof to the contrary. *Id.* at 679-81.

Earlier Supreme Court precedent underscores the Government's burden to prove an express reservation of the interest it claims to hold. In *Swendig,* entrymen to land patents disputed the rights of a power company to maintain a right-of-way that was constructed on their properties prior to the issuance of their land patents. The Court first affirmed the "general rule" that when "entry is made and a certificate given, the land covered ceased to be a part of the public lands . . . and that, when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States." *Swendig*, 265 U.S. at 331 (*citing United States v. Schurz*, 102 U.S. 378 (1880)); *see also Hastings*, 132 U.S. at 360-61 (characterizing this rule as a "doctrine" that "may now be regarded as *one of the fundamental principles underlying the land system of this country*.") (emphasis added); *United States v. New Orleans Pac. Ry. Co.*, 235 F. 833, 839 (5th Cir. 1916) (recognizing a "patent as valid and that it effected an

extinguishment of the title and interest of the government in the land"); (Br.§I.B.). In the case before it, however, the Court found that the "*regulation in effect* when appellants settled on the land *expressly* provided that permissions granted were subject to further and future regulations."[1/] *Id.* at 329 (emphasis added).

By contrast, while expressing some reservations, the patents before the Court in this case were never made "subject to" *any* reservation of a reversionary interest in the United States in the railroad rights-of-way. The express language of the 1875 Act provided for the contingency that the lands would be "dispose[d] of . . ." Accordingly, the patents were only made "subject to" the right-of-way easement itself.[2/]

The Government relies on the canon of "strict construction." (Resp.12-13.) But the canon is irrelevant when the statute is unambiguous. *Amoco*, 526 U.S. at

---

[1/] The Rails-to-Trails Conservancy ("RTC") claims incorrectly that the *Swendig* Court held "that the failure to explicitly reserve the . . . right-of-way did not . . . cause it to pass to the patentees." (RTC27.)

[2/] Here, as in *Leo Sheep*, "[g]enerations of land patents have issued without any express reservation of the right now claimed by the Government. *Nor has a similar right been asserted before.*" 440 U.S. at 687 (emphasis added). The Government does not deny that for the first hundred years after 1875, it did *not* assert ownership of reversionary rights in the 1875 Act rights-of-way in land patented to homesteaders. (*Compare* Br.§I.A.3, *with* the Governments Response Brief ("Resp.").) It is only in the past thirty-some years that the Government has claimed an interest in these 1875 Act rights-of-way.

880. As the Supreme Court noted, no more apt words could have been found to indicate that the 1875 Act intended to grant only easements. *Great Northern v. United States*, 315 U.S. 262, 271 (1942).

Moreover, the 1875 Act is not the source of the homesteaders' land interests – the homestead patents were. The law is well-settled that Congress intended all interests in a homestead patent to pass to the patentee unless expressly reserved. The canon cannot be "so construed as to defeat the intent of the legislature." *Leo Sheep*, 440 U.S. at 682-83. Therefore, the canon is inapposite here.

### B. THE 1875 ACT GRANTED ONLY EASEMENTS UNDER *GREAT NORTHERN*.

Relying on *State of Idaho v. Oregon Short Line Railroad Co.*, 617 F. Supp. 207 (D. Idaho 1985), the Government urges the Court to find that Congress intended, in the 1875 Act, to rewrite the substantive law of property. (Resp.18-30.) Specifically, inasmuch as *Great Northern* forecloses any dispute that the interests granted to the railroads by the Act were easements, the Government argues that they were a new and different species of easement: a "unique estate created by Congress" that one must not attempt to "shoe-horn . . . into a traditional common law category." (Resp.19.) The 1875 Act easements not being traditional easements, the argument proceeds, "the traditional rules regarding the passing of

the servient estate and precluding a 'reversionary interest' [in the Government] need not apply."[3/] (Resp.21.)

The problem with the Government's argument is that its basic premise – that we cannot "assume[] that Congress intended the rights-of-way to operate as common law easements" (Resp.20) – flies in the face of a fundamental rule of statutory construction. That Congress intended common law to apply is *exactly* what must be assumed, absent an express indication to the contrary:

> Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. *In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.*

*Evans v. United States*, 504 U.S. 255, 259-60 (1992), *quoting Morissette v. United States*, 342 U.S. 246, 263 (1952) (emphasis added). This principle has been expressly stated and applied by this Court. *See O'Neill v. Department of Housing and Urban Development*, 220 F.3d 1354, 1360 (Fed. Cir. 2000).

The Supreme Court's recognition that "Congress intends to incorporate the

---

3/ This argument fails under the *Leo Sheep* mandate no matter how indeterminate the right-of-way interests were. The mandate is clear – reservations must be express.

well-settled meaning of the common-law terms it uses . . . unless the statute otherwise dictates," *Neder v. United States*, 527 U.S. 1, 23 (1999), is nothing less than inevitable, given that the entire "system of jurisprudence" in this country "is derived" from the common law. *United States v. Sanges*, 144 U.S. 310, 312 (1892). "The language of the constitution, as has been well said, could not be understood without reference to the common law." *United States v. Wong Kim Ark*, 169 U.S. 649, 654 (1898). Thus, the *Neder* rule has governed the judicial construction of federal statutes for well over a century on a wide variety of subjects.[4/]

The common law is accorded respect in statutory construction even in cases where no particular terminology is at issue. "*No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.*"

---

[4/] *See Standard Oil Co. Of New Jersey v. United States*, 221 U.S. 1, 59-60 (1911) ("*the standard of reason which had been applied at the common-law and in this country in dealing with subjects of the character embraced by the statute*" was intended to provide the requisite standard for violation of the Sherman Act.); *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) (right to jury trial under Age Discrimination in Employment Act); *Kepner v. United States*, 195 U.S. 100, 125-26 (1904) (Bill of Rights protection provided by statute to residents of U.S. territory); *Keck v. United States*, 172 U.S. 434, 446 (1899) (criminal statute); *Wong Kim*, *supra* (Constitutional provision regarding citizenship); *Sanges*, *supra* (government cannot appeal adverse judgment in criminal case).

*Shaw v. Railroad Co.*, 101 U.S. 557, 565 (1879) (emphasis added); *see also Robert C. Herd & Co., Inc. v. Krawill Machinery Corp.*, 359 U.S. 297, 304-05 (1959).

Thus, the question in this case is not whether Congress *could* "pre-empt or override common-law rules regarding easements, reversions, or other traditional real property interests." *Oregon Short Line*, 617 F. Supp at 212. The question is whether Congress did so in the express terms of the 1875 Act. The answer is clearly no. Nothing in the Act purports to create a "unique estate" in the railroad. Nothing in the Act purports to characterize the easement, which indisputably was the "estate" the railroad received, as anything other than a common law easement. Nothing in the Act purports to reserve any interest of any kind in the railroad's "estate" to the United States. All that the Act does is grant the railroad "the right of way through the public lands of the United States." It offers *no* definition of right-of-way which, as this Court has put it, would be "indicative of a congressional purpose to vary from the common-law meaning." *O'Neill*, *supra,* 220 F.3d at 1360. In the face of "silence" from "the body that is empowered to give us a 'contrary direction' if it does not want the common-law rule to survive," the statute must be given the meaning it conveys under common law. *Evans, supra*, 504 U.S. at 269.

In *Great Northern*, the Supreme Court found that the language of the 1875 Act itself "clearly grants only an easement, and not a fee." 315 U.S. at 271. Disapproving the contrary conclusion that had been reached in *Stringham* and applied in subsequent cases, the Court noted: "Far more persuasive are two cases involving special acts granting rights of way passed after 1871 and rather similar to the general act of 1875[,]" and cited *Denver & R.G. Railway v. Alling*, 99 U.S. 463 (1878) and *Smith v. Townsend*, 148 U.S. 490 (1893). *Alling* involved an 1872 grant of "the right of way over the public domain," of which the Court said,

> *we do not doubt that the intention of Congress was to grant to the company a present beneficial easement* in the particular way over which the designated routes lay[.]

99 U.S. at 475 (emphasis added). *See also Smith*, 148 U.S. at 498 (on an 1884 grant, "The company had *simply an easement*, not a fee in the land.") (emphasis added); (*see also* Br.35, n.16). Also cited in *Great Northern*, *East Alabama Railway v. Doe*, 114 U.S. 340, 350 (1885), held that a railroad which acquired a "right of way" by deed acquired "merely an easement in the land[.]"

These decisions, contemporaneous with the 1875 Act, are noteworthy for the confidence and total lack of controversy with which they pronounce a "right-of-way" to be an easement. Such confidence was well placed. The English common law held unequivocally that a right-of-way was an easement. *Clifford v.*

*Hoare*, 43 L.J. Comm. Pleas. 225, 230, per Bret J., L.R. 9 C.P. 362. This principle was imported directly into American jurisprudence, where it was uniformly understood, as the 1875 Act was passed, that a "right-of-way" was a right or privilege of travel over land owned by another. Thus, a 19th century property law treatise explained:

> The grant of a right of way over land does not pass any other right or incident. The owner of the soil retains full dominion over his land subject merely to the right of way. He may make any use of his land which does not interfere with a reasonable use of the way. Subject to the easement granted, his control extends indefinitely upwards above the surface of the ground, and downwards beneath it ad inferos.

Jones, *Law of Easements* § 391 (1898) (quoted in *Abney v. Twombly*, 97 A. 806, 812 (R.I. 1916)). Similarly, an *easement* was a legal property right defined as "[a] liberty, privilege or advantage in land, without profit, existing distinct from the ownership of the soil." *Burrill's Law Dictionary* 409 (1850).

Given the governing law of statutory construction and the clear import of the term "right-of-way" under the common law, this Court must reject the Government's argument that an estate created by Congress cannot be "shoe-horn[ed] . . . into a traditional common law category." (Resp.19.) The 1875 Act offers no basis whatsoever on which to infer that Congress meant, by granting the

railroads "the right of way through the public lands," to grant anything other than a common law easement – or to reserve any "reversionary" interest.

Indeed, the Government's brief itself reveals the futility of its attempt to attribute to the 1875 Congress an intention to create a "unique estate" hitherto unknown to the law of property. While ostensibly denying the necessity of "shoe-horning" such an "estate" into a recognizable property interest, the Government struggles to do exactly that, on the basis of the early 20th century "limited fee" decisions, from which it coins its own phrase, "corporeal fee-like interest" (Resp.25), to describe the railroad's "unique estate." (Resp.20-21.)

There is a single and obvious reason that the Government needs to use the word "fee" to define that "estate": Under "traditional" property law, a "reversionary" interest can arise only from the grant of a fee. Thus, if the Government wishes to persuade the Court that it retains such an interest in the 1875 Act rights-of-way, it needs to first convince the Court that those rights-of-way amounted to a fee. For the reasons discussed above, however, that attempt must fail.

### C. THE GOVERNMENT CANNOT ESTABLISH A "REVERSIONARY INTEREST" IN THE 1875 ACT RIGHTS-OF-WAY ON THE BASIS OF PRE-1871 RAILROAD GRANTS.

The "limited fee" cases were, of course, discredited by *Great Northern* –

and no subsequent Supreme Court authority supports the contention that an 1875 Act right-of-way could be characterized as a fee. Moreover, as the Supreme Court recognized in *Great Northern*, the 1875 Act represented a "sharp change in Congressional policy" from the "lavish grants" that were bestowed on the railroads before 1871. 315 U.S. at 533-34. The Government nevertheless argues, contrary to the holding of *Great Northern*, that "the distinction between" the rights-of-way granted to the railroads by the 1875 Act and those granted under the prior acts "is at most minimal." (Resp.21.) In this regard, the Government ignores the significance which the Court accorded to the fact that none of the pre-1871 acts contained "any provision comparable to that of Section 4 of the 1875 Act that 'lands over which such right of way shall pass shall be disposed of subject to such right of way.'" 315 U.S. at 278.

The Government's purpose in attempting to undermine the distinction between the 1875 grant and its predecessors is to give credence to its argument that the easements granted by the 1875 Act were in reality that "corporeal fee-like interest" upon which the Government predicates its claim of an implied "reversionary interest." The "corporeal fee-like interest," in turn, is predicated on the pre-*Great Northern* "limited fee" cases – which, of course, *Great Northern* specifically determined to be inapplicable to the 1875 Act rights-of-way. The

Government relies, however, on *United States v. Union Pacific Railroad* Co., 353 U.S. 112 (1957), which it claims "established" that "both pre- and post-1871 railroad right-of-way statutes" granted the same interest to the railroads. (Resp.25.)

The Government's reliance on *Union Pacific* is misplaced, for two reasons. First, that case dismissed the "limited fee" cases as at "most" holding "that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes." 353 U.S. at 119. There is nothing about this description of the railroads' rights that supports characterizing them as a "corporeal fee-like interest." Indeed, the observation of the Tenth Circuit in *Wyoming v. Udall*, which the Government quotes, directly undermines its argument: "With the expansion of the meaning of 'easement' to include, so far as the railroads are concerned, a right in perpetuity to exclusive use and possession *the need for the 'limited fee' label disappeared*." *Wyoming v. Udall*, 379 F.2d 635, 640 (10th Cir. 1976) (emphasis added).

Second, contrary to the Government's insinuation, the Court in *Union Pacific* did not retract the distinction between the 1875 Act and its predecessors that the Court had recognized in *Great Northern*. To the contrary, *Union Pacific* reiterated the earlier holding that "a great shift in congressional policy occurred in

1871," and "after that period only an easement for railroad purposes was granted." 353 U.S. at 119. But this point was not relevant to the issue before the Court in *Union Pacific*. For purposes of that issue, the "heart of the matter" with respect to the prior cases was that none of them "involved the problem of rights to subsurface oil and minerals." *Id.* at 119-20. The essential point that needed to be made was: "There are no precedents which give the mineral rights to the owner of the right of way as against the United States." *Id.* at 120.

For these reasons, the Government cannot derive the "reversionary interest" it seeks from the pre-1871 railroad grants which are not at issue in this case.[5/]

### D. THE GOVERNMENT CANNOT CREATE A RESERVED INTEREST OUT OF SUBSEQUENTLY ENACTED LEGISLATION.

The Government argues that subsequent legislation may be used to assist in interpreting prior legislation. (Resp.30-38.) But if intent changes over time, it is

---

[5/] The Government relies on recent precedent that appear to be in accord with *Oregon Short Line, supra*. Those cases warrant careful reading. *Mauler v. Bayfield County*, 309 F.3d 997 (7th Cir. 2002), concerned pre-1871 grants; *Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330 (9th Cir. 1990), concerned pre-1871 grants, notwithstanding the court's dictum with no analysis that § 912 applied to post-1871 grants; *Marshall v. Chicago & Northwestern Transp. Co.*, 31 F.3d 1368 (10th Cir. 1994), actually support Plaintiffs-Appellants. (*See* §I.D, *infra*.) The *Marshall* holding was in accord with its earlier *ETSI* precedent and with 8th Circuit *ETSI* precedent that affirmed homestead patentees were vested with title to "reversionary interests" from federal land grants. (*See* Br.10, 20, & §I.C.1.)

the intent of the specific Congress that adopted the statute that is controlling. *See Teamsters v. United States*, 431 U.S. 324, 354 n.39 (1977). In addition, "the view of subsequent Congresses cannot override the unmistakable intent of the enacting one." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980).

The Government cites first to the forfeiture provision of an 1898 Act, 43 U.S.C. §§ 942-1 to 942-9, which allowed for the Alaskan Territory to be opened to homesteading and federal railway grants. In 1898, however, the public lands of Alaska burdened by prospective rights-of-way were owned entirely by the Government, and therefore, any forfeiture necessarily had to inure to the benefit of the Government alone.[6/] Like the 1875 Act, moreover, the 1898 Act does not provide for the reservation of a reversionary interest in the Government. In any event, the 1898 legislation did not concern the 1875 Act.

The 1906 and 1909 Acts cited by the Government, 43 U.S.C. § 940, did concern the 1875 Act. As noted by the Government, this legislation was enacted because forfeiture under the 1875 Act was not self-executing. (Resp.31.) Therefore, Congress enacted the special legislation in 1906, adopted materially *in toto* in 1909, that resulted in avoiding the need for litigation over the issue of

---

[6/] The earliest patents issued in Alaska appear to be as late as 1904. BLM General Land Office Records *at* http://www.glorecords.blm.gov.

forfeiture. 43 U.S.C. § 940. The statutes addressed forfeiture of railway grants under two possible contingencies: (1) the lands traversed by the right-of-way were still held by United States; and (2) the lands traversed by the right-of-way had been conveyed to private owners. In the former case, the statute provided that "the United States hereby resumes the full title to the lands covered, thereby freed and discharged from such easement." *Id.* In the latter case, "the forfeiture declared shall, *without need of further assurance or conveyance*, inure to the benefit of any owner or owners of land conveyed by the United States prior to such date subject to any such grant of right of way or station grounds." *Id.* (emphasis added). Contrary to the Government's argument, there is nothing about these provisions which "recognized" that an easement granted by the 1875 Act was "one in which the United States retained the reversionary interests." (Resp.33.) Rather, the statute simply "recognized" the common law result of the extinguishment of *any* easement: the resumption of full title in the underlying landowner "freed and discharged from such easement." 43 U.S.C. § 940. The same result applied regardless of whether the underlying landowner was the Government *or* the homesteader.

Finally, the Government argues that in enacting 43 U.S.C. § 912, "Congress for the fourth time demonstrated its understanding that the United States retained

the reversionary interests in the 1875 Act rights of way." (Resp.35.) The legislative history reveals, however, that any such "understanding" of Congress in 1922 was the direct result of the *Townsend* and *Stringham* decisions in 1903 and 1915. *See* H.R. REP. NO. 217, 67th Cong., 1st Sess. (1921) (reporting on purpose of H.R. 244 (Act of March 8, 1922)) (referring to "the decision of the courts" and incorporating the Interior's letter citing those cases). Those decisions, of course, were expressly overruled by the Supreme Court in 1942 as applied to 1875 Act rights-of-way. *Great Northern,* 315 U.S. at 276-79.

A mistaken Congress in 1921-1922 could not undo the interests that had already vested in "generations of land patents." *Leo Sheep,* 440 U.S. at 687. This is so because Congress may not retroactively withdraw property rights which have already vested. *Id., cf. Campbell v. Holt,* 115 U.S. 620, 623 (1885) (seminal decision, noting that a subsequent congressional act altering a limitations period may not disturb vested ownership rights).[7] Moreover, Congress expressly recognized that the relief afforded to the homesteader by § 912 "*in reality gives*

---

[7] If the terms of § 912, or the "repealing" provision of the Trails Act (Resp.36), do operate to defeat vested property interests, then the landowner may seek just compensation under the Fifth Amendment. *Preseault v. I.C.C.,* 494 U.S. 1, 22-23 (1990) ("*Preseault I*")(J., O'Connor, concurring) ("The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights.").

*[the homesteader] only the land covered by the original patent.*" H.R. REP. NO. 217[8/]; *see Marshall*, 31 F.3d 1028, 1029-32 (assuming and holding that all title to the "reversionary rights" passed to the homesteader, and therefore § 912 operated to confirm title to abandoned railroad right-of-way in his successor-in-interest).

Nor did § 912 change the interests that would pass to future homesteaders. Section 912, like the 1875 Act, failed to reserve any reversionary interest in the Government. Its terms are limited to lands in which the United States still held interests at the time (Br.§I.C.1) – and it is clear from the Report that Congress intended to dispose of unwanted "strips . . . of little or no value," *which in fact were easements*, to "the person to whom the whole of the legal subdivision has been granted." In other words, Congress intended to codify the same "reversionary rights" that would ordinarily vest[9/] under common law.

This proper construction of § 912 will not serve to defeat the terms of the Act, but will effectuate Congress' intent while ensuring that constitutional rights

---

8/ Attached, hereto, in Statutory Addendum. The parties have not previously referred directly to this Report. The full Report, including the express mention of the 1875 Act, came to Plaintiffs-Appellants' counsels' attention for the first time in preparation for this Reply.

9/ Rights to benefit from the extinguishment of easements are technically vested at the time of ownership of the servient estate–not at the time the burden is removed. *See Preseault v. United States*, 100 F.3d at 1534. But the phrase is often used in the context of discussing extinguished easements.

are preserved. Thus § 912, properly construed, simply assured to the landowner by legislative fiat the same rights to which he was entitled under common law.

### E. Decades of Interior Decisions Which Support the Landowners' Position Have Been Approved By the Supreme Court.

The Government seeks to distinguish the Interior's rules and decisions concerning the 1875 Act rights-of-way on the basis that (1) the Interior impermissibly treated all federal railway grants as if they were easements, and (2) subsequent Supreme Court decisions concerning "limited fee" interests "negate" these early Interior decisions and rules. (*Compare*, Br.19-24, *with* Resp.41.) But, the *Great Northern* Court expressly approved of the agency's handling of the disposition of the patents subject to the 1875 Act easements. 315 U.S. at 275. In fact, the Interior's interpretation of the 1875 Act was one of the main factors that informed the Court's decision. *Id.* at 275-76. Moreover, *Great Northern* also overruled the very "limited fee" cases that the Government argues "negated" the Interior decisions. *Id.* at 276. Indeed, when noting that Interior construed 1875 Act grants *in the very manner now advocated by the Government*, the Court observed that it would "not regard this subsequent interpretation as binding on . . . the Interior since it was impelled by what we regard as inaccurate statements in the *Stringham* case." *Id.* at 276.

The Government relies on *Proposed Installation of MCI Fiberoptic Comm. Line*, 96 Int. Dec. 439 (1989) ("*PIMFCL*"). (Resp.19-20, 42.) *PIMFCL* is an opinion letter written by then-acting assistant solicitor general Howard Shafferman. The opinion concerns both pre- and post-1871 Act rights-of-way and fails to address, let alone consider, whether constitutionally-protected property rights would be affected by the opinion. To the extent the opinion discusses *Great Northern*, it does so with a similar "shoe-horn" aversion, *id.* at 446, as seen in the Government's arguments. The opinion is a clear departure from all standing Interior decisions which have predominated for decades. *E.g.*, *Great Northern*, 315 U.S. at 275-76. As such, it is not an interpretation that has been consistently applied over a number of years and is not is entitled to any weight here. *United States v. Alabama G. S. R. Co.*, 142 U.S. 615 (1892).

The Government takes pains to suggest that *Amerada Hess*, 83 Int. Dec. 194 (1976), is unreliable because, the Government contends, the Interior "incorrectly relied on *Great Northern*" (Resp.43), in which the United States did not assert title to rights-of-way across public lands that had been disposed of. But, *Amerada Hess* reached its conclusions independently of the Government's disavowment of those interests and is squarely consistent with the Interior's early line of decisions that the Supreme Court embraced in *Great Northern*. *See* 83 Int. Dec. at 201-04.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBERT HASH and GERLENE HASH, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | ) | Case No. CV-99-324-S-MHW |

## DECLARATION OF ROBERT M. JEPSEN

**STATE OF IDAHO** )
:ss
**County of Washington** )

The Declarant being duly sworn, deposes and says:

1. I acquired this property along with my wife in 1993, located approximately ten (10) miles north of Council, Idaho.

2. My land consists of farm ground, hay, grain and pasture for my livestock

3. My property is bifurcated by the former railroad right-of-way that is the subject of this class action. I am not a class member, as I have filed a separate action in the Court of Federal Claims alleging a taking of more than $10,000.

4. The former railway separates my home from the majority of my land dedicated to farming. The right-of-way spans across my property for a distance of approximately half a mile.

5. My predecessor had farmed right up to the edge of the railroad tracks and had fences along part of the track to retain their livestock. I operated my farm in the same manner as my predecessor, maintaining and erecting fences as needed for livestock control.

6. We observed after we had moved onto the property that a train went up the valley north from our place and returned once or twice a week. During the time we owned the property while the railroad was running, we experienced no problems or interference with the operation and access to our farm because of the railroad.

7. We moved our farm equipment and vehicles up and down the railroad right-of-way without difficulty or problems. We also used the right-of-way to move livestock from one end of the farm to the other from pasture to pasture and across the right-of-way from one side to the other.

8. The railroad also allowed us to string a wire across the right-of-way from time to time for control of livestock and from each end of my property along the tracks in order to retain and protect my livestock and to keep other owners' livestock from moving along the tracks onto my property.

9. The railroad removed the tracks and railroad ties in approximately 1995, 1996.

10. The Friends of Weiser River Trail took over the possession of the right-of-way sometime after that.

11. After the trail users developed the trail, we received demands from the trail operator's legal counsel to discontinue crossing the right-of-way, driving cattle on the right-of-way and moving equipment up and down the right-of-way. We were only allowed to cross the right-of-way at one or two designated locations. We observed other livestock belonging to other parties going up and down the right-of-way creating damage to our property.

12. I observed on occasion people leaving the right-of-way walking across my property about a one quarter of a mile for hunting or fishing along the Weiser River. We have also observed people with horses and dogs going up and down the right-of-way through the center of our property. One time a hiker's dog came off the rail bed and ran my horses through a fence.

13. Previously allowed by the railroad to fence within the 100 feet (as were originally built and located by the railroad), I was required to remove fences to no closer than 100 feet from the centerline of the preexisting tracks. I was no longer able to farm closer than 100 feet from the preexisting tracks. I was also required to remove a roping arena made of pole fencing from within the 100 feet from the centerline of the track that had been allowed by the railroad previously.

14. The removal of the fences, the roping arena, and discontinuing farming along the right-of-way, was at a substantial expense to me and the trail people have not used more than an eight foot wide strip of land where the track was once located. The full two-hundred foot width is over run now by noxious weeds creating problems now for my unburdened property.

**Dated:** July 6, 2006

Robert M. Jepsen, Declarant

**SUBSCRIBED AND SWORN** to before me this 6th day of July 2006.

KYMBERLY D. WESCOTT NOTARY PUBLIC STATE OF IDAHO

Notary Public for the State of Idaho
Residing at: Weiser
Commission Expires: 05/17/2010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBERT HASH and GERLENE HASH, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | ) | Case No. CV-99-324-S-MHW |

## DECLARATION OF DOUG DICKERSON

**STATE OF IDAHO** )
:ss
**County of Washington** )

The Declarant being duly sworn, deposes and says:

1. I was born and raised on this property which is adjoining the City of Weiser. I have owned this property since approximately 1979.

2. The railroad at issue in this class action passes through my property separating the house from outbuildings, farmland and pastures. My property also parallels the Weiser River.

3. Although I am not a member to this class action, my property is bifurcated by the former railroad right-of-way that is the subject of this class action.

4. Throughout the years, the train traveled up and down the tracks on various occasions from one to three times per week.

6. My family and I have farmed the ground, added irrigation ditches and built fences along and parallel to the railroad right-of-way without interfering with the railroad traveling up and down the tracks. This practice was allowed throughout my life.

7. We did not encounter problems or difficulties of any kind from the use of the property on both sides of the right-of-way for more than 40 years.

8. When the railroad track and ties were removed and the right-of-way converted to a trail, we have observed the trail being used for walking, bicycling, jogging, and horse riding, which have occasionally left the right-of-way and crossed our property to access the Weiser River.

9. We have been required by the trail manager to remove the fences from 50 feet of the centerline, remove historical irrigation ditches, and discontinue the use of the right-of-way to move equipment one place to another along our farm. We have spent substantial amounts of money reestablishing fences, ditches, and resolving other problems caused by the trail operators.

**Dated:** July 6, 2006.

Doug Dickerson, Declarant

**SUBSCRIBED AND SWORN** to before me this 6th day of July 2006.

KYMBERLY D. WESCOTT
NOTARY
PUBLIC
STATE OF IDAHO

Notary Public for the State of Idaho
Residing at: ____________
Commission Expires: ____________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, et al., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. CV-99-324-S-MHW |

## DECLARATION OF WILLIAM DON LAKEY

**STATE OF IDAHO** )
:ss
**County of Washington** )

The Declarant being duly sworn, deposes and says:

1. I am a class representative and my wife and I owned property that is crossed by the former right-of-way at issue in the class action

2. I acquired this property along with my wife in 1965, located approximately 36 miles from Weiser, Idaho. At the time we acquired the property and until the railroad track was removed, we observed the train cross through our property only once or twice a week heading north on one day and returning the next day. The trains traveled only 20-25 mph and the railroad maintained the cattle guards to keep the livestock within our property boundary.

3. We only encountered a problem on one occasion where the train struck some of our livestock on the railroad right-of-way. However, the railroad compensated us for loss of livestock. Since that time, we did not encounter any other interference with our farming nor our livestock operation.

4. We historically moved our livestock and machinery along the right-of way as needed and at no time did we have interference from other local livestock coming up or down the right-of-way.

5. When the right-of-way was converted to a trail, we were no longer allowed to move our livestock or equipment within the right-of-way. During the conversion, the trail operator removed the cattle guards and local livestock now trespass upon my property causing damage to my crops.

6. We are also limited to the use of one or two crossings to move livestock across the right-of-way to pasture divided by the right-of-way.

7. The trail split our farm and ranch ground and we have observed trail users walking, jogging, bicycling and riding horses through our property along the right-of-way. Occasionally trail users leave the right-of-way trespassing to gain access to the Weiser River.

**Dated:** July 6, 2006.

William Don Lakey

William Don Lakey, Declarant

**SUBSCRIBED AND SWORN** to before me this 6th day of July 2006.

KYMBERLY D. WESCOTT NOTARY PUBLIC STATE OF IDAHO

Kymberly D. Wescott

Notary Public for the State of Idaho
Residing at: Weiser
Commission Expires: 06/17/2010

CHAP. 299.—An Act Extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes. May 14, 1898.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the homestead land laws of the United States and the rights incident thereto, including the right to enter surveyed or unsurveyed lands under provisions of law relating to the acquisition of title through soldiers' additional homestead rights, are hereby extended to the District of Alaska, subject to such regulations as may be made by the Secretary of the Interior; and no indemnity, deficiency, or lieu lands pertaining to any land grant whatsoever originating outside of said District of Alaska shall be located within or taken from lands in said District: *Provided*, That no entry shall be allowed extending more than eighty rods along the shore of any navigable water, and along such shore a space of at least eighty rods shall be reserved from entry between all such claims, and that nothing herein contained shall be so construed as to authorize entries to be made, or title to be acquired, to the shore of any navigable waters within said District: *And it is further provided*, That no homestead shall exceed eighty acres in extent.

Alaska. Homestead laws extended to. Location of lieu lands, etc. Provisos. Entries on navigable water. Alternate spaces reserved. Limit of homestead entry.

SEC. 2. That the right of way through the lands of the United States in the District of Alaska is hereby granted to any railroad company, duly organized under the laws of any State or Territory or by the Congress of the United States, which may hereafter file for record with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the center line of said road; also the right to take from the lands of the United States adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also the right to take for railroad uses, subject to the reservation of all minerals and coal therein, public lands adjacent to said right of way for station buildings, depots, machine shops, side tracks, turn-outs, water stations, and terminals, and other legitimate railroad purposes, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road, excepting at terminals and junction points, which may include additional forty acres, to be limited on navigable waters to eighty rods on the shore line, and with the right to use such additional ground as may in the opinion of the Secretary of the Interior be necessary where there are heavy cuts or fills: *Provided*, That nothing herein contained shall be so construed as to give to such railroad company, its lessees, grantees, or assigns the ownership or use of minerals, including coal, within the limits of its right of way, or of the lands hereby granted: *Provided further*, That all mining operations prosecuted or undertaken within the limits of such right of way or of the lands hereby granted shall, under rules and regulations to be prescribed by the Secretary of the Interior, be so conducted as not to injure or interfere with the property or operations of the road over its said lands or right of way. And when such railway shall connect with any navigable stream or tide water such company shall have power to construct and maintain necessary piers and wharves for connection with water transportation, subject to the supervision of the Secretary of the Treasury: *Provided*, That nothing in this Act contained shall be construed as impairing in any degree the title of any State that may hereafter be erected out of said District, or any part thereof, to tide lands and beds of any of its navigable waters, or the right of such State to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any State or States which may hereafter be erected out of said District. The term "navigable waters," as herein used, shall be held to include all tidal waters up to the line of ordinary high tide and all nontidal waters navigable in fact up to the line of ordinary high-water mark. That all charges for the transportation of freight and passengers on railroads in the District of Alaska shall be printed

Right of way to railroads. —width. Materials for construction. Stations. —limit. Proviso. Minerals excepted. Mining operations not to interfere with road. Wharves. Rights of future States. "Navigable waters," defined. Railroad charges to be printed and posted.

Vol. 24, p. 380.
Vol. 25, p. 855.

and posted as required by section six of an Act to regulate commerce as amended on March second, eighteen hundred and eighty-nine, and such rates shall be subject to revision and modification by the Secretary of the Interior.

Passage of railroads through canyons, etc.

SEC. 3. That any railroad company whose right of way, or whose track or roadbed upon such right of way, passes through any canyon, pass, or defile shall not prevent any other railroad company from the use and occupancy of said canyon, pass, or defile for the purposes of its road, in common with the road first located, or the crossing of other railroads at grade; and the location of such right of way through any canyon, pass, or defile shall not cause the disuse of any tramway, wagon road, or other public highway now located therein, nor prevent the location through the same of any such tramway, wagon road, or highway where such tramway, wagon road, or highway may be necessary for the public accommodation; and where any change in the location of such tramway, wagon road, or highway is necessary to permit the passage of such railroad through any canyon, pass, or defile, said railroad company shall, before entering upon the ground occupied by such tramway, wagon road, or highway, cause the same to be reconstructed at its own expense in the most favorable location, and in as perfect a manner as the original road or tramway: *Provided*, That such expenses shall be equitably divided between any number of railroad companies occupying and using the same canyon, pass, or defile, and that where the space is limited the United States district court shall require the road first constructed to allow any other railroad or tramway to pass over its track or tracks through such canyon, pass, or defile on such equitable basis as the said court may prescribe; and all shippers shall be entitled to equal accommodations as to the movement of their freight and without discrimination in favor of any person or corporation: *Provided*, That nothing herein shall be construed as depriving Congress of the right to regulate the charges for freight, passengers, and wharfage.

—Interference with wagon roads, etc.

—relocation of.

*Provisos.*
—expenses, etc.

Regulation of freight, etc., charges.

Appraisal by commissioners of land taken.

SEC. 4. That where any company, the right of way to which is hereby granted, shall in the course of construction find it necessary to pass over private lands or possessory claims on lands of the United States, condemnation of a right of way across the same may be made in accordance with section three of the Act entitled "An Act to amend an Act entitled 'An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes, approved July first, eighteen hundred and sixty-two,'" approved July second, eighteen hundred and sixty-four: *Provided further*, That any such company, by filing with the Secretary of the Interior a preliminary actual survey and plat of its proposed route, shall have the right at any time within one year thereafter, to file the map and profile of definite location provided for in this Act, and such preliminary survey and plat shall, during the said period of one year from the time of filing the same, have the effect to render all the lands on which said preliminary survey and plat shall pass subject to such right of way.

Vol. 13, p. 358.
Vol. 12, p. 489.

*Proviso.*
Filing of plat of preliminary survey, etc.

Maps of definite location.

SEC. 5. That any company desiring to secure the benefits of this Act shall, within twelve months after filing the preliminary map of location of its road as hereinbefore prescribed, whether upon surveyed or unsurveyed lands, file with the register of the land office for the district where such land is located a map and profile of at least a twenty-mile section of its road or a profile of its entire road if less than twenty miles, as definitely fixed, and shall thereafter each year definitely locate and file a map of such location as aforesaid of not less than twenty miles additional of its line of road until the entire road has been thus definitely located, and upon approval thereof by the Secretary of the Interior the same shall be noted upon the records of said office, and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within one year after the definite location of said

*Proviso.*
Forfeiture for non-completion, etc.

section so approved, or if the map of definite location be not filed within one year as herein required, or if the entire road shall not be completed within four years from the filing of the map of definite location, the rights herein granted shall be forfeited as to any such uncompleted section of said road, and thereupon shall revert to the United States without further action or declaration, the notation of such uncompleted section upon the records of the land office shall be canceled, and the reservations of such lands for the purposes of said right of way, stations, and terminals shall cease and become null and void without further action.

Right of way for wagon roads and tramways.

Sec. 6. That the Secretary of the Interior is hereby authorized to issue a permit, by instrument in writing, in conformity with and subject to the restrictions herein contained, unto any responsible person, company, or corporation, for a right of way over the public domain in said District, not to exceed one hundred feet in width, and ground for station and other necessary purposes, not to exceed five acres for each station for each five miles of road, to construct wagon roads and wire rope, aerial, or other tramways, and the privilege of taking all necessary material from the public domain in said District for the construction of such wagon roads or tramways, together with the right, subject to supervision and at rates to be approved by said Secretary, to levy and collect toll or freight and passenger charges on passengers, animals, freight, or vehicles passing over the same for a period not exceeding twenty years, and said Secretary is also authorized to sell to the owner or owners of any such wagon road or tramway, upon the completion thereof, not to exceed twenty acres of public land at each terminus at one dollar and twenty-five cents per acre, such lands when located at or near tide water not to extend more than forty rods in width along the shore line and the title thereto to be upon such expressed conditions as in his judgment may be necessary to protect the public interest, and all minerals, including coal, in such right of way or station grounds shall be reserved to the United States: *Provided*, That such lands may be located concurrently with the line of such road or tramway, and the plat of preliminary survey and the map of definite location shall be filed as in the case of railroads and subject to the same conditions and limitations: *Provided further*, That such rights of way and privileges shall only be enjoyed by or granted to citizens of the United States or companies or corporations organized under the laws of a State or Territory; and such rights and privileges shall be held subject to the right of Congress to alter, amend, repeal, or grant equal rights to others on contiguous or parallel routes. And no right to construct a wagon road on which toll may be collected shall be granted unless it shall first be made to appear to the satisfaction of the Secretary of the Interior that the public convenience requires the construction of such proposed road, and that the expense of making the same available and convenient for public travel will not be less on an average than five hundred dollars per mile: *Provided*, That if the proposed line of road in any case shall be located over any road or trail in common use for public travel, the Secretary of the Interior shall decline to grant such right of way, if, in his opinion, the interests of the public would be injuriously affected thereby. Nor shall any right to collect toll upon any wagon road in said District be granted or inure to any person, corporation, or company until it shall be made to appear to the satisfaction of said Secretary that at least an average of five hundred dollars per mile has been actually expended in constructing such road; and all persons are prohibited from collecting or attempting to collect toll over any wagon road in said District, unless such person or the company or person for whom he acts shall at the time and place the collection is made or attempted to be made possess written authority, signed by the Secretary of the Interior, authorizing the collection and specifying the rates of toll: *Provided*, That accurate printed copies of said written authority from the Secretary of the Interior, including toll, freight, and passenger charges thereby approved, shall be kept constantly and conspicuously

Use of material.

Toll.

Land at termini.

Minerals reserved.

*Provisos.*
—location of, etc.

Rights of way, to whom granted.

—amendment of, etc.

—conditions.

Location on existing road, etc.

Collection of toll.

—only on written authority.

—printed copies to be posted.

—penalty.

posted at each station where toll is demanded or collected. And any person, corporation, or company collecting or attempting to collect toll without such written authority from the Secretary of the Interior, or failing to keep the same posted as herein required, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined for each offense not less than fifty dollars nor more than five hundred dollars, and in default of payment of such fine and costs of prosecution shall be imprisoned in jail not exceeding ninety days, or until such fine and costs of prosecution shall have been paid.

Priority to applicants for right of way.

That any person, corporation, or company qualified to construct a wagon road or tramway under the provisions of this Act that may heretofore have constructed not less than one mile of road, at a cost of not less than five hundred dollars per mile, or one-half mile of tramway at a cost of not less than five hundred dollars; shall have the prior right to apply for such right of way and for lands at stations and terminals and to obtain the same pursuant to the provisions of this Act over and along the line hitherto constructed or actually being improved by the applicant, including wharves connected therewith. That if any party to whom license has been granted to construct such wagon road or tramway shall, for the period of one year, fail, neglect, or refuse to complete the same, the rights herein granted shall be forfeited as to any such uncompleted section of said wagon road or tramway, and thereupon shall revert to the United States without further action or declaration, the notation of such uncompleted section upon the records of the land office shall be canceled, and the reservations of such lands for the purposes of said right of way shall cease and become null and void without further action. And if such road or tramway shall not be kept in good condition for use, the Secretary of the Interior may prohibit the collection of toll thereon pending the making of necessary repairs.

Forfeiture for noncompletion.

No toll on roads in bad condition.

Recording of mortgages.

That all mortgages executed by any company acquiring a right of way under this Act, upon any portion of its road that may be constructed in said District of Alaska, shall be recorded with the Secretary of the Interior, and the record thereof shall be notice of their execution, and shall be a lien upon all the rights and property of said company as therein expressed, and such mortgage shall also be recorded in the office of the secretary of the District of Alaska and in the office of the secretary of the State or Territory wherein such company is organized: *Provided*, That all lawful claims of laborers, contractors, subcontractors, or material men, for labor performed or material furnished in the construction of the railroad, tramway, or wagon road shall be a first lien thereon and take precedence of any mortgage or other lien.

Mechanics' liens.

Government reservations.

SEC. 7. That this act shall not apply to any lands within the limits of any military, park, Indian, or other reservation unless such right of way shall be provided for by Act of Congress.

Amendment.

Transfer of right of way.

SEC. 8. That Congress hereby reserves the right at any time to alter, amend, or repeal this Act or any part thereof; and the right of way herein and hereby authorized shall not be assigned or transferred in any form whatever prior to the construction and completion of at least one-fourth of the proposed mileage of such railroad, wagon road, or tramway, as indicated by the map of definite location, except by mortgages or other liens that may be given or secured thereon to aid in the construction thereof: *Provided*, That where within ninety days after the approval of this Act, proof is made to the satisfaction of the Secretary of the Interior that actual surveys, evidenced by designated monuments, were made, and the line of a railroad, wagon road or tramway located thereby, or that actual construction was commenced on the line of any railroad, wagon road or tramway, prior to January twenty-first, eighteen hundred and ninety-eight, the rights to inure hereunder shall, if the terms of this Act are complied with as to such railroad, wagon road or tramway, relate back to the date when such survey or construction was commenced; and in all conflicts relative to the right of way or other privilege of this Act the person, company or corporation having

*Proviso.*
Preference to priority in survey, etc.

been first in time in actual survey or construction, as the case may be, shall be deemed first in right.

Sec. 9. That the map and profile of definite location of such railroad, wagon road, or tramway, to be filed as hereinbefore provided, shall, when the line passes over surveyed lands, indicate the location of the road by reference to section or other established survey corners, and where such line passes over unsurveyed lands the location thereon shall be indicated by courses and distances and by references to natural objects and permanent monuments in such manner that the location of the road may be readily determined by reference to descriptions given in connection with said profile map.

Indication of location on profile map.
—surveyed lands.
—unsurveyed.

Sec. 10. That any citizen of the United States twenty-one years of age, or any association of such citizens, or any corporation incorporated under the laws of the United States or of any State or Territory now authorized by law to hold lands in the Territories, hereafter in the possession of and occupying public lands in the District of Alaska in good faith for the purposes of trade, manufacture, or other productive industry, may each purchase one claim only not exceeding eighty acres of such land for any one person, association, or corporation, at two dollars and fifty cents per acre, upon submission of proof that said area embraces improvements of the claimant and is needed in the prosecution of such trade, manufacture, or other productive industry, such tract of land not to include mineral or coal lands, and ingress and egress shall be reserved to the public on the waters of all streams, whether navigable or otherwise: *Provided*, That no entry shall be allowed under this Act on lands abutting on navigable water of more than eighty rods: *Provided further*, That there shall be reserved by the United States a space of eighty rods in width between tracts sold or entered under the provisions of this Act on lands abutting on any navigable stream, inlet, gulf, bay, or seashore, and that the Secretary of the Interior may grant the use of such reserved lands abutting on the water front to any citizen or association of citizens, or to any corporation incorporated under the laws of the United States or under the laws of any State or Territory, for landings, and wharves, with the provision that the public shall have access to and proper use of such wharves, and landings, at reasonable rates of toll to be prescribed by said Secretary, and a roadway sixty feet in width, parallel to the shore line as near as may be practicable, shall be reserved for the use of the public as a highway: *Provided further*, That in case more than one person, association, or corporation shall claim the same tract of land, the person, association, or corporation having the prior claim, by reason of actual possession and continued occupation in good faith, shall be entitled to purchase the same, but where several persons are or may be so possessed of parts of the tract applied for the same shall be awarded to them according to their respective interests: *Provided further*, That all claims substantially square in form and lawfully initiated, prior to January twenty-first eighteen hundred and ninety-eight, by survey or otherwise, under sections twelve and thirteen of the Act approved March third, eighteen hundred and ninety-one (Twenty-sixth Statutes at Large, Chapter five hundred and sixty-one), may be perfected and patented upon compliance with the provisions of said Act, but subject to the requirements and provisions of this Act, except as to area, but in no case shall such entry extend along the water front for more than one hundred and sixty rods: *And provided further*, That the Secretary of the Interior shall reserve for the use of the natives of Alaska suitable tracts of land along the water front of any stream, inlet, bay, or sea shore for landing places for canoes and other craft used by such natives: *Provided*, That the Annette, Pribilof Islands, and the islands leased or occupied for the propagation of foxes be excepted from the operation of this Act.

Purchase of land embracing his improvements by occupant for purposes of trade.
*Provisos.*
Entries on navigable water, limit.
Alternate spaces reserved.
—use of for wharves, etc.
—roadway reserved.
Adverse claimants.
Purchases for trade
Vol. 26, p. 1100.
Landing places for natives.
Certain islands reserved.

That all affidavits, testimony, proofs, and other papers provided for by this Act and by said Act of March third, eighteen hundred and ninety-one, or by any departmental or Executive regulation thereunder,

Admissibility of testimony, etc.
Vol. 26, p. 1093.

by depositions or otherwise, under commission from the register and receiver of the land office, which may have been or may hereafter be taken and sworn to anywhere in the United States, before any court, judge, or other officer authorized by law to administer an oath, shall be admitted in evidence as if taken before the register and receiver of the proper local land office. And thereafter such proof, together with a certified copy of the field notes and plat of the survey of the claim, shall be filed in the office of the surveyor-general of the District of Alaska, and if such survey and plat shall be approved by him, certified copies thereof, together with the claimant's application to purchase, shall be filed in the United States land office in the land district in which the claim is situated, whereupon, at the expense of the claimant, the register of such land office shall cause notice of such application to be published for at least sixty days in a newspaper of general circulation published nearest the claim within the District of Alaska, and the applicant shall at the time of filing such field notes, plat, and application to purchase in the land office, as aforesaid, cause a copy of such plat, together with the application to purchase, to be posted upon the claim, and such plat and application shall be kept posted in a conspicuous place on such claim continuously for at least sixty days, and during such period of posting and publication or within thirty days thereafter any person, corporation, or association, having or asserting any adverse interest in, or claim to, the tract of land or any part thereof sought to be purchased, may file in the land office where such application is pending, under oath, an adverse claim setting forth the nature and extent thereof, and such adverse claimant shall, within sixty days after the filing of such adverse claim, begin action to quiet title in a court of competent jurisdiction within the District of Alaska, and thereafter no patent shall issue for such claim until the final adjudication of the rights of the parties, and such patent shall then be issued in conformity with the final decree of the court.

Procedure on application for patent.

Adverse claimants.

Timber, sale of.

Sec. 11. That the Secretary of the Interior, under such rules and regulations as he may prescribe, may cause to be appraised the timber or any part thereof upon public lands in the District of Alaska, and may from time to time sell so much thereof as he may deem proper for not less than the appraised value thereof, in such quantities to each purchaser as he shall prescribe, to be used in the District of Alaska, but not for export therefrom. And such sales shall at all times be limited to actual necessities for consumption in the District from year to year, and payments for such timber shall be made to the receiver of public moneys of the local land office of the land district in which said timber may be sold, under such rules and regulations as the Secretary of the Interior may prescribe, and the moneys arising therefrom shall be accounted for by the receiver of such land office to the Commissioner of the General Land Office in a separate account, and shall be covered into the Treasury. The Secretary of the Interior may permit, under regulations to be prescribed by him, the use of timber found upon the public lands in said District of Alaska by actual settlers, residents, individual miners, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and for domestic purposes, as may actually be needed by such persons for such purposes.

—limit.

—use of.

Land districts.

Sec. 12. That the President is authorized and empowered, in his discretion, by Executive order from time to time to establish or discontinue land districts in the District of Alaska, and to define, modify, or change the boundaries thereof, and designate or change the location of any land office therein; and he is also authorized and empowered to appoint, by and with the advice and consent of the Senate, a register for each land district he may establish and a receiver of public moneys therefor; and the register and receiver appointed for such district shall, during their respective terms of office, reside at the place designated for the land office. That the registers and receivers of public moneys in the land districts of Alaska shall each receive an annual salary of one thousand five hundred dollars and the fees provided by

Register and receiver.

—salaries.

law for like officers in the State of Oregon, not to exceed, including such salary and fees, a total annual compensation of three thousand dollars for each of said officers.

Citizens of Canada, mining rights, etc., of.

SEC. 13. That native-born citizens of the Dominion of Canada shall be accorded in said District of Alaska the same mining rights and privileges accorded to citizens of the United States in British Columbia and the Northwest Territory by the laws of the Dominion of Canada or the local laws, rules, and regulations; but no greater rights shall be thus accorded than citizens of the United States or persons who have declared their intention to become such may enjoy in said District of Alaska; and the Secretary of the Interior shall from time to time promulgate and enforce rules and regulations to carry this provision into effect.

Bonding privilege to Canada.

SEC. 14. That under rules and regulations to be prescribed by the Secretary of the Treasury, the privilege of entering goods, wares, and merchandise in bond or of placing them in bonded warehouses at any of the ports in the District of Alaska, and of withdrawing the same for exportation to any place in British Columbia or the Northwest Territory without payment of duty, is hereby granted to the Government of the Dominion of Canada and its citizens or citizens of the United States and to persons who have declared their intention to become such whenever and so long as it shall appear to the satisfaction of the President of the United States, who shall ascertain and declare the fact by proclamation, that corresponding privileges have been and are being granted by the Government of the Dominion of Canada in respect of goods, wares and merchandise passing through the territory of the Dominion of Canada to any point in the District of Alaska from any point in said District.

Approved, May 14, 1898.

---

May 17, 1898.

**CHAP. 338.**—An Act For the protection of fish in the District of Columbia, for the maintenance of a permanent spawning ground in the Potomac River in said District, and for other purposes.

District of Columbia. Protection of fish. Net fishing in Potomac River forbidden.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the date of the passage of this Act no person shall fish with fyke net, pound net, stake net, weir, float net, gill net, haul seine, dip net, or any other contrivance, stationary or floating, in the waters of the Potomac River and its tributaries within the District of Columbia: *Provided,* That nothing in this Act shall be construed to prevent the use of barrel nets or pots for the catching or killing of eels, or prevent the United States Commissioner of Fish and Fisheries, or his agents, from taking from said waters in any manner desired fish of any kind for scientific purposes or for purposes of propagation, and that none of the provisions of this Act shall apply to persons employed in catching young catfish, smelt, chub, bull minnows, and crayfish for use as bait in fishing with hook and line: *Provided further,* That any person engaged in taking such catfish, smelt, chub, bull minnows, and crayfish shall first have procured a written permit from the said Commissioner of Fish and Fisheries to take such bait for hook-and-line fishing.

*Provisos.* —barrel nets and pots may be used for eels. —fish for propagation, etc.

Permit required for taking bait.

Bass.

SEC. 2. That no person shall catch or kill in the waters of the Potomac River or its tributaries within the District of Columbia any black bass (otherwise known as green bass and chub), crappie (otherwise known as calico bass and strawberry bass), between the first day of April and the first day of June of each year, nor have in possession nor expose for sale any of said species between the dates aforesaid, nor catch or kill any of said species of fish at any other time during the year except by angling, nor catch nor kill any of the aforesaid species by what are known as out lines or trot lines, having a succession of hooks or devices.

Shad or herring.

SEC. 3. That it shall be unlawful for any person to have in possession or expose for sale in the District of Columbia after the tenth day of June in any year any fresh fish of the shad or herring species.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of July, 2006, I electronically filed Plaintiffs' Appendix of Exhibits (4 of 4) Filed in Support of their Cross-Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment as to the Category 1 Lands, through the CM/ECF system, which caused the following parties or counsel to be served with this document by electronic means, as more fully reflected in the Notice of Electronic Filing:

Kristine S. Tardiff, Counsel for Defendant
kristine.tardiff@usdoj.gov

/s/ Cecilia Fex
Email: fex@ackersonlaw.com
Counsel for Plaintiffs' Class